

Palo Alto Medical Foundation
Attn: My Health Online P.O. Box 255386
Sacramento , California 95865-5386

Name: Benjamin Kohn | DOB: 12/29/1993 | PCP: Graham Dresden, MD

# Letter Details



Benjamin Kohn
1913 Fordham Way
Mountain View CA 94040
July 16, 2020

Committee of Bar Examiners
Office of Admissions
Attn: Senior Director of Admissions
State Bar of California
180 Howard St,
San Francisco, CA 94105
June 4, 2020

I am writing this letter to clarify Mr. Kohn's medical status in regards to his disability accomodation requests. Specifically, I wanted to comment on his current medical status as this relates to the current Covid-19 pandemic. Due to several medical conditions, including chronic sinusitis, allergic rhinitis and his usage of immunosuppressive medication (Omalizumab), he is be considered to have a higher risk of getting complications from Covid-19. If it is possible to adapt his other accommodations to online testing, this would provide a safer alternative for him. An in-person test center would require him to stay at a hotel, use restaurants and ride public transportation. These actions could potentially increase his risk for acquiring Covid-19.

I certify under penalty of perjury under the laws of the State of California that all statements herein are true and accurate to the best of my professional knowledge and belief.

# Graham Dresden, M.D.

Graham Dresden, M.D.
Board Certified in Family Medicine
Palo Alto Medical Foundation

*This letter was initially viewed by Benjamin Kohn at 7/16/2020 4:32 PM.*

MyChart® licensed from Epic Systems Corporation © 1999 - 2018
Copyright © 2020 Sutter Health. All rights reserved. Sutter Health is a registered trademark of Sutter
Health ®, Reg. U.S. Patent & Trademark office.



Committee of Bar Examiners
Office of Admissions
Attn: Senior Director of Admissions
State Bar of California
180 Howard St,
San Francisco, CA 94105
June 4, 2020

I'm again writing in follow-up to provide further documentation regarding Mr. Kohn's need for disability accommodations on the California Bar exam, and to add-on to what I've previously written for Mr. Kohn's "Form B" evaluations and appeals. He has updated me on the post-ponement of the next exam to September and that you are considering making the exam available from home, online, and possibly using remote and/or electronic proctoring of the exam by using webcam recordings. Mr. Kohn reports that the finalized rules, exam format and composition, and standard conditions of this new modality is still being determined and is unknown at this time. This makes it difficult for me to determine the precise updates to my recommendations of what testing accommodations he would need due to his disabilities.

My present recommendations address the concerns Mr. Kohn has discussed with me about what he anticipates may create new disability issues due to the more plausible changes being considered. I'd request that we please be provided 30 days from the knowledge of standard conditions and modalities to revise the requests. If changes to the way the exam is administered do not allow Mr. Kohn to use the restroom freely, or flag perceived unusual lengths of restroom trips, such conditions will cause Mr. Kohn difficulties arising from his conditions of irritable bowel syndrome with constipation (K58.1) and pelvic floor dyssynergia (M62.89). Please see attached anorectal manometry studies for the medical details of this. He was diagnosed with this condition in Spring 2018 by his Iowa gastroenterologist, Dr. Avraham Levin, based on an anorectal manometry test and defecogram scan (which are attached to my 6/4/2020 affidavit attached hereto). Additionally, a colonoscopy ruled out other causes of symptoms. Months of specialized physical therapy and electromyography (EMG) biofeedback, along with rectal botulinum toxin injection was attempted through 2018, but to little improvement per a follow-up anorectal manometry performed at Stanford in December 2018 (also attached to my 6/4/2020 affidavit). In addition, he is using a medication, bethanechol, off label, for his Gastroparesis (K31.84) due to the potential benefits on smooth muscle from its cholinergic effect.

Briefly, because of these conditions, he has symptoms of anismus and anorectal pressure hyposensitivity, both of which result in significant difficulty detecting a bowel movement until close to when it becomes painfully urgent. Because of this, he cannot go to the restroom during more convenient times within a range (I.e. the standard breaks), but must use the restroom more spontaneously when the need occurs. In addition, due to the pelvic floor dysfunction and anal sphincter neuromotor impairment, he often needs a substantially longer time required to complete a bowel movement. He is current presently prescribes Linzess as a partial treatment, which reduces some of the discomfort with bowel movements and irritable lower GI digestion due to this


**Sutter Health**
Palo Alto Medical Foundation

condition and improves (though does not eliminate) the constipation, but also makes the urge to defecate come even more suddenly and urgently, and thus makes it harder to not promptly relieve it by waiting until a more convenient scheduled time for a restroom break. In addition, these conditions impairs the major life activity of operating a major bodily function, among others, and would handicap him on the California Bar Exam were he not allowed to use the restroom freely and for longer durations than is typical as needed.

If Mr. Kohn is allowed to test from home, he has access to a workstation that has further improvements than that we requested be provided for him in a test center, particularly the use of an external large screen monitor so that he can simultaneously keep both his monitor and keyboard/mouse at the ergonomic eye and wrist heights respectively, which is not possible using the built-in display to the laptop. He should be able to keep his arms at a 90 degree angle to his body while typing without having to tilt his head forward and downwards (a posture that would particularly aggravate myofascial pain in areas he commonly has it, including the suboccipital, posterior diagstric, SCM, scalene, levator scapulae, and upper trapezius muscle groups). While the chair is the most important component of the workstation for the effects of his myofascial pain syndrome, cervicalgia, occipital neuralgia, and scapular dyskinesis, using the sit-to-stand desk, Herman Miller "Embody" chair, adjustable external monitor, keyboard, and mouse in concert would further reduce the progression and symptoms of his myofascial pain syndrome. I understand he's already approved to bring ergonomic items generally into the test room, and although I'm unsure what that would mean for at-home testing, I wanted to clarify that he'd benefit from using all possible aids together and that the benefits provided by the external computer equipment are not interchangeable with those provided by the chair and/or desk.

I certify under penalty of perjury under the laws of the State of California that all statements herein are true and accurate to the best of my professional knowledge and belief.

Graham Dresden, M.D.
Board Certified in Family Medicine
Palo Alto Medical Foundation

# Appointment Details

Notes

## Procedures

**Yehudith Assouline-Dayan, MD at 4/17/2018 11:59 PM**
Procedure Orders
1. ANAL HIGH DEFINITION MANOMETRY [306085973] ordered by Levin, Avraham D, MD at 04/13/18 1707
Pre-procedure Diagnoses
1. Hematochezia [K92.1]
Post-procedure Diagnoses
1. Hematochezia [K92.1]
**ANAL HIGH DEFINITION MANOMETRY**

**Anorectal Manometry /Rectal Sensation /Tone /Compliance-Men Procedure Note**

**Procedure Date: 4/17/2018**

**Operation/Procedure:** Anorectal Manometry/Rectal Sensation/Tone/Compliance **[MEN]**

**Indications**: constipation

**Attending Staff**: Judith Assouline Dayan, MD

**Referring Physician**: Levin Avraham, MD.

**Description of Operation/Procedure:**
The high resolution anorectal manometry was performed using ManoScanTM system (Sierra Scientific Instruments, Los Angeles, CA) that has 36 channel catheter with sensors spaced at 1-cm intervals. After correct placement, the probe was taped to the perineum. After a run in period of five minutes, the patient was asked to perform anal squeeze maneuvers twice; party balloon inflation maneuvers twice, bearing down maneuvers twice. Thereafter, intermittent rectal balloon distentions were performed to assess rectoanal reflexes, rectal sensation and rectal compliance by distending the balloon in a step vise manner from 10 cc up to a maximum volume of 320 cc. The patient was then placed on a commode and a 60 cc balloon was inflated in the rectum and the patient was asked to attempt defecation to perform the simulated defecation study. After this, the probe was removed. Thereafter, we placed a 50 cc water filled balloon in the rectum and the patient was asked to expel this device in privacy on a commode.

**Findings**:
(Normal Mean and 95% Confidence Interval shown in parenthesis)

**Anal Sphincter Pressures**:
The maximum resting pressure was 136 mmHg (72, 64-80) and this was seen at 2.5 cm from the anal margin. The maximum squeeze pressure was 189 mmHg (193, 175-211) and this was seen at 2.5 cm from the anal margin. The duration of squeeze was 30 seconds. A sustained squeeze pressure was 150 mmHg (176, 156-196). When asked to blow a party balloon, the intrarectal pressure was 73 mmHg (66, 51-81) and anal pressure was 187 mmHg (154, 138-170). During a straining maneuver, the rectal pressure generated was 65 mmHg (68, 58-78), while anal residual pressure was 60 mmHg (49, 35-63). This was consistent with Normal Type pattern of defecation. The sphincter length was 4.4 cm (4, 3-8-4.2).

**Rectoanal Reflexes**:
The rectoanal inhibitory reflex was normal with a minimum volume for sphincter relaxation of 20 cc (11, 9-20).

**Rectal Sensation:**
The patient reported first sensation at 40 cc (20, 15-25), constant sensation at 70 cc, the desire to defecate at 310 cc (109, 85-134), the urgency to defecate at 400cc (185, 152-218), and a maximum tolerable volume of 400 cc (249, 223-275).

**Rectal Compliance**:
Compliance was determined by the pressures generated during the following volume distentions (after correcting for intrinsic balloon wall pressures: <50 cc~18 mmHg, 50-100 cc~16 mmHg, >100 cc~15 mmHg):

**Volume / Pressure:**
10 cc / 80 mmHg
20 cc / 55 mmHg
30 cc / 64 mmHg
40 cc / 50 mmHg
The compliance curve suggests a hypercompliance of the rectum when compared to normative values (adjusted for patient gender).

**Balloon Expulsion Test:** The patient was able to expel a 50 cc water-filled balloon in 26 seconds (60, 0-156).

**Simulated Defecation on the Commode:** The patient showed an intrarectal pressure of 116 mmHg and an anal residual pressure of 85 mmHg during this maneuver, consistent with Type III dyssynergia defecation pattern.

**COMPLICATIONS:**
None

**Impression**:
High resting pressure and normal squeeze pressure.
A normal balloon expulsion test.
Rectal hyposensitivity.

Dys-synergic defecation.

**Plan**:
Findings are equivocal for pelvic floor dys-synergia. Please consider ordering a Sitz Maker study and or a defecogram. Follow up with Dr. Levin for discussion of result and management.


Judith Assouline Dayan, MD
Clinical Associate Professor
Division of Gastroenterology-Hepatology
Department of Internal Medicine
University of Iowa Hospitals and Clinics


Electronically signed by Yehudith Assouline-Dayan, MD at 4/19/2018  1:47 PM


MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# FL DEFECOGRAM - Details

## Study Result

### Impression

Impression:
1.] Fluoroscopic findings consistent with dyssynergic defecation.

Fluoro time: 44 seconds

### Narrative

Procedure: FL DEFECOGRAM

Clinical Indication: Constipation. Suspected dyssynergic defecation.

Technique: Fluoroscopic cine barium defecogram is performed. Following digital rectal exam, enema tip is placed and 120 cc of barium paste is hand injected. Patient is placed in a seated lateral position for the exam.

Comparison: None.

Findings:
Anorectal junction: relative to the ischial tuberosities
Rest: 4 cm above the ischial tuberosities
Squeeze: 4 cm above the ischial tuberosities
Evacuation: 4 cm above the ischial tuberosities

Anorectal angle:
Rest: 136 degrees
Squeeze: 124 degrees

Normal puborectalis function. No descensus, incontinence, or anterior

rectocele. No enterocele. The patient attempts evacuation against closed/ contracted ano- rectal junction; these findings representing dyssynergic defecation. Approximately 50% of the contrast remains in the the mid rectum after about 2 minutes of attempted evacuation.

## Component Results

There is no component information for this result.

## General Information

Ordered by Avraham Levin, MD

Resulted on 04/27/2018 6:13 PM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

**Print This Page** | **Close This Window**

Name: Benjamin Kohn | DOB: 12/29/1993 | MRN: 60507761 | PCP: Graham M Dresden, MD

# ANORECTAL MANOMETRY - Details

## Study Result

### Narrative

Neshatian, Leila Neshatian, MD 12/23/2018 7:43 PM
Patient:
Kohn, Benjamin
60507761 Gender: Male Procedure: ARM 2D
DOB: 12/29/1993 Physician: Dr. Leila Neshatian
Height: Operator: Garrett Donohue RN
Weight: Referring Physician: Dr. Brooke Gurland
Examination Date: 12/21/2018


Resting Normal Squeeze Normal
Mean Sphincter Pressure(rectal ref.)(mmHg) 75.6 Max. Sphincter
Pressure(rectal ref.)(mmHg) 189.2
Max. Sphincter Pressure(rectal ref.)(mmHg) 80.3 Max. Sphincter
Pressure(abs. ref.)(mmHg) 196.6
Mean Sphincter Pressure(abs. ref.)(mmHg) 72.4 Duration of
sustained squeeze(sec) 16.1
Max. Sphincter Pressure(abs. ref.)(mmHg) 77.1
Length of HPZ(cm) 4.0
Length verge to center(cm) 1.2


Push(attempted defecation) Normal Balloon Inflation Normal
Residual Anal Pressure(abs. ref.)(mmHg) 75.7 RAIR Present
Percent anal relaxation(%) -2 First sensation(cc) 120
Intrarectal pressure(mmHg) 18.7 Urge to defecate(cc) 180
Rectoanal pressure differential(mmHg) -57 Discomfort(cc) 325
Minimum rectal compliance 1.32
Maximum rectal compliance 1.32



Procedure
The patient presented to the GI motility laboratory for a
high-resolution anorectal manometry. A high resolution anorectal
catheter was inserted in the rectum and positioned so that the
proximal sensors were in the rectum and distal sensors were
across the anorectal sphincter. Anorectal function testing was
then performed which included assessment of resting pressure,
squeeze, bear down, bear down with balloon inflation, rectoanal
inhibitory reflex, cough, and compliance. Following catheter
based testing, balloon expulsion was performed by filling an
expulsion balloon with 50cc of warm water and allowing patient up
to 2 minutes to expel the balloon in a private designated
bathroom. If this attempt was unsuccessful, patient was asked to
repeat expulsion trial with the assistance of a squatting stool.

Indications
obstructive defacation

Interpretation / Findings
- The anal sphincter pressure was normotensive. There was
appropriate sphincteric augmentation that was sustained during
squeeze.
- There was inadequate defecatory propulsion and paradoxical
contraction and incomplete anal sphincter relaxation consistent
with dyssynergic defecation during bear down.
- First sensation, urgency and discomfort to balloon distention
were elicited at higher distention volumes than expected
indicating sensory deficit.
- Balloon distention revealed an intact rectoanal inhibitory
reflex. Cough reflex was intact.
- Patient was able to expel the rectal balloon after 26 seconds.

* It is noted that normative data is not well established for
anorectal manometry parameters. Clinical correlation is
recommended.

Impressions
Findings of this high resolution anorectal manometry test are
abnormal. There was evidence of dyssynergia and inadequate rectal
propulsive forces at simulated defecation. However, balloon
expulsion test was normal.
• Consider Defecography to confirm the diagnosis of functional
defecatory disorder if clinically indicated.

Leila Neshatian, MD, MSC
12/23/2018 7:42 PM

Resting Pressure

Squeeze #1

Squeeze #2

Squeeze #3

Push #1

Push #2

Push #3

Push #4

Balloon Fill
There is no component information for this result.
## General Information

Ordered by Brooke Heidi Gurland, MD
Resulted on 12/21/2018 9:00 AM
Result Status: Final result
**This test result has been released by an automatic process.**



Benjamin Kohn
1913 Fordham Way
Mountain View CA 94040
March 13, 2020

TA Case Number: 00491832
File Number: 468532

To:
Committee of Bar Examiners
State of California

This is my appeal and response to the most recent letter sent to Mr. Kohn regarding accommodation requests.

1. I have known Mr. Kohn for almost a decade. During that time, I have evaluated him in many respects. I have personally reviewed the previous neuropsychologic testing that initially gave him a diagnosis of Autism. In addition, it is quite clear to me that he has this diagnosis. I did not need to review that formal document to come to this diagnosis as well. There is no specific medication/treatment for Autism. It is a pervasive disease, so it affects how I manage all of his other conditions. Therefore, I respectfully disagree that I have not evaluated or treated him for Autism. I have independently reviewed the neuropsychological testing done and wanted to further explain. Specifically, he scored in the extremely low range on the processing speed (9th percentile), as well as below average on reading and writing fluency exams. In addition, there was significant discrepancy between the timed and un-timed tests for those specific domains compared to other domains more associated with tasks done in multiple choice. Taken together, I find that this justifies additional time on the writing section compared to the multiple choice section. Specifically, I feel that 150% extra time on the writing section is a reasonable recommendation based on the diagnoses of Autism and Neuro-processing disorder. The appeals process for the Bar exam is quite onerous, and obtaining new testing would be a significant burden to Mr. Kohn, especially given the timing of the appeal relative to the testing dates. Because there is no 'cure' for Autism, it is expected that previous recommendations for extra time on tests would continue to be relevant for any future testing. Clinically, we would not ask Mr. Kohn to constantly get retested so as to have a new set of guidelines around timing.

2. Regarding the additional meal breaks. While it is true that he could potentially cut his food up into smaller pieces prior to the test (although this would be somewhat of a challenge given that he is staying in a hotel room), this would still not offset the need for more regular breaks. This recommendations was given based on the advice of an expertise in Gastroenterology due to his gaastroparesis. Gastroparesis is the technical term for when the stomach has a hard time (I.e. Slow) emptying itself. Because of this



(and also because of his fundoplication surgery, which complicates the process), he is not able to consume nor digest food in the normal manner. It requires him to take small bites slowly and to stagger his food intake throughout the day.

3. Regarding the discretionary lunch breaks - see above.

4. Regarding the weekend only testing. He has a huge amount of appointments scheduled through the year. In my system, I counted 49 appointments in the year 2019. These appointments ranged from visits with me, but most were with specialists including ENT, Gastroenterology, Colorectal and Vascular Surgery, Cardiology, Dermatology, and Neurology. Some of these appointments were for routine things but most were for specific issues that needed to be addressed at that time. This does not include appointments outside of my system such as with other hospitals or places such as Physical Therapy. This is by far the most number of appointments of any of my patients (I have over 2000 patients in my panel). In addition, he is meticulous about scheduling his appointments in the future, and pre-determining which days that he has appointments six months in advance is quite difficult. I personally have had to deal with this as he has had significant trouble in the past with scheduled Physical Therapy appointments and I had to get involved with the doctors at El Camino Hospital to assist with his schedule. Because of the multitude of medical appointments, it would be reasonable to say that he accomodation on timing would be beneficial to his health. In terms of whether this would compromise the security or validity of the exam, I can not say.

5. I don't believe that he is asking for more accommodations for the CBX because it is harder. Instead, he has stated that because the Iowa Bar exam was easier, despite not having the requested accommodations, he was able to pass. This doesn't mean that he should not be granted the appropriate accommodations for the CBX.

6. Finally, regarding the ergonomic set up. The patient tells me that he was granted an ergonomic chair and a sit-stand desk for the Iowa bar, but not for the CBX. Due to the long standing diagnosis of myofascial pain syndrome, which has required more Physical Therapy that any patient I have seen in my 15+ years of practice, I believe that the specific requests that we have asked for in the past would allow him to not be at a disadvantage when taking the CBX.

I certify under penalty of perjury under the laws of the State of California that all statements herein are true and accurate to the best of my professional knowledge and belief.

Graham Dresden, M.D.
Board Certified in Family Medicine
Palo Alto Medical Foundation
650-404-8370



**Sutter Health**
Palo Alto Medical Foundation

**We Plus You**

To Committee of Bar Examiners
Attention: Senior Director of Admissions
Office of Admissions
State Bar of California
180 Howard Street
San Francisco, CA 94105
December 19, 2019

Mr. Kohn has brought to my attention the outcome of his Petition for Disability
Accommodations for the February 2020 California Bar Exam and the input an expert
consultant for the California Bar had most recently provided regarding his requests. I
have now reviewed the excerpts of their opinion that you provided to Mr. Kohn,
particularly the concerns regarding perceived omissions from my recommendations of
certain accommodations requested by Mr.Kohn and a perception that all of these
requests were based on new medical concerns since his last submission or worsening
of his established medical conditions, as well as a perceived lack of specificity in my list
of medical issues other than autism and a neuro-processing disorder that Mr. Kohn has
been diagnosed with and treated for.

Many of the positions attributed by this expert to myself and to Mr. Kohn are not
accurate descriptions of the documentation that I and other experts have submitted to
you for Mr. Kohn. I'd ask that the expert whose opinion was provided and any other
appropriate persons at the California Bar reread my affidavit to you dated 1/26/2019, my
most recent physical disability verification form and its attached letter and test results
first submitted for the February 2019 bar exam that Mr. Kohn told me he would
"incorporate by reference" in the new petition and I now reconfirm as being up to date,
which contains my recommendations for physical disabilities only, including myofascial
pain syndrome and some secondary issues such as scapular dyskinesis and occipital
neuralgia, and also for gastroparesis and postoperative dysphagia. An accommodation
for scheduling of the exam based on the collective treatment requirements of numerous
other medical issues listed in the 1/26/2019 affidavit is also recommended. All of these
documents are intended to be read together, including my more recent and separate
psychological disability verification form containing my recommendations for autism and
the neuroprocessing disorder only. Those recommendations are based on my
independent opinion from the test results taken by Drs. Pinn and Preston in 2014 which,
as prior to Mr. Kohn's acquisition of keratoconus and the GI conditions, are reflective
only of the impairments caused by Mr. Kohn's autism and neuroprocessing disorder,
and my opinion considers both their report as clarified by Dr. Preston's 12/5/2017
affidavit to you (and provided to me by Mr. Kohn) as well as my professional expertise
and experience with patients with autism. As all of these documents are intended to be
read together and not treated as a complete list of recommendations for all disabilities,
and the absence of any recommendation for particular disability accommodation(s) on
any individual form or subsequent form does not indicate that I no longer recommend
anything I had previously or separately recommended, nor does it necessarily imply my



disagreement with any other recommendation Mr. Kohn's other specialized professionals would have made. If I believed any previous recommendation was no longer warranted due to improvement in Mr. Kohn's health, I would have said so. I'll further clarify that your expert was mistaken in their statement that I had not recommended the meal breaks, the additional test time for written sections, the provision of the ergonomic equipment, the weekend testing, or any other accommodation that I've recommended on any of the documents above.

I believe that the effects of Mr. Kohn's autism and neuro-processing weaknesses have been stable from the 2014 testing to the present and independently support 100% extra time on the Multiple Choice "MBE" sections and 150% extra time on the essay exam sections. This is consistent with the recommendations of Neuropsychologist Drs. Pinn and Preston based on their thorough testing as later clarified in the affidavit of Dr. Preston that Mr. Kohn will need more time for written sections than for multiple choice sections, which has also been my understanding of the neuroprocessing delays autism causes. This extra time should be additive to any extra time Mr. Kohn is given for any other disabilities that impair his ability to respond to the exam and demonstrate the extent of his knowledge of the subject matter compared to a person without such impairment in a different way, such as by reading the material as opposed to processing the contents and concentrating through consideration and transmittal of his responses, or by adding other tasks as compared to the degree of a person without such disabilities (i.e. eating, changing posture, or using the restroom with his dyssynergetic pelvic floor and irritable bowel disorders with a tendency to develop hemorrhoids) during the timed portion of the exam. It should especially be additive where the other disabilities were not present during the 2014 testing upon which the autism recommendations are based. There are a number of reasons why he would need more extra time on the Bar Exam than on other types of exams, including the length and format of those exams. Mr. Kohn will fatigue and have greater neuro-processing delay the longer the testing duration is for a particular day, and that the measurements quantifying the proposed amount of extra time rely on the absence of an additional handicap of longer test time per day than the exam would normally be completed over. Accordingly, Mr. Kohn should be granted an accommodation of test time (excluding breaks) not exceeding the amount per day as would a normal candidate have and scheduling the exam over enough days to receive the necessary extra time and breaks without imposing that handicap.

His Keratoconus was acquired subsequent to his routine eye exam July 2016 as I believe signs of it would have been detected then if present, but was acquired no later than its diagnosis July 2017. The only exams for which Mr. Kohn had opportunity to seek disability accommodations based on keratoconus were those for his last semester of law school, for the California and Iowa Bar Exams, and for FINRA exams. The accommodations approved for the SAT, LSAT, GMAT, MPRE, and school exams prior to his final semester in law school are not relevant. His ophthalmologist, Dr. Goodman, completed your Visual Disability Verification Form and recommended 100% extra time based on this condition. I believe his recommendation is reasonable, and supports at the very least a minimum of 150% extra time together with autism on the essay sections of the exam. You received another expert opinion recommending 30 minutes extra time per exam section, approximately 16% extra time, but that expert based his



**Sutter Health**
Palo Alto Medical Foundation

**We Plus You**

opinion in part on a finding that Mr. Kohn's visual acuity was mostly corrected by appropriate glasses, which Dr. Goodman disagreed with in another affidavit to you that Mr. Kohn provided me, due to the asymmetry of his astigmatism and cornea scans taken. The Iowa Bar also received input from their expert, optometrist Dr. Damari, who recommended 50% extra time for the keratoconus, but that this not be additive to the extra time for autism, the latter based explicitly on Mr. Kohn's reading comprehension in the 2014 Neuropsychological Testing that (seemingly missed by Dr. Damari) predated Mr. Kohn's acquisition of keratoconus entirely. I understand that the Iowa Bar relied on your decision for the California Bar Exam not to grant further extra time despite this mistake, but if their expert recommended 50% extra time if there was not an issue of the autism and Dr. Goodman and I recommend 100%, then 30 minutes per section seems clearly unreasonable to me. Mr. Kohn was provided all accommodations sought (100% extra time on multiple choice and 150% extra time on written sections) for his last semester of law school and for the FINRA exams. It is only the California Bar (and the Iowa Bar based in part on the California Bar) that has denied this. Mr. Kohn might be able to compensate for this by being far above the level of competency tested that is required to pass, enough to pass an exam with only the extra time given, as he was for the Iowa Bar Exam, but if the question is whether he would be able to demonstrate a given level of competency equally as to someone without disability than he would not be able to do so with less extra time than sought.

Mr. Kohn acquired myofascial pain syndrome subsequent to the SAT. He requires physical therapy three to five times per week along with regular chiropractic and osteopathic treatments to manage the symptoms sufficiently to avoid substantial loss of productivity and significant impairments of his quality of life. When this treatment lapses for several consecutive days or more, he experiences severe flare ups. This condition can be further aggravated by high levels of stress or anxiety, and by spending long periods of time in a sitting posture, reading, or using a computer, especially without the ergonomic setup he uses for home, study, and work. The Bar Exam requires suspension of ordinary treatment due to the need to take the exam at a substantial distance from his established providers, without any long periods of uninterrupted time during business hours, over several consecutive days, and then places him in conditions that inevitably will maximize the exacerbation of his disability. The symptoms he may experience will likely impair his ability to perform as well as he would otherwise be capable on the exam, and the extra sensory sensitivity people with autism experience would amplify these effects and greatly increase the concentration difficulties he would experience from that quantified on the neuropsychological testing. Exams not only subject him to the aggravating factors, but require heightened sustained mental focus and consistent productivity compared to ordinary work or study, and preclude the use of ordinary medications Mr. Kohn takes, such as Gabapentin, due to the need to avoid cognitively-dampening or drowsiness-inducing side effect risk. The increase in these symptoms from the sitting and computer-use postures can be partially ameliorated by using an ergonomic setup, including those components I've described previously and an adjustable height sit-or-stand desk like the Iowa Bar provided.

There is a spectrum of postural support available from standard chair to "office chair" (typically equipped with a padded seat and back rest along with arm rests) to



"ergonomic" office chair (typically with variations in the shape and viscosity of the back and sometimes the seat to provide lumbar and thoracic support) to the ergonomic office chair with dynamically adaptive full spinal support, which uses a matrix of small panels and mechanical devices on both the back and seat to provide disk by disk support along the entire spine and distribute one's weight evenly no matter what part of the chair is sat on or what angle the user leans into it from, allowing the user to vary seat positions without any loss of support. I recommend the latter, equipped on the Herman Miller Embody Chair, and using an ordinary desk I believe this would be necessary to put him anywhere close to as equal a position to others without such disability as can be done compared to any alternative, but agree with the Iowa Bar that an ergonomic office chair with just the shape and viscosity to provide lumbar and thoracic support might be adequate were he also to be provided a motorized adjustable height sit-or-stand desk. The LSAT, GMAT, MPRE, college exams, and law school exams differ from the Bar Exams for purposes of addressing myofascial pain syndrome due to the differences in the uninterrupted length of the exam time spent in a sitting or computer work posture, the need to suspend his routine physical therapy treatment when he needs it the most due to the lack of business hours availability for such appointments on exam days for so many days in a row and from being away from home and his providers.

In short, Mr. Kohn would be risking harm to his health if he took an exam lasting longer than six hours or longer than four hours per day for two or more consecutive days without access to the ergonomic equipment requested, and at any length (but increasingly so the longer the exam and with an interruption of physical therapy) this condition will otherwise have symptoms that would impair performance and speed on the exam past that already present from other disabilities.

Mr. Kohn acquired and was diagnosed with Severe Gastroparesis and GERD in 2018, subsequent to all tests other than the Bar Exams and FINRA exams, and also after his Petition for accommodations on the July 2018 Bar Exam. Even later in 2018 Mr. Kohn acquired postoperative dysphagia from the nissen fundoplication surgical response to the GERD. The food and drink permissions, meal break location, and extra meal breaks for a total number equal to 30 minutes per 90 minutes of test time that are requested based on these conditions are indeed based on new or worsened medical state compared to Mr. Kohn's first submissions to you. In order to avoid symptoms of bloating and dyspepsia that would, like myofascial pain, impair his productivity and performance on the test, especially with his sensory sensitivity, he should eat many small meals to minimize idle digestion time, as his digestion is much slower than that of an ordinary person. The accommodations requested are necessary for that reason, as a singular lunch break will not have the desired effect.

The weekend testing is recommended because there is a near certainty of Mr. Kohn needing an average of multiple medical appointments per weekday average, some requiring scheduling at specific intervals relative to each other, to collectively treat his extraordinary number of chronic health issues, and requiring one or more full business weeks for the entirety of business hours puts a strain on the ability of his providers to adequately treat his medical needs.

As I listed in my affidavit dated 1/26/2019, the full list of these conditions includes:

Autism spectrum disorder (F84.0)
Highly variable attention and neuro-processing speed deficit (R62.50)
Gross and fine motor delay (F82)
Myofascial pain syndrome (M79.18)
Cervicalgia (M54.2)
Occipital neuralgia (M54.81)
Keratoconus (H18.603)
Dry eye syndrome (H04.123)
Gastroparesis (K31.84)
Postoperative dysphagia (R13.10)
Irritable bowel syndrome with constipation (K58.9)
Pelvic floor dyssyngergia (M62.89)
history of hemorrhoids (K64.8)
Scapular dyskinesis (G25.89)
History of C. Difficile infection (Z86.19)
Chronic idiopathic urticaria (L50.1)
Eczema (L20.84)
Allergic rhinitis (J30.9)
Allergic sinusitis (J32.9)
history of sinonasal polyposis (J33.9)
Severe airborne and other food allergies (Z91.013)
Chronic oral aphthae (K12.0)
Circadian rhythm sleep disorder and history of sleep apnea (G47.33), (G47.20).

I certify under penalty of perjury under the laws of the State of California that all statements herein are true and accurate to the best of my professional knowledge and belief.

Graham Dresden, M.D.
Board Certified in Family Medicine
Palo Alto Medical Foundation
650-404-8370



**THE STATE BAR OF CALIFORNIA**
**COMMITTEE OF BAR EXAMINERS/OFFICE OF ADMISSIONS**

180 Howard Street • San Francisco, CA 94105-1639 • (415) 538-2300
845 S. Figueroa Street • Los Angeles, CA 90017-2515 • (213) 765-1500

# FORM E
## TESTING ACCOMMODATIONS – PSYCHOLOGICAL DISABILITIES VERIFICATION

All original documents must be filed with the Office of Admissions' San Francisco Office.
(Must be completed by the applicant; please type or print legibly)

**NOTICE TO APPLICANT: This section of this form is to be completed by you.**
The remainder of the form is to be completed by the qualified professional who is recommending testing accommodations for the California Bar Examination or First-Year Law Students' Examination for you on the basis of a psychological disability. Please read, complete, and sign below before submitting this form to the qualified professional for completion of the remainder of this form.

Applicant's Full Name: _____Benjamin Kohn_____

File Number: _____468532_____

> I give permission to the qualified professional completing this form to release the information requested on the form, and I request the release of any additional information regarding my disability or accommodations previously granted that may be requested by the Committee of Bar Examiners or consultant(s) of the Committee of Bar Examiners.

_____Benjamin Kohn_____                    _____5/20/2019_____
Signature of Applicant                              Date

**NOTICE TO QUALIFIED PROFESSIONAL:**

The above-named person is requesting accommodations for the California Bar Examination or First-Year Law Students' Examination. All such requests must be supported by a comprehensive evaluation report from the qualified professional who conducted an individualized assessment of the applicant and is recommending accommodations for the examination on the basis of a psychological disability. The Committee of Bar Examiners also requires the qualified professional to complete this form. **If any of the information requested in this form is fully addressed in the comprehensive evaluation report, you may respond by citing the <u>specific page and paragraph</u> where the answer can be found.** Please attach a copy of the evaluation report and all records and test results on which you relied in making the diagnosis and recommending accommodations for the an examination administered by the Committee of Bar Examiners. Your assistance is appreciated.

TA-FormE.0417

1

assistance is appreciated.

The California Board of Legal Specialization may forward this information to one or more qualified professionals for an independent review of the applicant's request. Print or type your responses to the items below. **Return the original of this completed form, the comprehensive evaluation report, and relevant records to the applicant for submission to the California Board of Legal Specialization.**

## I. QUALIFICATIONS OF THE PROFESSIONAL*

Name of professional completing this form: _Graham Dresden, MD_

Address: _701 E. El Camino Real, Montan View, CA 94040_

Telephone: _650-409-8370_ Fax: _650-409-8470_

E-Mail: _____

Occupation, title, and specialty: _Physician, MD, Family Medicine_

License Number/State: _A105743, California_

*The following professionals are deemed appropriate and qualified to provide a diagnosis of psychological disabilities: Psychiatrist, Psychologist or other licensed mental health professional.*

Please describe your qualifications and experience to diagnose and/or verify the applicant's condition or impairment and to recommend accommodations:

_I am a board certified Family Medicine physician with over ten years of experience including mental health_

## II. DIAGNOSTIC INFORMATION CONCERNING APPLICANT

1. Date of last evaluation/assessment of the applicant: _5/20/2019_

2. What is the applicant's specific diagnosis based on the DSM-5 (or most current version)? Please include diagnostic codes where applicable. If diagnosis is not definitive, please list differential diagnoses.

_① Austism Developmental Disorder_   _F89.0_
_② Neuroprocessing Disorder_   _R62.50_

3. Describe the applicant's history of presenting symptoms of a psychological disability. Include a description of symptom frequency, intensity, and duration to establish severity of symptomology.

_He shows frequent signs of attention variability; easily distracted by extra sensory symptoms from the environment; anxiety more; neuroprocessing speed and neuroprocessing psychomotor delay. See 2014 [Data] [evaluation] [from] [2018] [petition]._

4. Describe the applicant's **current** functional limitations caused by the psychological disability in different settings and specifically address the impact of the disability on the applicant's ability to take the Legal Specialist Examination under standard conditions. Note: Psychoeducational, neuropsychological or behavioral assessments often are necessary to demonstrate the applicant's current functional limitations in cognition.

_Limitations as described above + these slow his ability to process questions and then transmit answers. In addition, the distractibility and anxiety properties make it difficult for the patient to cope with logistical changes/issues if his routine is not fully cognizant of/how to administer to accommodate test. A [private room] [would] [ameliorate] [many of] [these] [issues.]_

5. Describe the applicant's compliance with and response to treatment and medication, if prescribed. Explain the effectiveness of any treatment and/or medication in reducing or ameliorating the applicant's functional limitations and the anticipated impact on the applicant in the setting of the Legal Specialist Examination.

_Medication trials in the past have not been effective and future trials are not planned due to no expectation of efficacy._

**ATTACH A COMPREHENSIVE EVALUATION REPORT.** The provision of reasonable accommodations is based on assessment of the *current* impact of the disability on the specific testing activity. Due to the changing nature of psychiatric disabilities, it is essential that the applicant provide recent and appropriate medical documentation. An applicant's psychological disability must have been identified by a comprehensive diagnostic/clinical evaluation that is well documented in the form of a comprehensive report. **Please attach to this form a copy of the comprehensive evaluation report and all records and test results on which you relied in making the diagnosis and recommending accommodations for the Legal Specialist Examination.**

The evaluation report should include the following:

- psychiatric/psychological history

- relevant developmental, educational, and familial history

- relevant medical and medication history

- results of full mental status examination

TA-FormE.0417

3

- results of full mental status examination

- description of current functional limitations in different settings

- results of any tests or instruments used to supplement the clinical interview and support the presence of functional limitations, including any psychoeducational or neuropsychological testing, rating scales, or personality tests

- diagnostic formulation, including discussion of differential or "rule out" diagnoses prognosis

## III. ACCOMMODATIONS RECOMMENDED FOR THE CALIFORNIA BAR EXAMINATION OR FIRST-YEAR LAW STUDENTS' EXAMINATION (check all that apply)

### FORMAT

The California Bar Examination is a timed examination administered over two days, consisting of a 3-hour morning session (9:00 a.m. to 12:00 noon) and a 3½-hour afternoon session (2:00 p.m. to 5:30 p.m.) on the first day, and two 3-hour sessions (9:00 a.m. to 12:00 noon and 2:00 p.m. to 5:00 p.m.) on the second day. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. each day. The examination is administered in a proctored setting.

The first day consists of three one-hour essay questions in the morning session and two one-hour essay questions plus one 90-minute Performance Test question in the afternoon session. The written portions of the examination are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The second day consists of 200 multiple-choice questions (Multistate Bar Examination or "MBE"), with 100 questions administered in the morning session and 100 questions in the afternoon session. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

The First-Year Law Students' Examination is a one-day timed examination administered in two sessions, a four-hour morning session from 8:00 a.m. to 12:00 noon and a three-hour afternoon session from 2:00 p.m. to 5:00 p.m. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. The examination is administered in a proctored setting.

The morning session consists of four one-hour essay questions. The essay questions are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop

computers to type their answers, or they may handwrite their answers. The afternoon session consists of 100 multiple-choice questions. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

## SETTING

Applicants are assigned seats, two per six-foot table, in a room set for as few as 100 to 400 applicants for the First-Year Law Students' Examination to as many as 1,500 applicants for the California Bar Examination. Applicants are not allowed to bring food, beverages, or certain other items into the testing room unless approved as accommodations. All applicants may bring prescription medication. The examination is administered in a quiet environment, and applicants are allowed to use small foam earplugs. They may leave the examination room only to use the restroom or drinking fountain, within the time allotted for the test session.

Taking into consideration this description of the examination and the functional limitations that you currently experience, what testing accommodation (or accommodations, if more than one would be appropriate) are you requesting?

**Alternative Formats**

☐ Audio CD version of the examination

☐ Electronic versions of the Essay and/or Performance Test questions in Microsoft Word format on CDs for use with screen-reading software

☐ Other: _____

**Personal Assistance**

☐ Dictate to a typist (for written sessions)

☐ Reader

☐ Assistance with multiple-choice answer sheet (Scantron sheet) (choose one)

  ☐ Permission to circle answers in question booklet

  ☐ Permission to dictate answers to proctor

☐ Dictate to a voice recorder (choose one)

  ☐ Digital voice recorder (for use with flash memory cards)

  ☐ Tape recorder (for use with microcassette tapes)

  ☐ Other: _____

## Equipment or Facility Requirements

[X] Computer *as an accommodation* (must have direct nexus to the effects of the disability)

  [ ] with SofTest installed

  [ ] with voice-recognition software (e.g., Dragon Naturally Speaking) installed

  [ ] with screen-reading software (e.g., JAWS) installed

  [ ] with other (specify): _____

[ ] Special equipment (specify): _____

[X] Private room

[ ] Semi-private room

[ ] Wheelchair accessibility (if table, specify height): _____

[X] Other: *Proctor that has been trained to work with patients with disabilities.*

Please provide a rationale for each request indicated above (attach additional sheets if necessary):

_____
_____
_____
_____
_____
_____

## Accommodation of Extra Time

Specify the amount of **extra time** requested for each session of the examination. Indicate why the specified extra time is needed (based on the diagnostic evaluation), provide the rationale for requesting the amount of time for each test format of the examination, and explain how you arrived at the specific amount of extra time requested. If either the amount of time or your rationale is different for different portions of the examination, please explain. **All requests for extra time must specify the exact amount of extra time. It is important to keep in mind that breaks are included in the timed portion of the examination. No accommodation of unlimited time will be granted. If extra testing time is requested, but the specific amount of extra time is not indicated, the petition will be returned as incomplete.**

**California Bar Examination: Essay Questions 1, 2 & 3 (standard session is 3 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

**California Bar Examination: Essay Questions 4 & 5, and Performance Test (standard session is 3 hours and 30 minutes):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

150% = 5 hours and 15 minutes extra
due to Autism, Neuroprocessing delay, motor Delay
related to Autism

**California Bar Examination: Multistate Bar Examination - MBE (each standard session is 3 hours):** Specify the amount of extra test time needed <u>for each MBE session</u> and provide the rationale:

100% = 3 hours extra
See above

**First-Year Law Students' Examination: Essay Questions 1, 2, 3 & 4 (standard session is 4 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

N/A

**First-Year Law Students' Examination: Multiple-Choice (standard session is 3 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

N/A

<u>**Explanations:**</u> (attach additional sheets if necessary)

ON All of the accommodations for Autism only,
plus extra time recommended for
 Keratoconus and gastroparesis breaks.

The extra time allowed should not increase
the total average hours per day, but
instead should increase the hours per day.

## IV. PRIOR HISTORY AND PAST ACCOMMODATIONS

Please describe any previously documented history of psychological disabilities and list accommodations that have been granted to the applicant in the past:

*See prior petitions for details.*

## V. CONFIDENTIALITY

Confidentiality policies of the Committee of Bar Examiners/Office of Admissions of the State Bar of California will be followed regarding its responsibility to maintain confidentiality of this form and any documents submitted with it. No part of the form or the accompanying diagnostic report will be released without the applicant's written consent or under the compulsion of legal process.

## VI. CLINICIAN/LICENSED PROFESSIONAL'S SIGNATURE

I am submitting the **original** of this form and have attached copies of the comprehensive evaluation report and all records and test results that I relied upon in making this diagnosis of the applicant's condition/disability (notes and worksheets are not required as part of this submission) and completing this form. I understand that all original documents submitted become the property of the Committee of Bar Examiners.

I declare under penalty of perjury under the laws of the State of California that the above information is true and correct.

_____          5/20/19
(Signature of Licensed Professional)                          (Date)

The Committee of Bar Examiners reserves the right to make final judgment concerning testing accommodations and may have all documentation related to this matter reviewed by an individual professional consultant or a panel of professional consultants if deemed necessary.

Name: Benjamin Kohn | PCP: Graham Dresden, MD



Palo Alto Medical Foundation
Attn: My Health Online P.O. Box 255386
Sacramento , California 95865-5386

# Letter Details



State Bar of California Senior Director of Admissions and Committee of Bar Examiners:

I am the Primary Care Physician for Mr. Kohn and have previously evaluated Mr. Kohn for disability accommodations on the California Bar Exam based on myofascial pain syndrome (M79.18) in August 2017 and on myofascial pain syndrome, gastroparesis (K31.84), and fundoplication-postoperative dysphagia (R13.10) in October 2018 (please see my completed "Form B" for both evaluations and the letter and test results attachments to my most recent one). I understand that, of the accommodations I had recommended based on these conditions, Mr. Kohn has been denied the modified meal breaks, permission to take meal breaks in the exam room, and an accommodation that would allow him to reasonably access (without risking or spending thousands of dollars or commuting with furniture he cannot independently move to and from home at the same time as all other testing materials and equipment, especially with his motor delays due to autism) the ergonomic workstation I specified in my letter attached to the 2018 Form B for mitigating both the test performance reducing symptoms of his myofascial pain and the impact of being required to sit and work on a laptop or test book for many hours per day of testing several days in a row has on the flare-up risk of this condition and possible worsening of long-term severity of symptoms. However, I understand that my recommendation for Mr. Kohn to be given permission to bring food and drinks to the test room and access them during the exam, even if he is not allowed to take breaks from the exam in that room has been partially granted, but limited to what has been called "non-aromatic" items and only drinks in containers with a lid.

You should be aware that Mr. Kohn has a multiplicity of chronic medical conditions that can exacerbate the challenges of treating and accommodating his primary disabilities and collectively impose highly time consuming and time interval sensitive treatment requirements.  All disability accommodations should be considered with a thorough study and comprehension of Mr. Kohn's holistic medical situation in mind. Presently these conditions include: autism spectrum disorder (F84.0); highly variable attention and neuro-processing speed deficit (R62.50); gross and fine motor delay (F82); myofascial pain syndrome (M79.18); cervicalgia (M54.2) ; occipital neuralgia (M54.81); keratoconus (H18.603); dry eye syndrome (H04.123); gastroparesis (K31.84); postoperative dysphagia (R13.10); irritable bowel syndrome with constipation (K58.9); pelvic floor dyssyngergia (M62.89); history of hemorrhoids (K64.8); Scapular dyskinesis (G25.89),  history of C. Difficile infection (Z86.19), chronic idiopathic urticaria (L50.1); eczema (L20.84); allergic rhinitis (J30.9) ;

allergic sinusitis (J32.9); history of sinonasal polyposis (J33.9); severe airborne and other food allergies (Z91.013); chronic oral aphthae (K12.0); circadian rhythm sleep disorder and history of sleep apnea (G47.33), (G47.20).

Appropriate treatment for some of these conditions may deviate or be greater than standard protocols as a consequence of the collective cross-treatment logistics and contraindications. He will require flexible scheduling arrangements of his professional commitments to not encompass most or all of weekday business hours in order to adequately treat these conditions and manage those treatments, and to perform as well as a person without such issues should start examination requiring peak performance no earlier than 11:00 am due to his delayed phase circadian rhythm sleep disorder.

As explained in my prior letter, Mr. Kohn will require an ergonomic workstation with the items I identified in order to take this exam with the least possible distractions and pain from the effects of this disability, and will also require such a workstation to reduce the aggravation that sitting for long periods of time straight and working on a laptop computer or book would cause to the underlying etymology of this condition, likely to result in increased symptoms during the test and adverse impact to his health following the exam. I would normally advise patients with this condition to avoid long periods of sitting or computer work, but given the requirements of the examination and Mr. Kohn's chosen vocation this is the minimal level of mitigation that would be adequate. Mr. Kohn's disabilities of autism and related motor delays would prevent him from transporting between his home and another location test supplies, his computer equipment, and his ergonomic equipment including a heavy office chair independently, or even just the chair independently where he would have to load or unload it into a vehicle. I have reviewed the expanded accommodations he has requested and had denied to address the access to the ergonomic workstation, and find it reasonable and necessary that he be granted an additional accommodation to address that issue.

Until now, Mr. Kohn has not asked me to evaluate him for other effects of his autism spectrum disorder, because much of the past evaluations have been performed by other specialists. At this time he has informed me of a deadline of 2/1/2019 for you to consider any supplemental materials for the appeal he is pursuing, and that I am the only specialist he has been able to schedule an appointment with in time to meet that deadline. I have reviewed the neuropsychological report by Drs. Pinn and Preston, which I note is based on testing that predates many of Mr. Kohn's other health concerns, such as the GI concerns and keratoconus, and the 12/5/2017 addendum by Dr. Preston.

Based on my own professional opinion treating Mr. Kohn and other patients with autism, I agree with an effect of heightened distractability that aggravates already impacted neuro-processing speed and variable attention. Based on this, I would recommend a silent testing environment with minimal interruptions, and that Mr. Kohn's proctor be instructed not to interrupt him to plan meal breaks, but rather wait for Mr. Kohn to elect to take one, and especially not to hold any conversations regarding their employment and possibility of not performing the requirements for Mr. Kohn's accommodated test. Because Mr. Kohn's disability would cause him substantial anxiety were logistical mix-ups or misunderstandings to occur that could aggravate his concentration weaknesses, I recommend Mr. Kohn request to be assigned to a proctor that has been well trained ahead of the examination and made aware of all of Mr. Kohn's accommodations that have been granted.

Given Mr. Kohn's meal needs and distractibility, in fairness to both him and others I would recommend he be tested in a private room.

Further, even if Mr. Kohn were neuro-typical his collective eye fatigue symptoms from the keratoconus and dry eyes, along with the baseline levels of myofascial pain, GI discomfort, and allergy symptoms, could justify extra testing time. I understand Mr. Kohn's ophthalmologist, Dr. Goodman, did not consider any disability or conditional aside from Mr. Kohn's vision and recommended that amount.

Having reviewed the testing and analysis by Drs. Pinn and Preston. I agree with their recommendation of at least 100% extra time based on Autism, and with Dr. Preston's opinion that the effects of autism on the speed at which Mr. Kohn can process questions and transmit cogent written responses is greater than for responding to multiple choice questions.  Accordingly, Mr. Kohn's request for 100% extra time on multiple choice sections and 150% extra time for written sections is reasonable.

I also agree that Mr. Kohn will fatigue and have greater neuro-processing delay the longer the testing duration is for a particular day, and that the measurements quantifying the proposed amount of extra time rely on the absence of an additional handicap of longer test time per day than the exam would normally be completed over. Accordingly, Mr. Kohn should be granted an accommodation of test time (excluding breaks) not exceeding the amount per day as would a normal candidate have and scheduling the exam over enough days to receive the necessary extra time and breaks without imposing that handicap.

I hereby certify under penalty of perjury under the laws of the State of California that the above statements are true and accurate to the best of my professional knowledge and belief.

Graham Dresden, M.D.
Board Certified in Family Medicine
Palo Alto Medical Foundation
650-404-8370

CC:
Benjamin Kohn
1913 Fordham Way
Mountain View CA 94040
January 26, 2019

*This letter was initially viewed by Benjamin Kohn at 1/26/2019 2:52 PM.*

MyChart® licensed from Epic Systems Corporation © 1999 - 2018



**THE STATE BAR OF CALIFORNIA**
**COMMITTEE OF BAR EXAMINERS/OFFICE OF ADMISSIONS**

180 Howard Street • San Francisco, CA 94105-1639 • (415) 538-2300
845 S. Figueroa Street • Los Angeles, CA 90017-2515 • (213) 765-1500

# FORM B
## TESTING ACCOMMODATIONS – PHYSICAL DISABILITIES
## VERIFICATION
All original documents must be filed with the Office of Admissions' San Francisco Office.
(Must be completed by the applicant; please type or print legibly)

**NOTICE TO APPLICANT: This section of this form is to be completed by you.**
The remainder of the form is to be completed by the qualified professional who is
recommending testing accommodations for the California Bar Examination or First-Year
Law Students' Examination for you on the basis of a physical disability. Please read,
complete, and sign below before submitting this form to the qualified professional for
completion of the remainder of this form.

Applicant's Full Name: _Benjamin Sean Kohn_

File Number: _469532_

> I give permission to the qualified professional completing this form to
> release the information requested on the form, and I request the release
> of any additional information regarding my disability or accommodations
> previously granted that may be requested by the Committee of Bar
> Examiners or consultant(s) of the Committee of Bar Examiners.

_[signature]_                                    _11/1/2018_
Signature of Applicant                           Date

## NOTICE TO QUALIFIED PROFESSIONAL:

The above-named person is requesting accommodations for the California Bar
Examination or First-Year Law Students' Examination. All such requests must be
supported by appropriate documentation (including evaluation reports, test results
and/or medical records) from the qualified professional who conducted an individualized
assessment of the applicant and is recommending accommodations for the examination
on the basis of a physical disability. The Committee of Bar Examiners also requires the
qualified professional to complete this form. **If any of the information requested in
this form is fully addressed in the documentation submitted (evaluation reports,
test results, medical records, etc.), you may respond by citing the <u>specific page
and paragraph</u> where the answer can be found.** Please attach a copy of the
evaluation report and/or all records and test results on which you relied in making the
diagnosis and recommending accommodations for the examination administered by the

Committee of Bar Examiners. Your assistance is appreciated.

The provision of reasonable accommodations is based on assessment of the *current* impact of the disability on the specific testing activity. The Committee of Bar Examiners generally requires documentation from an evaluation conducted within the past year because of the changing manifestations of many physical disabilities. Older evaluation reports may suffice if supplemented by an update of the diagnosis, current level of functioning, and a rationale for each recommended accommodation or an explanation of why the report and/or other documentation continue to be relevant in their entirety.

The Committee of Bar Examiners may forward this information to one or more qualified professionals for an independent review of the applicant's request. Print or type your responses to the items below. **Return the original of this completed form, the evaluation report, test results, and/or other relevant records to the applicant for submission to the Committee of Bar Examiners.**

## I. EVALUATOR/TREATING PROFESSIONAL INFORMATION

Name of professional completing this form: Graham Dresden, MD

Address: 701 E. El Camino Real  Mountain View, CA 94040

Telephone: 650-404-8370       Fax: 650-404-8470

E-Mail: —

Occupation, title, and specialty: Physician - Family Medicine

License Number/Certification/State: A105743 - California

Describe your qualifications and experience to diagnose and/or verify the applicant's condition or impairment and to recommend accommodations.

I am a Board Certified Family Medicine Specialist with over ten years of experience diagnosing and treating patients like Mr. Kohn.

## II. DIAGNOSIS AND RESULTING FUNCTIONAL LIMITATIONS

1. What is the specific diagnosis (including diagnosis code) for which the applicant requests testing accommodations?

   ① Myofascial Pain Syndrome — M79.1
   ② Autism Spectrum Disorder — F84.0
   ③ Gastroparesis — K31.84

2. Describe the nature of the physical disability. Include a history of presenting

symptoms, date of onset, and description of the duration and severity of the disability.

① Neck, back, shoulder pain that started in 2012. The symptoms vary in intensity but are persistent.
② Abdominal discomfort for many years, symptoms vary in intensity.

3. When did you first meet with the applicant? _2010_

4. When was the applicant's physical disability first diagnosed? ① 2012 ② 2018

5. Did you make the initial diagnosis? ☒ YES ①   ☒ NO ②

If no, provide the name of the professional who made the initial diagnosis and when it was made, if known. Attach copies of any prior evaluation reports, test results, or other records related to the initial diagnosis that you reviewed.

② The gastroparesis was initially made by the GI doctor at the University of Iowa and confirmed at Stanford Hospital. I've attached the relevant study confirming this.

6. Provide the date of your last complete evaluation of the applicant: _October 2018_

7. Is this a permanent condition/impairment? ☒ YES ☐ NO

If no, when is it likely to abate?

_____

_____

8. Does the severity of the condition/impairment fluctuate? ☒ YES ☐ NO

If yes, describe the settings and/or circumstances affecting severity that are relevant to taking the California Bar Examination of First-Year Law Students' Examination.

① Improper ergonomics can aggravate his symptoms.
② Prolonged sitting without proper breaks for timed meals can aggravate his condition.

9. Describe the applicant's current functional limitations and explain how the limitations restrict the condition, manner, or duration under which the applicant can take the California Bar Examination or First-Year Law Students' Examination.

① He can not sit for a prolonged time without proper ergonomics, which would lead to pain and distraction of thought.
② His ability to have frequent small meals would not allow proper nutrition and one large meal could aggravate his abdominal pain.

TA-FormB.04.17

3

10. Briefly describe any treatment, including any prescribed medications, and the effectiveness of treatment in reducing or ameliorating the applicant's functional limitations.

① Treatment has mainly be improving strength and flexibility through visions and extensive physical therapy.

② He has tried multiple different medications, but ultimately underwent surgery (pyloroplasty) to help with his symptoms due to their severity.

## III. ACCOMMODATIONS REQUESTED FOR THE CALIFORNIA BAR EXAMINATION OR FIRST-YEAR LAW STUDENTS' EXAMINATION (check all that apply)

### FORMAT

The California Bar Examination is a timed examination administered over two days, consisting of a 3-hour morning session (9:00 a.m. to 12:00 noon) and a 3½-hour afternoon session (2:00 p.m. to 5:30 p.m.) on the first day, and two 3-hour sessions (9:00 a.m. to 12:00 noon and 2:00 p.m. to 5:00 p.m.) on the second day. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. each day. The examination is administered in a proctored setting.

The first day consists of three one-hour essay questions in the morning session and two one-hour essay questions plus one 90-minute Performance Test question in the afternoon session. The written portions of the examination are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The second day consists of 200 multiple-choice questions (Multistate Bar Examination or "MBE"), with 100 questions administered in the morning session and 100 questions in the afternoon session. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

The First-Year Law Students' Examination is a one-day timed examination administered in two sessions, a four-hour morning session from 8:00 a.m. to 12:00 noon and a three-hour afternoon session from 2:00 p.m. to 5:00 p.m. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. The examination is administered in a proctored setting.

The morning session consists of four one-hour essay questions. The essay questions are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The afternoon session consists of 100 multiple-choice questions. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

## SETTING

Applicants are assigned seats, two per six-foot table, in a room set for as few as 100 to 400 applicants for the First-Year Law Students' Examination to as many as 1,500 applicants for the California Bar Examination. Applicants are not allowed to bring food, beverages, or certain other items into the testing room unless approved as accommodations. All applicants may bring prescription medication. The examination is administered in a quiet environment, and applicants are allowed to use small foam earplugs. They may leave the examination room only to use the restroom or drinking fountain, within the time allotted for the test session.

Taking into consideration this description of the examination and the functional limitations that you currently experience, what testing accommodation (or accommodations, if more than one would be appropriate) are you requesting?

**Alternative Formats**

☐ Audio CD version of the examination

☐ Electronic versions of the Essay and/or Performance Test questions in Microsoft Word format on CDs for use with screen-reading software

☐ Other: _____

**Personal Assistance**

☐ Dictate to a typist (for written sessions)

☐ Reader

☐ Assistance with multiple-choice answer sheet (Scantron sheet) (choose one)

☐ Permission to circle answers in question booklet

☐ Permission to dictate answers to proctor

☐ Dictate to a voice recorder (choose one)

☐ Digital voice recorder (for use with flash memory cards)

☐ Tape recorder (for use with microcassette tapes)

☐ Other: _____

**Equipment or Facility Requirements**

☒ Computer *as an accommodation* (must have direct nexus to the effects of the disability) *see prior approval*

☐ with SofTest installed

☐ with voice-recognition software (e.g., Dragon Naturally Speaking) installed

☐ with screen-reading software (e.g., JAWS) installed

☐ with other (specify): _____

☐ Special equipment (specify): _____

☐ Private room

☐ Semi-private room

☐ Wheelchair accessibility (if table, specify height): _____

☒ Other: _____

Please provide a rationale for each request indicated above (attach additional sheets if necessary):

*See attached paperwork*

_____

_____

_____

**Accommodation of Extra Time**

Specify the amount of **extra time** requested for each session of the examination. Indicate why the specified extra time is needed (based on the diagnostic evaluation), provide the rationale for requesting the amount of time for each test format of the examination, and explain how you arrived at the specific amount of extra time requested. If either the amount of time or your rationale is different for different portions of the examination, please explain. **All requests for extra time must specify the exact amount of extra time. It is important to keep in mind that breaks are included in the timed portion of the examination. No accommodation of unlimited time will be granted. If extra testing time is requested, but the specific amount of extra time is not indicated, the petition will be returned as incomplete.**

**California Bar Examination: Essay Questions 1, 2 & 3 (standard session is 3 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

*See prior approvals and additional forms*

_____

_____

**California Bar Examination:  Essay Questions 4 & 5, and Performance Test (standard session is 3 hours and 30 minutes):** Specify the amount of extra test time needed for this session and provide the rationale:

*See prior approvals and additional forms*

**California Bar Examination:  Multistate Bar Examination - MBE (each standard session is 3 hours):** Specify the amount of extra test time needed for each MBE session and provide the rationale:

*See prior approvals and additional forms*

**First-Year Law Students' Examination:  Essay Questions 1, 2, 3 & 4 (standard session is 4 hours):** Specify the amount of extra test time needed for this session and provide the rationale:

*See prior approvals and additional forms*

**First-Year Law Students' Examination:  Multiple-Choice (standard session is 3 hours):** Specify the amount of extra test time needed for this session and provide the rationale:

*See prior approvals and additional forms*

**Explanations:**  (attach additional sheets if necessary)

## IV. CONFIDENTIALITY

Confidentiality policies of the Committee of Bar Examiners/Office of Admissions of the State Bar of California will be followed regarding its responsibility to maintain confidentiality of this form and any documents submitted with it.  No part of the form or the accompanying medical documentation will be released without the applicant's written consent or under the compulsion of legal process.

## V. PROFESSIONAL'S SIGNATURE

I am submitting the **original** of this form and have attached copies of all evaluation reports, test results, medical records, and/or other documents that I relied upon in making this diagnosis of the applicant's condition/disability and completing this form. I understand that all original documents submitted become the property of the Committee of Bar Examiners.

I declare under penalty of perjury under the laws of the State of California that the above information is true and correct.

_____     10/12/2018
(Signature of Licensed Professional)          (Date)

The Committee of Bar Examiners reserves the right to make final judgment concerning testing accommodations and may have all documentation related to this matter reviewed by an individual professional consultant or a panel of professional consultants if deemed necessary.

## ▼ NUC GASTRIC EMPTYING-SOLID
University of Iowa Hospitals and Clinics (UIHC)

**Result Impression**

Impression: Severely decreased rate of gastric emptying for solid phase.

The findings of the study were discussed with Dr. Levin, Avraham pager 4210 at 1055 hours on 3/23/2018.

**Result Narrative**

Procedure: NUC GASTRIC EMPTYING-SOLID (78264)

Indication: Postprandial fullness.

Radiopharmaceutical: Technetium-99m (Tc-99m) labeled sulfur colloid 1.08 mCi PO.

Technique: After the patient ate the standard radiolabeled meal, anterior and posterior images of the abdomen were obtained at multiple time points over the course of 2 hrs. Regions of interest were drawn around the stomach to quantify clearance of activity over time by geometric mean analysis.

Findings: Initial images show activity within the stomach. Subsequent images show slow transit of activity into the small bowel activity over the acquisition interval. Based on the time-activity curve, only 24% of the initial gastric activity is emptied at 2 hours (normal: more than 40%).

**Status**

**Results Details**
Encounter Summary

---

## ▼ NM Gastric Emptying Solid
Stanford Health Care and University Healthcare Alliance

**Result Impression**

IMPRESSION:

1. Very severely delayed gastric emptying with 66% of radiotracer remaining in the stomach at the 4 hour time point.

"Physician to Physician Radiology Consult Line: (650) 736-1173"

Signed

**Result Narrative**

GASTRIC EMPTYING STUDY: 5/25/2018 12:00

CLINICAL HISTORY: 24 years of age, Male, with history concerning for gastroparesis, referred for evaluation of gastric emptying.

COMPARISON: None.

PROCEDURE COMMENTS:
Radiopharmaceutical: Tc-99m sulphur colloid 0.558 mCi PO.
Technique: A standard meal consisting of Eggbeater 120 ml, toast, jam and water was labeled with the radiopharmaceutica l and administered orally to the patient. The patient ate the meal in 10 minutes. Subsequent static images were obtaine d at approximately 60, 120, 180 and 240 minutes post ingestion, to calculate percent emptying.

FINDINGS:

There is prompt radiopharmaceutical accumulation within the stomach. There is initial filling of the gastric fundus, fo llowed by movement to the antrum. There is subsequent emptying of the radiotracer into the proximal gastrointestinal tr act. The emptying fraction (at interpolated times) are as tabulated:

| Time (minutes) | % Emptying | Normal Range % Empty | |
|---|---|---|---|
| 60 | 28 | | 10-70% |
| 120 | 29 | | 40-100% |
| 180 | 29 | | 70-100% |
| 240 | 34 | | 90-100% |

**Status**

**Results Details**
Encounter Summary

**Sutter Health**
Palo Alto Medical Foundation
**We Plus You**

Benjamin Kohn
1913 Fordham Way
Mountain View CA 94040
October 12, 2018

To whom it may concern,

Re: Accommodations attachment

1.
(M79.18) Myofascial pain syndrome and
(F84.0) Autism spectrum disorder

For the myofascial pain syndrome, I request renewal of the accommodation previously approved to bring any ergonomic workstation materials. These materials include a chair with dynamic spinal support (for example, a Herman Miller Embody office chair or one with equivalent features) - the relevant features of this chair exceeds the standards of most standard office chairs. In addition, ergonomic equipment should include an adjustable laptop stand, mac-compatible bluetooth or thunderbolt external keyboard, wearable braces. He has previously been approved a computer as an accommodation based on Autism fine motor disability.

2.
(K31.84) Gastroparesis

I recommend a 30-minute supervised meal break per 90 minutes of testing time. The 30 minutes need to be used only for the completion of the meal. Any time getting to and from the testing site should be considered additional break time. This is in addition to the extra time that was previously approved to accommodate his other disabilities. The additional meal time break is based on the recommendation of six smaller meals per day due to severe gastroparesis (see attached Gastric emptying study) and more limited swallowing capacity due to his recent Nissen fundoplication. This restricts his ability to take large bites of foods (and hence makes the consumption of a meal more prolonged than an average person).

I also request permission to bring and eat snacks and drinks into the testing room. This request is due to more than typical dysphagia from his recent Nissen Fundoplication.

Patient has been approved on previous test administration to have extra time due to Autism and other disabilities. These breaks should not impact the amount of testing time offered to the patient.

Graham Dresden, MD



**THE STATE BAR OF CALIFORNIA**
**COMMITTEE OF BAR EXAMINERS/OFFICE OF ADMISSIONS**

**180 Howard Street • San Francisco, CA 94105-1639 • (415) 538-2300**
**845 S. Figueroa Street • Los Angeles, CA 90017-2515 • (213) 765-1500**

# FORM B
## TESTING ACCOMMODATIONS – PHYSICAL DISABILITIES VERIFICATION

All original documents must be filed with the Office of Admissions' San Francisco Office.
(Must be completed by the applicant; please type or print legibly)

**NOTICE TO APPLICANT: This section of this form is to be completed by you.** The remainder of the form is to be completed by the qualified professional who is recommending testing accommodations for the California Bar Examination or First-Year Law Students' Examination for you on the basis of a physical disability. Please read, complete, and sign below before submitting this form to the qualified professional for completion of the remainder of this form.

Applicant's Full Name: _____

File Number: _____

> I give permission to the qualified professional completing this form to release the information requested on the form, and I request the release of any additional information regarding my disability or accommodations previously granted that may be requested by the Committee of Bar Examiners or consultant(s) of the Committee of Bar Examiners.

_____          _____
Signature of Applicant                                        Date

**NOTICE TO QUALIFIED PROFESSIONAL:**

The above-named person is requesting accommodations for the California Bar Examination or First-Year Law Students' Examination. All such requests must be supported by appropriate documentation (including evaluation reports, test results and/or medical records) from the qualified professional who conducted an individualized assessment of the applicant and is recommending accommodations for the examination on the basis of a physical disability. The Committee of Bar Examiners also requires the qualified professional to complete this form. **If any of the information requested in this form is fully addressed in the documentation submitted (evaluation reports, test results, medical records, etc.), you may respond by citing the specific page and paragraph where the answer can be found.** Please attach a copy of the evaluation report and/or all records and test results on which you relied in making the diagnosis and recommending accommodations for the examination administered by the

Committee of Bar Examiners, Your assistance is appreciated.

The provision of reasonable accommodations is based on assessment of the *current* impact of the disability on the specific testing activity. The Committee of Bar Examiners generally requires documentation from an evaluation conducted within the past year because of the changing manifestations of many physical disabilities. Older evaluation reports may suffice if supplemented by an update of the diagnosis, current level of functioning, and a rationale for each recommended accommodation or an explanation of why the report and/or other documentation continue to be relevant in their entirety.

The Committee of Bar Examiners may forward this information to one or more qualified professionals for an independent review of the applicant's request. Print or type your responses to the items below. **Return the original of this completed form, the evaluation report, test results, and/or other relevant records to the applicant for submission to the Committee of Bar Examiners.**

## I. EVALUATOR/TREATING PROFESSIONAL INFORMATION

Name of professional completing this form: _Graham Dresden, MD_

Address: _701 E. El Camino Real, Mountain View, CA 94040_

Telephone: _650-404-8370_     Fax: _650-404-8476_

E-Mail: _____

Occupation, title, and specialty: _Physician, MD, Family Medicine_

License Number/Certification/State: _A105743, California_

Describe your qualifications and experience to diagnose and/or verify the applicant's condition or impairment and to recommend accommodations.

_I am a specialist in Family Medicine and have 10+ years experience in treating patients similar to Mr. Kohn._

## II. DIAGNOSIS AND RESULTING FUNCTIONAL LIMITATIONS

1. What is the specific diagnosis (including diagnosis code) for which the applicant requests testing accommodations? _Myofascial Pain Syndrome_

   _M 79.1_

2. Describe the nature of the physical disability. Include a history of presenting

symptoms, date of onset, and description of the duration and severity of the disability.

*He has pain and stiffness in the musculoskeletal system, including neck, lumbar spine + shoulders. This has been going on for several years and it is severe enough to require extensive therapy*

3. When did you first meet with the applicant? _____2010_____

4. When was the applicant's physical disability first diagnosed? _____2012_____

5. Did you make the initial diagnosis?  ☐ YES  ☐ NO

If no, provide the name of the professional who made the initial diagnosis and when it was made, if known. Attach copies of any prior evaluation reports, test results, or other records related to the initial diagnosis that you reviewed.

_____
_____
_____

6. Provide the date of your last complete evaluation of the applicant: _____6/23/2017_____

7. Is this a permanent condition/impairment?  ☒ YES  ☐ NO

If no, when is it likely to abate?

_____
_____

8. Does the severity of the condition/impairment fluctuate?  ☐ YES  ☒ NO

If yes, describe the settings and/or circumstances affecting severity that are relevant to taking the California Bar Examination of First-Year Law Students' Examination.

_____
_____
_____

9. Describe the applicant's current functional limitations and explain how the limitations restrict the condition, manner, or duration under which the applicant can take the California Bar Examination or First-Year Law Students' Examination.

_____
_____
_____
_____
_____

10. Briefly describe any treatment, including any prescribed medications, and the effectiveness of treatment in reducing or ameliorating the applicant's functional limitations.

_He is getting extensive therapy, including physical therapy, Chiropractic care and home exercise regimen. No medications used. This therapy helps tremendously._

## III. ACCOMMODATIONS REQUESTED FOR THE CALIFORNIA BAR EXAMINATION OR FIRST-YEAR LAW STUDENTS' EXAMINATION (check all that apply)

### FORMAT

The California Bar Examination is a timed examination administered over two days, consisting of a 3-hour morning session (9:00 a.m. to 12:00 noon) and a 3½-hour afternoon session (2:00 p.m. to 5:30 p.m.) on the first day, and two 3-hour sessions (9:00 a.m. to 12:00 noon and 2:00 p.m. to 5:00 p.m.) on the second day. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. each day. The examination is administered in a proctored setting.

The first day consists of three one-hour essay questions in the morning session and two one-hour essay questions plus one 90-minute Performance Test question in the afternoon session. The written portions of the examination are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The second day consists of 200 multiple-choice questions (Multistate Bar Examination or "MBE"), with 100 questions administered in the morning session and 100 questions in the afternoon session. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

The First-Year Law Students' Examination is a one-day timed examination administered in two sessions, a four-hour morning session from 8:00 a.m. to 12:00 noon and a three-hour afternoon session from 2:00 p.m. to 5:00 p.m. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. The examination is administered in a proctored setting.

The morning session consists of four one-hour essay questions. The essay questions are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The afternoon session consists of 100 multiple-choice questions. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

**SETTING**

Applicants are assigned seats, two per six-foot table, in a room set for as few as 100 to 400 applicants for the First-Year Law Students' Examination to as many as 1,500 applicants for the California Bar Examination. Applicants are not allowed to bring food, beverages, or certain other items into the testing room unless approved as accommodations. All applicants may bring prescription medication. The examination is administered in a quiet environment, and applicants are allowed to use small foam earplugs. They may leave the examination room only to use the restroom or drinking fountain, within the time allotted for the test session.

Taking into consideration this description of the examination and the functional limitations that you currently experience, what testing accommodation (or accommodations, if more than one would be appropriate) are you requesting?

**Alternative Formats**

☐ Audio CD version of the examination

☐ Electronic versions of the Essay and/or Performance Test questions in Microsoft Word format on CDs for use with screen-reading software

☐ Other: _____

**Personal Assistance**

☐ Dictate to a typist (for written sessions)

☐ Reader

☐ Assistance with multiple-choice answer sheet (Scantron sheet) (choose one)

    ☐ Permission to circle answers in question booklet

    ☐ Permission to dictate answers to proctor

☐ Dictate to a voice recorder (choose one)

    ☐ Digital voice recorder (for use with flash memory cards)

    ☐ Tape recorder (for use with microcassette tapes)

    ☐ Other: _____

**Equipment or Facility Requirements**

☐ Computer *as an accommodation* (must have direct nexus to the effects of the disability)

☐ with SofTest installed

☐ with voice-recognition software (e.g., Dragon Naturally Speaking) installed

☐ with screen-reading software (e.g., JAWS) installed

☐ with other (specify): _____

☐ Special equipment (specify): _____

☐ Private room

☐ Semi-private room

☐ Wheelchair accessibility (if table, specify height): _____

☒ Other: _Ergonomic workstation_

Please provide a rationale for each request indicated above (attach additional sheets if necessary):

① He has a longstanding diagnosis of myofascial pain syndrome for which he undergoes regular treatment.

② In addition, he needs additional accommodations for Asperger's as recommended by the neuropsychological assessment group.

**Accommodation of Extra Time**

Specify the amount of **extra time** requested for each session of the examination. Indicate why the specified extra time is needed (based on the diagnostic evaluation), provide the rationale for requesting the amount of time for each test format of the examination, and explain how you arrived at the specific amount of extra time requested. If either the amount of time or your rationale is different for different portions of the examination, please explain. **All requests for extra time must specify the exact amount of extra time. It is important to keep in mind that breaks are included in the timed portion of the examination. No accommodation of unlimited time will be granted. If extra testing time is requested, but the specific amount of extra time is not indicated, the petition will be returned as incomplete.**

**California Bar Examination: Essay Questions 1, 2 & 3 (standard session is 3 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

_____

_____

_____

**California Bar Examination: Essay Questions 4 & 5, and Performance Test (standard session is 3 hours and 30 minutes):** Specify the amount of extra test time needed for this session and provide the rationale:

_____
_____
_____

**California Bar Examination: Multistate Bar Examination - MBE (each standard session is 3 hours):** Specify the amount of extra test time needed for each MBE session and provide the rationale:

_____
_____
_____

**First-Year Law Students' Examination: Essay Questions 1, 2, 3 & 4 (standard session is 4 hours):** Specify the amount of extra test time needed for this session and provide the rationale:

_____
_____
_____

**First-Year Law Students' Examination: Multiple-Choice (standard session is 3 hours):** Specify the amount of extra test time needed for this session and provide the rationale:

_____
_____
_____

**Explanations:** (attach additional sheets if necessary)

_____
_____
_____
_____
_____

## IV. CONFIDENTIALITY

Confidentiality policies of the Committee of Bar Examiners/Office of Admissions of the State Bar of California will be followed regarding its responsibility to maintain confidentiality of this form and any documents submitted with it. No part of the form or the accompanying medical documentation will be released without the applicant's written consent or under the compulsion of legal process.

## V. PROFESSIONAL'S SIGNATURE

I am submitting the **original** of this form and have attached copies of all evaluation reports, test results, medical records, and/or other documents that I relied upon in making this diagnosis of the applicant's condition/disability and completing this form. I understand that all original documents submitted become the property of the Committee of Bar Examiners.

I declare under penalty of perjury under the laws of the State of California that the above information is true and correct.

_____          8/28/2017
(Signature of Licensed Professional)                        (Date)

The Committee of Bar Examiners reserves the right to make final judgment concerning testing accommodations and may have all documentation related to this matter reviewed by an individual professional consultant or a panel of professional consultants if deemed necessary.



**THE STATE BAR OF CALIFORNIA**
**COMMITTEE OF BAR EXAMINERS/OFFICE OF ADMISSIONS**

**180 Howard Street • San Francisco, CA 94105-1639 • (415) 538-2300**
**845 S. Figueroa Street • Los Angeles, CA 90017-2515 • (213) 765-1500**

# FORM E
# TESTING ACCOMMODATIONS – PSYCHOLOGICAL DISABILITIES VERIFICATION

All original documents must be filed with the Office of Admissions' San Francisco Office.
(Must be completed by the applicant; please type or print legibly)

**NOTICE TO APPLICANT:  This section of this form is to be completed by you**.
The remainder of the form is to be completed by the qualified professional who is
recommending testing accommodations for the California Bar Examination or First-Year
Law Students' Examination for you on the basis of a psychological disability.  Please
read, complete, and sign below before submitting this form to the qualified professional
for completion of the remainder of this form.

Applicant's Full Name: Benjamin Kohn

File Number: 468532

> I give permission to the qualified professional completing this form to
> release the information requested on the form, and I request the release
> of any additional information regarding my disability or accommodations
> previously granted that may be requested by the Committee of Bar
> Examiners or consultant(s) of the Committee of Bar Examiners.

6/4/2020

/s/ Benjamin Kohn

Signature of Applicant                         Date

**NOTICE TO QUALIFIED PROFESSIONAL:**

The above-named person is requesting accommodations for the California Bar
Examination or First-Year Law Students' Examination.  All such requests must be
supported by a comprehensive evaluation report from the qualified professional who
conducted an individualized assessment of the applicant and is recommending
accommodations for the examination on the basis of a psychological disability.  The
Committee of Bar Examiners also requires the qualified professional to complete this
form.  **If any of the information requested in this form is fully addressed in the
comprehensive evaluation report, you may respond by citing the <u>specific page
and paragraph</u> where the answer can be found.**  Please attach a copy of the
evaluation report and all records and test results on which you relied in making the
diagnosis and recommending accommodations for the an examination administered by
the Committee of Bar Examiners.  Your assistance is appreciated.

The Committee of Bar Examiners may forward this information to one or more qualified professionals for an independent review of the applicant's request. Print or type your responses to the items below. **Return the original of this completed form, the comprehensive evaluation report, and relevant records to the applicant for submission to the Committee of Bar Examiners.**

## I. QUALIFICATIONS OF THE PROFESSIONAL*

Name of professional completing this form:   Dr. Rosalie Toren, PhD

Address:   2427 Benjamin Dr, Mountain View, CA 94043

Telephone:   (650) 833-8834          Fax:

E-Mail:   rtoren57@gmail.com

Occupation, title, and specialty:   Clinical Psychologist

License Number/State:   CA PSY 21581

*The following professionals are deemed appropriate and qualified to provide a diagnosis of psychological disabilities:  Psychiatrist, Psychologist or other licensed mental health professional.*

Please describe your qualifications and experience to diagnose and/or verify the applicant's condition or impairment and to recommend accommodations:
I am a licensed clinical psychologist and state credentialed school psychologist specializing in neuropsychological and psychoeducational evaluations.  I have extensive experience evaluating both children and adults for autism and other psychological and learning disabilities, both for special education services and testing accommodations.

## II. DIAGNOSTIC INFORMATION CONCERNING APPLICANT

1. Date of last evaluation/assessment of the applicant:   5/27/2020-6/4/2020

2. What is the applicant's specific diagnosis based on the DSM-5 (or most current version)?  Please include diagnostic codes where applicable.  If diagnosis is not definitive, please list differential diagnoses.
Autism Spectrum Disorder (299.00)
Highly Variable Attention and Neuroprocessing Disorder (315.8)

3. Describe the applicant's history of presenting symptoms of a psychological disability.

Include a description of symptom frequency, intensity, and duration to establish severity of symptomology.

See Attached Report.

_____

_____

_____

_____

4. Describe the applicant's **current** functional limitations caused by the psychological disability in different settings and specifically address the impact of the disability on the applicant's ability to take the California Bar Examination or First-Year Law Students' Examination under standard conditions. Note: Psychoeducational, neuropsychological or behavioral assessments often are necessary to demonstrate the applicant's current functional limitations in cognition.

See Attached Report.

_____

_____

_____

_____

5. Describe the applicant's compliance with and response to treatment and medication, if prescribed. Explain the effectiveness of any treatment and/or medication in reducing or ameliorating the applicant's functional limitations and the anticipated impact on the applicant in the setting of the California Bar Examination or First-Year Law Students' Examination.

See Attached Report.

_____

_____

_____

_____

**ATTACH A COMPREHENSIVE EVALUATION REPORT.** The provision of reasonable accommodations is based on assessment of the *current* impact of the disability on the specific testing activity. Due to the changing nature of psychiatric disabilities, it is essential that the applicant provide recent and appropriate medical documentation. An applicant's psychological disability must have been identified by a comprehensive diagnostic/clinical evaluation that is well documented in the form of a comprehensive report. **Please attach to this form a copy of the comprehensive evaluation report and all records and test results on which you relied in making the diagnosis and recommending accommodations for the California Bar Examination or First-Year Law Students' Examination.**

The evaluation report should include the following:

- psychiatric/psychological history

- relevant developmental, educational, and familial history

- relevant medical and medication history

- results of full mental status examination

- description of current functional limitations in different settings

- results of any tests or instruments used to supplement the clinical interview and support the presence of functional limitations, including any psychoeducational or neuropsychological testing, rating scales, or personality tests

- diagnostic formulation, including discussion of differential or "rule out" diagnoses prognosis

## III. ACCOMMODATIONS RECOMMENDED FOR THE CALIFORNIA BAR EXAMINATION OR FIRST-YEAR LAW STUDENTS' EXAMINATION (check all that apply)

## FORMAT

The California Bar Examination is a timed examination administered over two days, consisting of a 3-hour morning session (9:00 a.m. to 12:00 noon) and a 3½-hour afternoon session (2:00 p.m. to 5:30 p.m.) on the first day, and two 3-hour sessions (9:00 a.m. to 12:00 noon and 2:00 p.m. to 5:00 p.m.) on the second day. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. each day. The examination is administered in a proctored setting.

The first day consists of three one-hour essay questions in the morning session and two one-hour essay questions plus one 90-minute Performance Test question in the afternoon session. The written portions of the examination are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The second day consists of 200 multiple-choice questions (Multistate Bar Examination or "MBE"), with 100 questions administered in the morning session and 100 questions in the afternoon session. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

The First-Year Law Students' Examination is a one-day timed examination administered in two sessions, a four-hour morning session from 8:00 a.m. to 12:00 noon and a three-hour afternoon session from 2:00 p.m. to 5:00 p.m. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. The examination is administered in a proctored setting.

The morning session consists of four one-hour essay questions. The essay questions are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop

computers to type their answers, or they may handwrite their answers. The afternoon session consists of 100 multiple-choice questions. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

## SETTING

Applicants are assigned seats, two per six-foot table, in a room set for as few as 100 to 400 applicants for the First-Year Law Students' Examination to as many as 1,500 applicants for the California Bar Examination. Applicants are not allowed to bring food, beverages, or certain other items into the testing room unless approved as accommodations. All applicants may bring prescription medication. The examination is administered in a quiet environment, and applicants are allowed to use small foam earplugs. They may leave the examination room only to use the restroom or drinking fountain, within the time allotted for the test session.

Taking into consideration this description of the examination and the functional limitations that you currently experience, what testing accommodation (or accommodations, if more than one would be appropriate) are you requesting?

**Alternative Formats**

☐ Audio CD version of the examination

☐ Electronic versions of the Essay and/or Performance Test questions in Microsoft Word format on CDs for use with screen-reading software

☐ Other: _____

**Personal Assistance**

☐ Dictate to a typist (for written sessions)

☐ Reader

☐ Assistance with multiple-choice answer sheet (Scantron sheet) (choose one)

　　☐ Permission to circle answers in question booklet

　　☐ Permission to dictate answers to proctor

☐ Dictate to a voice recorder (choose one)

　　☐ Digital voice recorder (for use with flash memory cards)

　　☐ Tape recorder (for use with microcassette tapes)
　　☑ Other: Instructions to proctors
　　　　　 _____

**Equipment or Facility Requirements**

☑ Computer *as an accommodation* (must have direct nexus to the effects of the disability)

☐ with SofTest installed

☐ with voice-recognition software (e.g., Dragon Naturally Speaking) installed

☐ with screen-reading software (e.g., JAWS) installed

☐ with other (specify): _____

☑ Special equipment (specify): Ergonomic Workstation desc. by PCP further supported by autism.

☑ Private room

☐ Semi-private room

☐ Wheelchair accessibility (if table, specify height): _____

☑ Other: No longer testing per day than standard; See R

Please provide a rationale for each request indicated above (attach additional sheets if necessary):

Autism results in greater distractability, sensory sensitivity, and anxiety from logistical issues. Exams rely on sustained top mental performance and have higher stakes than classroom settings, so he should receive a private room, the workstation requested by his PCP for a phys. disability that produces effects his autism will make him more sensitive to and distracted by, and a proctor familiar with the changes his accommodations and affected rules, who refrains from distracting behaviors. See R

**Accommodation of Extra Time**

Specify the amount of **extra time** requested for each session of the examination. Indicate why the specified extra time is needed (based on the diagnostic evaluation), provide the rationale for requesting the amount of time for each test format of the examination, and explain how you arrived at the specific amount of extra time requested. If either the amount of time or your rationale is different for different portions of the examination, please explain. **All requests for extra time must specify the exact amount of extra time. It is important to keep in mind that breaks are included in the timed portion of the examination. No accommodation of unlimited time will be granted. If extra testing time is requested, but the specific amount of extra time is not indicated, the petition will be returned as incomplete.**

**California Bar Examination: Essay Questions 1, 2 & 3 (standard session is 3 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

Additional 4.5 Hrs/150% extra time for psych. disabilities if <= standard total length per day and up to 200% extra time if significantly longer per day than standard. Recs additive to any extra time for distinct visual and physical handicaps or impairments.

**California Bar Examination: Essay Questions 4 & 5, and Performance Test (standard session is 3 hours and 30 minutes):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

Additional 4.5 Hrs/150% extra time for psych. disabilities if <= standard total length per day and up to 200% extra time if significantly longer per day than standard. Recs additive to any extra time for distinct visual and physical handicaps or impairments.

**California Bar Examination: Multistate Bar Examination - MBE (each standard session is 3 hours):** Specify the amount of extra test time needed <u>for each MBE session</u> and provide the rationale:

Additional 3 Hrs/100% extra time for psych. disabilities if <= standard total length per day and up to 125% extra time if significantly longer per day than standard. Recs additive to any extra time for distinct visual and physical handicaps or impairments.

**First-Year Law Students' Examination: Essay Questions 1, 2, 3 & 4 (standard session is 4 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

N/A

**First-Year Law Students' Examination: Multiple-Choice (standard session is 3 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

N/A

<u>**Explanations:**</u> (attach additional sheets if necessary)

As demonstrated by my testing and reflected in my observations, Mr. Kohn's autism has severerely impaired his neuroprocessing speed, though to unequal degrees between domains, and has made his attention extremely variable, with a large standard deviation between test administrations in the severity of that impairment. This condition is associated with a multiplicity of additional handicaps, which include heightened distractability from both sensory and stress or anxiety induced distractors, and increased propensity for anxiety from circumstances such as he's described relating to the behavior of his proctor on the July 2018 CBX or from proctor unfamiliarity with his accommodations and which rules they'd affect. He'd already had a nearly lifelong autism diagnosis, and these results remain consistent.

## IV. PRIOR HISTORY AND PAST ACCOMMODATIONS

Please describe any previously documented history of psychological disabilities and list accommodations that have been granted to the applicant in the past:

Mr. Kohn reports the time of his autism diagnosis to have been when he was 5 to 6 years old, which was made at Stanford. He's had an IEP providing assistance with this diagnosis for most of his K-12 schooling. He received testing accommodations in both college and law school, including a private room and at least double time, though this increased to 150% extra time his last semester in law school due to diagnosis with a new visual disability. He's received from 50%-just over 100% extra time on standardized tests, all but the bar exams being partial day shorter multiple choice exams. He has a multitude of other medical issues, of varying recency.

## V. CONFIDENTIALITY

Confidentiality policies of the Committee of Bar Examiners/Office of Admissions of the State Bar of California will be followed regarding its responsibility to maintain confidentiality of this form and any documents submitted with it. No part of the form or the accompanying diagnostic report will be released without the applicant's written consent or under the compulsion of legal process.

## VI. CLINICIAN/LICENSED PROFESSIONAL'S SIGNATURE

I am submitting the **original** of this form and have attached copies of the comprehensive evaluation report and all records and test results that I relied upon in making this diagnosis of the applicant's condition/disability (notes and worksheets are not required as part of this submission) and completing this form. I understand that all original documents submitted become the property of the Committee of Bar Examiners.

I declare under penalty of perjury under the laws of the State of California that the above information is true and correct.

_(Signature of Licensed Professional)_                    6/4/20
                                                          _(Date)_

The Committee of Bar Examiners reserves the right to make final judgment concerning testing accommodations and may have all documentation related to this matter reviewed by an individual professional consultant or a panel of professional consultants if deemed necessary.

**Toren Psychological Services**
**2427 Benjamin Dr.**
**Mountain View, CA 94043**
**(650) 833-8834**
rtoren57@gmail.com

**CONFIDENTIAL**
**Psychoeducational Evaluation**

**Name:** Benjamin Kohn                    **Date of Testing:** 5/27/20, 5/29/20, 5/31/20,
**6/1/20, 6/2/20, 6/4/20**
**Date of Birth:** 12/29/1993              **Date of Report:** 6/4/2020

**Examiner:** Rosalie Toren                **Age:** 26
**Grade:** Postgraduate                    **Sex:** Male

**Reason for Evaluation:**
Benjamin was self-referred for testing to assess his current psychoeducational functioning
pursuant for application for accommodations for taking the California bar examination.

**Method of Evaluation:**
Clinical Interview and Review of Records
Weschler Adult Intelligence Scale-fourth edition
Weschler Memory Scale fourth edition
Wechsler Individual Achievement Test third edition
Nelson Denny Reading Test
Visual Search and Attention Test
Delis Kaplan Executive Function System Trails 1-5
Behavior Assessment System, Third Edition (BASC-3)

**BACKGROUND INFORMATION:**
**Family Background**
Benjamin is a 26-year-old Caucasian male who resides with his parents while studying
for the bar and is self-employed.

**Health and Medical History and Psychological History**
Benjamin is a product of a normal pregnancy and delivery.  Developmental history is
positive for Autism Spectrum Disorder and delays in speech and gross motor
development.  Medical and developmental history is negative for seizures or head
injuries, drug or alcohol dependence, or abuse, or suicidal ideation or attempts.  Benjamin
identifies the following psychological and neurological, and medical issues associated
with autism: sleep disturbance, distractibility, inattention and highly variable attention,
poor concentration, obsessive thoughts, compulsive behavior, anxiety, memory
impairment, headaches, and introversion.  Benjamin was provided speech therapy in
elementary school; privately, Benjamin's parents paid for "social thinking," occupational,

and physical therapies through 8th Grade. Benjamin still receives physical therapy for these and other issues to this day.

He has no incidents of problems with the law other than a couple traffic tickets.

Benjamin has many neurological/psychological and medical conditions which interact with each other and impinge on his learning, achievement, and other major life activities. Due to the breadth and extraordinary scope of these health concerns, while my testing accommodation recommendations are only for his psychological disabilities in scope, many of his testing needs are affected by multiple interacting, but distinct, functional limitations, where the effects of these conditions and his medical conditions intermingle, and all of his disability concerns should be considered with his holistic medical situation in mind.

<u>Medical Synopsis:</u>

<u>Neuro-Psychiatric:</u>

Autism Spectrum Disorder (F84.0)

Highly variable attention and neuroprocessing speed deficit (R62.50)

Circadian Rhythm Sleep Disorder (Delayed Phase & Irregular Sleep/Wake Types) (G47.33)

<u>Neuro-Muscular-Skeletal:</u>

Gross and Fine Motor Delay (F82)

Myofascial Pain Syndrome (M79.18)

Cervicalgia (M54.2)

Occipital Neuralgia (M54.81)

Scapular Dyskinesis (G25.89)

<u>Allergy:</u>

Allergic Rhinitis (J30.9)

Allergic Sinusitis (J32.9)

Allergic Keratoconjunctivitis (H10.45)

Food Allergies (Fish, Airborne & Severe Untreated; Nuts and Dairy) (Z91.013)

Dermatological:

Chronic Idiopathic Urticaria (L50.1)

Eczema (L20.84)

Chronic Folliculitis (L73.9)


Gastroenterological/Gastrointestinal:

Gastroparesis (K31.84)

Postoperative Dysphagia (R13.10)

Irritable Bowel Syndrome with Chronic Constipation (K58.9)

Pelvic Floor Dyssynergia (M62.89)

Recurrent Anal Hemorrhoids (K64.8)

Recurrent Anal Fissures (K60.2)

History of Gastroesophageal Reflux Disease (K21.9)


Otolaryngology:

Chronic Oral Aphthae (K12.0)

History of Sleep Apnea (G47.20)

History of Sinonasal Polyposis (J33.9)


Ophthalmology:

Keratoconus (H18.603)

Irregular/Asymmetric Astigmatism of Both Eyes (H52.213)

Dry Eye Syndrome (Severe Meibomian Gland Dysfunction & Tear Film Insufficiency) (H04.123)

Eye Floaters (H43.399)


Prescription Medication List:


Regularly:

Modafinil (200 mg Tablet Daily for Circadian Rhythm Sleep Disorder)

DyMista Nasal Spray (Twice Daily for Allergic Rhinitis)

Bethanechol (25 mg Tablet up to 3 times daily 30 minutes before meals for gastroparesis)

Linzess (290 mcg daily before bed for irritable bowel syndrome and constipation)

Montelukast Sodium (10 mg Tablet daily for allergic sinusitis)

Famotidine (20 mg Tablet up to twice daily after meals for gastroparesis)

Pulmicort Respules (0.25-0.75 mg twice daily in 16 oz. saline sinus rinses for allergic sinusitis and to prevent recurrence of sinonasal polyposis)

Xolair (300 mg subcutaneous injections in-clinic every ~21 days for chronic idiopathic urticaria, eczema, food allergy suppression, some benefit for allergic rhinitis, sinusitis, and keratoconjunctivitis)

Restasis Eye Drops (0.4 ml twice daily for dry eye syndrome)

Xiidra Eye Drops (0.2 ml twice daily for dry eye syndrome)


<u>As Needed:</u>

Losartan 25 mg Tablets (for hypertension associated with myofascial pain syndrome)

Nortriptyline 10 mg Tablets (for myofascial pain syndrome)

Gabapentin 100-400 mg Capsules (for myofascial pain syndrome)

Cyclobenzaprine 5 mg Tablets (for myofascial pain syndrome)

Rectiv Ointment (for anal fissures and hemorrhoids)

Hydrocortisone/Pramoxine 2.5%/1% Rectal Cream (for anal hemorrhoids)

Compounded Magic Mouthwash (for oral aphthae)

Dexamethasone Mouthwash (for oral aphthae)

Oral Benzocaine Cream (for oral aphthae)

Valacyclovir 1 G Tablets (for oral aphthae)

Desloratadine 5 mg Tablets (for eczema)

Eucrisa Ointment (for eczema)

Tacrolimus 0.1% Ointment (for eczema)

Desonide Cream (for eczema)

Clindamycin/Benzoyl Peroxide Topical Gel 1%/5% (for folliculitis)

Tretinoin 0.025% Cream (for folliculitis)

Pazeo 0.7% Eye Drops (for allergic keratoconjunctivitis)

Epipen (for allergic emergencies)

Prednisone (for severe allergy condition flare-ups)

**Educational History**

Benjamin attended school in Mountain View through 12th grade. He was on IEP (Individualized Educational Plan) for Autism. He received speech therapy, had one to one aide from second to fifth grade, was in special day class for sixth grade. In middle school and high school, he received double time for examinations and extra time to complete assignments and also received adaptive physical education in high school. Benjamin achieved a 3.0 in high school. He then attended San Jose State University and got a degree in Business Administration and Marketing in which he had a GPA of 3.1. He attended University of Iowa for law school and passed the Iowa Bar after attending school between his second and third attempt at the California Bar. He's attempted to take the California Bar three times and did not pass.

**Behavioral Observations and Clinical Interview:**

Benjamin attended many sessions to assess cognitive, academic, processing and personality assessment. He showed appropriate concentration, attention, effort and motivation. Benjamin appeared stressed, and his speech was pressured. His affect was within normal range. He appeared somewhat anxious about getting all the testing done. His eye contact was good, as he maintained contact with this examiner. His speech was somewhat slurred when he was talking fast, but understandable. He exhibited no abnormalities of flow of thought and mental content. There was no evidence of perceptual disturbances and he was oriented to time, place, and person. At all times, he was cooperative with the examiner. Insight and judgement were generally good. He exhibited stereotypical autistic traits, including picking on his clothes and doing flapping motions with his hands, when the tasks became more difficult. This appears to be related to Autism Diagnosis.

Benjamin denies the use of drugs and occasionally drinks. He denied suicidal or homicidal ideation. Processing time was paper and pencil tasks that were timed. Therefore, also, time and a half and double time and double time and a half were administered and noticeable differences were noted on these tasks that were timed. Based on his level of effort and the seriousness of his approach, these testing results are considered a valid and accurate representation of his current academic, cognitive, and psychological functioning.

**Prior Testing:**

I'd previously evaluated Benjamin with a more limited scope in 2010 for his high school IEP. In 2014, Benjamin was tested with the same testing protocol by Drs. Preston and Pinn in order to seek accommodations to take LSAT and GMAT. He was noted to have variable attention, and poor psychomotor processing. Academic tests ranged from

average to superior range with the exception of fluency test which measured speed along with conceptual understanding. Cognitive testing ranged from high average to superior range.  His verbal/conceptual skills were more developed than visual/perceptual skills. Memory skills were consistent with his cognitive functioning with auditory memory much higher than visual memory.  Personality testing suggested no social/emotional concerns.

## COGNITIVE ABILITIES

**Cognitive Skills:**
**TEST RESULTS AND INTERPRETATION:**

Benjamin was administered standardized tests to evaluate current intellectual functioning and/or how he processes information.  The scores will show how he compares to others of the same age across the United States that took the same tests.  Most tests use Standard Scores, Scaled Scores, Percentiles Ranks, and Confidence Intervals. *Standard Scores* range from the highest possible score of 160, to a low of 55.  Half of all students will score less than 100 and half will score more than 100.  Scores from 90 to 109 are average. *Scaled Scores* range from a high of 19, to a low of 1.  The average range is 8 to 12. *Percentiles* show how well SUDENT ranks in the national comparison group.  For example, a percentile rank of 55 would mean that Student scored higher than approximately 55 out of 100 children the same age. *Confidence Interval*:  It is important to remember that no test score is perfectly accurate.  Any score might be slightly higher or lower if student were tested again a different day.  The confidence interval for a score of 100, using a 95% probability, would range from 90-110. The *Classification Range* provides another means to show relative position compared to others.

| Classification Range | Standard Scores (Composite Scores) | Scaled Scores (Subtest Scores) | Percentile |
|---|---|---|---|
| Very Superior | 130 and above | 16-19 | 98 and above |
| Superior | 120-129 | 14-15 | 91-97 |
| High Average | 110-119 | 12-13 | 75-90 |
| Average | 90-109 | 8-11 | 25-74 |
| Low Average | 80-89 | 6-7 | 9-24 |
| Low | 70-79 | 4-5 | 3-8 |
| Very Low | 69 and below | 1-3 | 2 and below |

## COGNITIVE ABILITIES

## Wechsler Adult Intelligence Scale Fourth Edition

The WAIS-4 is a formal measure of cognitive functioning comprised of four factor-based indices including Verbal Comprehension, Perceptual Reasoning, Working Memory, Processing Speed and an overarching Full-Scale Intelligence Quotient; the average range is from 90 to 109. An analysis of the various subtests comprising each portion of the test yields a profile of individual strengths and weaknesses; subtests scaled scores of 8 through 12 are considered average. The WAIS-4 has demonstrated validity and reliability for the measurement of intelligence in individuals aged 18 through Adulthood. It should be noted that intelligence tests measure only a portion of the competencies involved in human intelligence. Scores may be limited to external factors, and are considered to represent a sample of that individual's performance at that time.

| Test | Scaled Scores | Standard Scores | Percentile | Description |
|---|---|---|---|---|
| Similarities | 12 | -- | 75 | Measures verbal concept formation and abstract reasoning. It also involves crystallized intelligence, word knowledge, cognitive flexibility, auditory comprehension, long-term memory, associative and categorical thinking, distinction between nonessential and essential features and verbal expression. |
| Vocabulary | 16 | -- | 98 | Measures word knowledge and verbal concept formation. It also measures crystallized intelligence, fund of knowledge, learning ability, verbal expression, long-term memory, and degree of vocabulary development. Other abilities that may be used during this task include auditory perception and comprehension and abstract thinking. |
| Verbal Comprehension | -- | 122 | 93 | |
| Block Design | 6 | -- | 9 | Measures the ability to analyze and synthesize abstract visual stimuli. It also involves nonverbal concept formation and reasoning, broad visual intelligence, visual perception and organization, simultaneous processing, visual-motor coordination, learning and the ability to separate figure-ground in visual stimuli. |
| Visual Puzzles | 6 | | 9 | Measures mental, non-motor construction ability, which requires visual and spatial reasoning, mental rotation, visual working memory, |

| | | -- | | understanding part-whole relationships, and the ability to analyze and synthesize abstract visual stimuli. |
|---|---|---|---|---|
| Perceptual Reasoning | -- | 81 | 10 | |
| Digit Span | 7 | -- | 16 | Measures auditory rehearsal and temporary storage capacity in working memory.  Digit Span Backward involves working memory, transformation of information, mental manipulation, and may involve visuospatial imaging. |
| Arithmetic | 14 | -- | 91 | Measures mental math calculation |
| Working Memory | -- | 102 | 55 | |
| Coding | 2 | -- | 1 | Measures short-term visual memory, procedural and incidental learning ability, psychomotor speed, visual perception, visual-motor coordination, visual scanning ability, cognitive flexibility, attention, concentration, and motivation.  It may also involve visual sequential processing and fluid intelligence. |
| Symbol Search | 2 | -- | 1 | Measures visual-perceptual and decision-making speed, the subtest involves short-term visual memory, visual-motor coordination, inhibitory control, visual discrimination, psychomotor speed, sustained attention, and concentration. |
| Processing Speed | -- | 56 | 0.2 | |
| Full Scale | -- | 91 | 27 | |

The Full-Scale IQ is derived from a combination of seven subtest scores and is considered the most representative estimate of global intellectual functioning. Benjamin's full-scale IQ score fell within the average range (SS 91indicating his thinking and reasoning abilities exceed or are equal to approximately 27% of peers his age. Because there was a discrepancy between index scores, the full-scale IQ should be reported with care.

To obtain a more global perspective of Benjamin's intellectual functioning, the examiner administered additional subtests beyond the standard seven subtest battery. A total of ten subtests were given; yielding a more reliable estimate of Benjamin's cognitive processing skills within the four indices as measured by the WAIS-4.

The Verbal Comprehension Index (VCI) measures verbal abilities that utilize reasoning, conceptualization, and knowledge acquired from one's environment. The VCI measures the ability to understand and communicate using language. The VCI composite is comprised of two subtests, Similarities and Vocabulary. Benjamin's performance fell within the superior range. (SS 122).

The Perceptional Reasoning Index measures the ability to analyze and synthesize abstract visual information. Additionally, subtests are administered within a specified time limit. The VSI composite is comprised of two subtests, Block Design and Visual Puzzles. Benjamin achieved a low average score (SS 81), revealing that his ability to solve problems using visual perception and organization, mental rotation, and simultaneous processing are more developed for his age, and equal to or better than 10% of his same-age peers.

The Working Memory Index (WMI) measures the ability to hold information in immediate awareness while performing a mental operation on the presented information. This composite also taps into auditory and visual short-term and working memory, sequencing skills, attention, and concentration. The WMI composite is comprised of two subtests, Digit Span (auditory working memory) and arithmetic. Benjamin achieved an average range score, (SS 102). He did much better with arithmetic than digit span. He had difficulty sequencing information in his head, which we view as mental control which is foundation of working memory.

The Processing Speed Index (PSI) measures individuals' ability to fluently and automatically perform cognitive tasks using psychomotor speed. This index indicates the rapidity in which an individual can mentally process simple or routine visual information without making errors within a time limit. This composite is comprised of two subtests, Coding and Symbol Search. Within this domain, Benjamin achieved a score that fell within the low range (SS 56). He had particular difficulty with this index.  While he made no errors on either task, in comparison to normative sample, he performed in 0.2 Percentile in comparison to normal peers his age. Therefore, he was given extended time for this particular index and you can see how extra time affected his scores greatly.

**Processing Speed Index with Extended Time**

| | | | | |
|---|---|---|---|---|
| Processing Speed | -- | 79 | 8 | Time and Half |
| Processing Speed | -- | 92 | 30 | Double Time |
| Processing Speed | -- | 124 | 95 | Double Time and Half |

## Academic Testing
## WIAT-3

| Composite | Standard Score | Percentile | Qualitative Description |
|---|---|---|---|
| Oral language | 102 | 55 | Average |
| Total Reading | 120 | 91 | Above Average |
| Basic Reading | 129 | 97 | Above Average |
| Reading Comprehension | 108 | 70 | Average |
| Written Expression | 126 | 96 | Above Average |
| Mathematics | 133 | 99 | Superior |
| Math Fluency | 74 | 4 | Below Average |

Benjamin performed in the average to superior range for academic performance. However, for math fluency, there the client is timed on how many simple problems in division, addition and subtraction can be completed, Benjamin performed in the below average range in comparison to his superior score in mathematics which was not timed. While, he performed in average range for written expression, he was not able to complete the task within the standard time constraints. Therefore, the examiner also tested Benjamin for written expression and math fluency with extended time increments. Benjamin will benefit from using a computer to write his answers due to autism-related fine motor delays.

It must be made clear that answering multiple choice answers versus actual essay writing are different tasks. Benjamin had difficulty organizing an essay and completing all the steps. The WIAT prompt asks for Benjamin to write an essay about his favorite game and to give three reasons. In addition, he gets credit tor topic sentence, number of words, transition sentences, conclusion and elaborations to the theme. He was able to complete the essay only when he was given double time and half. It was clear he had difficulty with organizing his essay and he went through several permutations until he completed the essay. He greatly requires extra time when completing an essay. The highest level of executive functioning is required in writing an essay which include initiation, sustained attention and follow through to complete the task. Benjamin's deficits greatly impact his ability to create and write an essay when only given standard time. He psychomotor processing speed also impacts his ability to complete written tasks.

While answering multiple choice tests require visual scanning, sustained attention and psychomotor speed and memory recall, it does not require planning and organization, mental control as essay requires.

Benjamin's Autism Spectrum Disorder impacts his executive functioning particularly in planning and organization. In addition, the increase pressure of completing a thorough essay with a huge word count is greatly hampered by his poor psychomotor speed.

| | | | | |
|---|---|---|---|---|
| Essay Writing | -- | 117 | 87 | Time and Half |
| Essay Writing | -- | 138 | 99 | Double Time |
| Essay Writing | -- | 160 | 99 | Double Time and Half |

Only on double time and half, did Benjamin complete the essay with all the components.

| | | | | |
|---|---|---|---|---|
| Addition Fluency | -- | 87 | 19 | Time and Half |
| Subtraction Fluency | -- | 111 | 77 | Time and Half |
| Multiplication Fluency | -- | 110 | 75 | Time and Half |

| | | | | |
|---|---|---|---|---|
| Addition Fluency | -- | 114 | 82 | Double Time |
| Subtraction Fluency | -- | 113 | 81 | Double Time |
| Multiplication Fluency | -- | 120 | 91 | Double Time |

| | | | | |
|---|---|---|---|---|
| Addition Fluency | -- | 114 | 82 | Double Time and Half |
| Subtraction Fluency | -- | 115 | 84 | Double Time and Half |
| Multiplication Fluency | -- | 120 | 91 | Double Time and Half |

## Nelson Denny (Standard Time)

| | Percentile | Grade Level |
|---|---|---|
| Vocabulary | 42 | 14.6 |
| Comprehension | 25 | 9.3 |

## Time and Half

| | Percentile | Grade Level |
|---|---|---|
| Vocabulary | 92 | 12,8 |
| Comprehension | 50 | 10.0 |

## Double Time

| | Percentile | Grade Level |
|---|---|---|
| Vocabulary | 99 | 18.9 |
| Comprehension | 67 | 18,3 |

**Double Time and Half**

|  | Percentile | Grade Level |
|---|---|---|
| Vocabulary | 99 | 18.9 |
| Comprehension | 99 | 18,9 |

**Particularly with comprehension where there were increasingly longer and more complex passages with the increased time, Benjamin was able to perform equitably close to WIAT reading score. Attention and processing speed impact his ability to do his best on reading tasks due to Autism and extremely slow processing speed.**

**Memory WMS-IV**

| Index | Index Score | Percentile | Level \ |
|---|---|---|---|
| AMI | 93 | 32 | Average |
| VMI | 55 | .02 | Poor |
| VWM | 89 | 22 | Low Average |
| IMI | 61 | 0,5 | Poor |
| DLM | 78 | 7 | Borderline |

Benjamin performed in average range for auditory memory. However, he performed better on list learning task where there were multiple repeated trails than on task requiring the learning and recall of contextual information. It appeared that variable attention impacted his memory which would require to look over reading over and over in order for him to get the useful information. Therefore, extra time would allow Benjamin to perform adequately despite attentional and memory impairments.

Benjamin demonstrated a significant difference between auditory memory and visual memory, with cognitive testing which showed a significant difference between verbal/conceptual learning and visual/perceptual learning. Benjamin overall performed better on delayed memory than on immediate memory. This may suggest that Benjamin may need additional time to consolidate his memory for both visual and auditory inputs. Also given Benjamin's poor visual memory he needs time to process the visual words of passage into auditory mental schemas for better access to information. This slow processing time inhibits Benjamin from accessing visual information in a timely manner.

**Attention and Concentration**

| Test | Time | Level |
|---|---|---|
| Trails A | 101 seconds | Deficient |
| Trails B | 190 seconds | Deficient |

**The trail making testis neuropsychological test of visual attention and task switching. It consists of two parts in which one with just connecting numbers with ascending, and other with switching between numbers and letters. (Average is 29 seconds for Trail A, Deficient is greater than 78 seconds. For trail B Average is 75 seconds and deficient greater than 150 seconds.)**

Benjamin performed in the deficient range suggesting difficulty with visual attention and task switching which is hallmark of standardized testing, being to be able to accurate and efficient between reading a passage and answering question directly related to a passage. Benjamin will have difficulty with comprehension tasks where he will have to quickly scan over passages for relevant information.

**VISUAL SPATIAL ATTENTION TASK (STANDARD ADMINISTRATION)**

|  | PERCENTILE | LEVEL |
|---|---|---|
| **LEFT** | 1 | **EXTREMELY LOW** |
| **RIGHT** | 1 | **EXTREMELY LOW** |
| **TOTAL** | 1 | **LOW** |

**VISUAL SPATIAL ATTENTION TASK (TIME AND HALF)**

|  | PERCENTILE | LEVEL |
|---|---|---|
| **LEFT** | 1 | **EXTREMELY LOW** |
| **RIGHT** | 3 | **EXTREMELY LOW** |
| **TOTAL** | 2 | **LOW** |

**VISUAL SPATIAL ATTENTION TASK (DOUBLE TIME)**

|  | PERCENTILE | LEVEL |
|---|---|---|
| **LEFT** | 74 | **AVERAGE** |
| **RIGHT** | 61 | **AVERAGE** |
| **TOTAL** | 67 | **AVERAGE** |

**VISUAL SPATIAL ATTENTION TASK (DOUBLE AND HALF)**

|  | PERCENTILE | LEVEL |
|---|---|---|
| **LEFT** | 85 | **ABOVE AVERAGE** |
| **RIGHT** | 91 | **ABOVE AVERAGE** |
| **TOTAL** | 89 | **ABOVE AVERAGE** |

**The Visual Spatial Attention Task measures visual scanning and sustained attention. Also, the client needs to be able determine vital from unimportant information, and be able to ignore distractions. Due to Benjamin disabilities, sustained attention, and visual scanning are difficult for him and makes it hard for him in reading long passages and discerning vital information from distracting information in answering questions. Also, poor psychomotor speed impinges on his ability to perform in even average range in completing these tasks. As with all the timed tests, his scores go from extremely low range to above average when allowing for extra time.**

**Social-emotional Functioning:**
<u>SOCIO-EMOTIONAL TESTING</u>

**BEHAVIOR ASSESSMENT SYSTEM FOR CHILDREN (BASC-3)**

| T-Score Levels | | |
|---|---|---|
| **T-Score** | **Clinical Scales** | **Adaptive Scales** |

| | | |
|---|---|---|
| *70+* | Clinically Significant | Very High |
| 60-69 | At-Risk | High |
| 41-59 | Average | Average |
| 31-40 | Low | At-Risk |
| -30 | Very Low | Clinically Significant |

| **Clinical Scales** | **Description** |
|---|---|
| Aggression | *Tendency to do physical or emotional harm to others or property* |
| Anxiety | *Feelings of nervousness, worry and fear; the tendency to be overwhelmed by problems* |
| Attention Problems | *Tendency to be easily distracted and inability to maintain attention* |
| Atypicality | *Behavior considered odd or strange, such as appearing disconnected with one's surroundings* |
| Conduct Problems | *Socially deviant and disruptive behaviors: cheating, stealing, truancy, lying, running away from home, and alcohol and drug use* |
| Depression | *Feelings of unhappiness, sadness, or stress* |
| Hyperactivity | *Overly active, difficulties taking turns, rushing through work or acting without thinking* |
| Learning Problems | *Writing, reading, math or spelling difficulty* |
| Somatization | *To be overly sensitive and complain about relatively minor physical problems and discomforts* |
| Withdrawal | *Tendency to evade others, avoid social contact, lack of social interest* |
| **Adaptive Scales** | |
| Adaptability | *The ability to adjust to changes in the environment* |
| Functional Communication | *Ability to express ideas and communicate in an understandable way* |
| Leadership | *Behaviors that contribute to good community and school adaptation* |
| Social Skills | *Interpersonal skills: complimenting or encouraging others, offering help, saying "please" and "thank you"* |
| Study Skills | *Organizational skills, study skills and turning in assignments on time* |
| **Composite Scales** | *Summarize problems of behavior, personality and positive behavior* |

| | |
|---|---|
| Externalizing Problems | *Disruptive behavior problems; tend to lead toward relationship problems* |
| Internalizing Problems | *Emotional difficulties not marked by "acting-out"; inwardly focused distress* |
| School Problems | *Academic difficulties, motivational, attention, learning and cognitive problems* |

| Scale | Self-Report T – Scores |
|---|---|
| Atypicality | 64* |
| Locus of Control | 76** |
| Social Stress | 68* |
| Anxiety | 59 |
| Depression | 51 |
| Sense of Inadequacy | 65* |
| Somatization | 88** |
| Attention Problems | 69* |
| Hyperactivity | 56 |
| Sensation Seeking | 48 |
| Alcohol Abuse | 55 |
| Social Maladjustment | 47 |
| Relations with Parents | 38* |
| Interpersonal Relations | 32* |
| Self-Esteem | 58 |
| ** = Clinical          * = At Risk | |

Social/emotional functioning is consistent with his medical conditions and his diagnosis of Autism.

## SUMMARY OF RESULTS

Benjamin has average to high average cognitive ability. Verbal/conceptual skills are more developed than visual/perceptual skills. Academic Testing is from average to superior range and with exception of academic fluency tasks which are in low range

when extra time is not given. Auditory memory is more developed than visual memory. Delayed memory is better than immediate memory. Benjamin has difficulty with working memory tasks where mental control is a key feature. He has difficulty holding something in his immediate memory and working on that information to do operation on information. His delayed memory allows for memory consolidation. His attention and visual scanning are viable. Benjamin performs poorly on psychomotor speed tests. His processing speed is very poor, performing worse than 99.8% of others his age. With additional time, his performance is greatly enhanced.

The testing results taken allow for tailored measurements of the effects of the neuropsychological impairments evaluated such as to calculate the amount of extra time that, for a particular testing domain and set of other contextual factors, I'd expect to allow for his exams to measure the domains they are intended to as accurately as is possible without reflecting these adverse effects of autism. Based on the test results, this is not identical for all formats of examination, but is higher for written composition exam components than for multiple choice exam components.

The highest level of executive functioning is required in writing an essay which include initiation, sustained attention and follow through to complete the task. Benjamin's deficits greatly impact his ability to create and write an essay when only given standard time. He psychomotor processing speed also impacts his ability to complete written tasks. While answering multiple choice tests require visual scanning, sustained attention and psychomotor speed and memory recall, it does not require planning and organization, mental control as essay requires. Benjamin's Autism Spectrum Disorder impacts his executive functioning particularly in planning and organization. In addition, the increase pressure of completing a thorough essay with a huge word count is greatly hampered by his poor psychomotor speed.

Similarly, the amount of extra time calculated to achieve this effect will vary based on how that exam time is scheduled and would need to be adjusted if longer testing per day than the control variable of standard length per sitting was introduced, as impairments for these conditions will be greater the longer the standard time per sitting is for a particular exam. While autism may be considered as an aggravating factor based on sensory sensitivity to physical conditions, the extra time I recommend for autism is based on the other weaknesses, and should be additive to any extra time that may be appropriate for a distinct impairment, which would be beyond the design of the evaluations and testing I've performed to reflect, such as physical impairments and visual impairments. This is particularly important for an exam given over much longer sittings than the testing I performed.

Benjamin suffers from numerous medical conditions which impact his daily life which is magnified when he is under stress. Additionally, Benjamin has been lifelong diagnosed with Autism Spectrum Disorder, which amplifies his medical conditions. People with Autism have more difficulty with medical conditions than typically developed individuals. There is an insistence on sameness in their environment, inflexible adherence to routines, difficulties with transitions, and distress with small changes in

their environment. Benjamin tries to be flexible given the demands of the real world, but it is most difficult to not know ahead of time what is coming. He becomes easily agitated when things are not exactly like he is expecting. So, in proctoring his exam, he needs an environment which is quiet, and not overly loaded with stimuli or undue cause for anxiety. He is easily distracted by noise or other sensory input. The issues he's described with his proctor in July 2018 would affect someone with autism far worse than someone who is neurotypical. His proctor should already be aware of all of his accommodations, which standard rules and instructions they modify, and all other information necessary to administer the exam, should be instructed to refrain from unnecessary conversation on the test time clock, and should have training on working with autistic individuals. Success, with accommodations, in classroom lectures would not equate to what Benjamin would need in a time-pressured, high-stakes examination setting, and he should also be guaranteed assignment to a private test room.

He has hypersensitivity to sensory input to pain, temperature, noise, gas-bloat, and other sensory discomforts associated with his medical conditions. When he is in pain or experiencing digestive disturbances, this is exacerbated by Autism and he is unable to focus and attend when in his mind his medical symptoms becomes beyond the pale. All accommodations for physical disabilities, additional to those primarily for autism, should be considered with this information in mind, and so I second the recommendation of his PCP that the ergonomic equipment and facilities requested by his PCP be provided to him.

His attention and concentration can not be sustained for long periods of time without taking frequent breaks, and such stop-the-clock breaks should be timed around present symptoms and observed effects, along with any other considerations or symptoms from his physical medical issues, restroom needs, etc. and not be committed to a scheduled time in advance.

For these reasons, I recommend the following accommodations to "level the playing field" for Benjamin, which I believe are necessary to avoid these disability impairments adversely impacting his testing.

**Recommendations:**
- 100% extra time for autism on multiple choice exam portions if daily test time limited to standard length and extra time scheduled over proportionally more days, and 125% extra time if not so limited and scheduled; additive to any extra time recommended by other experts for visual and/or physical impairments.

- 150% extra time for autism on written composition exam portions if daily test time limited to standard length and extra time scheduled over proportionally more days, and 200% extra time if not so limited and scheduled; additive to any extra time recommended by other experts for visual and/or physical impairments.

- Frequent stop-the-clock breaks timed at Benjamin's determinations on when symptoms best justify it.

limited to standard length and extra time scheduled over proportionally more days, and 200% extra time if not so limited and scheduled; additive to any extra time recommended by other experts for visual and/or physical impairments.

- Frequent stop-the-clock breaks timed at Benjamin's determinations on when symptoms best justify it.

- Assignment to proctor who's received training on working with autistic individuals, has been instructed regarding all accommodations and how the modified exam should be administered, and who refrains from unnecessary conversation during test time.

- Access to computer to write essays.

- Private Room.

- Provision of all nonportable ergonomic equipment recommended by Benjamin's PCP, Dr. Dresden, as such is further supported by autism sensory sensitivity.

- Ability to Type Written Responses.

**DSM 5 Diagnosis**
**299.00 Autism Spectrum Disorder**
**315.8 Other Specified Neurodevelopmental Disorder (Impaired Processing Speed and Attention)**

I certify under penalty of perjury under the laws of the State of California that I have performed the above tests for Benjamin Kohn, and that all statements herein are true and accurate to the best of my knowledge and professional opinion.

Rosalie E. Toren Ph.D.

State Credentialed School Psychologist

Licensed Educational Psychologist

The contents of this report have been communicated to me, and I have received a copy of this report.

Benjamin Kohn
_____
Client's Signature

6/4/2020
_____
Date



# Neuropsychological Assessment Group
2211 Moorpark Avenue, Suite 260, San Jose, CA 95128
(877) 454-6469   www.neuropsychgroup.com

12/5/2017

To Whom it may Concern:

This letter is to confirm the results of a neuropsychological assessment for Benjamin Kohn.  All statements made here are based the these results.

Results of testing are consistent with a diagnosis of F84.00 Autism Spectrum Disorder.

Due to this Neurodevelpmental disorder, Mr. Kohn processes information and responds at a significantly slower rate than would be expected given his level of Intellectual Functioning.

In order to have an accurate assessment of what he has learned during his time in law school, he would need significantly more time to complete all parts of exams as compared to relatively neurotypical examinees.   Given his processing difficulties, Mr. Kohn will be able to respond more quickly to multiple choice responses as opposed to essay type responses

Mr. Kohn also fatigues quickly and required more than double the typical time to complete his neuropsychological assessment.  On exams that are for long duration over multiple days, Mr. Kohn will need frequent brakes and more time for each subtest.

I hereby declare, on penalty of perjury under the laws of the State of California, that the above is true and accurate to the best of my professional knowledge.


Charles Preston, Ph.D.
PSY21075
Clinical Psychologist



**THE STATE BAR OF CALIFORNIA**
**COMMITTEE OF BAR EXAMINERS/OFFICE OF ADMISSIONS**

180 Howard Street • San Francisco, CA 94105-1639 • (415) 538-2300
845 S. Figueroa Street • Los Angeles, CA 90017-2515 • (213) 765-1500

# FORM C
## TESTING ACCOMMODATIONS – SPECIFIC LEARNING DISORDER/ DISABILITY VERIFICATION

All original documents must be filed with the Office of Admissions' San Francisco Office.
(Must be completed by the applicant; please type or print legibly)

**NOTICE TO APPLICANT: This section of this form is to be completed by you.** The remainder of the form is to be completed by the qualified professional who is recommending testing accommodations for the California Bar Examination or First-Year Law Students' Examination for you on the basis of a specific learning disorder/ disability. Please read, complete, and sign below before submitting this form to the qualified professional for completion of the remainder of this form.

Applicant's Full Name: ~~Benjamin Sean Kohn~~

File Number: ~~0468532~~

        I give permission to the qualified professional completing this form to release the information requested on the form, and I request the release of any additional information regarding my disability or accommodations previously granted that may be requested by the Committee of Bar Examiners or consultant(s) of the Committee of Bar Examiners.

~~Benjamin Kohn~~
Signature of Applicant

~~7/18/2017~~
Date

## NOTICE TO QUALIFIED PROFESSIONAL:

The above-named person is requesting accommodations for the California Bar Examination or First-Year Law Students' Examination. All such requests must be supported by a comprehensive evaluation report from the qualified professional who conducted an individualized assessment of the applicant and is recommending accommodations for the examination on the basis of a specific learning disorder/disability. The Committee of Bar Examiners also requires the qualified professional to complete this form. **If any of the information requested in this form is fully addressed in the comprehensive evaluation report, you may respond by citing the specific page and paragraph where the answer can be found.** Please attach a copy of the comprehensive evaluation report and all records and test results on which you relied in making the diagnosis and recommending accommodations for the examination administered by the Committee of Bar Examiners. Your assistance is appreciated.

TA-FormC.0417

1

The Committee of Bar Examiners may forward this information to one or more qualified professionals for an independent review of the applicant's request. Print or type your responses to the items below. **Return the original of this completed form, the comprehensive evaluation report, and relevant records to the applicant for submission to the Committee of Bar Examiners.**

## I. QUALIFICATIONS OF THE PROFESSIONAL*

Name of professional completing this form:  Jodi Pinn, Ph.D., Charles Preston, Ph.D.

Address:  2211 Moorpark Avenue, suite 260, San Jose, CA 95128

Telephone:  877-454-6469          Fax:  877-454-6469

E-Mail:  neuropsychgroup@gmail.com

Occupation, title, and specialty:  Licensed Clinical Psychologists, practicing clinical neuropsychology

License Number/State:  PSY 19171    PSY 21075

*The following professionals are deemed appropriate and qualified to provide a diagnosis of specific learning disorders/disabilities: Clinical Psychologist\*\*, Neuropsychologist\*\*, Educational or School Psychologist\*\*, Educational Diagnostician, Learning Disabilities Specialist, Educational Therapist (\*\* must be licensed).*

Please describe your specialized training in the assessment, diagnosis and remediation of specific learning disorders/disabilities with the adult population. Experience in working with cultural and/or linguistically diverse populations is also essential. A minimum of three (3) years of demonstrated experience with the adult population is considered appropriate and critical:

We work in a county hospital system providing neuropsychological assessment including assessment of specific learning disorders. We do the same work in our private practice with adults and adolescents.

We serve an extremely diverse county in the San Francisco Bay area, and routinely work with individuals of various cultures, languages, and socioeconomic status. We have each been practicing more than 10 years.

## II. DIAGNOSTIC INFORMATION CONCERNING APPLICANT

1. Provide the date the applicant was first diagnosed with a specific learning disorder/disability:

   unknown

2. Did you make the initial diagnosis?   ☐ YES   ☒ NO

TA-FormC.0417

2

If no, provide the name of the professional who made the initial diagnosis and when it was made, if known. Attach copies of any prior evaluation reports, test results or other records related to the initial diagnosis that you reviewed.

Dr. Toren; no longer have access to the psychoeducational report. Will ask applicant to provide a copy.

3. When did you first meet with the applicant? _____3/22/2014_____

4. Provide the date of your last complete evaluation of the applicant: _4/26/2014_

5. Provide a concise description of your diagnosis.  Please include the specific DSM-5 (or most current edition) diagnosis:

F84.0 Autism Spectrum Disorder;

F88 Other Specified Neurodevelopmental Disorder- ( Impaired Processing Speed and Attention)

6. Describe the applicant's **current** level of functioning and the impact of any functional limitations on the applicant's major life activities.

see 2014 comprehensive report p. 3-4 "Behavioral Observations" section

p. 7-8 "Emotional Functioning" section and "Summary" section

7. Were the applicant's motivation level, interview behavior, and/or test-taking behavior adequate to yield reliable diagnostic information/test results?

[X] YES  [ ] NO

Describe how this determination was made, including whether any symptom validity tests were administered.  If such tests were not administered, please state why they were not.

Validity indices from the PAI as well as Mr. Kohn's observed level of motivation and effort were considered.

**ATTACH A COMPREHENSIVE EVALUATION REPORT.**  An applicant's specific learning disorder/disability must have been identified by an appropriate psychoeducational assessment process that is well documented in the form of a comprehensive diagnostic report. The provision of reasonable accommodations is based on assessment of the *current* impact of the disability on the specific testing activity. Although a specific learning disorder/disability normally is lifelong, the severity and manifestations can change.  The Committee of Bar Examiners generally requires documentation from an evaluation conducted within the last <u>five years</u> to establish the current impact of the disability.  **Please attach to this form a copy of the comprehensive evaluation report and all records and test results on which you relied in making the diagnosis and recommending accommodations for the**
TA-FormC.0417

3

**California Bar Examination or First-Year Law Students' Examination.**

The evaluation report should include the following:

A. an account of a thorough diagnostic interview that summarizes relevant components of the individual's developmental, medical, family, social, and educational history;

B. clear, objective evidence of a substantial limitation to learning or performance provided through assessment in the areas of cognitive aptitude, achievement, and information processing abilities (results must be obtained on standardized test(s) appropriate to the general adult population and be reported in age-based standard scores and percentiles);

C. interpretation of the diagnostic profile that integrates assessment data, background history, and observations made during the evaluation process, as well as the inclusion or ruling out of possible coexisting conditions (such as previously diagnosed psychological issues or English as a second language) affecting the applicant's performance;

D. a specific diagnostic statement, which should not include nonspecific terms such as "learning differences," "learning styles," or "academic problems"; and

E. a rationale for each recommended accommodation based on diagnostic information presented (background history, test scores, documented observations, etc.).

## III. FORMAL TESTING

It is important that the tests used in the evaluation are reliable, valid, and age-appropriate, and that the most recent edition of each diagnostic measure is used. Scores should be reported as age-based standard scores and percentiles. The following lists of tests are provided as a guide to assessment instruments appropriate for the adult population. The lists are not intended to be all-inclusive and will vary with the needs of the individual being evaluated.

1. Aptitude/Cognitive Ability

   - Wechsler Adult Intelligence Scale IV (WAIS IV, or most current version) (including IQ, index, and scaled scores)
   - Woodcock-Johnson IV (WJ IV): Tests of Cognitive Ability
   - Stanford-Binet Intelligence Scale (5th edition, or most current version)
   - Kaufman Adolescent and Adult Intelligence Test (KAIT)

Please note: The Slossen Intelligence Test and the Kaufman Brief Intelligence Test are primarily screening instruments and should not be considered comprehensive

measures of aptitude/cognitive ability.

2. Achievement

- Woodcock-Johnson IV (WJ IV): Tests of Achievement
- Wechsler Individual Achievement Test (WIAT III, or most current version)
- Scholastic Abilities Test for Adults (SATA)

Please note: The Wide Range Achievement Test: Fourth Edition (WRAT-4), the Peabody Individual Achievement Test (PIAT, PIAT-R or PIAT-R/NU), and the Nelson Denny Reading Test are not comprehensive measures of academic achievement and should not be used as sole measures in this area.

3. Information Processing

- Wechsler Memory Scale IV (WMS-IV, or most current version)
- Swanson Cognitive Process Test (S-CPT)
- Test of Adolescent/Adult Wordfinding (TAWF-2)
- Information from subtest, index, and/or cluster scores on the WAIS IV (Working Memory, Perceptual Organization, Processing Speed) and/or the Woodcock-Johnson IV (WJ IV): Tests of Cognitive Ability (Visual Processing, Short Term Memory, Long Term Memory, Processing Speed) and/or The Detroit Tests of Learning Aptitude-Adult (DTLA-4, or most current version), as well as other neuropsychological instruments that measure rapid automatized naming and/or phonological processing.

## IV. ACCOMMODATIONS RECOMMENDED FOR THE CALIFORNIA BAR EXAMINATION OR FIRST-YEAR LAW STUDENTS' EXAMINATION (check all that apply)

### FORMAT

The California Bar Examination is a timed examination administered over two days, consisting of a 3-hour morning session (9:00 a.m. to 12:00 noon) and a 3½-hour afternoon session (2:00 p.m. to 5:30 p.m.) on the first day, and two 3-hour sessions (9:00 a.m. to 12:00 noon and 2:00 p.m. to 5:00 p.m.) on the second day. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. each day. The examination is administered in a proctored setting.

The first day consists of three one-hour essay questions in the morning session and two one-hour essay questions plus one 90-minute Performance Test question in the afternoon session. The written portions of the examination are designed to assess, among other

things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The second day consists of 200 multiple-choice questions (Multistate Bar Examination or "MBE"), with 100 questions administered in the morning session and 100 questions in the afternoon session. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

The First-Year Law Students' Examination is a one-day timed examination administered in two sessions, a four-hour morning session from 8:00 a.m. to 12:00 noon and a three-hour afternoon session from 2:00 p.m. to 5:00 p.m. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. The examination is administered in a proctored setting.

The morning session consists of four one-hour essay questions. The essay questions are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The afternoon session consists of 100 multiple-choice questions. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

## SETTING

Applicants are assigned seats, two per six-foot table, in a room set for as few as 100 to 400 applicants for the First-Year Law Students' Examination to as many as 1,500 applicants for the California Bar Examination. Applicants are not allowed to bring food, beverages, or certain other items into the testing room unless approved as accommodations. All applicants may bring prescription medication. The examination is administered in a quiet environment, and applicants are allowed to use small foam earplugs. They may leave the examination room only to use the restroom or drinking fountain, within the time allotted for the test session.

Taking into consideration this description of the examination and the functional limitations that you currently experience, what testing accommodation (or accommodations, if more than one would be appropriate) are you requesting?

### Alternative Formats

☐ Audio CD version of the examination

☐ Electronic versions of the Essay and/or Performance Test questions in Microsoft Word format on CDs for use with screen-reading software

### Personal Assistance

☐ Dictate to a typist (for written sessions)

☐ Reader

☐ Assistance with multiple-choice

TA-FormC.0417

6

☐ Other: _____ answer sheet (Scantron sheet) (choose one)

☐ Permission to circle answers in question booklet

☐ Permission to dictate answers to proctor

☐ Dictate to a voice recorder (choose one)

☐ Digital voice recorder (for use with flash memory cards)

☐ Tape recorder (for use with microcassette tapes)

☐ Other: _____

## Equipment or Facility Requirements

☐ Computer *as an accommodation* (must have direct nexus to the effects of the disability)

☐ with SofTest installed

☐ with voice-recognition software (e.g., Dragon Naturally Speaking) installed

☐ with screen-reading software (e.g., JAWS) installed

☐ with other (specify): _____

☐ Special equipment (specify): _____

☐ Private room

☐ Semi-private room

☐ Wheelchair accessibility (if table, specify height): _____

☐ Other: _____

Please provide a rationale for each request indicated above (attach additional sheets if necessary):

_____
_____
_____
_____
_____
_____

## Accommodation of Extra Time

Specify the amount of **extra time** requested for each session of the examination. Indicate why the specified extra time is needed (based on the diagnostic evaluation), provide the rationale for requesting the amount of time for each test format of the examination, and explain how you arrived at the specific amount of extra time requested. If either the amount of time or your rationale is different for different portions of the examination, please explain. **All requests for extra time must specify the exact amount of extra time. It is important to keep in mind that breaks are included in the timed portion of the examination. No accommodation of unlimited time will be granted. If extra testing time is requested, but the specific amount of extra time is not indicated, the petition will be returned as incomplete.**

**California Bar Examination: Essay Questions 1, 2 & 3 (standard session is 3 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

additional 1.5 hours (50%) due to significantly slow processing speed

**California Bar Examination: Essay Questions 4 & 5, and Performance Test (standard session is 3 hours and 30 minutes):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

additional 1.75 hours (50%) due to significantly slow processing speed

**California Bar Examination: Multistate Bar Examination - MBE (each standard session is 3 hours):** Specify the amount of extra test time needed <u>for each MBE session</u> and provide the rationale:

additional 1.5 hours (50%) for each session due to significantly slow processing speed

**First-Year Law Students' Examination: Essay Questions 1, 2, 3 & 4 (standard session is 4 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

**First-Year Law Students' Examination: Multiple-Choice (standard session is 3 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

**Explanations:** (attach additional sheets if necessary)

## V. PRIOR HISTORY AND PAST ACCOMMODATIONS

Please describe any previously documented history of specific learning disorders/disabilities and list accommodations that have been granted to the applicant in the past:

see 2014 comprehensive report p. 1 paragraph 4 - p.2 paragraph 1

In addition, he was granted accommodations of 50% extra time on the LSAT based on the 2014 report & diagnoses

## VI. CONFIDENTIALITY

Confidentiality policies of the Committee of Bar Examiners/Office of Admissions of the State Bar of California will be followed regarding its responsibility to maintain confidentiality of this form and any documents submitted with it. No part of the form or the accompanying medical documentation will be released without the applicant's written consent or under the compulsion of legal process.

## VII. CLINICIAN/LICENSED PROFESSIONAL'S SIGNATURE

I am submitting the **original** of this form and have attached copies of the comprehensive evaluation report and all records and test results that I relied upon in making this diagnosis of the applicant's condition/disability (notes and worksheets are not required as part of this submission) and completing this form. I understand that all original documents submitted become the property of the Committee of Bar Examiners.

I declare under penalty of perjury under the laws of the State of California that the above information is true and correct.

_____          7/18/17
(Signature of Licensed Professional)                      *(Date)*

The Committee of Bar Examiners reserves the right to make final judgment concerning testing accommodations and may have all documentation related to this matter reviewed by an individual professional consultant or a panel of professional consultants if deemed necessary.

Mr. Benjamin Kohn

# NEUROPSYCHOLOGICAL ASSESSMENT GROUP

**1475 SARATOGA AVENUE–SUITE 170**
**SAN JOSE, CA 95129–WWW.NEUROPSYCHGROUP.COM–(877)454-6469**

## Report of Results of Neuropsychological Evaluation

**Name:** Mr. Kohn      **Date of Report:** 4/1/14
**Age:**      **Date(s) Tested:** 3.22.14; 3.26.14
**Date of Birth:** 12/29/1993      **Duration of Assessment:** 10 hours Face to Face
**Examiner:** Charles J. Preston, Ph.D.

**Background & Reason for Referral:** Mr. Kohn is a 20-year-old, white, Caucasian, English-speaking male. He is currently an undergraduate student, pursuing a Bachelor's of Science degree in Business Administration Marketing at San Jose State University. Mr. Kohn is in his second year of studies and currently lives on campus. He was self-referred for testing to assess his current level of psychoeducational functioning pursuant to an application for accommodations on the LSAT and GMAT. He requested documentation of disability that would qualify him for extra time on these standardized tests.

**Identifying Information/History:** (*The following information was derived from Mr. Kohn during clinical interview; additional information was obtained from a report of previous evaluation.*)

Mr. Kohn was born in Los Gatos, California to married parents, the eldest of 2 boys. He reported that he was born prematurely, but without complications or medical problems. He had some early childhood delays including being late to walk and talk, some hearing problems, and "low percentile with muscle strength". He was diagnosed with Asperger's Syndrome at age 5 or 6 at Stanford University Hospital. He reported additional diagnoses of Myofascial Pain Syndrome and Eczema. His mother stayed at home when he and his brother were young, but currently teaches Sign Language and helps translate. She has a Masters degree and teaching credential. His father is an engineer, and also has a Masters degree. He described a generally good relationship with his parents. He and his brother share an interest in the trading card game, Magic; and he reports that they generally get along.

Mr. Kohn is single, has never been married or in a romantic relationship, and has no children.

Mr. Kohn received special education resources throughout his education, beginning in preschool. As per previous report in 2010, he received physical therapy and speech/language support. He also was treated at the Michelle Garcia Winner's Center for Social Thinking, and continued private physical therapy to improve muscle strength and coordination. He reported that he is the only one in his family to have been diagnosed with a learning disability. He was on an Individualized Education Plan (IEP)

through high school, and got extended time for tests. He also attended study hall with "special help". He did well in his regular and Advanced Placement (AP) classes, earning mostly A's & B's and a couple C's. In college he also is granted extended time for testing, and is achieving C's in classes with memorization. He gets mostly B's and some A's when interested in the class. He has a 3.80 GPA in Business classes, and has a 3.00 cumulative GPA.

Mr. Kohn first worked during high school summer breaks in a game store where he sorted Magic cards. More recently he started his own investments barter business, since he is not a licensed investor. He noted that he makes significant income from his own investing, which he began at age 18. Before that he made money with collectables.

Mr. Kohn denied any legal history, arrests, or jail time. He reported he has "a sip" of wine on special occasions with his parents' consent. He denied tobacco use, illicit substance use, prescription medication abuse, or substance abuse treatment. He also denied any history of trauma or abuse.

Mr. Kohn reported a family medical history positive for Diabetes (maternal grandmother, paternal uncle), Alzheimers Disease (paternal grandmother), Heart Disease (maternal grandmother), Cancer (grandparents, Leukemia, Lung; aunt, Breast), Developmental Disability (maternal great uncle), Depression (mother, diagnosis unknown), and Schizophrenia (maternal uncle). He denied a childhood history of major illness, but has been on medications since childhood for allergies and eczema. He also had "motor issues", sleep apnea, and repeated ear infections which resulted in him having his adenoids removed and tubes placed.

Mr. Kohn wears glasses when working at the computer and reported that he may need them daily. He believes his hearing is less than average. He is currently prescribed: Xolair (Omalizumab) injection every 28 days for allergies, Vicodin PRN for pain related to mouth ulcers, and Modafinil (Provigil)200mg/day for allergies and help with attention. He also has an Epi pen for use PRN for fish allergy, and takes supplements, probiotics, Lutein, Allegra, and Benadryl over-the-counter.

He sought treatment for depression in 10th grade and tried different medications. He noted that Prozac made him "feel depressed". He denied all other psychiatric symptoms in interview, however on a written intake form he endorsed having experienced extreme depressed mood, extreme mood swings, rapid speech, extreme anxiety, panic attacks, phobias (stinging insects), repetitive thoughts, repetitive behaviors, and sleep disturbance in the past.

Mr. Kohn denied a history of head injury or any other significant accident or injury.

Mr. Kohn denied having serious memory problems, noting that his memory is "good for certain things". He reported problems with attention/concentration, visual spatial abilities, and getting lost if distracted. He noted that he is good at problem-solving, but bad at multi-tasking. He feels that he has "less than average" social skills.

## Behavioral Observations:
Mr. Kohn was oriented to person, place, time, and purpose for both testing sessions. He was casually dressed. Speech was monotone and speech flow was mechanical; content was concrete, direct and void of elaboration. When test instructions directed him to repeat back stimuli exactly as the administrator presented it, he would parrot back responses with exact timing, rhythm and inflection. He made

minimal eye contact. His mood was reported as "fine", affect was flat. Thought processes were focused on completing tasks. Many times he expressed concern about the testing being completed in a time limit. He requested one break during which he remained in his chair answering emails on his phone. He requested a second break shortly after, however this was in the middle of administration of tasks that incorporated a built in time-delay, so his request was denied. He became agitated, which affected his focus on the next several tasks. Due to his testing behavior, notable for significantly slow (> 2 SD) processing speed, he took several hours more time than usual to complete testing.

Mr. Kohn displayed stereotypical movements including picking at his clothes, and twirling his hair, while completing complex problems. While he was able to manipulate solid objects (blocks), and correctly complete designs, he was extraordinarily slow. Mr. Kohn denied current or past suicidal and homicidal ideation.

**Validity Statement:**
Based on the level of effort exerted, and the seriousness with which he approached the assessment, results of testing are considered to be a valid and accurate representation of Mr. Kohn's current psychological and cognitive functioning.

**Tests Administered:**
Clinical Interview and Review of Previous report
Wechsler Adult Intelligence Scale-fourth edition (WAIS-IV)
Wechsler Memory Scale-fourth edition (WMS-IV)
Wechsler Individual Achievement Test-third edition (WIAT-III)
Visual Search and Attention Test (VSAT)
Delis Kaplan Executive Function System (DKEFS) Trails 1-5
Personality Assessment Inventory (PAI)

**Test Results:**

**1. Attention/Concentration:**

Mr. Kohn demonstrated variable attention. His scores ranged from Average to the Extremely Low Range. His attention fluctuated throughout this evaluation, with scores on particular types of tests Within Normal Limits for one task, then impaired on the next (e.g. Visual Scanning Average; then Symbol Search in the Borderline Range). It should be noted that Mr. Kohn took his ADHD medication on both testing dates. Therefore, results of attention testing are considered his best possible performance.

| Test | Subtest | Standard Score | Level of Intellectual Functioning |
|------|---------|----------------|-----------------------------------|
| WAIS-IV | Digit Span | 85 | Low Average Range |
| WAIS-IV | Cancellation | 75 | Borderline Range |
| DKEFS | Visual Scanning | 95 | Average Range |
| DKEFS | Number Sequencing | 85 | Low Average Range |
| DKEFS | Letter Sequencing | 85 | Low Average Range |

| DKEFS | Number-Letter Switching | 80 | Low Average Range |
|-------|------------------------|-----|---------------------|
| DKEFS | Motor Speed | 56 | Extremely Low Range |
| VSAT | Left | 65 | Extremely Low Range |
| VSAT | Right | 65 | Extremely Low Range |
| VSAT | Total | 65 | Extremely Low Range |

\* Fluctuating/impaired attention may influence performance on all measures administered. Therefore, results should be interpreted with this caveat in mind.

## 2. Intellectual Functioning:

Current intellectual functioning was measured by the WAIS-IV. Subtests were administered in the standard way in accordance with normative administration; after standardized administration, a process approach was utilized in order to test limits. This allows for evaluation of whether extended time and/or discontinuation thresholds results in higher scores on items. Mr. Kohn's Full Scale IQ fell in the Average Range for both standard and process approach administrations. Due to the extreme scatter in scores among all subtest scores, this Full Scale IQ score is not considered a true or valid measure of his actual intellectual functioning. There was a significant difference between Mr. Kohn's Verbal Comprehension Index (VCI) and Perceptual Reasoning Index (PRI) scores, with the VCI in the High Average Range, and his PRI in the Low Average Range. This suggests that his FSIQ is an underestimate of true intelligence. This discrepancy was magnified with the process approach administration, resulting in a VCI in the Superior Range, and a PRI at the very bottom of the Average Range. His Processing Speed Index (PSI) was the most discrepant, falling in the Borderline Range. His Working Memory Index (WMI) was in the High Average Range, consistent with his VCI.

Mr. Kohn's highest subtest score was on Vocabulary, and was in the Very Superior Range. Arithmetic was the next highest score and was likewise in the Very Superior Range. Both were obtained via standard administration. Vocabulary, often used alone as an indicator of overall intelligence, is considered a "hold" test, in that it remains relatively stable throughout one's lifetime, and is resistant to decline even in cases of neurological disease or damage. Therefore, Mr. Kohn's Very Superior score on Vocabulary is suggestive of extraordinarily high intelligence. His lowest subtest score was in the Borderline Range on two measures of visual attention and processing speed.

His pattern of performance, with significantly low processing speed and perceptual reasoning skills relative to his Vocabulary and other verbal performance, is indicative of learning disability or another neurological anomaly as a contributing factor to lowered overall intellectual functioning. Based on his VCI score in the High Average Range, and process approach score in the Superior Range of functioning, scores on subsequent tests are expected to fall in at least the High Average Range.

| Test | Index | Index Score | Level of Intellectual Functioning |
|------|-------|-------------|-----------------------------------|
| **WAIS-IV** | Full Scale IQ | 98 | Average Range |
| | VCI | 118 | High Average Range |
| | PRI | 86 | Low Average Range |
| | WMI | 111 | High Average Range |
| | PSI | 76 | Borderline Range |

### 3. Memory: (Auditory & Visual)

Mr. Kohn demonstrated a significant difference between auditory and visual memory functioning, with severe impairment on visual memory tasks requiring visual attention, visual working memory, and recall. Auditory (verbal) memory was in the Average Range. Specific results are discussed below.

Auditory Memory: Mr. Kohn's Auditory Memory Index (AMI) was in the Average Range. He scored in the Superior Range on a measure requiring learning and recall of contextual information (Logical Memory). He scored in the Average Range on a list-learning task which employed the use of paired words as a means of cueing recall.

Visual Memory: Mr. Kohn's Visual Memory Index (VMI) was his lowest index score, falling in the Extremely Low Range. On the Designs I task, he requested a rest break, was told he needed to continue and he became frustrated and appeared less focused than on previous tasks. Therefore, he was unable to learn geometric designs for immediate or delayed recall, and scored in the Profound Impairment Range. He also had difficulty reproducing and later recalling geometric drawings.

Visual Working Memory: Mr. Kohn's second lowest index score, also in the Extremely Low Range, was on the Visual Working Memory Index (VWMI). He had trouble on both subtests that comprise this Index; both subtests require visual attention and working memory.

Immediate Memory: The Immediate Memory Index (IMI) is made up of subtests in which auditory or visual information is initially learned and recalled. He scored in the Low Average Range on the index, but had significant scatter between subtest scores that comprise the index, with a score in the Superior Range on a verbal measure, and a score in the Extremely Low Range on a visual measure.

Delayed Memory: The Delayed Memory Index (DMI) is made up of subtests in which previously learned auditory or visual information is recalled after a time delay. He scored in the Low Average Range on the index, but again had significant scatter between subtest scores that comprise the index, with substantially better scores on verbal measures, and significant impairment on visual measures.

| Test | Index | Index Score | Level of Functioning |
|------|-------|-------------|----------------------|
| WMS-IV | AMI | 107 | Average Range |
| | VMI | 57 | Extremely Low Range |
| | VWMI | 63 | Extremely Low Range |
| | IMI | 81 | Low Average Range |
| | DMI | 81 | Low Average Range |

### 4. Achievement:

Achievement in areas taught and learned via formal education was measured by the WIAT-III. Total

Mr. Benjamin Kohn

Achievement Composite Standard Score was in the High Average Range. Composite Scores varied significantly, with scores ranging from the Average Range to the Very Superior Range. There was scatter among subtest scores as well. Lower subtest scores are likely related to the requirement of speed, visual processing or attention on these measures which were timed.

Mr. Kohn demonstrated Very Superior mastery of Mathematics. His highest score on the WIAT-III was on the Math Problem Solving subtest (Very Superior Range). His Numerical Operations score was in the Superior Range. Lower composite scores (Average Range) were obtained on Math Fluency, Reading Comprehension & Fluency, and Total Reading. His performances on the Math Fluency subtests: Addition, Subtraction and Multiplication were all in the Average Range, likely lowered by the requirement of speed or visual processing or attention on these measures which were timed. This is in contrast to his exceptional Math Problem Solving performance which was untimed.

His Oral Reading Fluency and Reading Comprehension subtest scores were also in the Average Range. Word Reading and Pseudoword Decoding scores, the remainder of the Total Reading Composite, were in the High Average Range. His remaining Composite scores, Oral Language, Basic Reading, and Written Expression, were in the High Average Range. He performed in the Superior Range on the Spelling subtest which is one of the subtests that makes up the Written Expression composite.

| Test | Composite | Standard Score | Level of Functioning |
|------|-----------|----------------|----------------------|
| WIAT-III | Total Achievement | 116 | High Average Range |
| WIAT-III | Oral Language | 115 | High Average Range |
| WIAT-III | Total Reading | 107 | Average Range |
| WIAT-III | Basic Reading | 116 | High Average Range |
| WIAT-III | Reading Comp & Fluency | 98 | Average Range |
| WIAT-III | Written Expression | 110 | High Average Range |
| WIAT-III | Mathematics | 131 | Very Superior Range |
| WIAT-III | Math Fluency | 99 | Average Range |

The Nelson-Denny Reading Test was also administered as per LSAT requirements. Results indicate that under extended time administration scores for Vocabulary increased from the 12th percentile rank to the 56th percentile rank. When given more than 50 percent additional time, Mr. Kohn was able to achieve a score at the 63rd percentile rank.

For the Comprehension subtest, Mr. Kohn was able to achieve a reading rate at the 13th percentile. His Comprehension score for the regular administration was at the 36th percentile. With additional time, he was able to improve his score by over 1 standard deviation to the 48th percentile.

By having additional time, his scores on Comprehension were much closer to the scores he was able to achieve on the untimed Reading Comprehension subtest of the WIAT-III.

| Nelson-Denny | Number of Items attempted | Raw Score | Scale Score | Grade Equivalent | Grade 14 end of year Percentile Rank | Grade 13 Beginning of the year Percentile Rank |
|--------------|---------------------------|-----------|-------------|------------------|--------------------------------------|------------------------------------------------|
|  |  |  |  |  |  |  |
| Vocabulary |  |  |  |  |  |  |

| | | | | | | |
|---|---|---|---|---|---|---|
| Score at 15mins (Regular Administration) | 41 | 40 | 193 | 10.5 | 12 | 28 |
| Score at 24 mins (Extended Time Administration) | 76 | 67 | 230 | 15.4 | 56 | 79 |
| Score at end of Test (25 mins) | 80 | 70 | 234 | 16.1 | 63 | 84 |
| | | | | | | |
| Comprehension | | | | | | |
| 1 min reading rate | | 164 | 183 | | 13 | 19 |
| Score at 20 mins (Regular Administration) | 28 | 52 | 213 | 13.7 | 36 | 55 |
| Score at 32 mins (Extended Time Administration) | 38 | 66 | 221 | 14.7 | 48 | 65 |
| Score at end of test (30 mins) | 38 | 66 | 221 | 14.7 | 48 | 65 |
| | | | | | | |
| Total Score (Regular Administration) | 80 | 92 | 204 | 12.3 | 22 | 42 |
| Total Score (Extended Time Administration) | 38 | 133 | 227 | 15.1 | 51 | 73 |
| Total Score (End of test total time= 55 mins) | 38 | 136 | 231 | 15.8 | 58 | 79 |

## 5. Emotional Functioning:

Mr. Kohn was administered the PAI, a self-report measure of past and current psychiatric symptoms. His profile pattern indicates that he responded in a forthcoming manner. His interpersonal style can be best characterized as remote and somewhat controlling. He is not likely to be very interested or invested in social relationships. His relationships are likely to be pragmatic and business-like. He is probably skeptical of close relationships, and will be disinterested in any commitment to them. This is congruent with his report of his social functioning during interview. Mr. Kohn's profile pattern was negative for all other psychiatric concerns. He reported in interview that

## Summary:

Mr. Kohn is a 20-year-old, Caucasian male. He has 14 years of formal education and speaks English as his primary language. Mr. Kohn currently lives on the SJSU campus where he is pursuing his Bachelor's degree. He was self-referred for testing to assess his current level of psychoeducational functioning pursuant to an application for accommodations on the LSAT and GMAT. He requested documentation of disability that would qualify him for extra time on these standardized tests.

- Mr. Kohn has *variable attention*. Impaired/ fluctuating attention may influence performance on all measures administered. Therefore, results should be interpreted with this caveat in mind.

- Results of intellectual functioning test were uninterruptable due to the large amount of scatter within and between subtests and index scores. Given his Very Superior score on Vocabulary, it

Mr. Benjamin Kohn

is likely his intellectual functioning falls between the High Average and Very Superior Range. His scores on timed tasks on the WAIS-IV were negatively impacted by his slow processing speed.

- Mr. Kohn achieved significantly lower scores on timed tasks versus similar untimed tasks. He demonstrated *impairments on measures requiring attention and speed*. He did not make errors but processing speed was slow.

- Mr. Kohn demonstrated *variable fluency functions*. Fluency was impaired by slow processing speed and possibly inattention.

- Mr. Kohn demonstrated a concrete conceptualization when inferring meaning from ambiguous materials. This is likely related to his Asperger's diagnosis. This prevents him from grasping full meaning from written and verbally presented information.

- During testing sessions, Mr. Kohn reported a euthymic mood and displayed flat affect. He denied all other current psychiatric symptoms.

**Recommendations:**

1. 100 % Extended time on testing and assignments
2. Quiet, distraction free testing environment
3. Provide sufficient time to copy visually presented class/lecture materials
4. Access to instructor lecture notes
5. Class/testing seating to facilitate focused attention and concentration

**DSM 5 Diagnosis:**

299.00 Autism Spectrum Disorder
315.8 Other Specified Neurodevelopmental Disorder- ( Impaired Processing Speed and Attention)


Charles Preston, Ph.D.
PSY 21075

Jodi Pinn, Ph.D.
PSY19171

Mr. Benjamin Kohn

Summary of Scores

| WAIS-IV | | |
|---|---|---|
| Subtest | Scaled Score | Percentile |
| Block Design | 6 | 9 |
| Similarities | 8 | 26 |
| Digit Span | 7 | 16 |
| Matrix Reasoning | 11 | 64 |
| Vocabulary | 19 | 99.9 |
| Arithmetic | 17 | 99.1 |
| Symbol Search | 5 | 5 |
| Visual Puzzles | 6 | 9 |
| Information | 13 | 84 |
| Coding | 6 | 9 |
| Cancellation | 5 | 5 |
| Index | | |
| FSIQ | 98 | 45 |
| VCI | 118 | 88 |
| PRI | 86 | 18 |
| WMI | 111 | 77 |
| PSI | 76 | 5 |
| | | |
| WMS-IV | | |
| Subtest | Scaled Score | |
| Logical Memory I | 14 | 91.2 |
| Logical Memory II | 14 | 91.2 |
| Verbal Paired Associates I | 8 | 26 |
| Verbal Paired Associates II | 9 | 36 |
| Designs I | 1 | 0.17 |
| Designs II | 2 | .4 |
| Visual Reproduction I | 6 | 9 |
| Visual Reproduction II | 4 | 2.3 |
| Spatial Addition | 5 | 5 |
| Symbol Span | 3 | 0.9 |
| Index | Index Score | |
| AMI | 107 | 68 |
| VMI | 57 | 0.25 |
| VWMI | 63 | 1 |
| IMI | 81 | 10 |
| DMI | 81 | 10 |
| | | |
| WIAT-III | | |

Mr. Benjamin Kohn

| Subtest | Standard Score | Percentile |
|---|---|---|
| Listen Comprehension | 109 | 73 |
| Reading Comprehension | 100 | 50 |
| Math Problem Solving | 132 | 98 |
| Sentence Composition | 102 | 55 |
| Word Reading | 110 | 75 |
| Wssay Composition | 102 | 55 |
| Pseudoword Decoding | 119 | 90 |
| Numerical Operation | 125 | 95 |
| Oral Expression | 117 | 87 |
| Oral Reading Fluency | 97 | 42 |
| Spelling | 120 | 91 |
| Math Fluency-Addition | 91 | 27 |
| Math Fluency-Subtraction | 103 | 58 |
| Math Fluency-Multiplication | 103 | 58 |

| Composite | Standard Score | |
|---|---|---|
| Total Achievement | 116 | 86 |
| Oral Language | 115 | 84 |
| Total Reading | 107 | 68 |
| Basic Reading | 116 | 86 |
| Reading Comp & Fluency | 98 | 45 |
| Written Expression | 110 | 75 |
| Mathematics | 131 | 98 |
| Math Fluency | 99 | 47 |

| DKEFS Trail Making Condtion | Scaled Score | |
|---|---|---|
| Trail Making-Visual Scanning | 9 | 36 |
| Trail Making-Number Sequencing | 7 | 16 |
| Trail Making-Letter Sequencing | 7 | 16 |
| Trail Making-Number -Letter Switching | 6 | 9 |
| Trail Making-Motor Speed | 1 | 0.17 |

| Visual Search and Attention Test | Left =1st Percentile | Right= 1st percentile | Total= 1st percentile |
|---|---|---|---|

| Nelson-Denny | Number of Items attempted | Raw Score | Scale Score | Grade Equivalent | Grade 14 end of year Percentile Rank | Grade 13 Beginning of the year Percentile Rank |
|---|---|---|---|---|---|---|
| | | | | | | |
| Vocabulary | | | | | | |

Mr. Benjamin Kohn

| | | | | | | |
|---|---|---|---|---|---|---|
| Score at 15mins (Regular Administration) | 41 | 40 | 193 | 10.5 | 12 | 28 |
| Score at 24 mins (Extended Time Administration) | 76 | 67 | 230 | 15.4 | 56 | 79 |
| Score at end of Test (25 mins) | 80 | 70 | 234 | 16.1 | 63 | 84 |
| | | | | | | |
| Comprehension | | | | | | |
| 1 min reading rate | | 164 | 183 | | 13 | 19 |
| Score at 20 mins (Regular Administration) | 28 | 52 | 213 | 13.7 | 36 | 55 |
| Score at 32 mins (Extended Time Administration) | 38 | 66 | 221 | 14.7 | 48 | 65 |
| Score at end of test (30 mins) | 38 | 66 | 221 | 14.7 | 48 | 65 |
| | | | | | | |
| Total Score (Regular Administration) | 80 | 92 | 204 | 12.3 | 22 | 42 |
| Total Score (Extended Time Administration) | 38 | 133 | 227 | 15.1 | 51 | 73 |
| Total Score (End of test total time= 55 mins) | 38 | 136 | 231 | 15.8 | 58 | 79 |

| PAI | | | |
|---|---|---|---|
| Scale | T-Score | Scale | T-Score |
| ICN | 61 | BOR | 48 |
| INF | 67 | ANT | 51 |
| NIM | 47 | ALC | 41 |
| PIM | 45 | DRG | 52 |
| SOM | 77 | AGG | 56 |
| ANX | 58 | SUI | 45 |
| ARD | 57 | STR | 48 |
| DEP | 58 | NON | 56 |
| MAN | 65 | RXT | 48 |
| PAR | 52 | DOM | 58 |
| SCZ | 64 | WRM | 30 |

Charles Preston, Ph.D.
PSY 21075

Jodi Pinn, Ph.D.
PSY19171



## CONFIDENTIAL
### Psychoeducational Evaluation

**Name:** Benjamin Kohn
**Date of Birth:** 12/29/93
**Examiner: Rosalie Toren**
**Grade:** 9

**Date of Testing**: 12/1/2010
**Date of Report:** 12/10/10
**Age:** 16-11
**Sex:** Male

### <u>REASON FOR EVALUATION:</u>
Benjamin was tested to determine the difference between his performances on academic tests for times versus untimed tests.

### <u>METHOD OF EVALUATION:</u>
Student Interview
Review of Records
Woodcock Johnson Tests of Achievement

### <u>BACKGROUND INFORMATION:</u>
**Family Background**
Benjamin lives with his parents and younger brother in an English speaking house. His father works as an engineer and his mother was trained as a special education teacher, who made a decision to be "a stay at home mom."

**Health and Medical History and Psychological History**
. Current overall health is reported to be good. His vision and hearing are within normal limits. Benjamin was the product of normal pregnancy and delivery. He was in good health at birth. However, in early childhood he exhibited eczema, allergies, hypotonicity, frequent vomiting after feedings, and frequent ear and sinus infections which resulted with tubes being placed in his ears at 18 months and not removed until he was four and half years of age.

Concerns about his development occurred in preschool. He showed difficulty with attention, following directions, socializing, fine/gross motor development, fears and obsessions and repetitive behaviors and preoccupations. Benjamin was initially diagnosed with ADHD and then Nonverbal Learning Disability, but later the diagnosis was changed to Aspergers's Disorder.

**Educational History**
Benjamin attends Mountain High School as junior. He takes Trig/Math Analysis, Learning Skills, Physics, US History, American Lit Honors and Crossroads P.E. He began receiving special education services since preschool. In addition to resource support, he has received physical therapy and speech and language support. He received support from Michelle Garcia Winner's Center for Social Thinking and he receives private physical therapy to improve muscle strength and coordination.

Psy 21581
LEP
ABSNP
650 833-8834

**BEHAVIORAL OBSERVATIONS AND CLINICAL INTERVIEW:**
Benjamin came willingly to testing and was cooperative throughout. He was able to establish a rapport. He applied himself fully to most tasks and results are considered to be a valid representation of his abilities. He presents as a very polite and motivated student. He showed good persistence on all tasks.

Benjamin believes he is auditory learner, which the testing supports. He enjoys playing Magic Gathering a card game, and is interested in hypnosis and psychology. He is interested in majoring in psychology in school and eventually getting an MBA.

## Prior Testing:

## Academic Abilities (Administered by Lori Johnson 12/08)

**Wechsler Individual Achievement Tests**

| | |
|---|---|
| Word Reading | 109 |
| Reading Comp | 130 |
| Pseudoword Decoding | 110 |
| Reading Composite | 121 |
| | |
| Math Composite | 134 |
| Numeric Operations | 135 |
| Math Reasoning | 122 |
| Writing Composite | 119 |
| Spelling | 113 |
| Writing Samples | 119 |

Benjamin performs in the average to superior range for reading, writing and mathematics.

## Cognitive Abilities (Administered by Angela Tamada 10/06)

**Wechsler Intelligence Test for Children (WISC-IV)**
The WISC-IV provides a measure of general intellectual functioning, and four index scores. The four index scores include Verbal Comprehension, The Perceptual Reasoning Index, Working Memory and Processing Speed Index. The VCI is composed of subtests measuring verbal abilities utilizing reasoning, comprehension, and conceptualization. The PRI is composed of subtest measuring perceptual reasoning and organization. The WMI

2

is composed of subtests, which measure attention, concentration, and working memory. The PSI is composed of subtests that measure mental and graphomotor processing.

**Composite Scores Summary**

| Scale | Composite Score | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|
| Verbal Comprehension (VCI) | 128 | 97 | 122-132 | Superior |
| Perceptual Reasoning (PRI) | 96 | 39 | 91-101 | Average |
| Working Memory (WMI) | 102 | 55 | 97-107 | Average |
| Processing Speed (PSI) | 80 | 9 | 73-91 | Low Average |
| Full Scale (FSIQ) | 105 | 63 | 100-110 | Average |

A significant discrepancy is noted between his Verbal Comprehension and Perceptual Reasoning making his Full Scale IQ an invalid indice to measure his cognitive testing. Benjamin'strengths lies in verbal/ conceptual skills. He is less adept at visual/perceptual skills. His working memory is in the average range and his processing speed is in the low average range. His low score in processing will make it difficult to focus on lectures and to take adequate notes. He will have difficulty copy off boards and overheads. He definitely needs extra time to complete writing assignments or any task requiring paper and pencil skills.

## PROCESSING SKILLS:
### Test of Auditory Processing Skills- Third Edition (Administered by Shady Allen 12/08)

The Test of Auditory Processing Skills is an individually administered assessment of auditory skills necessary for development use, and understanding of language commonly utilized in academic and everyday activities. The test measures phonemic skills, auditory memory and auditory cohesion (reasoning).

| | Scaled Scores | Percentile |
|---|---|---|
| Word Discrimination | 10 | 50 |
| Phonological Segmentation | 9 | 37 |
| Phonological Blending | 7 | 16 |
| Number Memory Forward | 7 | 16 |
| Number Reversed | 5 | 5 |
| Word Memory | 9 | 37 |
| Sentence Memory | 5 | 5 |
| Auditory Comprehension | 8 | 25 |
| Auditory Reasoning | 13 | 84 |
| Auditory Memory | 83 | 13 |
| Phonologic | 91 | 30 |
| Cohesion | 103 | 58 |

| Overall | 91 | 30 | |
|---------|-----|-----|---|

Overall, Benjamin performed in the average range. He performed adequately on phonemic awareness and auditory reasoning. However, he shows a definite weakness in auditory memory will impact his ability to retain information from lectures readily.

### Beery-Bukentica Developmental Test of Visual Motor Integration Skills. (VMI)
### Standard Score 88    Percentile 21 Classification Low Average

Consist with the Processing Speed test of WISC-III; he performed in low average range for visual motor skills.  It was noted by examiner, he had somewhat awkward grip, had some directionality issues, and had unique system of replicating the designs.

### PRESENT TESTING:
### WOODCOCK TESTS OF ACHIEVEMENT

The **Woodcock Johnson Tests of Achievement-III (WJ-3)** is a standardized achievement test that assesses a child's academic functioning in the areas of reading, math, written language and broad knowledge.  The information derived from the WJ-3 is most relevant for determining educational progress and the presence of intra-achievement discrepancies and learning difficulties.

| Subtests | Standard Scores | Percentile | Range | Grade |
|----------|-----------------|------------|-------|-------|
| *Subtest Scores* | | | | |
| Passage Comprehension | 109 | 73 | 104-114 | >18 |
| Reading Fluency | 97 | 42 | 93-100 | 10.3 |
| Calculation | 116 | 86 | 112-120 | >18 |
| Applied Problems | 115 | 84 | 112-118 | >18 |
| Math Fluency | 108 | 70 | 105-110 | 13.9 |
| Writing Fluency | 89 | 23 | 83-94 | 7.0 |
| Writing Samples | 114 | 82 | 107-121 | >18 |

Benjamin showed a significant discrepancy between his timed tests and non-timed tests: Reading Fluency 96 Reading/ Comprehension 109 Math Fluency 108/ Calculation 116. Applied Problems 115. Written Fluency 89/ Writing Samples 114.  In addition, Written Fluency is in the low average range consistent with his processing speed.  He showed the most difficulty with eye hand coordination in constructing his sentences on paper and getting his ideas on paper. He made several elementary errors inconsistent with higher cognitive processing. This verifies that he definitely needs extra time to complete academic tasks (particularly written work) in a timely and efficient manner that is representative of his cognitive level.

### SUMMARY AND CONCLUSIONS:

Benjamin a cooperative and pleasant young man diagnosed with Asperger's and showing aspects of Executive Functioning Disorder was further testing in fluency with tasks.  The present is testing is consistent with psychomotor processing disorder.  There is a significant discrepancy between his performance on non timed tests and timed tests. Also

he has most difficulty with written tasks requiring visual/motor integration and psycho motor speed.

**Recommendations:**
1) Provide 100% extra time to complete written assignments and exams.
2) Provide extra time to copy off boards and overheads.
3) Access to teacher or peer lecture notes

Appropriate seating for attention and concentration
4) Placed in resource support program to help with organization and planning of his studies.
5) Needs help with breakdown of larger homework assignments.

Rosalie E. Toren, Ph.D., ABSNP
State Credentialed School Psychologist
Licensed Clinical Psychologist

The contents of this report have been communicated to me, and I have received a copy of this report.

Parent's Signature                                    Date

The contents of this report have been communicated to me, and I have received a copy of this report.



**THE STATE BAR OF CALIFORNIA**
**COMMITTEE OF BAR EXAMINERS/OFFICE OF ADMISSIONS**

**180 Howard Street • San Francisco, CA 94105-1639 • (415) 538-2300**
**845 S. Figueroa Street • Los Angeles, CA 90017-2515 • (213) 765-1500**

# FORM H
## TESTING ACCOMMODATIONS – VISUAL DISABILITY VERIFICATION
All original documents must be filed with the Office of Admissions' San Francisco Office.
(Please type or print; must be legible)

**NOTICE TO APPLICANT: This section of this form is to be completed by you.**
The remainder of the form is to be completed by the qualified professional who is recommending testing accommodations for the California Bar Examination or First-Year Law Students' Examination for you on the basis of a visual disability. Please read, complete, and sign below before submitting this form to the qualified professional for completion of the remainder of this form.

Benjamin Kohn

Applicant's Full Name: _____

468532

File Number: _____

I give permission to the qualified professional completing this form to release the information requested on the form, and I request the release of any additional information regarding my disability or accommodations previously granted that may be requested by the Committee of Bar Examiners or consultant(s) of the Committee of Bar Examiners.

/s/ Benjamin Kohn 7/10/2020

_____       _____
Signature of Applicant                                        Date

**NOTICE TO QUALIFIED PROFESSIONAL:**

The above-named person is requesting accommodations for the California Bar Examination or First-Year Law Students' Examination. All such requests must be supported by a comprehensive diagnostic evaluation by the qualified professional who conducted an individualized assessment of the applicant and is recommending accommodations for an examination administered by the Committee of Bar Examiners on the basis of a visual disability. The Committee of Bar Examiners also requires the qualified professional to complete all questions on this form that pertain to the applicant's visual impairment. Reference specific tests or other objective data and clinical observations, and **attach copies of test results**, if relevant. Please also attach a copy of any evaluation report and/or other records on which you relied in making the diagnosis and recommending accommodations. Your assistance is appreciated.

TA-FormH.0417

The Committee of Bar Examiners may forward this information to one or more qualified professionals for an independent review of the applicant's request. Print or type your responses to the items below. **Return the original of this completed form, the comprehensive evaluation report, and relevant records to the applicant for submission to the Committee of Bar Examiners.**

## I. EVALUATOR/TREATING PROFESSIONAL INFORMATION

Name of professional completing this form:   James Tearse, MD

Address:   1391 Woodside Rd STE 200 Redwood City, CA 94061

Telephone:   (650) 368-3937          Fax:   Please call.

E-Mail:   Please call.

Occupation, title, and specialty:   Ophthalmologist

License Number/Certification/State:   CA A42953

Describe your qualifications and experience to diagnose and/or verify the applicant's condition or impairment and to recommend accommodations
I am an experienced and board certified ophthalmologist who subspecializes particularly in dry eye disease conditions such as Mr. Kohn's.

## II. DIAGNOSIS

1. What is the applicant's current diagnosis?  Include a statement as to whether the condition is stable or progressive.
Progressive: Keratoconus with Asymmetric Astigmatism (Primarily Evaluated/ Treated by Dr. Goodman, Patient has Multiple Subspecialists).
Stable: Dry Eye Syndrome, Allergic Keratoconjunctivitis, and Eye Floaters.

2. Please state the applicant's best corrected visual acuities for distance and near vision.
I've tested, evaluated, and treated Mr. Kohn only for his dry eye syndrome; please refer to other experts.

3. When was the applicant's visual disability first diagnosed?  Dry Eye Syndrome in 2006 and Keratoconus 7/2017

4. Did you make the initial diagnosis?      ☐ YES    ☑ NO
5. Provide the date of your last complete evaluation of the applicant:  3/7/2019

6. Is this a permanent condition/impairment? ☑ YES ☐ NO

   If no, when is it likely to abate?

   _____

7. Does the severity of the condition/impairment fluctuate? ☐ YES ☑ NO

   If yes, describe the settings and/or circumstances affecting severity that are relevant to taking the California Bar Examination or First-Year Law Students' Examination.

   _____

   _____


## III. DIAGNOSIS-SPECIFIC FINDINGS; ONLY ADDRESS RELEVANT AREAS

1. Please describe the applicant's eye health (both external and internal evaluations).
   Patient has diagnosis for keratoconus with asymmetric astigmatism, allergic keratoconjunctivitis, both evaporative and aqueous deficiency severe dry eye syndrome, and eye floaters. I personally evaluated and treat his dry eye issues.

2. Visual Field: threshold field, not confrontation (provide measurements and copies of reports)
   Beyond scope of my evaluation.

   _____

3. Binocular Evaluation: eye deviation (provide measurements), diplopia, suppression, depth perception, convergence, etc. Specify whether difficulty with distance, near point, or both.
   Beyond scope of my evaluation.

   _____

4. Accommodative Skills: at near point, with and without lenses (provide measurements)
   Beyond scope of my evaluation.

   _____

5. Oculomotor Skills: saccades, pursuits, tracking
   Beyond scope of my evaluation.

   _____

TA-FormH.0417

3

## IV. FUNCTIONAL LIMITATIONS

1. Describe the functional impact, if any, of the applicant's visual condition on the applicant's reading ability.
   He will have slower reading abilities and less visual endurance for sustained visual work, especially on smaller computer displays such as a laptop. Effects increase the longer time spent per day on focused visual work.

2. Describe the applicant's current functional limitations and explain how the limitations restrict the condition, manner, or duration under which the applicant can take the California Bar Examination or First-Year Law Students' Examination.
   He will have slower reading abilities and less visual endurance for sustained visual work, especially on smaller computer displays such as a laptop. Effects increase the longer time spent per day on focused visual work.

3. Briefly describe any treatment, including any prescribed medications, and the effectiveness of treatment in reducing or ameliorating the applicant's functional limitations.
   Restasis and Xiidra, meibomian gland probing in Spring 2019, and punctal plugs. Some improvement, esp. to evaporative pathology component, but patient remains impaired at reading speed, esp. for all day focused visual work on laptop screen.

## V. ACCOMMODATIONS REQUESTED FOR THE CALIFORNIA BAR EXAMINATION OR FIRST-YEAR LAW STUDENTS' EXAMINATION (check all that apply)

## FORMAT

The California Bar Examination is a timed examination administered over two days, consisting of a 3-hour morning session (9:00 a.m. to 12:00 noon) and a 3½-hour afternoon session (2:00 p.m. to 5:30 p.m.) on the first day, and two 3-hour sessions (9:00 a.m. to 12:00 noon and 2:00 p.m. to 5:00 p.m.) on the second day. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. each day. The examination is administered in a proctored setting.

The first day consists of three one-hour essay questions in the morning session and two one-hour essay questions plus one 90-minute Performance Test question in the afternoon session. The written portions of the examination are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The second day consists of 200 multiple-choice questions (Multistate Bar Examination or "MBE"), with 100 questions administered in the morning session and 100 questions in the afternoon session. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

<u>The First-Year Law Students' Examination</u> is a one-day timed examination administered in two sessions, a four-hour morning session from 8:00 a.m. to 12:00 noon and a three-hour afternoon session from 2:00 p.m. to 5:00 p.m. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. The examination is administered in a proctored setting.

The morning session consists of four one-hour essay questions. The essay questions are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The afternoon session consists of 100 multiple-choice questions. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

## SETTING

Applicants are assigned seats, two per six-foot table, in a room set for as few as 100 to 400 applicants for the First-Year Law Students' Examination to as many as 1,500 applicants for the California Bar Examination. Applicants are not allowed to bring food, beverages, or certain other items into the testing room unless approved as accommodations. All applicants may bring prescription medication. The examination is administered in a quiet environment, and applicants are allowed to use small foam earplugs. They may leave the examination room only to use the restroom or drinking fountain, within the time allotted for the test session.

Taking into consideration this description of the examination and the functional limitations that you currently experience, what testing accommodation (or accommodations, if more than one would be appropriate) are you requesting?

### Alternative Formats

☐ Braille version of the examination

☐ Audio CD version of the examination

☐ Electronic versions of the Essay and/or Performance Test questions in Microsoft Word format on CDs for use with screen-reading software

☐ Large print / 18-point font

☐ Large print / 24-point font

**Personal Assistance**

☐ Reader

☐ Dictate to a typist/transcriber (for written sessions)

☐ Dictate answers to proctor/scribe (Scantron answer sheet - multiple-choice sessions)

**Equipment or Facility Requirements**

☑ Computer *as an accommodation* (must have direct nexus to the effects of the disability)

☐ with SofTest installed

☐ with voice-recognition software (e.g., Dragon Naturally Speaking) installed

☐ with screen-reading software (e.g., JAWS) installed

☑ with other (specify): External Larger Screen Monitor & Compatible Exam Software

☐ Special equipment (specify): _____

☐ Private room

☐ Semi-private room

**Other**

☑ Other arrangements (e.g., elevated table, limited testing time per day, lamp, etc.). Describe the recommended arrangements and explain why each is necessary.
Extra Time scheduled to proportionally increase the number of days the exam is scheduled for, as longer time per day will increase severity of the impairment.

_____

**Extra Time**

☑ Extra testing time

Specify the amount of **extra time** recommended for each session of the examination.

Indicate why the specified extra time is needed (based on the diagnostic evaluation), provide the rationale for recommending the amount of time for each test format of the examination, and explain how you arrived at the specific amount of extra time recommended. If either the amount of time or your rationale is different for different portions of the examination, please explain. If relevant, address why extra breaks or longer breaks are insufficient to accommodate the applicant's functional limitations. **All recommendations for extra time must specify the exact amount of extra time. It is important to keep in mind that breaks are included in the timed portion of the examination. No accommodation of unlimited time will be granted. If extra testing time is requested, but the specific amount of extra time is not indicated, the form will be returned as incomplete.**

**California Bar Examination: Essay Questions 1, 2 & 3 (standard session is 3 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:
<u>For all visual conditions, for reasons above, additive to any accommodations for</u>
<u>other disabilities, extra 3 hours (double time).</u>

**California Bar Examination: Essay Questions 4 & 5, and Performance Test (standard session is 3 hours and 30 minutes):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:
<u>For all visual conditions, for reasons above, additive to any accommodations for</u>
<u>other disabilities, extra 3.5 hours (double time).</u>

**California Bar Examination: Multistate Bar Examination - MBE (each standard session is 3 hours):** Specify the amount of extra test time needed <u>for each MBE session</u> and provide the rationale:
<u>For all visual conditions, for reasons above, additive to any accommodations for</u>
<u>other disabilities, extra 3 hours (double time).</u>

**First-Year Law Students' Examination: Essay Questions 1, 2, 3 & 4 (standard session is 4 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:
N/A

**First-Year Law Students' Examination: Multiple-Choice (standard session is 3 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:
N/A

_____
_____

**Explanations:** (attach additional sheets if necessary)
Please see attached dry eye tests and scans taken 3/7/2019 (last complete evaluation, as any subsequent testing was narrower in scope). Mr. Kohn's dry eye syndrome would impair his reading speed and endurance for the conditions of multi-day all-day bar examinations by a significantly greater degree than were his only visual impairment caused by keratoconus, which is already a significant impairment with a different pathology that cannot be adequately corrected by glasses.

_____
_____
_____
_____

## VI. CONFIDENTIALITY

Confidentiality policies of the Committee of Bar Examiners/Office of Admissions of the State Bar of California will be followed regarding its responsibility to maintain confidentiality of this form and any documents submitted with it. No part of the form or the accompanying medical documentation will be released without the applicant's written consent or under the compulsion of legal process.

## VII. PROFESSIONAL'S SIGNATURE

I am submitting the **original** of this form and have attached copies of all evaluation reports, test results, medical records, and/or other documents that I relied upon in making this diagnosis of the applicant's condition/disability and completing this form. I understand that all original documents submitted become the property of the Committee of Bar Examiners.

I declare under penalty of perjury under the laws of the State of California that the above information is true and correct.

_James Tearse MD_                              7-13-20
(Signature of Licensed Professional)            (Date)

The Committee of Bar Examiners reserves the right to make final judgment concerning testing accommodations and may have all documentation related to this matter reviewed by an individual professional consultant or a panel of professional consultants if deemed necessary.

TA-FormH.0417

8

# T E A R S E

## EYE CARE

Ophthalmology
Diplomate, American Board of Ophthalmology
James E. Tearse M.D.

Optometry
Jasdeep Manik, O.D.

1391 Woodside Road, Suite 200
Redwood City, CA 94061
650.368.EYES (3937)
FAX 650.368.0270

Name:  Benjamin Kohn

Date:  03/07/2019

Personal Physician:  Graham Dresden MD

Referred by    :
Registration.ReferringPhysician

Age:  25

Sex:  male

### Chief (1st):

Chief (1st) Symptom or Problem Description: new patient, dry eye pretesting and evaluation, self-referred for second opinion, patient wants to know how much the lipiflow from April 2018 is still in effect (had that done in Iowa). He said he may need it repeated in 1 year, but patient and patient's dad want to know if that is really necessary. Patient will no longer be going back to Iowa because he finished school there and wants to establish his dry eye care here. How is dry eye right now? Does he need to repeat Lipiflow? Wants to know if he has to keep taking Pazeo, Xiidra, restasis drops? Wants to know realistic consequence for him of permanent damage to the eyes and cornea if dry eyes are not adequately treated

### Medical History

- Other Eye Conditions: Keratoconus OU - being followed by Goodman Eye Center
- Eye care provider(s): Dr. Goodman, MD and associates (for keratoconus and eye health care); Dr. Nicholas Blasco, OD (in Iowa. Had lipiflow done with him)

### Surgical History:

2017 Corneal crosslinking w/ Dr. Goodwin, 3.7.19 Right lower lid dura collagen plug and left lower lid dura collagen plug

### Social History:

Smoking status: never smoked

### Allergies

Fish allergy
Nut allergy
Dairy allergy

### Current Medication

Restasis 0.05% ophthalmic emulsion : Directions: Take 1 emulsion every 12 hours, Start Date: 08/01/2017
Xiidra 5% ophthalmic solution : Directions: Take 1 drops of solution 2 times a day, Start Date: 01/01/2018
Pazeo 0.7% ophthalmic solution : Directions: Take 1 drops of solution once a day, Start Date: 07/01/2017
Rest LD yesterday am
Xiid LD yesterday am
Pazeo LD 2 days ago

**Exam:**

VA sc R: 20/50, VA sc L: 20/30, VA cc R: 20/25, VA cc L: 20/25, VA ph R: 20/30, VA ph L: 20/25, OSM R: 306, OSM L: 312, Jones Right (mm): 10, Jones Left (mm): 10, TBUT Right (seconds): 5, TBUT Left (seconds): 8

**Lids:**

Lid Right Upper: mb exp 18, Lid Left Upper: mb exp 18, Lid Right Lower: mb exp 20, Lid Left Lower: mb exp 20,

R Superior 1+ Scurf

L Superior 1+ Scurf

R Inferior 1+ Scurf

L Inferior 1+ Scurf

, Puncta - Right Upper: medium, Puncta - Left Upper: medium, Puncta - Right Lower: medium, Puncta - Left Lower: medium, Conjunctiva Right: lissamine all 0, Conjunctiva Left: lissamine all 0, Cornea Right: lissamine all 0, Cornea Left: lissamine all 0

Meibomography: all 4 lids 100%

Labs: Vit D 36 (20-80), ANA negative, Sjogrens negative

**Impression:**

Primary Diagnosis : Other keratitis(H16.8)

Vitamin D deficiency unspecified(E55.9)

Unspecified exophthalmos(H05.20)

Keratoconjunctivitis sicca not specified as Sjogren's bilateral(H16.223)

1. Dry eyes, slightly symptomatic in both eyes. Reading time has improved from 5 minutes to 30 on current therapy. Tear film stability is good, although lipid layer is mildly low. Aqueous flow and oil functionality is mildly low. No epithelial staining. He has excess outflow. Will insert punctal drainage plugs in order to help with tear retention and help relieve dry eye symptoms. Discussed routes of treatment: medical treatment, LipiFlow, or meibomian gland probings. Patient will move forward with meibomian gland probings.

- Had discussion with patient and patient's father in regards to dry eye treatments. Reviewed dry eye therapies. Discussed evenly distributing application of Xiidra and Restasis uniformly on a daily basis.

- Patient wishes to avoid long term damage from dry eyes. Patient has been previously diagnosed with keratoconus and is concerned that dry eyes may result in damage to eye and result in permanent decrease in vision. Reassured him that he will is not dry enough to aggravate the keratoconus or get permanent damage to the cornea and vision. His prognosis is good. He will need to maintain the oil flow to prevent drifting back to his prior condition.

**Plan:**

Dry Eye Plan:

Therapies:

Long term homework:

1 Continue Xiidra one drop to both eyes twice a day

Continue using Restasis drops in both eyes.

2 Continue using Heat to lids 5-10 minutes daily (Gel Mask is heated in Microwave for 12 seconds or eyegiene® heat pad mask). Demonstrated Eyegiene mask.

3 Begin Compression: After heat, compress the base of the eyelashes directly against the eyeball for 1/4th inch (6 mm) for 3 seconds. Compress along the entire upper and lower eyelid of both eyes. Compression can be done any time of the day.

4. Begin Avenova or Acuicyn spray, 1 spray to both eyes twice a day.

5. Begin Omega 3 2 grams per day (or Optimum Omega 4 capsules per day, from Pharmanex). Kirkland brand, recommended re-esterified form, take 4x recommended dosage.

6 Begin Vitamin D supplement. Recommended 3000-4000 iu daily for Vitamin D3.

Short Term: (optional)

1 Optional to Begin Retaine MGD eye drops. Instill one drop in both eyes in the morning and at each meal.

2 Begin Retaine Ointment at bedtime to both eyes (for 2 months). Apply a small pea size onto the eyelashes or directly into the eyes.

Appointments:

Meibomian gland probing of each eye lid.

then 6 weeks later dry eye pretesting and then dry eye recheck.

Labs: (CBC, RF, SSA, SSB, Early Sjogren's syndrome antibody Profile, Vitamin A, Vitamin D and TSH) (Ask your doctor if they have results within the last year of these tests. If needed get blood drawn for the remaining tests).

**Prescription**

Avenova 80 ML Spray: Directions: Take 1 spray directly onto lashes 2 times a day both eyes, #80, Days: 30, Refill: 4, Start Date: 03/07/2019, Electronic Prescription

Education Materials: Provided

Dry eye folder

Procedure

Punctal Closure: Plug (Extended collagen) OU Inferior Indication: Prior exam shows poor tear film and dry eyes. This will help retain the tears produced, reduce the tear outflow and work toward improving the tear film, eye comfort and vision. Risk: epiphoria, blurred vision, pain, infection. Lasts up to 6 months, photo shown, return if any sharp pain. Proparacaine instilled.

Plug 0.4 mm placed OU. no complication

Electronically Signed By : James E Tearse, MD on 03/07/2019 5:59PM



**GOODMAN**
**EYE·CENTER**

Committee of Bar Examiners
Office of Admissions
Attn: Senior Director of Admissions
State Bar of California
180 Howard St,
San Francisco, CA 94105

July 10, 2020

RE: Kohn, Benjamin
DOB: 12/29/1993

To Whom It May Concern:

I'd last written you on 12/23/2019 to follow-up on the documentation (including a "Form H" and 11/2017 appeal affidavit) I'd provided Mr. Kohn to document his visual disabilities and seek accommodations on the California bar exam. Since then, I've heard that he has again been denied the accommodations requested, again failed the exam, and is reapplying for accommodations on his next retake.

You wrote in your 2/14/2020 decision letter that the reasons for denial of the amount of extra time sought were:
1. Mr. Kohn had not shown "substantive new information or evidence of changed circumstances" since the last time he sought this accommodation.
2. Mr. Kohn's experts have not submitted "adequate medical documentation or testing" to support their conclusions.
3. Mr. Kohn passed the Iowa bar exam in July 2019 despite only receiving double time for all of his disabilities combined, far less than the sum of what his experts have each recommended for disabilities of distinct pathologies and specialties, including keratoconus, dry eye syndrome, autism, and GI conditions, which each impair different test taking processes and access skills.
4. Although Mr. Kohn's PCP, Dr. Dresden, recommends more extra time than approved on the written sections of the exam, Mr. Kohn's experts who have treated Mr. Kohn as specialists in autism and visual conditions each recommend between 50% extra time and 100% extra time, and none of them more than 100% extra time.

I address each of these issues in turn:

1. Mr. Kohn had not shown "substantive new information or evidence of changed circumstances" since the last time he sought this accommodation.

Since the last time Mr. Kohn has been provided any excerpt from a visual disability expert consultant the Bar asked to evaluate my recommendations, which was in the decision for his first petition in 2017, I've provided expanded, responsive, and more detailed explanations of the reasons for my Form H recommendations for Mr. Kohn's visual conditions, most recently my affidavit dated 12/23/2019. Both were substantive new information, and if the original decision from the prior circumstances was based on incorrect premises, it should be reconsidered. The reasons for the disparity in the recommendations of that expert and myself can be at least partially explained by two facts: that expert incorrectly concluded that Mr. Kohn's keratoconus could be "largely corrected by appropriate glasses" and that they also did not address Mr. Kohn's independent visual impairment of severe dry eye syndrome with both tear film and Meibomian gland deficiencies, which substantially aggravates the degree of impairment for all-day testing on a laptop computer from that Mr. Kohn would experience with just keratoconus. Please see my 12/23/2019 affidavit for more details.

2. Mr. Kohn's experts have not submitted "adequate medical documentation or testing" to support their conclusions.

Regarding Mr. Kohn's diagnosis of keratoconus, I've previously submitted a lengthy "Form H" questionnaire response, cornea scans demonstrating the presence of keratoconus, and multiple detailed affidavits describing the symptoms and effects of this condition. The presence of this diagnosis was not disputed by the Bar or its visual disabilities expert. I'm unsure what other medical documentation or testing the Bar wants to be provided, but would be happy to provide such on request if possible. In all of my correspondence to date, I've always invited the Bar to feel free to call my office with any questions.

Regarding Mr. Kohn's diagnosis of dry eye syndrome, I acknowledge that I'd mistakenly omitted it from my initial Form H, which may be why your expert did not address it previously, but have confirmed and described this condition in my 11/2017 and 12/2019 affidavits. To further support this diagnosis and my recommendations, I've appended specialized testing records my office received from Eye Care of Iowa in Spring 2018 from his Iowa subspecialist that he saw during law school when he resided in Iowa. I hope you consider that adequate, but again, if you need further information please feel free to call my office with any questions.

3. Mr. Kohn passed the Iowa bar exam in July 2019 despite only receiving double time for all of his disabilities combined, far less than the sum of what his experts have each recommended for disabilities of distinct pathologies and specialties, including keratoconus, dry eye syndrome, autism, and GI conditions, which each impair different test taking processes and access skills.

Passage of an exam by an individual with disabilities does not necessarily mean that individual had been provided appropriate disability accommodations on that exam. It could instead mean that individual had been able to surmount the handicap by performing much better than the standard required on the other relevant skills and knowledge. That does not mean the person with disabilities should not be accommodated adequately on a different exam to ameliorate access deficiencies such as reading speed and endurance to be able to demonstrate the factors tested as well as a person without a visual impairment.

As I've recommended 100% extra time be additive to extra time granted for any other disability, 100% extra time for autism and visual disabilities combined would not have been adequate to provide Mr. Kohn a level playing field on either the Iowa or California bar exam. Even if he could pass the Iowa one despite this, he should be provided equal opportunity so that disabilities do not add to any increased comparative difficulty of the California exam compared to the Iowa exam.

4.  Although Mr. Kohn's PCP, Dr. Dresden, recommends more extra time than approved on the written sections of the exam, Mr. Kohn's experts who have treated Mr. Kohn as specialists in autism and visual conditions each recommend between 50% extra time and 100% extra time, and none of them more than 100% extra time.

Again, my recommendation of 100% extra time is intended to be additive to any extra time granted for any other disability. Visual impairments affect Mr. Kohn's reading speed, endurance during all day focused visual work, and ability to transmit written responses already mentally formulated. Neuroprocessing speed, executive functioning, and attention impairments affect primarily consideration of the material already read and composition tasks before transmission, which largely do not overlap in time with those visual functional limitations. As other experts have recommended that Mr. Kohn receive extra time for autism based on these other impairments, and for completely unrelated GI conditions, 100% extra time is too little extra time to accommodate the totality of Mr. Kohn's disabilities. Based on what the other experts have recommended for those disabilities, 100% extra time plus an additional 30 minutes per day is also inadequate, especially on the written sections of the exam that are not multiple choice.

Expanded Request and Recommendations:

Mr. Kohn's visual impairments may be partially alleviated, though not to a degree as to substitute for all of the extra time, by using a larger screen computer monitor instead of a laptop display. I'd recommend that he be given permission to use his ~31.5" external monitor with his laptop if he is allowed to test from home due to the pandemic, with arrangements to ensure the compatibility of any examination software with that monitor, and that such a monitor and compatible with his laptop and such compatible exam software be provided to him if he is required to test in-person at a test center.

I reconfirm my recommendation in Form H of 100% extra time, additive to any extra time granted for any other disability. Feel free to contact my office with any further questions.

I hereby declare on the penalty of perjury under the laws of the State of California that the facts and opinions offered herein are true to the best of my knowledge and belief.

Sincerely,

Daniel F. Goodman, M.D.

| Kohn,Benjamin | | |
|---|---|---|
| ID#: 12/29/1993 | | **OD** |

| Kohn,Benjamin | | |
|---|---|---|
| ID#: 12/29/1993 | | **OS** |

| Date: 7/10/2020 10:46:33 AM |
|---|

| Date: 7/10/2020 10:46:42 AM |
|---|

Ka: 44.53 @ 146° Kf: 43.31 @ 56°    AvgK: 43.92
MinK: 43.30 @ 56°  Es: 0.64 / Em: 0.33  Cyl: 1.22
SRI: 0.15        PVA: 20/15-20/20      SAI: 1.36

Ka: 43.66 @ 105° Kf: 43.44 @ 15°    AvgK: 43.66
MinK: 43.39 @ 28°  Es: 0.33 / Em: 0.57  Cyl: 0.44
SRI: 0.56        PVA: 20/20-20/25      SAI: 0.46




Standard          Absolute          Diopters



9.0  14.0  19.0  24.0  29.0  35.5  37.0  38.5  40.0  41.5  43.0  44.5  46.0  47.5  49.0  50.5  56.5  61.5  66.5  71.5  76.5  81.5  86.5  91.5  96.5 101.5


22C-200S-1G0



OCULUS, Inc.
Lynnwood, WA 98036

www.oculususa.com

425-670-9977

OCULUS - PENTACAM  4 Maps Refractive

1:22b5

# OCULUS - PENTACAM  4 Maps Refractive



| Exam Info | | |
|---|---|---|
| Last Name: | Korn | |
| First Name: | Benjamin | |
| ID: | | |
| Date of Birth: | 12/29/1993 | |
| Exam Date: | 07/10/2020 | Eye: Left |
| | Time: 10:50:29 | |

**Cornea Front**

| | | |
|---|---|---|
| Rh: | 7.30 mm | K1: 43.2 D |
| Rf: | 7.61 mm | K2: 44.4 D |
| Rm: | 7.71 mm | Km: 43.6 D |
| Rpax: | 7.85 mm | Astig: 1.1 D |
| Rmin: | 8.99 mm | |

Axis (steep): 97.9°

**Cornea Back**

| | | |
|---|---|---|
| Rh: | 6.36 mm | K1: 6.3 D |
| Rf: | 6.00 mm | K2: 6.7 D |
| Rm: | | Km: 6.5 D |
| Rpax: | | Astig: 0.4 D |
| Rmin: | 6.31 mm | |

Axis (steep): 108.7°

QS: ✓ OK

Q-val. (30°): 0.39
Q-val. (30°): 0.17  OS: ✓ OK

**Pachy:**

| | | |
|---|---|---|
| Pupil Center: | + | 552 µm |
| Pachy Apex: | | 550 µm |
| Thinnest Locat.: | O | 546 µm |
| K Max (Front): | | 49.3 D |

Rpel: 6.15 mm

| | x[mm] | y[mm] |
|---|---|---|
| | -0.11 | +0.24 |
| | 0.00 | 0.00 |
| | -0.13 | -0.51 |
| | -0.19 | -2.66 |

| | | |
|---|---|---|
| Cornea Volume: | 66.1 mm³ | HWTW: 11.6 mm |
| Chamber Volume: | 179 mm³ | Angle: 42.4° |
| A.C. Depth (Int.): | 3.13 mm | Pupil Dia.: 3.42 mm |
| Enter IOP | IOP(cor.): | Lens Th.: |

Refractive

OS — Axial / Sagittal Curvature (Front)

OS — Elevation (Front)  BFS=7.71 Float, Dia=8.00

OS — Corneal Thickness

OS — Elevation (Back)  BFS=6.06 Float, Dia=8.00

1.22b5

# EXAMINATION RECORD

**Eye Care of Iowa**
**5075 E. University Ave Suite C**
**Pleasant Hill, IA 50327-7001**
**515-265-5322 FAX: 515-265-1437**

### For: Kohn, Mr. Benjamin
**Exam Date:** 01/20/2018
**Print Date:** 02/09/2018 1:57 pm
**DOB:** 12/29/1993      **Age:** 24
**Occupation:** child
**Gender:** Male      **Race:** White
**Chart:** PH

## REASON FOR VISIT
**EXAMINATION:** Dry Eye Workup

## CHIEF COMPLAINT
**CHIEF COMPLAINT:** Here for dry eye workup/Lipiview evaluation given severe ocular discomfort and no relief with dry eye therapies.
**NOTES:** History of dry eye. Here for medical evaluation

## HISTORY PRESENT ILLNESS (HPI)
**OCULAR SYMPTOMS:** Eyes are dry and itchy. Dryness causes him to be photophobic and less visual endurance with visual tasks. OD>OS. Itchiness is mostly of discomfort and distraction, OU fairly equally felt.

## PATIENT HISTORY
**OCULAR HISTORY:** Dry Eye Disease,   Keratoconus OU,   Allergic Rhinoconjunctivitis.
**OCULAR SURGICAL HISTORY:** s/p Corneal Cross Linking OU (06.2017).
**OCULAR MEDICATIONS:** Pazeo (qam OU PRN),  Restasis (q12hrs OU),  Xiidra (q12hrs OU)
**OCULAR FAMILY HISTORY:** Family history is reported to be unremarkable.
**MEDICAL HISTORY:** Myofascial Pain Syndrome,   Obstructive Sleep Apnea,   Asperger Syndrome (gross motor delay),   Autism,   Eczema,   Chronic Idiopathic Urticaria,   Multiple Food Allergies, Occipital Neuralgia.
**SYSTEMIC SURGICAL HISTORY:** No pertinent past surgical history exists.
**SYSTEMIC MEDICATIONS:** Budesonide, Desloratadine, Dymista, Modafinil, Omeprazole, Ranitidine, Sucralfate, Xolair,  No known systemic medication allergies.
**SYSTEMIC FAMILY HISTORY:** No pertinent medical history exists,   No pertinent medical history exists.
**SOCIAL HISTORY:** No reported use of tobacco, alcohol or narcotics and reports no history of STD or blood transfusions.

## REVIEW OF SYSTEMS
**REVIEW OF SYSTEMS:** No reported disorders or current medical treatment of: Allergy  Cardiovascular Constitutional  Ears,nose,mouth,throat  Endocrine  Gastrointestinal  Genitourinary  Hematologic / Lymphatic  Immunologic  Integumentary / Skin  Musculoskeletal  Neurologic  Psychiatric  Respiratory Unless otherwise noted below.

## PRESENTING FINDINGS
**UNAIDED ACUITIES:**
  RT:  DVA 20/40++
  LT:  DVA 20/30 -

1

Ｐ. 002      FAX No. 5152822610      Eye Care of Iowa      FEB/28/2018/WED 03:16 PM

**EXAMINATION**
**EYELIDS:** 2+MGD OU.    Obtain special testing as indicated.
**DRY EYE:**
LipiView Avg ICU:
OD: 79
OS: 73

Partial Blink (Y/N): Y (4/10 OD, 7/7 OS)
Lagophthalmos (Y/N): Y

MGE:  Number of glands(5) x secretion quality
        (3=clear liquid oil, 2=colored/cloudy liquid, 1=inspissated/semi-solid, 0=no secretion)
OD:
  Temporal:  3 x 2
  Central:   3 x 2
  Nasal:   3 x 2
  Total:18

OS:
  Temporal:  3 x 2
  Central:   3 x 2
  Nasal:   3 x 2
  Total:18

MG Structure via Oculus Keratograph 5M Meibography: Meiboscale: See digital images
     Degree 0=0% loss, Degree 1=<25%, Degree 2=25-50%, Degree 3=51-75%, Degree 4=>75%
OD:
SUP LID:   Temporal: 0   Central:  0   Nasal: 0
INF LID:   Temporal: 0   Central: 0   Nasal: 0

OS:
SUP LID:   Temporal: 0   Central:  0   Nasal: 0
INF LID:   Temporal: 0   Central: 0   Nasal: 0

Staining (NAFL/Lissamine Green): (Y/N):  Y
TBUT: OD: 5 sec OS: 5 sec
Seal Test: Normal/Abnormal:Abnormal

**CORNEA:** No staining.
**CONJUNCTIVA:**  OD :1+ injection, N=T. 1+ fine papillary rxn. No LG staining.
  OS: 1+ injection, N=T. 1+ fine papillary rxn. trace LG staining nasal bulbar conj. None temporally.

**SPECIAL TESTING**
**TEAR TEST:** Tear Osmolarity:  OD: 318 (mild ),   OS: 309 (mild )
  InflammaDry:  OD ( + ),  OS ( - )
**EXTERNAL PHOTOGRAPHY:** Bilateral: CPT 92285 - Interpretation and Report: Anterior segment
imaging demonstrates a defective ocular structure in the following areas:  Lids.  Consistent with
meibomian gland dysfunction/meibomian gland atrophy
**IMPRESSION(S):**
Meibomian gland dysfunction Upper/Lower Lids OU
Bilateral:  Chronic papillary conjunctivitis

 - On Pazeo BID since 07.2017
Dry eye syndrome OU (oil + H2O deficient)

2

- On Restasis q12hrs since 07.2017

- On Xiidra q12hrs since 01.12.2018

- Lubrication drops: has used brands like Systane/Refresh without significant relief

- No gross structural glandular loss OU; grade 2 expressions

## PLAN
**TREATMENT EYELIDS:** Advising continue with lid scrubs. Start gel/ung qhs OU
**TREATMENT DRY EYE:** Discussed adjustments/additions to treatment. Continue Restasis/Xiidra therapies. Educated needs PF Tears (Systane/Refresh advised versus generic drops which Ben uses) hourly. Blinking exercises. Fish Oil - > 2,00mg/day advised. Would be a candidate for Lipiflow as he has great gland tissue present with some decrease in quality of oil expression noted OU.

RTC for completion of Lipiflow pending insurance prior auth. outcome.
**NOTES:** **Of note, exam findings reflect data with Restasis/Xiidra treatment having already been initiated**

## PATIENT MANAGEMENT
**COUNSELING:** Counseling has been provided to review this patient's case and discuss options for treatment.
**COUNSELING / EDUCATION:** I have verbally discussed my clinical findings and recommendations in detail with this patient. They acknowledge that they do not have additional questions.
**PROFESSIONAL CORRESPONDENCE:** 1/22/2018 12:29:17 PM Auto Letter
**ELECTRONIC SIGNATURE:** Electronically Signed By: Nicholas J Blasco, O.D. on 01/20/2018 11:30 AM.

**DIAGNOSIS:**
H00.026 Internal hordeolum.
H16.223 Keratoconjunctivitis sicca, not specified as Sjogren's, bila
**PROCEDURE:**
99213 Level III Exam Intermediate Established
0330T LipiView Imaging
92285 Photography-External
1036F Tobacco use screened, NON-USER of tobacco
83861 Tear Osmolarity Test - QW|LT
83861 Tear Osmolarity Test - QW|RT
83516 InflammaDry
83516 InflammaDry - 59

**Finalized Exam:**                                     Date: 01/20/2018
Nicholas J. Blasco, O.D.

3



## ⊘ LIPIVIEW®
*INTERFEROMETER*

| | |
|---|---|
| Patient ID:<br>Patient Name: BENJAMIN KOHN<br>Report Date: 2018-01-20 11:47<br>Operator: DEFAULT ACCOUNT | EYE CARE OF IOWA<br>5075 E UNIVERSITY AVE<br>PLEASANT HILL IA 50327<br>515 265 5322,<br>LipiView Interferometer<br>Serial Number: 00279 |
| EYE: OD 2018-01-20 11:33:09 | EYE: OS 2018-01-20 11:32:56 |
| Tags: ▯ ▯▯ ▯ | Tags: ▯ ▯▯ ▯ |
| *Images @ Maximum ICU* | *Images @ Maximum ICU* |

OD

| Video Length | 19.0 sec | Avg ICU | 79 |
|---|---|---|---|
| Max ICU | 100+ @ 61 | Min ICU | 70 @ 568 |
| Std. Dev. | 10 | CF: 0.89 | PB: 4/10 |

OS

| Video Length | 19.1 sec | Avg ICU | 73 |
|---|---|---|---|
| Max ICU | 94 @ 226 | Min ICU | 64 @ 26 |
| Std. Dev. | 6 | CF: 0.86 | PB: 7/7 |

❤ *TearScience*

P. 005    FAX No. 5152622810    Eye Care of Iowa    FEB/28/2018/WED 03:17 PM



EYECARE OF IOWA, PC

2566 Hubbell Ave

Des Moines, IA 50317

Phone: 515-262-1094

Fax: 515-262-2610

Date: 2-28-18

Company Name: Dr. Daniel Goodman

Attention: _____

Fax Number: 415-474-3939

From: _____

Number of Pages (Including cover): 5

Re: Patient wanted us to fax these to you
to add to his chart +

If you have any problems receiving this fax, please call the phone number in the letterhead.

Statement of Confidentiality

The documents transmitted by this facsimile may contain confidential and privileged information. This information is intended for the use of the addressee named on this transmitted sheet. If you are not the addressee, any disclosure, photocopying distribution or use of its contents is prohibited. If you have received this facsimile in error, please call us immediately so that we can arrange to retrieve the original documents.



# EYE CARE
OF IOWA, PC

EYECARE OF IOWA, PC

5075 E. University Ave Ste C

Pleasant Hill, IA 50327

Phone: 515-265-5322

Fax: 515-265-1437

Date: 4-30-18

Company Name: Dr. Goodman

Attention: Dr. Goodman

Fax Number: (415) 474-3939

From: Eye Care of Iowa - Dr. Nick Blasco

Number of Pages (Including cover): 4

Re: Benjamin Kohn

**If you have any problems receiving this fax, please call the phone number in the letterhead.**

Statement of Confidentiality

The documents transmitted by this facsimile may contain confidential and privileged information. This information is intended for the use of the addressee named on this transmitted sheet. If you are not the addressee, any disclosure, photocopying distribution or use of its contents is prohibited. If you have received this facsimile in error, please call us immediately so that we can arrange to retrieve the original documents.

April 30, 2018

**RE: Kohn, Mr. Benjamin**
**Exam Date: 04/28/2018**
**Patient's Date of Birth: December 29, 1993**

Dear Daniel Goodman, M.D. :

This report will provide you with a summary of pertinent clinical findings and observations from my examination. It is a pleasure to have the opportunity to share in the care of this patient.

**CHIEF COMPLAINT:** Returning to have Lipiflow completed OU.
**OCULAR SYMPTOMS:** Eyes are dry and itchy. Dryness causes him to be photophobic and less visual endurance with visual tasks. OD>OS. Itchiness is mostly of discomfort and distraction, OU fairly equally felt.
**OCULAR HISTORY:** Allergic Rhinoconjunctivitis, Dry Eye Disease, Keratoconus OU.
**OCULAR SURGICAL HISTORY:** s/p Corneal Cross Linking OU (06.2017).
**OCULAR FAMILY HISTORY:** Family history is reported to be unremarkable.
**OCULAR MEDICATIONS:** Pazeo, (qam OU PRN), Restasis, (q12hrs OU), Xiidra, (q12hrs OU).
**MEDICAL HISTORY:** Asperger Syndrome (gross motor delay), Autism, Chronic Idiopathic Urticaria, Eczema, Multiple Food Allergies, Myofascial Pain Syndrome, Obstructive Sleep Apnea, Occipital Neuralgia.
**SYSTEMIC SURGICAL HISTORY:** No pertinent past surgical history exists.
**SYSTEMIC FAMILY HISTORY:** No pertinent medical history exists, No pertinent medical history exists.
**SYSTEMIC MEDICATIONS:** Budesonide, Desloratadine, Dymista, Modafinil, Omeprazole, Ranitidine, Sucralfate, Xolair, No known systemic medication allergies.[ALLERGIC].
**SOCIAL HISTORY:** No reported use of tobacco, alcohol or narcotics and reports no history of STD or blood transfusions.

**UNAIDED ACUITIES:**
  RT:  DVA 20/40++
  LT:  DVA 20/30 -

**EYELIDS:** 2+MGD OU.
**DRY EYE:**
  LipiView Avg ICU:
  OD: 79
  OS: 73

  Partial Blink (Y/N): Y (4/10 OD, 7/7 OS)
  Lagophthalmos (Y/N): Y

  MGE: Number of glands(5) x secretion quality
        (3=clear liquid oil, 2=colored/cloudy liquid, 1=inspissated/semi-solid, 0=no secretion)
  OD:
   Temporal:  3 x 2
   Central:  3 x 2
   Nasal:  3 x 2
   Total:18

1

OS:
Temporal: 3 x 2
Central: 3 x 2
Nasal: 3 x 2
Total:18

MG Structure via Oculus Keratograph 5M Meibography: Meiboscale: See digital images
    Degree 0=0% loss, Degree 1=<25%, Degree 2=25-50%, Degree 3=51-75%, Degree 4=>75%
OD:
SUP LID: Temporal: 0 Central: 0 Nasal: 0
INF LID: Temporal: 0 Central: 0 Nasal: 0

OS:
SUP LID: Temporal: 0 Central: 0 Nasal: 0
INF LID: Temporal: 0 Central: 0 Nasal: 0

Staining (NAFL/Lissamine Green): (Y/N): Y
TBUT: OD: 5 sec OS: 5 sec
Seal Test: Normal/Abnormal:Abnormal

**CORNEA:** No staining.
**CONJUNCTIVA:** OD :1+ injection, N=T. 1+ fine papillary rxn. No LG staining.
              OS: 1+ injection, N=T. 1+ fine papillary rxn. trace LG staining nasal bulbar conj. None
                  temporally.
**TEAR TEST:** Tear Osmolarity: OD: 318 (mild ) OS: 309 (mild ) (02.2018)
         InflammaDry:    OD: ( + )    OS: ( - )    (02.2018)
**NOTES:** **Of note, exam findings reflect data with Restasis/Xiidra treatment having already been
initiated**
**EXTERNAL PHOTOGRAPHY:** Bilateral: CPT 92285 - Interpretation and Report: Anterior segment
imaging demonstrates a defective ocular structure in the following areas: Lids. Consistent with
meibomian gland dysfunction/meibomian gland atrophy

**IMPRESSION(S):**
Meibomian gland dysfunction Upper/Lower Lids OU
Bilateral: Chronic papillary conjunctivitis
 - On Pazeo BID since 07.2017
Dry eye syndrome OU (oil + H2) deficient)
- On Restasis q12hrs since 07.2017
- On Xiidra q12hrs since 01.12.2018
- Lubrication drops: has used brands like Systane/Refresh without significant relief
- No gross structural glandular loss OU; grade 2 expressions

**TREATMENT EYELIDS:** Advising continue with lid scrubs. Helpful to use gel/ung qhs OU
**TREATMENT DRY EYE:** Lipiflow performed (at his request) today to help improve upon any evaporative
component to his ocular surface disease. Continue Restasis and Xiidra therapies as previously directed.
Educated needs PF Tears (Systane/Refresh advised versus generic drops which Ben uses) hourly. Blinking
exercises. Fish Oil - > 2,00mg/day advised.

Ben notes he will resume his F/U care with Dr. Goodman in San Francisco area. We will send records from
today. I've advised Ben it takes 6-8 weeks for his glands to start producing oil again. I'd ask him to be
seen in about 3 months for assessment of gland opening and secretion quality. I'd advise completion of
manual expression of the glands (sometime necessary with metallic paddle in-office procedure) at these
F/U's. RTC Eye Care of Iowa PRN

Respectfully submitted,

2

Nicholas J. Blasco OD

Note: The information contained in this report is confidential. Unauthorized disclosure may result in civil/criminal action as provided by HIPAA (1996) regulations.

Committee of Bar Examiners
Attention: Senior Director of Admissions
Office of Admissions
State Bar of California
180 Howard Street
San Francisco, CA 94105

December 23, 2019

RE: Kohn, Benjamin
DOB: 12/29/1993

To Whom It May Concern:

Benjamin Kohn has a diagnosis of Keratoconus in both eyes (ICD-10:
H18.623). This condition causes irregular bulging of the normally round
cornea. It's characterized by protrusion of the central cornea, resulting in
distortion of vision including ghosting, glare, photophobia, and halos around
lights, decreased vision, and monocular diplopia (double vision). In addition to
keratoconus, Mr. Kohn also has asymmetric astigmatism (ICD-10: H52.213).
All of these visual disabilities cannot be fully corrected in glasses.
Unfortunately, Mr. Kohn cannot wear contact lenses due to a fine motor delay.
He also suffers from dry eye syndrome (ICD-10: H04.123). This condition
causes his vision to fluctuate, especially during long periods of focused visual
work, which in turn can cause substantial eye fatigue during test taking.

In light of these eye conditions, I reconfirm my previous recommendation as
indicated on the previously completed Visual Disability Verification (Form H)
for the California Bar Exam. Note that these recommendations are based solely
on Mr. Kohn's visual disabilities and should be additive to any extra time
provided to accommodate other disabilities that slow his test taking. Feel free to
contact my office with any further questions.

I hereby declare on the penalty of perjury under the laws of the State of
California that the facts and opinions offered herein are true to the best of my
knowledge and belief.

Sincerely,

Daniel Goodman, MD

November 27, 2017

RE: Kohn, Benjamin
DOB:12/29/1993

To Whom It May Concern:

Benjamin has a diagnosis of Keratoconus in both eyes (ICD-10: H18.623). This condition causes distortion of vision. Additionally, he has a physical handicap and is unable to wear contact lenses. As a result, his visual functioning is reduced since he constantly perceives glare and halos. He also suffers from dry eye syndrome (ICD-10: H04.123). This condition causes his vision to fluctuate especially during long periods of focused visual work. Consequently, he will need additional time for his academic work.

In light of these eye conditions, please allow Benjamin additional accommodations as indicated on Form H for the California Bar Exam. I have attached scans of his corneas, documenting his diagnosis of keratoconus. Feel free to contact my office with any further questions.

I hereby declare on the penalty of perjury under the laws of the State of California that the facts and opinions offered herein are true to the best of my knowledge and belief.

Sincerely,

Daniel Goodman, MD

| Kohn,Benjamin | | | Kohn,Benjamin | | |
|---|---|---|---|---|---|
| ID#: 12/29/1993 | | OD | ID#: 12/29/1993 | | OS |

| Date: 7/17/2017 10:51:01 AM | Exam 3 | Date: 7/17/2017 10:51:04 AM | Exam 4 |
|---|---|---|---|

| Ks: 44.61 @ 165° Kf: 42.61 @ 65° | AveK: 43.71 | Ks: 43.89 @ 69° Kf: 43.61 @ 159° | AveK: 43.75 |
|---|---|---|---|
| MinK: 42.78 @ 75° Es: 0.67 / Em:-0.58 | Cyl: 1.80 | MinK: 43.51 @ 138° Es: 0.12 / Em: 0.38 | Cyl: 0.29 |
| SRI: 0.41 PVA: 20/20-20/25 | SAI: 1.40 | SRI: 0.31 PVA: 20/20-20/25 | SAI: 0.66 |



Standard                              Absolute                              Diopters



9.0  14.0  19.0  24.0  29.0  35.5  37.0  38.5  40.0  41.5  43.0  44.5  46.0  47.5  49.0  50.5  55.5  61.5  66.5  71.5  76.5  81.5  86.5  91.5  96.5 101.5



Version 4.2D

AUG 0 4 2017 CXL s/p 1mo ou                    Kohn, Benjamin
            noticing some eye fatigue / smearing w/
                bright lights

$V_{sc}$ < 20/30                    $T_T$ < $^{18}_{19}$ @10:46      Prizeo x1    gtts
        20/25-                                                    AT q1h

M < -0.50 +1.25 x 165  20/30
      -0.75 sph        20/25+2        ext 2+ lid debris      RTC 3mo
P < 522 I 91          (fluctuate      slc  k ok              if possible
    542 ± 61           w/ Blnk)          @haze              in 1mon.

                                        FDVM



**THE STATE BAR OF CALIFORNIA**
**COMMITTEE OF BAR EXAMINERS/OFFICE OF ADMISSIONS**

180 Howard Street • San Francisco, CA 94105-1639 • (415) 538-2300
845 S. Figueroa Street • Los Angeles, CA 90017-2515 • (213) 765-1500

# FORM H
## TESTING ACCOMMODATIONS – VISUAL DISABILITY VERIFICATION

All original documents must be filed with the Office of Admissions' San Francisco Office.
(Please type or print; must be legible)

**NOTICE TO APPLICANT**: **This section of this form is to be completed by you.** The remainder of the form is to be completed by the qualified professional who is recommending testing accommodations for the California Bar Examination or First-Year Law Students' Examination for you on the basis of a visual disability. Please read, complete, and sign below before submitting this form to the qualified professional for completion of the remainder of this form.

Applicant's Full Name: Benjamin Sean Kohn

File Number: 0468532

I give permission to the qualified professional completing this form to release the information requested on the form, and I request the release of any additional information regarding my disability or accommodations previously granted that may be requested by the Committee of Bar Examiners or consultant(s) of the Committee of Bar Examiners.

/s/ Benjamin Kohn                                    8/11/2017
Signature of Applicant                               Date

## NOTICE TO QUALIFIED PROFESSIONAL:

The above-named person is requesting accommodations for the California Bar Examination or First-Year Law Students' Examination. All such requests must be supported by a comprehensive diagnostic evaluation by the qualified professional who conducted an individualized assessment of the applicant and is recommending accommodations for an examination administered by the Committee of Bar Examiners on the basis of a visual disability. The Committee of Bar Examiners also requires the qualified professional to complete all questions on this form that pertain to the applicant's visual impairment. Reference specific tests or other objective data and clinical observations, and **attach copies of test results**, if relevant. Please also attach a copy of any evaluation report and/or other records on which you relied in making the diagnosis and recommending accommodations. Your assistance is appreciated.

TA-FormH.0417

The Committee of Bar Examiners may forward this information to one or more qualified professionals for an independent review of the applicant's request. Print or type your responses to the items below. **Return the original of this completed form, the comprehensive evaluation report, and relevant records to the applicant for submission to the Committee of Bar Examiners.**

## I. EVALUATOR/TREATING PROFESSIONAL INFORMATION

Name of professional completing this form: _Denniel Goodman, MD_

Address: _224 Bush A 2nd Floor SF CA 94115_

Telephone: _415 474 3370_ Fax: _415 474 3439_

E-Mail: _frontdesk @ goodman eyecenter.com_

Occupation, title, and specialty: _ophthalmology_

License Number/Certification/State: _G53124 / CA_

Describe your qualifications and experience to diagnose and/or verify the applicant's condition or impairment and to recommend accommodations

_patient's ophthalmologist_

## II. DIAGNOSIS

1. What is the applicant's current diagnosis? Include a statement as to whether the condition is stable or progressive.

   _Keratoconus Stable_

2. Please state the applicant's best corrected visual acuities for distance and near vision.

   _20/30 OD 20/25+2 OS_

3. When was the applicant's visual disability first diagnosed? _7/7/17_

4. Did you make the initial diagnosis? ☐ YES ☒ NO

5. Provide the date of your last complete evaluation of the applicant: _8/4/17_

TA-FormH.0417

2

6. Is this a permanent condition/impairment?  ☒ YES  ☐ NO

If no, when is it likely to abate?

_____

_____

7. Does the severity of the condition/impairment fluctuate?  ☐ YES  ☒ NO

If yes, describe the settings and/or circumstances affecting severity that are relevant to taking the California Bar Examination or First-Year Law Students' Examination.

_____

_____

_____

## III. DIAGNOSIS-SPECIFIC FINDINGS; ONLY ADDRESS RELEVANT AREAS

1. Please describe the applicant's eye health (both external and internal evaluations).

_____ corneal irregularity causing fluctuating vision, glare, distortion _____ at distance and near vision

2. Visual Field: threshold field, not confrontation (provide measurements and copies of reports)

_____ only confrontation visual fields performed - normal _____ findings

3. Binocular Evaluation: eye deviation (provide measurements), diplopia, suppression, depth perception, convergence, etc. Specify whether difficulty with distance, near point, or both.

_____ Not eval _____

_____

4. Accommodative Skills: at near point, with and without lenses (provide measurements)

_____ Not eval _____

_____

5. Oculomotor Skills: saccades, pursuits, tracking

_____ Not eval _____

_____

TA-FormH.0417

3

## IV. FUNCTIONAL LIMITATIONS

1. Describe the functional impact, if any, of the applicant's visual condition on the applicant's reading ability.

blur when reading due to distortion of cornea
fatigue after long periods of reading due to distortion

2. Describe the applicant's current functional limitations and explain how the limitations restrict the condition, manner, or duration under which the applicant can take the California Bar Examination or First-Year Law Students' Examination.

Pt will experience eye/visual fatigue after long periods
of reading (72 hours)

3. Briefly describe any treatment, including any prescribed medications, and the effectiveness of treatment in reducing or ameliorating the applicant's functional limitations.

No treatment other than glasses - with limited visual
improvement

## V. ACCOMMODATIONS REQUESTED FOR THE CALIFORNIA BAR EXAMINATION OR FIRST-YEAR LAW STUDENTS' EXAMINATION (check all that apply)

## FORMAT

The California Bar Examination is a timed examination administered over two days, consisting of a 3-hour morning session (9:00 a.m. to 12:00 noon) and a 3½-hour afternoon session (2:00 p.m. to 5:30 p.m.) on the first day, and two 3-hour sessions (9:00 a.m. to 12:00 noon and 2:00 p.m. to 5:00 p.m.) on the second day. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. each day. The examination is administered in a proctored setting.

The first day consists of three one-hour essay questions in the morning session and two one-hour essay questions plus one 90-minute Performance Test question in the afternoon session. The written portions of the examination are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The second day consists of 200 multiple-choice questions (Multistate Bar Examination or "MBE"), with 100 questions administered in the morning session and 100 questions in the afternoon session. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

The First-Year Law Students' Examination is a one-day timed examination administered in two sessions, a four-hour morning session from 8:00 a.m. to 12:00 noon and a three-hour afternoon session from 2:00 p.m. to 5:00 p.m. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. The examination is administered in a proctored setting.

The morning session consists of four one-hour essay questions. The essay questions are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The afternoon session consists of 100 multiple-choice questions. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

## SETTING

Applicants are assigned seats, two per six-foot table, in a room set for as few as 100 to 400 applicants for the First-Year Law Students' Examination to as many as 1,500 applicants for the California Bar Examination. Applicants are not allowed to bring food, beverages, or certain other items into the testing room unless approved as accommodations. All applicants may bring prescription medication. The examination is administered in a quiet environment, and applicants are allowed to use small foam earplugs. They may leave the examination room only to use the restroom or drinking fountain, within the time allotted for the test session.

Taking into consideration this description of the examination and the functional limitations that you currently experience, what testing accommodation (or accommodations, if more than one would be appropriate) are you requesting?

### Alternative Formats

☐ Braille version of the examination

☐ Audio CD version of the examination

☐ Electronic versions of the Essay and/or Performance Test questions in Microsoft Word format on CDs for use with screen-reading software

☐ Large print / 18-point font

☐ Large print / 24-point font

**Personal Assistance**

☐ Reader

☐ Dictate to a typist/transcriber (for written sessions)

☐ Dictate answers to proctor/scribe (Scantron answer sheet - multiple-choice sessions)

**Equipment or Facility Requirements**

☒ Computer *as an accommodation* (must have direct nexus to the effects of the disability)

☐ with SofTest installed

☐ with voice-recognition software (e.g., Dragon Naturally Speaking) installed

☐ with screen-reading software (e.g., JAWS) installed

☐ with other (specify): _____

☐ Special equipment (specify): _____

☐ Private room

☐ Semi-private room

**Other**

☐ Other arrangements (e.g., elevated table, limited testing time per day, lamp, etc.). Describe the recommended arrangements and explain why each is necessary.

_____
_____
_____
_____

**Extra Time**

☒ Extra testing time

Specify the amount of **extra time** recommended for each session of the examination.

TA-FormH.0417

Indicate why the specified extra time is needed (based on the diagnostic evaluation), provide the rationale for recommending the amount of time for each test format of the examination, and explain how you arrived at the specific amount of extra time recommended. If either the amount of time or your rationale is different for different portions of the examination, please explain. If relevant, address why extra breaks or longer breaks are insufficient to accommodate the applicant's functional limitations. **All recommendations for extra time must specify the exact amount of extra time. It is important to keep in mind that breaks are included in the timed portion of the examination. No accommodation of unlimited time will be granted. If extra testing time is requested, but the specific amount of extra time is not indicated, the form will be returned as incomplete.**

**California Bar Examination: Essay Questions 1, 2 & 3 (standard session is 3 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

Additional 3 hours

**California Bar Examination: Essay Questions 4 & 5, and Performance Test (standard session is 3 hours and 30 minutes):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

Additional 3 hours 30 min.

**California Bar Examination: Multistate Bar Examination - MBE (each standard session is 3 hours):** Specify the amount of extra test time needed <u>for each MBE session</u> and provide the rationale:

Additional 3 hours

**First-Year Law Students' Examination: Essay Questions 1, 2, 3 & 4 (standard session is 4 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

Additional 4 hours

**First-Year Law Students' Examination: Multiple-Choice (standard session is 3 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

Additional 3 hours

**Explanations:** (attach additional sheets if necessary)

Patient has visual blur / distortion due to membranes for attached corneal topography. He has visual fatigue after extended near work due to this distortion.

## VI. CONFIDENTIALITY

Confidentiality policies of the Committee of Bar Examiners/Office of Admissions of the State Bar of California will be followed regarding its responsibility to maintain confidentiality of this form and any documents submitted with it. No part of the form or the accompanying medical documentation will be released without the applicant's written consent or under the compulsion of legal process.

## VII. PROFESSIONAL'S SIGNATURE

I am submitting the **original** of this form and have attached copies of all evaluation reports, test results, medical records, and/or other documents that I relied upon in making this diagnosis of the applicant's condition/disability and completing this form. I understand that all original documents submitted become the property of the Committee of Bar Examiners.

I declare under penalty of perjury under the laws of the State of California that the above information is true and correct.

_(Signature of Licensed Professional)_                  8/14/17
                                                         _(Date)_

The Committee of Bar Examiners reserves the right to make final judgment concerning testing accommodations and may have all documentation related to this matter reviewed by an individual professional consultant or a panel of professional consultants if deemed necessary.



**Digestive Health Center**
420 Broadway, Pavilion D, M/C 5355
Redwood City, CA 94063
Tel: (650) 736-5555
Fax: (650) 498-6323
http://stanfordhospital.org

Committee of Bar Examiners
Office of Admissions
Attn: Senior Director of Admissions
State Bar of California
180 Howard St,
San Francisco, CA 94105
July 9, 2020

To Whom It May Concern:

I'm again following up to provide further documentation regarding Mr. Benjamin Kohn's need for disability accommodations on the California bar exam and add to what I've previously written for my "Form B" and for his appeals regarding his physical disabilities of gastroparesis and postoperative dysphagia, as well as to confirm and provide documentation for two other gastrointestinal conditions he has been diagnosed with. Those other two conditions would particularly impair his access to an exam in which the restroom could not be used freely for extended periods of time and still be able to return to an in progress portion of the exam, something Mr. Kohn expressed concern regarding for his next retake based on a likely adaptation of the exam to remote testing. Mr. Kohn has informed me that standard test conditions might change to secure a possible remote "modality" using webcams, and that he anticipates an issue regarding his restroom access needs then, so I also confirm Mr. Kohn has the additional conditions of pelvic floor dyssynergia and irritable bowel syndrome with chronic constipation, summarize the relevant effects of these conditions for the exam and expand upon those I provided previously for gastroparesis and postoperative dysphagia with updated/expanded recommendations for these four conditions.

I previously recommended an accommodation of meal breaks of up to 30 minutes for every 90 minutes of testing time to address Mr. Kohn's medical need to distribute his eating over more frequent smaller meals more evenly spaced throughout the day to minimize idle digestion time based on his physical disability of gastroparesis, which request I understand from Mr. Kohn has so far been denied and substituted with extra time of 30 minutes per test session, something I understand is currently scheduled as 30 minutes per test day. The necessity for my denied request is based on the slowed digestion and stomach emptying that occurs in persons with gastroparesis and particularly in cases of the severity Mr. Kohn's has been measured to take in both a 2-hour gastric emptying study performed at his clinic in Iowa March 2018 and a 4-hour gastric emptying study performed at our (Stanford) radiology center May 2018 (both appended below), even more so on the latter. This test involves the patient, after appropriate fasting, eating a standardized breakfast of scrambled eggs and toast that have been laced with a radio-tracer and then taking nuclear medicine scans each hour for the length of the test to determine what portion of the food has emptied from the stomach. The rate and distribution of the emptying in each data point are then scaled among individuals who ate the same foods and quantities to provide interpretable clinical diagnostic results. Based on this information, reported symptoms, and an extensive workup of other tests (also appended) that both ruled

out other potential causes of some of the symptoms and confirmed conditions that are associated with the presence of gastroparesis, including multiple types of 24-hour intraluminal impedance with esophageal Ph studies both off and on proton pump inhibitors, glucose and fructose hydrogen breath testing, Xifaxan trial, proton pump inhibitors trials, abdominal ultrasound, esophageal manometry testing, multiple upper GI endoscopies with 48-hour bravo and biopsy tests, etc., he's been diagnosed with severe gastroparesis and with gastroesophageal reflux disease, the latter of which he underwent nissen fundoplication surgery for in August 2018.

That surgery presented a side-effect of postoperative dysphagia because in order to prevent excessive stomach acid damaging the esophagus, it modifies the esophagus in such a way as to make it more difficult to pass large or sticky pieces of food not adequately cut or chewed, or food that is not eaten at a slowed pace, into the stomach, and also increases gas-bloat symptoms from eating meals too fast or too large at a time and not also spaced out more frequently. If Mr. Kohn is not careful to eat in this way, it is possible for him to clog his esophagus, which produces severe pain and regurgitation urge that, once triggered, can last for hours, or even need an emergency medical response. For this reason, aggravated by Mr. Kohn's fine motor delay slowing the process of cutting food, I pointed out that Mr. Kohn's time to complete even the smaller meals he should be eating more frequently throughout the day will still be significant due to these impairments. I understand that this explanation was misunderstood to be part of the explanation for the number of meal breaks and how they are scheduled, and not for the length of them as it was intended and of which it is but one factor. I understand this to have contributed to the denial per the reasons given as the Committee then did not understand why food could not be pre-cut before arrival at the test center, something which I understand to be an issue of logistics for Mr. Kohn given the source, availability, and timing of obtaining fresh food while staying in a hotel relative to when he must report for the exam.

Symptoms from failing to comply with these dietary modifications necessitating accommodation on an all-day examination, for these conditions, are very uncomfortable and can be debilitating. If fewer, larger meals (such as breakfast and dinner outside exam hours and lunch in the break Mr. Kohn says he gets without an accommodation) are eaten instead, where more breaks are denied, in order to preserve exam time for completing exam questions, I'd expect Mr. Kohn to have significant difficulty both sating his appetite and not eating too much at once. If he did the latter, I'd expect his gastroparesis would cause him to experience dyspepsia, nausea, and most importantly excessive gas-bloat, something we try to minimize in patients who have underwent the nissen fundoplication surgery Mr. Kohn did in August 2018 as the modifications to the stomach and esophagus to reduce acid reflux also reduce the ability of excess gas to escape the stomach upwards to an extent where, once present, it lasts longer and is far more painful than for someone who does not have that surgical history. These symptoms would be highly disadvantageous to anyone on such a mentally intensive and sustained focus high stakes and time pressured exam, but autistic individuals like Mr. Kohn would be impaired to a more severe degree than the average person. For these reasons, given the length of the

test sessions on the California bar exam, it is very important that Mr. Kohn be allowed to eat smaller meals during a test session without losing test time.

Thirty minutes of extra time per day is not sufficient to accomplish this on test days that run from about 8:30 am report time, to between 4:30 pm and 5:30 pm after starting testing at 9:00 am, with only a single lunch break. In exam conditions of this kind, where minimization of symptoms is needed past those tolerable in less exacting circumstances, even eating before and after exam hours he should eat at least four times during those hours, and, considering the effects of his postoperative dysphagia and fine motor delays, he should be given a time limit for each of no less than 30 minutes if testing from a test center requiring him to stay in a hotel and order from restaurants, and no less than 20 minutes if testing from home. These meals should be accommodated by stop the clock breaks in which Mr. Kohn can monitor his symptoms and appetite, among other things, and determine spontaneously when to pause for a break, up to the time limit specified and number specified based on overall test day length, which should generally be one for every 90 minutes of test time.

If granting extra time is preferred and permission to eat and drink in the test room is granted, the amount of extra time should be proportional to the amount of break time converted. I'd recommend 120 minutes of extra time per day if he tests in a test center and 80 minutes of extra time per day if he tests from home, if such a substitution is used. These recommendations would only address gastroparesis and dysphagia and would need to be additive to extra time granted for any other disability.

Although not a substitute for the above dietary modifications, as part of his treatments for these conditions I've prescribed Mr. Kohn the medication bethanechol off label for its benefits on the smooth muscle found in the digestive track due to its cholinergic effect. The on label use indicated for this medication is use as a urinary motility stimulator, so aside from specific conditions Mr. Kohn will experience a side effect of needing to urinate more frequently and more spontaneously rather than at more planned times to coincide with a scheduled break.

Other than gastroparesis and postoperative dysphagia, Mr. Kohn also has pelvic floor dyssynergia and irritable bowel syndrome with chronic constipation. He's had the irritable bowel syndrome diagnosis since his early adolescence, diagnosed by his then pediatrician. He was diagnosed with pelvic floor dyssynergia more recently, in April 2018, by his previous gastroenterologist while residing in Iowa for law school following an anorectal manometry and a defecogram scan (both appended), with a colonoscopy also having been performed to rule out other causes of some of the symptoms (appended). Once Mr. Kohn moved home after graduating from law school, I, his PCP Dr. Dresden, and a specialized physical therapist took over treatment and management of this condition. As a secondary effect of this condition, he often develops very painful recurrent anal hemorrhoids, which Dr. Dresden and I work with my rectal surgery colleague Dr. Brooke Gurland here at Stanford, and two other outside specialized rectal surgeons (Dr. Stuart Weisman for infrared coagulation and Dr. Roger Kao for banding) to remove surgically where necessary, and also recurrent anal fissures, which we treat with Rectiv.

Throughout much of 2018, in addition to medication trials he regularly attended specialized

pelvic floor physical therapy, separate from his two other physical therapy regimes for neuromotor deficits and myofascial pain, in which he attempted electromyography (EMG) biofeedback therapy. He's repeatedly had his hemorrhoids surgically removed, and on one such occasion tried a rectal botulinum toxin injection to attempt to reset the paradoxical muscle behavior and improve receptivity to biofeedback. Very little, if any, improvement was detected on his postoperative December 2018 anorectal manometry done at our clinic (appended).

These two conditions, each through a different pathology, both act in concert to make Mr. Kohn's bowel movements less frequent and less controllable, predictable, or plannable in timing, and to take far longer than is ordinary to complete. While the constipation does so by impaired motility generally throughout the entire digestive tract, the pelvic floor dyssynergia is essentially a neuromotor impairment that obstructs the defecation process and also creates very uncomfortable anismus sensations during and following bowel movements that makes it difficult to leave the toilet for some time after starting. Due to this condition, the impulse to pass stool simultaneously causes muscles that obstruct the passage of stool to contract involuntarily (what we call paradoxical contractions clinically) and both strains and makes difficult to activate those which would ordinarily be used, which also produces the vascular stress which produces painful hemorrhoids that can prolapse outside the anorectal canal during bowel movement and/or become thrombosed. The pain these hemorrhoids produce during future bowel movements in turn creates a form of negative biofeedback to hold in stool, and contributes cyclically to reinforcing the pathology of the pelvic floor dyssynergia.

Mr. Kohn's case of pelvic floor dyssynergia, as measured through his anorectal manometries, also presents an additional complication of rectal hyposensitivity. Among the things the manometry measures are the amount of rectal pressure that creates a "first sensation" indication of restroom need, as well as the amount of rectal pressure that creates a painful "urgency" to defecate. For Mr. Kohn, both of these numbers were abnormally high, but also abnormally close together. This means that he will have no sensory notice that he will need to use the restroom until very close in time to when he will feel excruciating discomfort from not doing so. This is especially true as a side effect of the medication he takes to reduce constipation discomforts from irritable bowel syndrome, linzess, further compresses the time between when he will have any sensory indication and when he'll urgently need to defecate.

Due to these irritable bowel syndrome with chronic constipation and pelvic floor dyssynergia conditions, and independently, due to the use of bethanechol to mitigate some of his gastroparesis symptoms and linzess to mitigate digestive discomfort from irritable bowel syndrome, and particularly for Mr. Kohn due to added sensitivity to distractions from these symptoms during the exam relating to his autism, Mr. Kohn will not be able to time bowel movements to hard-scheduled breaks, but will instead need spontaneously electable access to a restroom without losing the ability to return to the exam, and because for bowel movements he will take far longer than is ordinary due to his medical issues, I'd both note that time spent in the restroom must not be at issue in any measures taken to detect potential cheating or exam security concerns and recommend that restroom breaks also be treated as stop the clock

breaks to prevent an ill-timed bowel movement from unduly detracting from the amount of time he'll have to complete any part of the exam.

Mr. Kohn tells me there may be exam security considerations relating to these accommodations if he tests from home, since his home restroom would not be part of a secured test area he had been screened for prohibited items to enter, so there might be concerns about cheating if he left view of the webcam on his computer and still could return to test. He also suggests that this could be addressed by the Bar sending the proctor(s) to his home in a manner that complies with physical distancing guidelines at that time and using the appropriate protective equipment instead of relying solely on webcam-based technology, so that a proctor could inspect the restroom before the exam starts and then monitor that it's accessed without detour. Alternatively, he suggests a body-worn camera be used that records him from his vantage point, including while using the restroom, to ensure no prohibited materials are accessed while out of sight of any computer webcam facing him. To me, either or both of these proposals would be reasonable and adequately address any security concerns from both providing the recommended accommodations and continuing to allow Mr. Kohn to test from home if that is what is otherwise offered to others due to the pandemic.

Mr. Kohn has some concern that if you decide otherwise, but grant these accommodations for a test center administration where most test from home, but specific disabled candidates and those without certain computer equipment are required to test in person, this would expose him to numerous disadvantages compared to other candidates, including greater coronavirus exposure risks, greater financial barriers and costs to accessing the exam due to his disability accommodations, the need to commute putting him at a disadvantage, uncertainty until close to the exam about where he would need to go, and most importantly the effect of a continued to denial of his myofascial pain syndrome disability accommodation request for provision of nonportable furniture ergonomic equipment he would otherwise need to bring and remove every test day to access the exam if forced to test in person. Disability accommodations should be selected to provide as little disadvantage due to total disability impairments as is possible, and so in my opinion his proposals for securing the exam while providing for his restroom access needs would be far more reasonable than conditioning their receipt on testing in person at a test center, particularly if the State Bar does not overturn its prior denial of his request for the ergonomic equipment Dr. Dresden requests to be provided as a disability accommodation.

In summary, for the four physical disability conditions of gastroparesis, postoperative dysphagia, irritable bowel syndrome with chronic constipation, and pelvic floor dyssynergia, I recommend the following updated/expanded accommodations:
1. Permission to bring, eat, and drink food and beverages in the exam room, and to remain in the exam room subject to proctor supervision during any meal breaks (already approved).
2. A number of stop the clock breaks for meals during each exam day equal to the lower of the test time for that day divided by 90 minutes or four such breaks, instead of a singular hourlong lunch break, that can be initiated any time Mr. Kohn chooses within the exam session and have

a time limit of no less than 30 minutes each if he tests at a test center and no less than 20 minutes each if he tests at home; or, alternatively 120 minutes of additional extra time to any for other disabilities on each exam day if he tests at a test center and 80 minutes of such additional extra time if he tests at home.

3. Permission to use the restroom freely during all exam sessions and still be allowed to return to the exam.

4. That length of restroom trips not be held against Mr. Kohn in any exam security measures.

5. That, due to the effects of bethanechol, Mr. Kohn be allowed up to one up to 5-minute stop the clock break for restroom use for each hour of the exam; or alternatively an additive 30 minutes per exam day of additional extra time.

6. That, due to his constipation and pelvic floor dyssynergia, Mr. Kohn be allowed up to one up to 20-minute stop the clock break per exam day for bowel movements; or alternatively an additional 20 minutes per exam day of additional extra time.

I certify under penalty of perjury under the laws of the State of California that all statements herein are true and accurate to the best of my professional knowledge and belief.

John O. Clarke, MD
Clinical Associate Professor of Medicine
Director, Esophageal Program
Stanford University

## ▾ NUC GASTRIC EMPTYING-SOLID
University of Iowa Hospitals and Clinics (UIHC)

**Result Impression**

Impression: Severely decreased rate of gastric emptying for solid phase.

The findings of the study were discussed with Dr. Levin, Avraham pager 4210 at 1055 hours on 3/23/2018.

**Result Narrative**

Procedure: NUC GASTRIC EMPTYING-SOLID (78264)

Indication: Postprandial fullness.

Radiopharmaceutical: Technetium-99m (Tc-99m) labeled sulfur colloid 1.08 mCi PO.

Technique: After the patient ate the standard radiolabeled meal, anterior and posterior images of the abdomen were obtained at multiple time points over the course of 2 hrs. Regions of interest were drawn around the stomach to quantify clearance of activity over time by geometric mean analysis.

Findings: Initial images show activity within the stomach. Subsequent images show slow transit of activity into the small bowel activity over the acquisition interval. Based on the time-activity curve, only 24% of the initial gastric activity is emptied at 2 hours (normal: more than 40%).

**Status**

Results Details
Encounter Summary

---

## ▾ NM Gastric Emptying Solid
Stanford Health Care and University Healthcare Alliance

**Result Impression**

IMPRESSION:

1. Very severely delayed gastric emptying with 66% of radiotracer remaining in the stomach at the 4 hour time point.

"Physician to Physician Radiology Consult Line: (650) 736-1173"

Signed

**Result Narrative**

GASTRIC EMPTYING STUDY: 5/25/2018 12:00

CLINICAL HISTORY: 24 years of age, Male, with history concerning for gastroparesis, referred for evaluation of gastric emptying.

COMPARISON: None.

PROCEDURE COMMENTS:
Radiopharmaceutical: Tc-99m sulphur colloid 0.558 mCi PO.
Technique: A standard meal consisting of Eggbeater 120 ml, toast, jam and water was labeled with the radiopharmaceutica l and administered orally to the patient. The patient ate the meal in 10 minutes. Subsequent static images were obtaine d at approximately 60, 120, 180 and 240 minutes post ingestion, to calculate percent emptying.

FINDINGS:

There is prompt radiopharmaceutical accumulation within the stomach. There is initial filling of the gastric fundus, fo llowed by movement to the antrum. There is subsequent emptying of the radiotracer into the proximal gastrointestinal tr act. The emptying fraction (at interpolated times) are tabulated:

| Time (minutes) | % Emptying | Normal Range % Empty | |
|---|---|---|---|
| 60 | | 28 | 10-70% |
| 120 | | 29 | 40-100% |
| 180 | | 29 | 70-100% |
| 240 | | 34 | 90-100% |

**Status**

Results Details
Encounter Summary

# Appointment Details

Notes

## Procedures

**Yehudith Assouline-Dayan, MD at 11/20/2017 11:59 PM**

Procedure Orders
1. OTHER PROCEDURE [297276885] ordered by Dong, Jae Wook, MD at 11/22/17 1809
Post-procedure Diagnoses
1. GERD (gastroesophageal reflux disease) [K21.9]
**AMBULATORY ESOPHAGEAL PH TEST W BRAVO**

**DATE OF PROCEDURE:** 11/20/2017

**OPERATION/PROCEDURE**
48 hour bravo pH Study

**INDICATIONS** Heartburn
**ATTENDING STAFF** Judith Assouline-Dayan, MD
**RESIDENT/FELLOW** Jae Wook Dong, MD
**REFERRING PHYSICIAN** Levin, MD
**DESCRIPTION OF OPERATION/PROCEDURE**
After an overnight fast and oropharyngeal anesthesia, a Bravo pH sensor was placed
through the mouth and clipped onto the esophageal mucosa 6.0 cm above the lower
esophageal sphincter. The sensor location was confirmed either endoscopically and/or
fluoroscopically. Acid reflux was defined as a fall in pH below 4. The patient was
instructed to maintain a symptom diary and to record any events such as chest pain,
meals, sleep time, etc. The patient was off of any anti-secretory medication. The
recording was carried out for 48hr 00min and downloaded to a computer for graphic
display and analysis. The tracing was also analyzed manually.

**FINDINGS**

**REFLUX MONITORING SUMMARY**

| Acid Exposure Summary | Total | Normal | Upright | Normal | Supine | Normal |
|---|---|---|---|---|---|---|
| Acid exposure time (%) | **7.6** | <4.9 | **9.9** | <7.3 | 1.3 | <1.4 |
| Longest reflux (min) | **62.7** | <16.0 | 62.7 | | 3.5 | |
| DeMeester Score | **24.1** | <14.7 | | | | |

| Symptom Association Summary | Heartbur | Cough |
|---|---|---|

|                                    | n   |     |
| ---------------------------------- | --- | --- |
| Number of occurrences              | 3   | 5   |
| Symptom index for reflux (SI)      | 0.0 | 0.0 |
| Symptom association prob. (SAP)*   | 0.0 | 0.0 |

**Note**: pH normal values in the report are from publications wherein subjects are not taking acid suppressive medication, irrespective of the medication selection in the Diary.

## DETAIL TABLES

**Total**

| Period Durations (HH:MM) | Total | Upright | Supine | Post-prandial |
| ------------------------ | ----- | ------- | ------ | ------------- |
| Total Time               | 48:00 | 36:22   | 11:38  | 06:13         |
| Analysis Time            | 38:53 | 28:37   | 10:16  | 06:13         |

| Acid Reflux Analysis        | Total | Upright | Supine | Post-prandial |
| --------------------------- | ----- | ------- | ------ | ------------- |
| Acid exposure time (HH:MM)  | 02:57 | 02:49   | 00:08  | 00:15         |
| Acid exposure time (%)      | **7.6** | **9.9** | 1.3   | 4.0           |
| Number of refluxes          | 55    | 42      | 13     | 8             |
| Number of long refluxes     | 4     | 4       | 0      | 0             |
| Longest reflux (min)        | **62.7** | 62.7 | 3.5    | 4.8           |

| DeMeester Score | Score    | Normal* |
| --------------- | -------- | ------- |
| Ch 1            | **24.1** | <14.7   |

* 95th percentile

| Symptom Analysis                   | Heartburn | Cough |
| ---------------------------------- | --------- | ----- |
| Number of occurrences              | 3         | 5     |
| Symptoms related to reflux         | 0         | 0     |
| Symptoms not related to reflux     | 3         | 5     |
| Reflux periods                     | 55        | 55    |
| Symptom Index (SI)                 | 0.0       | 0.0   |
| Symptom Association Prob. (SAP)*   | 0.0       | 0.0   |

* Probability that symptom and reflux are not associated solely by chance, (>95% is significant)

## Day 1

| Period Durations (HH:MM) | Total | Upright | Supine | Post-prandial |
|---|---|---|---|---|
| Total Time | 24:00 | 13:47 | 10:13 | 01:58 |
| Analysis Time | 21:46 | 12:48 | 08:58 | 01:58 |

| Acid Reflux Analysis | Total | Upright | Supine | Post-prandial |
|---|---|---|---|---|
| Acid exposure time (HH:MM) | 02:07 | 02:00 | 00:07 | 00:00 |
| Acid exposure time (%) | **9.7** | **15.6** | **1.4** | 0.3 |
| Number of refluxes | 36 | 26 | 10 | 2 |
| Number of long refluxes | 2 | 2 | 0 | 0 |
| Longest reflux (min) | **62.7** | 62.7 | 3.5 | 0.3 |

| DeMeester Score | Score | Normal* |
|---|---|---|
| Ch 1 | **28.4** | <14.7 |

* 95th percentile

| Symptom Analysis | Heartburn | Cough |
|---|---|---|
| Number of occurrences | 2 | 1 |
| Symptoms related to reflux | 0 | 0 |
| Symptoms not related to reflux | 2 | 1 |
| Reflux periods | 36 | 36 |
| Symptom Index (SI) | 0.0 | 0.0 |
| Symptom Association Prob. (SAP)* | 0.0 | 0.0 |

* Probability that symptom and reflux are not associated solely by chance, (>95% is significant)

## Day 2

| Period Durations (HH:MM) | Total | Upright | Supine | Post-prandial |
|---|---|---|---|---|
| Total Time | 24:00 | 22:35 | 01:25 | 04:16 |
| Analysis Time | 17:07 | 15:49 | 01:18 | 04:16 |

| Acid Reflux Analysis | Total | Upright | Supine | Post-prandial |
|---|---|---|---|---|
| Acid exposure time (HH:MM) | 00:50 | 00:50 | 00:00 | 00:15 |
| Acid exposure time (%) | **4.9** | 5.2 | 0.6 | 5.7 |
| Number of refluxes | 19 | 16 | 3 | 6 |
| Number of long refluxes | 2 | 2 | 0 | 0 |
| Longest reflux (min) | 14.9 | 14.9 | 0.3 | 4.8 |

| DeMeester Score | Score | Normal* |
|---|---|---|
| Ch 1 | 13.0 | <14.7 |

* 95th percentile

| Symptom Analysis | Heartburn | Cough |
|---|---|---|
| Number of occurrences | 1 | 4 |
| Symptoms related to reflux | 0 | 0 |
| Symptoms not related to reflux | 1 | 4 |
| Reflux periods | 19 | 19 |
| Symptom Index (SI)* | 0.0 | 0.0 |
| Symptom Association Prob. (SAP)* | 0.0 | 0.0 |

* Probability that symptom and reflux are not associated solely by chance, (>95% is significant)

**IMPRESSION**

Abnormal Bravo pH probe study with increased esophageal acid exposure **off PPI. The high DeMeester score is secondary to one single very long episode of reflux which lasted for about 90 min. If this specific episode is excluded from the analysis, DeMeester is normal at 12. This is a very unusual finding and it is not clear if it is a true finding or not. If conservative treatment fails and the patient wishes to seek surgical treatment, I would strongly consider to repeat the test.** Heartburn or cough was not correlated with acid reflux.

**Signature**

Jae Wook Dong, MD
Fellow Physician
Department of Internal Medicine
Division of Gastroenterology and Hepatology

**Teaching Statement**

I have personally reviewed and interpreted the results of the exam, and agree with the findings and plan as documented.

Judith Assouline Dayan, MD
Clinical Associate Professor
Division of Gastroenterology-Hepatology
Department of Internal Medicine
University of Iowa Hospitals and Clinics

Electronically signed by Yehudith Assouline-Dayan, MD at 11/25/2017  9:55 PM

**Peter Nau, MD at 11/20/2017  2:01 PM**

Procedure Orders
1. AMBULATORY ESOPHAGEAL PH TEST W BRAVO BY UPPER ENDOSCOPY [294127823] ordered by Levin, Avraham D, MD at 10/24/17 1541
Pre-procedure Diagnoses
1. GERD (gastroesophageal reflux disease) [K21.9]
Post-procedure Diagnoses
1. GERD (gastroesophageal reflux disease) [K21.9]

**AMBULATORY ESOPHAGEAL PH TEST W BRAVO BY UPPER ENDOSCOPY**

**DATE** 11/20/2017

**OPERATION/PROCEDURE**
Esophagogastroduodenoscopy with Bravo placement

**Attending Staff**
Peter Nau, MD, MS

**Resident**
Budreau

**Indications**
GERD

**Preprocedural History and Physical**
BP 132/73  | Temp 37.1 °C (98.8 °F) (Tympanic)  | Resp 21  | SpO2 100%
HEENT:  Head is atraumatic, normocephalic.  PERRLA.  EOMI bilaterally.  Tracheal midline.  Neck is supple
Lungs: Clear to auscultation bilaterally, normal respiratory effort
Heart: Normal S1 and S2.  No murmurs, rubs or gallops
Abdomen: Soft, nontender, nondistended
Mental Status: awake and alert; oriented to person, place, and time
**ASA Class:** 1

In addition to a focused physical exam, the patient's past medical history and medications were reviewed.  Following this, the patient was deemed an appropriate candidate for the aforementioned procedure.

**Consent for procedure**
The risks, benefits, and alternatives of the procedure and sedation were discussed with

the patient in detail today and all questions were answered. The patient elects to proceed with the procedure and sedation as outlined.


## PROCEDURAL MEDICATIONS
Midazolam 6 mg IV
Fentanyl 50 mcg IV
Lidocaine spray
Oxygen by nasal canula
Sedation start - 13:44
Sedation end - 13:57

## DESCRIPTION OF OPERATION/PROCEDURE
Based on the pre-procedure assessment, including review of the patient's medical history, medications, allergies, and review of systems, he had been deemed to be an appropriate candidate for conscious sedation; he was therefore sedated with the medications listed previously.  He was monitored continuously with pulse oximetry, blood pressure monitoring, and direct observation.

Prior to proceeding, the patient's name, date of birth, and procedure to be undertaken was verified with a time out. The patient was then placed in the left lateral decubitus position and the oropharynx was adequately anesthetized with Lidocaine spray. Adequate analgesia was achieved with the use of fentanyl and midazolam and a bite-block was placed. An adult Olympus endoscope (GIF-H180) was then placed in the oropharynx and advanced easily down through the esophagus and into the stomach.  The pylorus was visualized and traversed.  The first and second portions of the duodenum were then investigated.  Following this, the scope was withdrawn into the stomach and a retroflexed view of the GE junction was obtained.  Next, the rest of the stomach was visualized. The scope was then withdrawn into the esophagus and it was investigated during scope withdrawal.

Findings:
**Esophagus**: GE junction noted at 41 cm from the incisors.  There were no masses, strictures or ulcers noted.  No esophageal varices.  GEJ consistent with GERD.
**Stomach:** Retroflexed view of the fundus revealed no hiatal hernia.  There were no masses, ulcers or gastric varices noted.  Gastric folds were normal and flattened appropriately with insufflation.
**Antrum/ pylorus**: Normal grossly - of note, he did have a relative narrowing at the angularis.  Otherwise, his anatomy was WNL.
**Duodenum:**  There were no masses, ulcers or other overt pathology identified up to the distal second portion of the duodenum.


**PHOTOGRAPHS**  Photographs were taken and scanned into EPIC.

**BIOPSY:** Deferred due to Bravo placement

**COMPLICATIONS:** None immediately.

**PLAN:** Follow-up with referring provider to discuss pH results

**Teaching statement:** I, Dr. Nau was present for the entire procedure.

Electronically signed by Peter Nau, MD at 11/20/2017  2:03 PM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# Appointment Details

Notes

## Procedures

**Peter Nau, MD at 2/8/2018 11:59 PM**

Procedure Orders
1. 24 HR AMBULATORY IMPEDANCE ESOPHAGEAL PH TEST [297276925] ordered by Nau, Peter N, MD at 02/06/18 1325

Pre-procedure Diagnoses
1. Heartburn [R12]

Post-procedure Diagnoses
1. Heartburn [R12]

**24 HR AMBULATORY IMPEDANCE ESOPHAGEAL PH TEST**

**24 Hr Ambulatory Impedence pH Test Procedure Note**

**Patient:**  Benjamin S Kohn

**Procedure Date: 12/8/2018**

**Operation/Procedure:** 24 Hr Impedance pH Test

**Indications:** Heartburn

**Attending Staff:** Yehudith Assouline-Dayan MD.

**Fellow:** Maen Masadeh, MD

**Referring Physician:** Dresden, Graham

**Description of Operation/Procedure:**
The procedure was performed by placing an impedance pH probe (Comfor Tec MII.pH, Sandhill Scientific) that was attached to an ambulatory impedance pH recorder (Sandhill Scientific). The 2.13 mm probe has 8 impedance sensors that are 2 cm apart and 2 antimony pH sensors, 15 cm apart.  The probe was calibrated before placement into the esophagus.  The impedance ph probe was advanced via the naris into the esophagus, after nasal lubrication.The probe was placed such that the distal pH channel was located in the stomach, 10 cm below the LES and the proximal pH channel was located in the esophagus, 5 cm proximal to the LES. The impedance sensors were located at 2, 4, 6, 8, 10, 12, 14 and 16 cm above the LES in the esophagus. The location of the lower

esophageal sphincter was previously determined by manometry. The patient was encouraged to conduct normal daily activities throughout the study including consuming usual regular meals and usual activity and to record these events using an event button as well as on a symptom diary. The patient was asked to discontinue anti-secretory medication during the test.

The patient noted meal ingestion, upright or supine position and symptoms during the study by pressing an event marker. The recordings were carried out for 24 hours and 0 minutes and downloaded to a computer for graphic display and analysis. The tracing was analyzed manually as well as using the computer software analysis for acid reflux and non-acid reflux events and correlation of symptoms with these events.

**REFLUX MONITORING SUMMARY**

| [pH]Acid Exposure Summary | Total | Normal | Upright | Normal | Supine | Normal |
|---|---|---|---|---|---|---|
| Ch 1 Prox. | | | | | | |
| Acid exposure time (%) | **7.6** | <4.2 | **8.9** | <6.3 | **5.6** | <1.2 |
| Longest reflux (min) | **20.5** | <9.2 | 9.5 | | 20.5 | |
| DeMeester Score | **28.8** | <14.7 | | | | |
| Ch 2 Dist. | | | | | | |
| Acid exposure time (%) | 84.5 | | 82.2 | | 87.9 | |
| Longest reflux (min) | 302.4 | | 281.2 | | 253.3 | |

| [Z]Reflux Episode Activity Summary | Total | Upright | Supine | Post-prandial |
|---|---|---|---|---|
| All reflux episodes* | 7 | 7 | 0 | 0 |
| Proximal episodes* | 2 | 2 | 0 | |
| Bolus Exposure Time (%) | 0.2 | 0.3 | 0.0 | 0.0 |
| Bolus Exposure Time (%)(Normal) | <2.3 | <4.2 | <1.6 | |

* not normalized

| [Z]Symptom Association Summary | Heartburn |
|---|---|
| Number of occurrences | 1 |
| Acid reflux | 0 |
| Weakly acidic reflux | 0 |
| Non-acid reflux | 0 |
| All reflux | 0 |
| Symptom Index (SI) | 0.0 |
| Symptom Association Probability (SAP) | 0.0 |

**Note**:
1. pH normal values in the report are from publications wherein subjects are not taking acid suppressive medication, irrespective of the medication selection in the Diary.
2. Impedance normal values in the report are from Zerbib et al., Clinical Gastro. &

Hepato. 2013. The normal values are dependent on the medication selection in the Diary.

## REFLUX ANALYSIS BASED ON pH MEASUREMENT

| Period Durations (HH:MM) | Total | Upright | Supine | Post-prandial |
|---|---|---|---|---|
| Total Time | 24:00 | 15:03 | 08:57 | 04:00 |
| Analysis Time | 22:11 | 13:14 | 08:57 | 04:00 |

| [pH]Acid Reflux Analysis | Total | Upright | Supine | Post-prandial |
|---|---|---|---|---|
| Ch 1 Prox. | | | | |
| Acid exposure time (HH:MM) | 01:41 | 01:11 | 00:30 | 00:28 |
| Acid exposure time (%) | **7.6** | **8.9** | **5.6** | 11.7 |
| Number of refluxes | 85 | 72 | 13 | 30 |
| Number of long refluxes | 4 | 3 | 1 | 0 |
| Longest reflux (min) | **20.5** | 9.5 | 20.5 | 3.8 |
| Ch 2 Dist. | | | | |
| Acid exposure time (HH:MM) | 18:45 | 10:53 | 07:52 | 02:39 |
| Acid exposure time (%) | 84.5 | 82.2 | 87.9 | 66.2 |
| Number of refluxes | 102 | 94 | 10 | 81 |
| Number of long refluxes | 16 | 12 | 5 | 7 |
| Longest reflux (min) | 302.4 | 281.2 | 253.3 | 70.2 |

| [pH]DeMeester Score | Score | Normal* |
|---|---|---|
| Ch 1 Prox. | **28.8** | <14.7 |

* 95th percentile

| [pH]Symptom Analysis | Heartburn |
|---|---|
| Number of occurrences | 1 |
| Ch 1 Prox. | |
| Symptoms related to reflux | 0 |
| Symptoms not related to reflux | 1 |
| Reflux periods | 85 |
| Symptom Index (SI) | 0.0 |
| Symptom Association Prob. (SAP)* | 0.0 |
| Ch 2 Dist. | |
| Symptoms related to reflux | 1 |
| Symptoms not related to reflux | 0 |
| Reflux periods | 102 |
| Symptom Index (SI) | 100.0 |
| Symptom Association Prob. (SAP)* | 9.7 |

* Probability that symptom and reflux are not associated solely by chance, (>95% is significant)

# REFLUX ANALYSIS BASED ON Z MEASUREMENT AND CLASSIFIED BASED ON pH

| [Z]Normalized Reflux Episode Activity* | Total | Normal** |
|---|---|---|
| Acid reflux | 5 | <40.0 |
| Weakly acidic reflux | 2 | <21.0 |
| **Non-acid reflux** | **0** | <0.0 |
| All reflux | 8 | <53.0 |

* Episodes/24 hr.
** 95th percentile

| [Z]Reflux Episode Activity | Total | Upright | Supine | Post-prandial |
|---|---|---|---|---|
| Acid reflux | 5 | 5 | 0 | 0 |
| Weakly acidic reflux | 2 | 2 | 0 | 0 |
| Non-acid reflux | 0 | 0 | 0 | 0 |
| All reflux | 7 | 7 | 0 | 0 |

| [Z]Reflux Composition | Total | Normal | Upright | Normal | Supine | Normal |
|---|---|---|---|---|---|---|
| Liquid Only | 5 | | 5 | | 0 | |
| Mixed | 2 | | 2 | | 0 | |
| Gas Only | 127 | | 120 | | 7 | |

| [Z]Bolus Exposure Time | Total | Upright | Supine |
|---|---|---|---|
| Acid reflux | 00:02 | 00:02 | 00:00 |
| Weakly acidic reflux | 00:01 | 00:01 | 00:00 |
| Non-acid reflux | 00:00 | 00:00 | 00:00 |
| All reflux | 00:03 | 00:03 | 00:00 |

5.0 cm above LES

| [Z]Bolus Exposure Time (%)* | Total | Upright | Supine |
|---|---|---|---|
| Acid reflux | 0.1 | 0.2 | 0.0 |
| Weakly acidic reflux | 0.1 | 0.1 | 0.0 |
| Non-acid reflux | 0.0 | 0.0 | 0.0 |
| All reflux | 0.2 | 0.3 | 0.0 |
| All reflux (Normal) | <2.3 | <4.2 | <1.6 |

5.0 cm above LES
*% time of selected period

| [Z]Bolus Exposure Longest Reflux (min) | Total | Upright | Supine |
|---|---|---|---|
| Acid reflux | 0.7 | 0.7 | 0.0 |
| Weakly acidic reflux | 0.9 | 0.9 | 0.0 |
| Non-acid reflux | 0.0 | 0.0 | 0.0 |
| All reflux | 0.9 | 0.9 | 0.0 |

5.0 cm above LES

| [Z]Symptom Correlation to Reflux | Heartbur |
|---|---|

|  | n |
|---|---|
| Number of occurrences | 1 |
| Acid reflux | 0 |
| Weakly acidic reflux | 0 |
| Non-acid reflux | 0 |
| All reflux | 0 |
| Unrelated | 1 |

| [Z]Reflux Symptom Index | Heartburn |
|---|---|
| Acid reflux | 0.0 |
| Weakly acidic reflux | 0.0 |
| Non-acid reflux | 0.0 |
| All reflux | 0.0 |

| [Z]Reflux Symptom Association Probability* | Heartburn |
|---|---|
| Acid reflux | 0.0 |
| Weakly acidic reflux | 0.0 |
| Non-acid reflux | 0.0 |
| All reflux | 0.0 |

* Probability that symptom and reflux are not associated solely by chance, (>95% is significant)

| [Z]Proximal Reflux Count | Total | Upright | Supine |
|---|---|---|---|
| Acid reflux | 1 | 1 | 0 |
| Weakly acidic reflux | 1 | 1 | 0 |
| Non-acid reflux | 0 | 0 | 0 |
| All reflux | 2 | 2 | 0 |

15.0 cm above LES

| [Z]Proximal Reflux (%)* | Total | Upright | Supine |
|---|---|---|---|
| Acid reflux | 14.3 | 14.3 | N/A |
| Weakly acidic reflux | 14.3 | 14.3 | N/A |
| Non-acid reflux | 0.0 | 0.0 | N/A |
| All reflux | 28.6 | 28.6 | N/A |

15.0 cm above LES
* Percent of all refluxes

**Impression:**

1. Abnormal 24 hr study with increase in acid exposure while off proton pump inhibitor therapy.
2. Proximal esophagus: increase in acid exposure while supine
3. Distal esophagus: increase in acid exposure while supine and upright

**This is a preliminary report, not yet reviewed by a staff physician**

**Staff Involved**

Staff and Resident/Fellow

**Teaching Statement**
I have discussed the case with the resident/fellow and agree with the findings and
reading as documented.

Electronically signed by Peter Nau, MD at 2/14/2018  7:16 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# Appointment Details

Notes

## Procedures

**Yehudith Assouline-Dayan, MD at 3/15/2018 11:59 PM**

Procedure Orders
1. 24 HR AMBULATORY IMPEDANCE ESOPHAGEAL PH TEST [306085943] ordered by Levin, Avraham D, MD at 03/05/18 1301
Pre-procedure Diagnoses
1. Postprandial bloating [R14.0]
Post-procedure Diagnoses
1. Postprandial bloating [R14.0]
2. Heartburn [R12]
**24 HR AMBULATORY IMPEDANCE ESOPHAGEAL PH TEST**

**24 Hr Ambulatory Impedence pH Test Procedure Note**

**Patient:** Benjamin S Kohn

**Procedure Date: 3/15/18**

**Operation/Procedure: 24 Hr Impedence pH Test on PPI**
**Indications:** Heartburn

**Attending Staff:** Huy Tran, MD.

**Fellow:** Vancura

**Referring Physician: Dr Avraham**

**Description of Operation/Procedure:**
The procedure was performed by placing an impedance pH probe (Comfor Tec MII.pH, Sandhill Scientific) that was attached to an ambulatory impedance pH recorder (Sandhill Scientific). The 2.13 mm probe has 8 impedance sensors that are 2 cm apart and 2 antimony pH sensors, 15 cm apart. The probe was calibrated before placement into the esophagus. The impedance ph probe was advanced via the naris into the esophagus, after nasal lubrication.The probe was placed such that the distal pH channel was located in the stomach, 10 cm below the LES and the proximal pH channel was located in the esophagus, 5 cm proximal to the LES. The impedance sensors were located at 2, 4, 6, 8, 10, 12, 14 and 16 cm above the LES in the esophagus. The location of the lower

esophageal sphincter was previously determined by manometry. The patient was encouraged to conduct normal daily activities throughout the study including consuming usual regular meals and usual activity and to record these events using an event button as well as on a symptom diary. The patient was asked to **continue** anti-secretory medication during the test.

The patient noted meal ingestion, upright or supine position and symptoms during the study by pressing an event marker. The recordings were carried out for 24 hours and 00 minutes and downloaded to a computer for graphic display and analysis. The tracing was analyzed manually as well as using the computer software analysis for acid reflux and non-acid reflux events and correlation of symptoms with these events.

## REFLUX MONITORING SUMMARY

| [pH]Acid Exposure Summary | Total | Normal | Upright | Normal |
|---|---|---|---|---|
| Ch 1 Prox. | | | | |
|    Acid exposure time (%) | 2.3 | <4.2 | 2.3 | <6.3 |
|    Longest reflux (min) | 5.2 | <9.2 | 5.2 | |
|    DeMeester Score | 9.8 | <14.7 | | |

| [Z]Reflux Episode Activity Summary | Total | Upright | Post-prandial |
|---|---|---|---|
| All reflux episodes | 207 | 207 | 80 |
| Proximal episodes | 80 | 80 | |
| Bolus Exposure Time (%) | 10.1 | 10.1 | 16.0 |
| Bolus Exposure Time (%)(Normal) | <2.1 | <3.2 | |

| [Z]Symptom Association Summary | Heartburn |
|---|---|
| Number of occurrences | 4 |
| Acid reflux | 0 |
| Weakly acidic reflux | 1 |
| Non-acid reflux | 0 |
| All reflux | 1 |
| Symptom Index (SI) | 25.0 |
| Symptom Association Probability (SAP) | 0.0 |

## REFLUX ANALYSIS BASED ON pH MEASUREMENT

| Period Durations (HH:MM) | Total | Upright | Post-prandial |
|---|---|---|---|
| Total Time | 24:00 | 24:00 | 04:45 |
| Analysis Time | 22:10 | 22:10 | 04:45 |
| [pH]Acid Reflux Analysis | Total | Upright | Post-prandial |

| Ch 1 Prox. Esophageal | | | |
|---|---|---|---|
| Acid exposure time (HH:MM) | 00:30 | 00:30 | 00:14 |
| Acid exposure time (%) | 2.3 | 2.3 | 4.8 |
| Number of refluxes | 63 | 63 | 28 |
| Number of long refluxes | 1 | 1 | 0 |
| Longest reflux (min) | 5.2 | 5.2 | 3.3 |
| Ch 2 Dist. Gastric | | | |
| Acid exposure time (%) | 6.2 | 6.2 | 17.5 |

| [pH]DeMeester Score | Score | Normal* |
|---|---|---|
| Ch 1 Prox. | 9.8 | <14.7 |

| [pH]Symptom Analysis | Heartburn |
|---|---|
| Number of occurrences | 4 |
| Ch 1 Prox. | |
| Symptoms related to reflux | 0 |
| Symptoms not related to reflux | 4 |
| Reflux periods | 63 |
| Symptom Index (SI) | 0.0 |
| Symptom Association Prob. (SAP)* | 94.2 |

## REFLUX ANALYSIS BASED ON Z MEASUREMENT AND CLASSIFIED BASED ON pH

| [Z]Normalized Reflux Episode Activity | Total | Normal |
|---|---|---|
| Acid reflux | 17 | <7.0 |
| Weakly acidic reflux | 207 | <55.0 |
| Non-acid reflux | 0 | <2.0 |
| All reflux | 224 | <57.0 |

| [Z]Reflux Episode Activity | Total | Upright | Post-prandial |
|---|---|---|---|
| Acid reflux | 16 | 16 | 11 |
| Weakly acidic reflux | 191 | 191 | 69 |
| Non-acid reflux | 0 | 0 | 0 |
| All reflux | 207 | 207 | 80 |

| [Z]Reflux Composition | Total | Normal | Upright | Normal |
|---|---|---|---|---|
| Liquid Only | 189 | | 189 | |
| Mixed | 18 | | 18 | |
| Gas Only | 67 | | 67 | |

| [Z]Bolus Exposure Time | Total | Upright |
|---|---|---|
| Acid reflux | 00:16 | 00:16 |
| Weakly acidic reflux | 01:58 | 01:58 |

| Non-acid reflux | 00:00 | 00:00 |
| All reflux | 02:14 | 02:14 |

5.0 cm above LES

| [Z]Bolus Exposure Time (%)* | Total | Upright |
|---|---|---|
| Acid reflux | 1.2 | 1.2 |
| Weakly acidic reflux | 8.9 | 8.9 |
| Non-acid reflux | 0.0 | 0.0 |
| All reflux | 10.1 | 10.1 |
| All reflux (Normal) | <2.1 | <3.2 |

5.0 cm above LES
*% time of selected period

| [Z]Bolus Exposure Longest Reflux (min) | Total | Upright |
|---|---|---|
| Acid reflux | 5.9 | 5.9 |
| Weakly acidic reflux | 7.5 | 7.5 |
| Non-acid reflux | 0.0 | 0.0 |
| All reflux | 7.5 | 7.5 |

5.0 cm above LES

| [Z]Symptom Correlation to Reflux | Heartburn |
|---|---|
| Number of occurrences | 4 |
| Acid reflux | 0 |
| Weakly acidic reflux | 1 |
| Non-acid reflux | 0 |
| All reflux | 1 |
| Unrelated | 3 |

| [Z]Reflux Symptom Index | Heartburn |
|---|---|
| Acid reflux | 0.0 |
| Weakly acidic reflux | 25.0 |
| Non-acid reflux | 0.0 |
| All reflux | 25.0 |

| [Z]Reflux Symptom Association Probability* | Heartburn |
|---|---|
| Acid reflux | 0.0 |
| Weakly acidic reflux | 57.7 |
| Non-acid reflux | 0.0 |
| All reflux | 0.0 |

| [Z]Proximal Reflux Count | Total | Upright |
|---|---|---|
| Acid reflux | 7 | 7 |
| Weakly acidic reflux | 73 | 73 |
| Non-acid reflux | 0 | 0 |
| All reflux | 80 | 80 |

15.0 cm above LES

| [Z]Proximal Reflux (%)* | Total | Upright |
|---|---|---|
| Acid reflux | 3.4 | 3.4 |
| Weakly acidic reflux | 35.3 | 35.3 |
| Non-acid reflux | 0.0 | 0.0 |
| All reflux | 38.6 | 38.6 |

15.0 cm above LES
* Percent of all refluxes


**Impression:**
1. Normal Esophageal acid exposure on PPI, with DeMeester score of 9.8.
2. Adequate acid suppression on current dose of PPI, since gastric pH is above 4 during 93.8% of the time.
2. Reported heartburn symptom is not associated with reflux.


Follow-up with Dr. Levin.

James Vancura D.O.
Fellow
University of Iowa Hospitals and Clinics
Department of Gastroenterology and Hepatology
Pager: 6904
Volte: 82941

**Staff Involved**
Staff and Resident/Fellow

I have reviewed the patient's chart, interpreted test result, and edited if it is necessary. I agreed with impression and plan as outlined above by the fellow.

*Huy Tran, M.D*
*GI staff*
*Division of Gastroenterology-Hepatology*
*Department of Internal Medcine*
*University of Iowa Hospitals and Clinics*

Electronically signed by Yehudith Assouline-Dayan, MD at 3/24/2018  7:42 PM


MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# Appointment Details

Notes

## Procedures

### Peter Nau, MD at 2/23/2018 11:59 PM

Procedure Orders
1. ESOPHAGEAL HIGH RESOLUTION PRESSURE MANOMETRY [297276930] ordered by Nau, Peter N, MD at 02/21/18 1627
Pre-procedure Diagnoses
1. Heartburn [R12]
Post-procedure Diagnoses
1. Heartburn [R12]

**ESOPHAGEAL HIGH RESOLUTION PRESSURE MANOMETRY**

**Esophageal Manometry/HREPT Procedure Note**

**Procedure Date:** 2/23/2018

**Operation/Procedure:** Esophageal Manometry/High Resolution Esophageal Pressure Topography (HREPT)

**Indications**: GERD

**Attending Staff**: Peter Nau, MD, MS

**Referring Physician**: Nau

**Description of Operation/Procedure:**
After an overnight fast, and calibration of the manometry system and application of 2% lidocaine gel to the nares, a 4 mm solid state manometry catheter was introduced through the nares into the esophagus and stomach. The catheter has 36 pressure channels spaced 1 cm apart, that create pressure image from pharynx to stomach.

The catheter was advanced until the distal 5 cm was in the stomach. Pressure sensors were located simultaneously across the UES, esophageal body and lower esophageal sphincter. The patient was placed in a 30 degree supine position. The probe was fixed to the nose and remained stationary throughout the recording.

The recordings were made using Sierra Scientific Instruments Manoscan 360 high resolution manometry software. This software was used for graphic display and analysis and the tracing was also analyzed manually. After a rest period, and landmark evaluation:

11 wet swallows-Supine

Any symptoms were recorded. After test completion, the probe was removed

**Findings**:

<u>**Lower Esophageal Sphincter Region**</u>

| Landmarks | Distance/Length | Normal Value |
|---|---|---|
| Proximal LES (from nares) | 44.4 cm | - |
| LES Length | 1.5 cm | 2.7 – 4.8 |
| Esophageal Length (LES – UES) | 24.0 cm | - |
| Intra-abdominal Length | 0.4 cm | - |
| Hiatal Hernia | No | No |

| LES Pressures | Pressure mmHg | Normal Value |
|---|---|---|
| Basal (Respiratory min) | 7.5 | 4.8 – 32.0 |
| Basal (Respiratory mean) | 16.7 | 13 – 43 |
| Residual (mean) | **1.6** | < 15.0 |

<u>**Esophageal Motility**</u>
Number of swallows evaluated - 11 @ 3.0 - 11.0 above LES

| Esophageal Motility | % of Swallows | Normal Value |
|---|---|---|
| Peristaltic (velocity ≤ 6.25 cm/s) | 91% | 100% |
| Simultaneous (vel. ≥ 6.25 cm/s) | 0% | 10% |
| Failed | 9% | 0% |

<u>**High Resolution Parameters**</u>

| Parameter | Finding | Normal Value |
|---|---|---|
| Distal Contractile Integral (mean) | 588.8 | 500-5000 |
| Distal Latency | 7.0 | > 4.5 |
| Percent Swallows Failed | 9% | 0% |
| Percent Panesophageal Pressurization | 0% | 0% |
| Percent Premature Contraction | 0% | 0% |
| Percent Rapid Contraction | 0% | 0% |
| Percent Large Breaks | 0% | 0% |
| Percent Small Breaks | 0% | 0% |

**EGJ**
<u>Morphology</u>: Type 1

<u>Basal pressure</u>: 16.7
<u>IRP</u>: 1.6

**Esophageal body**
Normal contraction vigor with DCI of 588.8.
Normal contractile propagation with distal latency of 7.0.

**Diagnosis/Interpretation**
While he does have some weakness to his contractions, this is a technically normal
HREM based on Chicago Classification v3


Electronically signed by Peter Nau, MD at 2/28/2018  5:19 PM




MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# Appointment Details

Notes

## Procedures

### Yehudith Assouline-Dayan, MD at 2/19/2018  8:30 AM

Procedure Orders
1. DDC - HYDROGEN BREATH TEST FRUCTOSE [297276916] ordered by Nau, Peter N, MD at 02/01/18 1111
Pre-procedure Diagnoses
1. Abdominal bloating [R14.0]

### DDC - HYDROGEN BREATH TEST FRUCTOSE

**Procedure Date:** 2/19/2018

**Indications**:  bloating, fullness after meals and flatulence/gas, heartburn, cough upon getting up, irritable bowl, constipation

**Attending Staff**:  Yehudith Assouline-Dayan MD.

**Referring Physician**: Peter Nau, MD

**Description of Operation/Procedure:**
The patient received instructions on preparation for a hydrogen breath test that included a low carbohydrate diet, avoidance of laxatives (one week) and antibiotics (4 weeks) prior to the test. After an overnight fast, a baseline breath sample that was collected in a Quintron bag that eliminated airway dead space. The patient was then given 25 grams of fructose dissolved in 250 ml of water. Thereafter, sequential breath samples were collected at 30 minutes intervals for the next three hours. All specimens were analyzed for hydrogen and methane using a Quintron gas analyzer and the patient's condition was monitored throughout the study. The patient was also asked to score the presence and severity of any symptoms on a visual analog scale throughout the study.

**Findings**:
**Fructose Breath Test Collection Table**

| | | Results | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Baseline** | **30** | **60** | **90** | **120** | **150** | **180** | **210** | **240** | **270** | **300** |
| Hydrogen (ppm) | 17 | 17 | 15 | 28 | 21 | 12 | 14 | | | | |
| Methane (ppm) | 6 | 4 | 6 | 6 | 5 | 6 | 6 | | | | |
| **Symptoms** | | | | | | | | | | | |
| Abdominal Pain | | | | | | | | | | | |

| Cramping | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Bloating | | | | | | | | | |
| Fullness | | | | | | | | | |
| Nausea | | | | | | | | | |
| Belching | | | | | | | | | |
| Indigestion | | | | | | | | | |
| Diarrhea | | | | | | | | | |
| Gas/Flatulence | | | | | | | | | |
| Distension | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**Symptom Scale: 0=Absent, 1=Mild, 2=Moderate, 3=Severe**

**NOTE:  Patient did not report any symptoms.**

**Impression**:

No significant increase in hydrogen or methane production following fructose administration.  This is a negative test for fructose malabsorption.

**Plan**

Follow up with the referring provider for discussion of test results.

**Teaching Statement**

I have personally reviewed and interpreted the results of the exam,  and agree with the findings and plan as documented.

Judith Assouline Dayan, MD
Clinical Associate Professor
Division of Gastroenterology-Hepatology
Department of Internal Medicine
University of Iowa Hospitals and Clinics

Electronically signed by Yehudith Assouline-Dayan, MD at 2/20/2018 10:19 AM
**Yehudith Assouline-Dayan, MD at 2/19/2018  8:30 AM**
Procedure Orders
1. DDC - HYDROGEN BREATH TEST GLUCOSE [297276917] ordered by Nau, Peter N, MD at 02/01/18 1111
Pre-procedure Diagnoses
1. Abdominal bloating [R14.0]
**DDC - HYDROGEN BREATH TEST GLUCOSE**

**Procedure Date:** 2/19/2018

**Indications**: bloating, fullness after meals and flatulence/gas, heartburn, cough upon getting up, irritable bowl, constipation

**Attending Staff**: Yehudith Assouline-Dayan MD.

**Referring Physician**: Peter Nau, MD

**Description of Operation/Procedure:**
The patient received instructions on preparation for a hydrogen breath test that included a low carbohydrate diet, avoidance of laxatives (one week) and antibiotics for (4 weeks) prior to the test. After an overnight fast, a baseline breath sample was collected in a Quintron bag that eliminated airway dead space. The patient was then given 75 grams of glucose dissolved in 250 ml of water. Thereafter, sequential breath samples were collected at 15 minutes intervals for the next two hours. All specimens were analyzed for hydrogen and methane using a Quintron gas analyzer and the patient's condition was monitored throughout the study. The patient was also asked to score the presence and severity of any symptoms on a visual analog scale throughout the study.

**Findings**:
**Glucose Breath Test Collection Table**

|  | Results | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
|  | **Baseline** | **15** | **30** | **45** | **60** | **75** | **90** | **105** | **120** |
| Hydrogen (ppm) | 9 | 1 | 4 | 8 | 7 | 8 | 11 | 15 | 17 |
| Methane (ppm) | 4 | 3 | 3 | 5 | 5 | 3 | 4 | 5 | 6 |
| **Symptoms** | | | | | | | | | |
| Abdominal Pain | | | | | | | | | |
| Cramping | | | | | | | | | |
| Bloating | | | | 2 | | | | | |
| Fullness | | | | 1 | | | | | |
| Nausea | | | | | | | | | |
| Belching | | | | | | | | | |
| Indigestion | | | | | | | | | |
| Diarrhea | | | | | | | | | |
| Gas/Flatulence | | | | 1 | | | | | |
| Distension | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

**Symptom Scale: 0=Absent, 1=Mild, 2=Moderate, 3=Severe**

**Impression**:
No significant increase in hydrogen or methane production following glucose administration. This is a negative test for bacterial overgrowth by breath test.

**Plan**
Follow up with the referring provider for discussion of test results.

**Teaching Statement**

I have personally reviewed and interpreted the results of the exam,  and agree with the
findings and plan as documented.

Judith Assouline Dayan, MD
Clinical Associate Professor
Division of Gastroenterology-Hepatology
Department of Internal Medicine
University of Iowa Hospitals and Clinics


Electronically signed by Yehudith Assouline-Dayan, MD at 2/20/2018 10:21 AM


MyChart® licensed from Epic Systems Corporation © 1999 - 2019

**CBC WITH DIFFERENTIAL**
*Narrative:*
*The following orders were created for panel order*
*CBC WITH DIFFERENTIAL.*
*Procedure                    Abnormality      Status*
*---------                    -----------      ------*
*CBC (COMPLETE BLOOD COUNT)[306085957]*
*Normal        Final result*
*DIFFERENTIAL[306085959]               Abnormal*
*Final result*

*Please view results for these tests on the individual*
*orders.*

## Radiology Results:
No orders to display

## EKG: None

## Medications Administered in ED :
Medications - No data to display

## Consults:
None

## Emergency Department Course:
Most recent VS: BP 146/67  | Pulse 103  | Temp 36.7 °C (98.1 °F) (Tympanic)  | Resp 18
| SpO2 98%
Patient was roomed and evaluated.  Vital signs are stable.  Physical exam is
unremarkable.  Patient's abdomen is soft, nontender, no rebound or guarding.  Basic labs
had been obtained in team triage.  Results are unremarkable.  Bedside ultrasound was
obtained.  No evidence of gallstones or sludge in gallbladder.  No evidence of gallbladder
wall thickening.  No evidence of hydronephrosis. No bladder distention. No free fluid in
the abdomen.  Rectal exam did not show any hemorrhoids or anal fissures.  Hemoccult
was negative.  Discussed with patient that with current testing and physical exam there
does not appear to be any emergent cause of his abdominal pain at this time.  No
additional imaging is indicated at this time.  Pain could be caused by constipation.
Recommended he discuss further bowel regimen with GI doctor tomorrow if he would not
like to take miralax or milk of magnesia.  Patient is agreeable with plan.  Return
precautions were reviewed.  Patient states understanding of no further questions this
time.  Patient was discharged in stable condition.

## Impression:
Abdominal pain

## Plan:
Discharged to home

**Discharge Medication List as of 4/13/2018 12:44 AM**

Alison Kast, ARNP
Department of Emergency Medicine
University of Iowa Health Care

Staff and PA/ARNP/PNP/NM (team effort)

**Supervising Physician Statement**
I have seen and evaluated this patient personally. I have reviewed the history, physical, and medical decision making with the advanced practice provider.

Key Elements of my History: abd discomfort, concern for bowel pathology

Key Elements of my Physical Exam: alert, well appearing male, benign abd exam

Assessment and Plan: H&P reassuring, will f/u with GI tomorrow

Paul Van Heukelom, MD
Staff Physician
Department of Emergency Medicine
University of Iowa Healthcare

Electronically signed by Paul Van Heukelom, MD at 4/13/2018  9:14 PM

## Discharge Attachments

ABDOMINAL PAIN, ADULT (ENGLISH)

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

Print This Page | Close This Window

Name: Benjamin Kohn | DOB: 12/29/1993 | MRN: 60507761 | PCP: Graham M Dresden, MD

# UPPER GI ENDOSCOPY - Details

## Study Result

### Impression

Patient Name: Kohn , Benjamin
Procedure Date: 7/30/2018 1:35 PM
MRN: 60507761
Account #: 131249763176
Date of Birth: 12/29/1993
Admit Type: Outpatient
Note Status: Finalized
Attending MD: Sarah Streett ,
Procedure: Upper GI endoscopy
Indications: Follow-up of esophageal reflux
Providers: Sarah Streett
Referring MD: John O'brien Clarke (Referring MD)
Medicines: Fentanyl 100 micrograms IV, Midazolam 4 mg IV,
Diphenhydramine 25 mg IV, Ondansetron 4 mg IV
Complications: No immediate complications. Estimated blood loss:
Minimal.
Procedure:
Pre-Anesthesia Assessment:
- see epic
After obtaining informed consent, the endoscope was passed under direct
vision. Throughout the procedure, the patient's blood pressure, pulse,
and oxygen saturations were monitored continuously. The Endoscope was
introduced through the mouth, and advanced to the second part of
duodenum. The upper GI endoscopy was accomplished with ease. The patient
tolerated the procedure well.
Findings:
There is no endoscopic evidence of areas of erosion or inflammation in
the entire esophagus. Multiple biopsies were obtained with cold forceps
for histology in the mid esophagus and in the distal esophagus.
A small hiatal hernia was present.
The cardia, gastric fundus, gastric body and gastric antrum were normal.
The ampulla was prominent. Biopsies were taken with a cold forceps for
histology.
The exam of the duodenum was otherwise normal.
Impression: - Small hiatal hernia.
- Normal cardia, gastric fundus, gastric body and antrum.
- Multiple biopsies were obtained in the mid esophagus
and in the distal esophagus.
Moderate Sedation:
Moderate (conscious) sedation was administered by the endoscopy nurse
and supervised by the endoscopist. The following parameters were
monitored: oxygen saturation, heart rate, blood pressure, respiratory
rate, EKG, adequacy of pulmonary ventilation, and response to care.
Total physician intraservice time was 18 minutes.
Recommendation: - Await pathology results to exclude EOE.
- Return to Dr.s Clarke and Lau as previously scheduled.
- Discharge patient to home (via wheelchair).

- Advance diet as tolerated today.
Attending Participation:
I personally performed the entire procedure.
Sarah Streett,
7/31/2018 11:57:34 AM
This report has been signed electronically.
Number of Addenda: 0
Note Initiated On: 7/30/2018 1:35 PM
Scope In:
Scope Out:
There is no component information for this result.

## General Information

Ordered by Sarah Elizabeth Streett, MD
Collected on 07/30/2018 1:35 PM
Resulted on 07/31/2018 11:57 AM
Result Status: Final result

Print This Page | Close This Window

Name: Benjamin Kohn | DOB: 12/29/1993 | MRN: 60507761 | PCP: Graham M Dresden, MD

# Pathology Specimen Review - Details

## Study Result

### Narrative

Accession No: SHS-18-27466
SPECIMEN SUBMITTED:
A. AMPULLA PROMINENT
B. DISTAL ESOPHAGUS
C. MID ESOPHAGUS

SUBMITTED ICD9 CODE: GERD (gastroesophageal reflux disease)

DIAGNOSIS (MICROSCOPIC):
A. DUODENUM, AMPULLA PROMINENT, BIOPSY
-- DUODENAL MUCOSA WITH REACTIVE CHANGES (INCLUDING FOVEOLAR
METAPLASIA)

B. ESOPHAGUS, DISTAL, BIOPSY
-- SQUAMOUS MUCOSA WITH NO SIGNIFICANT ABNORMALITY

C. ESOPHAGUS, MID, BIOPSY
-- SQUAMOUS MUCOSA WITH NO SIGNIFICANT ABNORMALITY

CHAMBERS/ADAMS/SHEN

CLINICAL HISTORY: 24-year-old male with history of GERD and
gastroparesis, considering fundoplication, and needs eosinophilic
esophagitis excluded.

OPERATION: EGD

OPERATIVE FINDINGS: Normal exam, mildly prominent ampulla

CLINICAL DIAGNOSIS: Gastroesophageal reflux disease

GROSS DESCRIPTION: Three specimens are received labeled with the
patient's name and medical record number.

The first specimen is labeled "prominent ampulla biopsy" is received
in formalin and consists of two fragments of tan-brown-translucent
soft tissue measuring 0.4 x 0.3 x 0.2 cm in aggregate. The specimen
is entirely submitted between sponges in one cassette labeled A1.

The second specimen is labeled "distal esophagus biopsy" is received
in formalin and consists of three fragments of
pale-white-translucent soft tissue measuring 0.8 x 0.5 x 0.1 cm in
aggregate. The specimen is entirely submitted between sponges in one
cassette labeled B1.

The third specimen is labeled "mid esophagus biopsy" is received in formalin and consists of multiple fragments of pale-white-translucent soft tissue measuring 1.0 x 0.5 x 0.1 cm in aggregate. The specimen is entirely submitted between sponges in one cassette labeled C1. Anand (7/30/2018)

I have reviewed the specimen and agree with the interpretation above. JEANNE SHEN, M.D. Electronically signed 7/31/2018 7:10 PM
There is no component information for this result.

## General Information

Ordered by Sarah Elizabeth Streett, MD
Collected on 07/30/2018 3:17 PM
Resulted on 07/31/2018 7:40 PM
Result Status: Final result

Print This Page | Close This Window
Name: Benjamin Kohn | DOB: 12/29/1993 | MRN: 60507761 | PCP: Graham M Dresden, MD

# FL ESOPHAGRAM - Details
## Study Result
**Impression**

IMPRESSION:

No evidence of leak or obstruction at the gastroesophageal junction.

Contrast material has not progressed into distal stomach or proximal small bowel. As such, pyloroplasty site and surgical drain cannot be evaluated completely. Consider delayed abdominal film for further evaluation to confirm absence of surgical drain contrast opacification. Depending on clinical suspicion, CT can be performed to exclude contrast extravasation.

"Physician to Physician Radiology Consult Line: (650) 736-1173"

Signed
## Narrative
FLUOROSCOPIC ESOPHAGRAM: 8/9/2018 7:35

CLINICAL HISTORY: 24 years of age, Male, Nissen, with pyloroplasty.

COMPARISON: None.

PROCEDURE COMMENTS: Fluoroscopic evaluation of the esophagus was performed during and following oral administration of contrast. Approximately 100 mL of Omnipaque contrast was used.

Fluoroscopy time: 1.2 minutes.

FINDINGS:

Pre-procedure radiograph: Surgical drain projected near the distal stomach. Gas-filled, distended loops of small and large bowel in a non-obstructive pattern.

Stomach: Slightly delayed contrast transit through gastroesophageal junction into stomach with no evidence of leak from the GE junction procedure site, likely due to post-operative edema.

Post-procedure radiograph: Contrast material remains in the proximal stomach. Due to patient's intolerance to upright and right lateral decubitus positions, contrast material has not progressed into the region of pylorus proximal small bowel and area of the surgical drain. There is no component information for this result.

## General Information

Ordered by Mary Hawn, MD
Collected on 08/09/2018 10:41 AM
Resulted on 08/09/2018 2:43 PM
Result Status: Final result
**This test result has been released by an automatic process.**

**Print This Page** | **Close This Window**

Name: Benjamin Kohn | DOB: 12/29/1993 | MRN: 60507761 | PCP: Graham M Dresden, MD

# XR ABD 1 VIEW - Details
## Study Result
### Impression
IMPRESSION:

1. Distal propagation of oral contrast to the colon. No obstruction.

"Physician to Physician Radiology Consult Line: (650) 736-1173"

Signed
### Narrative
RADIOGRAPHIC EXAMINATION OF THE ABDOMEN: 8/9/2018 13:15

CLINICAL HISTORY: 24 years of age, Male, post nissen evaluation.

COMPARISON: Same day upper GI examination.

PROCEDURE COMMENTS: Single view of the abdomen.

FINDINGS:

Oral contrast is noted within the right colon. No definite evidence to suggest extravasation. Nondilated, gas-filled loops of small bowel are noted in the abdomen. Partially image a surgical drain in the upper abdomen noted.
There is no component information for this result.

## General Information

Ordered by Mary Hawn, MD
Collected on 08/09/2018 3:47 PM
Resulted on 08/09/2018 4:10 PM
Result Status: Final result
**This test result has been released by an automatic process.**

# Appointment Details

Notes

## Procedures

### Randhir Jesudoss, MD at 4/26/2018  1:00 PM

Procedure Orders
1. ENDOSCOPY COLONOSCOPY [306085981] ordered by Levin, Avraham D, MD at 04/13/18 1707
Pre-procedure Diagnoses
1. Hematochezia [K92.1]
Post-procedure Diagnoses
1. Hematochezia [K92.1]
**ENDOSCOPY COLONOSCOPY**

**Colonoscopy Procedure Note**

**Date:** 4/26/2018                          **Referring Physician:** Avraham D Levin
**Patient:** Benjamin S Kohn                 **PCP:** Dresden, Graham
**Age:** 24 y.o. **Sex:** male               **Attending Staff:** Randhir Jesudoss, MD
**DOB:** 12/29/1993                          **Fellow:** none

**Operation/Procedure:**  Colonoscopy with none
**Indications:** Hematochezia
**Colorectal Neoplasm Risks:** None
Proceduralist directed.from 4/26/18  1:57 PM to   4/26/18  2:35 PM.

**Location:** IRL - GASTROENTEROLOGY PROCEDURE UNIT

**Consent for Operation or Procedure:**  The risks, benefits, and alternatives of the
procedure and sedative medications were discussed with the patient in detail.  Potential
complications including bleeding, infection, reaction to sedation medication, accidental
perforation, or missing lesions were discussed with the patient. All questions were
answered.  Written consent was obtained.  The patient elected to proceed with the
procedure as described.

**Procedure Medications:**

1. Midazolam 10mg IV
2. Fentanyl 150mcg IV
3. Adverse events: None

**Procedure Description:**  Prior to proceeding, the patient's name, date of birth, and

procedure were verified at the time out.  The patient was then placed in the left lateral decubitus position and adequate sedation was achieved to proceed. A manual rectal examination was performed.

The cecum was identified by landmarks including the appendix orifice and the ileocecal valve.  The colonoscope was then slowly withdrawn and the mucosa was carefully examined.  Excess air and fluid were removed during colonoscope withdrawal and the procedure terminated.  The patient was in good condition and was transferred to the recovery area.

**Colon preparation:** Poor or unprepped; multiple obstructed views
**Ancillary maneuvers:** Hand pressure

**Cecum Photograph:** Ileocecal valve          **Scope Inserted:** 4/26/18  2:05 PM
**Pathology Specimens:**  no                         **Cecum Reached:** 4/26/18  2:28 PM
**Complications:**  None immediately          **Scope Removed:** 4/26/18  2:35 PM

The procedure findings are listed below:
- Ileum: not entered.
- Cecum: filled with liquid and solid stool in the cecum.
- Ascending Colon: normal.
- Transverse Colon: filled with liquid and solid stool  Through out the lumen at multiple points.
- Descending Colon: normal.
- Sigmoid: filled with liquid and solid stool  Through out the lumen at multiple points.
- Rectum: filled with liquid and solid stool  Through out the lumen at multiple points.
- Anal Canal: one grade hemorrhoid.
- Only 60% of the colonic mucosa was able to be visualized.

Retroflexion was done in the cecum and there were no polyps behind the folds.
No diverticula or vascular abnormalities were present.
Retroflexion in the rectum did not reveal any abnormalities /revealed internal hemorrhoids.

**IMPRESSION:** No major lesions in the colon, filled with solid and liquid stool residue with obstructed views in the sigmoid, transverse colon and cecum.
**He has one column of grade 2 hemorrhoids.**
**PLAN:**No follow-up colonoscopy for Polyp screening
 -High fiber diet.
Randhir Jesudoss, MD


Randhir Jesudoss, MD
Clinical Assistant Professor
University of Iowa Hospitals & Clinics
Gastroenterology & Hepatology

Electronically signed by Randhir Jesudoss, MD at 6/20/2018  2:12 PM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# Appointment Details

Notes

## Procedures

### Yehudith Assouline-Dayan, MD at 4/17/2018 11:59 PM

Procedure Orders
1. ANAL HIGH DEFINITION MANOMETRY [306085973] ordered by Levin, Avraham D, MD at 04/13/18 1707

Pre-procedure Diagnoses
1. Hematochezia [K92.1]

Post-procedure Diagnoses
1. Hematochezia [K92.1]

**ANAL HIGH DEFINITION MANOMETRY**

**Anorectal Manometry /Rectal Sensation /Tone /Compliance-Men Procedure Note**

**Procedure Date: 4/17/2018**

**Operation/Procedure:** Anorectal Manometry/Rectal Sensation/Tone/Compliance **[MEN]**

**Indications:** constipation

**Attending Staff:** Judith Assouline Dayan, MD

**Referring Physician**: Levin Avraham, MD.

**Description of Operation/Procedure:**
The high resolution anorectal manometry was performed using ManoScanTM system (Sierra Scientific Instruments, Los Angeles, CA) that has 36 channel catheter with sensors spaced at 1-cm intervals. After correct placement, the probe was taped to the perineum. After a run in period of five minutes, the patient was asked to perform anal squeeze maneuvers twice; party balloon inflation maneuvers twice, bearing down maneuvers twice. Thereafter, intermittent rectal balloon distentions were performed to assess rectoanal reflexes, rectal sensation and rectal compliance by distending the balloon in a step vise manner from 10 cc up to a maximum volume of 320 cc. The patient was then placed on a commode and a 60 cc balloon was inflated in the rectum and the patient was asked to attempt defecation to perform the simulated defecation study. After this, the probe was removed. Thereafter, we placed a 50 cc water filled balloon in the rectum and the patient was asked to expel this device in privacy on a commode.

**Findings**:
(Normal Mean and 95% Confidence Interval shown in parenthesis)

**Anal Sphincter Pressures**:
The maximum resting pressure was 136 mmHg (72, 64-80) and this was seen at 2.5 cm from the anal margin. The maximum squeeze pressure was 189 mmHg (193, 175-211) and this was seen at 2.5 cm from the anal margin. The duration of squeeze was 30 seconds. A sustained squeeze pressure was 150 mmHg (176, 156-196). When asked to blow a party balloon, the intrarectal pressure was 73 mmHg (66, 51-81) and anal pressure was 187 mmHg (154, 138-170). During a straining maneuver, the rectal pressure generated was 65 mmHg (68, 58-78), while anal residual pressure was 60 mmHg (49, 35-63). This was consistent with Normal Type pattern of defecation. The sphincter length was 4.4 cm (4, 3-8-4.2).

**Rectoanal Reflexes**:
The rectoanal inhibitory reflex was normal with a minimum volume for sphincter relaxation of 20 cc (11, 9-20).

**Rectal Sensation:**
The patient reported first sensation at 40 cc (20, 15-25), constant sensation at 70 cc, the desire to defecate at 310 cc (109, 85-134), the urgency to defecate at 400cc (185, 152-218), and a maximum tolerable volume of 400 cc (249, 223-275).

**Rectal Compliance**:
Compliance was determined by the pressures generated during the following volume distentions (after correcting for intrinsic balloon wall pressures: <50 cc~18 mmHg, 50-100 cc~16 mmHg, >100 cc~15 mmHg):

**Volume / Pressure:**
10 cc / 80 mmHg
20 cc / 55 mmHg
30 cc / 64 mmHg
40 cc / 50 mmHg
The compliance curve suggests a hypercompliance of the rectum when compared to normative values (adjusted for patient gender).

**Balloon Expulsion Test:** The patient was able to expel a 50 cc water-filled balloon in 26 seconds (60, 0-156).

**Simulated Defecation on the Commode:** The patient showed an intrarectal pressure of 116 mmHg and an anal residual pressure of 85 mmHg during this maneuver, consistent with Type III dyssynergia defecation pattern.

**COMPLICATIONS:**
None

**Impression**:
High resting pressure and normal squeeze pressure.
A normal balloon expulsion test.
Rectal hyposensitivity.

Dys-synergic defecation.

**Plan**:
Findings are equivocal for pelvic floor dys-synergia. Please consider ordering a Sitz Maker study and or a defecogram. Follow up with Dr. Levin for discussion of result and management.


Judith Assouline Dayan, MD
Clinical Associate Professor
Division of Gastroenterology-Hepatology
Department of Internal Medicine
University of Iowa Hospitals and Clinics


Electronically signed by Yehudith Assouline-Dayan, MD at 4/19/2018  1:47 PM


MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# FL DEFECOGRAM - Details

## Study Result

### Impression

Impression:
1.] Fluoroscopic findings consistent with dyssynergic defecation.

Fluoro time: 44 seconds

### Narrative

Procedure: FL DEFECOGRAM

Clinical Indication: Constipation. Suspected dyssynergic defecation.

Technique: Fluoroscopic cine barium defecogram is performed. Following
digital rectal exam, enema tip is placed and 120 cc of barium paste is
hand injected. Patient is placed in a seated lateral position for the
exam.

Comparison: None.

Findings:
Anorectal junction: relative to the ischial tuberosities
Rest: 4 cm above the ischial tuberosities
Squeeze: 4 cm above the ischial tuberosities
Evacuation: 4 cm above the ischial tuberosities

Anorectal angle:
Rest: 136 degrees
Squeeze: 124 degrees

Normal puborectalis function. No descensus, incontinence, or anterior

rectocele. No enterocele. The patient attempts evacuation against closed/ contracted ano- rectal junction; these findings representing dyssynergic defecation. Approximately 50% of the contrast remains in the the mid rectum after about 2 minutes of attempted evacuation.

## Component Results

There is no component information for this result.

## General Information

Ordered by Avraham Levin, MD

Resulted on 04/27/2018 6:13 PM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

**Print This Page** | **Close This Window**
Name: Benjamin Kohn | DOB: 12/29/1993 | MRN: 60507761 | PCP: Graham M Dresden, MD

# ANORECTAL MANOMETRY - Details
## Study Result
### Narrative
Neshatian, Leila Neshatian, MD 12/23/2018 7:43 PM
Patient:
Kohn, Benjamin
60507761 Gender: Male Procedure: ARM 2D
DOB: 12/29/1993 Physician: Dr. Leila Neshatian
Height: Operator: Garrett Donohue RN
Weight: Referring Physician: Dr. Brooke Gurland
Examination Date: 12/21/2018


Resting Normal Squeeze Normal
Mean Sphincter Pressure(rectal ref.)(mmHg) 75.6 Max. Sphincter
Pressure(rectal ref.)(mmHg) 189.2
Max. Sphincter Pressure(rectal ref.)(mmHg) 80.3 Max. Sphincter
Pressure(abs. ref.)(mmHg) 196.6
Mean Sphincter Pressure(abs. ref.)(mmHg) 72.4 Duration of
sustained squeeze(sec) 16.1
Max. Sphincter Pressure(abs. ref.)(mmHg) 77.1
Length of HPZ(cm) 4.0
Length verge to center(cm) 1.2


Push(attempted defecation) Normal Balloon Inflation Normal
Residual Anal Pressure(abs. ref.)(mmHg) 75.7 RAIR Present
Percent anal relaxation(%) -2 First sensation(cc) 120
Intrarectal pressure(mmHg) 18.7 Urge to defecate(cc) 180
Rectoanal pressure differential(mmHg) -57 Discomfort(cc) 325
Minimum rectal compliance 1.32
Maximum rectal compliance 1.32



Procedure
The patient presented to the GI motility laboratory for a
high-resolution anorectal manometry. A high resolution anorectal
catheter was inserted in the rectum and positioned so that the
proximal sensors were in the rectum and distal sensors were
across the anorectal sphincter. Anorectal function testing was
then performed which included assessment of resting pressure,
squeeze, bear down, bear down with balloon inflation, rectoanal
inhibitory reflex, cough, and compliance. Following catheter
based testing, balloon expulsion was performed by filling an
expulsion balloon with 50cc of warm water and allowing patient up
to 2 minutes to expel the balloon in a private designated
bathroom. If this attempt was unsuccessful, patient was asked to
repeat expulsion trial with the assistance of a squatting stool.

Indications
obstructive defacation

Interpretation / Findings
- The anal sphincter pressure was normotensive. There was
appropriate sphincteric augmentation that was sustained during
squeeze.
- There was inadequate defecatory propulsion and paradoxical
contraction and incomplete anal sphincter relaxation consistent
with dyssynergic defecation during bear down.
- First sensation, urgency and discomfort to balloon distention
were elicited at higher distention volumes than expected
indicating sensory deficit.
- Balloon distention revealed an intact rectoanal inhibitory
reflex. Cough reflex was intact.
- Patient was able to expel the rectal balloon after 26 seconds.

* It is noted that normative data is not well established for
anorectal manometry parameters. Clinical correlation is
recommended.

Impressions
Findings of this high resolution anorectal manometry test are
abnormal. There was evidence of dyssynergia and inadequate rectal
propulsive forces at simulated defecation. However, balloon
expulsion test was normal.
• Consider Defecography to confirm the diagnosis of functional
defecatory disorder if clinically indicated.

Leila Neshatian, MD, MSC
12/23/2018 7:42 PM


Resting Pressure



Squeeze #1



Squeeze #2



Squeeze #3

Push #1

Push #2

Push #3

Push #4

Balloon Fill
There is no component information for this result.

## General Information

Ordered by Brooke Heidi Gurland, MD
Resulted on 12/21/2018 9:00 AM
Result Status: Final result
**This test result has been released by an automatic process.**


## Stanford
### HEALTH CARE

**Digestive Health - Blake Wilbur**
900 Blake Wilbur Dr, 2nd Flr
Palo Alto CA 94305
Tel: (650) 736-5555
Fax: (650) 498-6323
http://stanfordhospital.org

Digestive Health - Redwood City

Subhas Banerjee, MD
Laren S Becker, MD, Ph.D
Ann Mei-Tzu Chen, MD
Nielsen Fernandez-Becker, MD, Ph.D
Christine A. Cartwright, MD
Shai Friedland, MD
Lauren Gerson, MD
Gary M. Gray, MD
Aida Habtezion, MD
Uri Ladabaum, MD
Anson W. Lowe, MD
Linda Anh B.Nguyen, MD
Walter G. Park, MD
Jay Pasricha, MD
Michael Rothenberg, MD
Shamita B. Shah, MD
Trevor A Winter, MD

Clinical Assistant Professor
Clinical Director
Inflammatory Bowel Disease
Dr. Shamita Shah

Clinical Assistant Professor
Director of Motility
Dr. Linda Nguyen

Clinical Assistant Professor
Advanced Endoscopy
Dr. Ann Chen

To committee of bar examiners
Attention: Senior Director of Admissions
Office of Admissions
State bar of California
180 Howard Street
San Francisco, CA 94105

December 20, 2019

I am the gastroenterologist of Mr.Benjamin Kohn and have previously completed a physical disability verification (Form B) for the California Bar. I'm writing to reconfirm that I am up to date with Mr. Kohn's upper GI issues, including Gastroparesis (please see gastric emptying studies provided to you previously), Dysphagia, and Nissen Fundoplication postoperative state, with eating in an appropriate manner sometimes affected by a fine motor delay. I maintain my recommendations based on these conditions as follows:

1. Permission to bring food and drinks into the test room and take all meal breaks in the test room, subject to supervision.

2. Short (e.g. up to 30-minute) meal breaks per 90 minutes of testing time, balancing a need for frequent small meals due to the slowed digestion of gastroparesis requiring minimization of idle digestion time with a slowed ability to eat a fixed quantity of many foods due to the bite size constraints required for the food pass his surgically altered esophagus without clogging it and triggering slow, painful regurgitation,and the fine motor delay can slow his ability to cut food into such bite size where required.

I certify under penalty of perjury under the laws of the state of california that all statements herein are true and accurate to the best of my professional knowledge and belief.

John O. Clarke, MD
Clinical Associate Professor of Medicine
Director, Esophageal Program
Stanford University



**THE STATE BAR OF CALIFORNIA**
**COMMITTEE OF BAR EXAMINERS/OFFICE OF ADMISSIONS**

180 Howard Street • San Francisco, CA 94105-1639 • (415) 538-2300
845 S. Figueroa Street • Los Angeles, CA 90017-2515 • (213) 765-1500

# FORM B
## TESTING ACCOMMODATIONS – PHYSICAL DISABILITIES VERIFICATION

All original documents must be filed with the Office of Admissions' San Francisco Office.
(Must be completed by the applicant; please type or print legibly)

**NOTICE TO APPLICANT: This section of this form is to be completed by you.**
The remainder of the form is to be completed by the qualified professional who is recommending testing accommodations for the California Bar Examination or First-Year Law Students' Examination for you on the basis of a physical disability. Please read, complete, and sign below before submitting this form to the qualified professional for completion of the remainder of this form.

Applicant's Full Name: _Benjamin Sean Kohn_

File Number: _468532_

> I give permission to the qualified professional completing this form to release the information requested on the form, and I request the release of any additional information regarding my disability or accommodations previously granted that may be requested by the Committee of Bar Examiners or consultant(s) of the Committee of Bar Examiners.

_Benjamin Kohn_

Signature of Applicant

_11/12/18_

Date

**NOTICE TO QUALIFIED PROFESSIONAL:**

The above-named person is requesting accommodations for the California Bar Examination or First-Year Law Students' Examination. All such requests must be supported by appropriate documentation (including evaluation reports, test results and/or medical records) from the qualified professional who conducted an individualized assessment of the applicant and is recommending accommodations for the examination on the basis of a physical disability. The Committee of Bar Examiners also requires the qualified professional to complete this form. **If any of the information requested in this form is fully addressed in the documentation submitted (evaluation reports, test results, medical records, etc.), you may respond by citing the specific page and paragraph** where the answer can be found. Please attach a copy of the evaluation report and/or all records and test results on which you relied in making the diagnosis and recommending accommodations for the examination administered by the

TA-FormB.0417

1

Committee of Bar Examiners. Your assistance is appreciated.

The provision of reasonable accommodations is based on assessment of the *current* impact of the disability on the specific testing activity. The Committee of Bar Examiners generally requires documentation from an evaluation conducted within the past year because of the changing manifestations of many physical disabilities. Older evaluation reports may suffice if supplemented by an update of the diagnosis, current level of functioning, and a rationale for each recommended accommodation or an explanation of why the report and/or other documentation continue to be relevant in their entirety.

The Committee of Bar Examiners may forward this information to one or more qualified professionals for an independent review of the applicant's request. Print or type your responses to the items below. **Return the original of this completed form, the evaluation report, test results, and/or other relevant records to the applicant for submission to the Committee of Bar Examiners.**

## I. EVALUATOR/TREATING PROFESSIONAL INFORMATION

Name of professional completing this form: Jonn CLARKE

Address: 420 Broadway Street

Telephone: 650 736 5515          Fax: 650 498 6323

E-Mail: N/A

Occupation, title, and specialty: MD

License Number/Certification/State:

Describe your qualifications and experience to diagnose and/or verify the applicant's condition or impairment and to recommend accommodations.

Dr. JOHN CLARKE is Patients GI doctor. Patient has trouble swallowing, abdominal discomfort and reoccurrent stool infection

## II. DIAGNOSIS AND RESULTING FUNCTIONAL LIMITATIONS

1. What is the specific diagnosis (including diagnosis code) for which the applicant requests testing accommodations?

   * gastroparesis   K 31.84

2. Describe the nature of the physical disability. Include a history of presenting

TA-FormB.0417

2

symptoms, date of onset, and description of the duration and severity of disability.

_____

_____

_____

3. When did you first meet with the applicant? **5/29/18**

4. When was the applicant's physical disability first diagnosed? **5/25/18**

5. Did you make the initial diagnosis? ☒ YES ☐ NO

If no, provide the name of the professional who made the initial diagnosis and when it was made, if known. Attach copies of any prior evaluation reports, test results, or other records related to the initial diagnosis that you reviewed. **9/20/18**

_____

_____

6. Provide the date of your last complete evaluation of the applicant: **9/20/18**

7. Is this a permanent condition/impairment? ☒ YES ☒̶ NO

If no, when is it likely to abate?

_____

_____

8. Does the severity of the condition/impairment fluctuate? ☒ YES ☒̶ NO

If yes, describe the settings and/or circumstances affecting severity that are relevant to taking the California Bar Examination of First-Year Law Students' Examination.
**Patient needs frequent breaks for meals due to diagnosis**

9. Describe the applicant's current functional limitations and explain how the limitations restrict the condition, manner, or duration under which the applicant can take the California Bar Examination or First-Year Law Students' Examination.
**Patient needs frequent breaks for patients gastroparesis**

TA-FormB.0417

3

10. Briefly describe any treatment, including any prescribed medications, and the effectiveness of treatment in reducing or ameliorating the applicant's functional limitations.

_Small frequent meals_

## III. ACCOMMODATIONS REQUESTED FOR THE CALIFORNIA BAR EXAMINATION OR FIRST-YEAR LAW STUDENTS' EXAMINATION (check all that apply)

## FORMAT

The California Bar Examination is a timed examination administered over two days, consisting of a 3-hour morning session (9:00 a.m. to 12:00 noon) and a 3½-hour afternoon session (2:00 p.m. to 5:30 p.m.) on the first day, and two 3-hour sessions (9:00 a.m. to 12:00 noon and 2:00 p.m. to 5:00 p.m.) on the second day. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. each day. The examination is administered in a proctored setting.

The first day consists of three one-hour essay questions in the morning session and two one-hour essay questions plus one 90-minute Performance Test question in the afternoon session. The written portions of the examination are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The second day consists of 200 multiple-choice questions (Multistate Bar Examination or "MBE"), with 100 questions administered in the morning session and 100 questions in the afternoon session. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

The First-Year Law Students' Examination is a one-day timed examination administered in two sessions, a four-hour morning session from 8:00 a.m. to 12:00 noon and a three-hour afternoon session from 2:00 p.m. to 5:00 p.m. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. The examination is administered in a proctored setting.

The morning session consists of four one-hour essay questions. The essay questions are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The afternoon session consists of 100 multiple-choice questions. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

## SETTING

Applicants are assigned seats, two per six-foot table, in a room set for as few as 100 to 400 applicants for the First-Year Law Students' Examination to as many as 1,500 applicants for the California Bar Examination. Applicants are not allowed to bring food, beverages, or certain other items into the testing room unless approved as accommodations. All applicants may bring prescription medication. The examination is administered in a quiet environment, and applicants are allowed to use small foam earplugs. They may leave the examination room only to use the restroom or drinking fountain, within the time allotted for the test session.

Taking into consideration this description of the examination and the functional limitations that you currently experience, what testing accommodation (or accommodations, if more than one would be appropriate) are you requesting?

**Alternative Formats**

☐ Audio CD version of the examination

☐ Electronic versions of the Essay and/or Performance Test questions in Microsoft Word format on CDs for use with screen-reading software

☐ Other: _____

**Personal Assistance**

☐ Dictate to a typist (for written sessions)

☐ Reader

☐ Assistance with multiple-choice answer sheet (Scantron sheet) (choose one)

  ☐ Permission to circle answers in question booklet

  ☐ Permission to dictate answers to proctor

☐ Dictate to a voice recorder (choose one)

  ☐ Digital voice recorder (for use with flash memory cards)

  ☐ Tape recorder (for use with microcassette tapes)

☐ Other: _____

**Equipment or Facility Requirements**

☐ Computer *as an accommodation* (must have direct nexus to the effects of the disability)

TA-FormB.0417

☐ with SofTest installed

☐ with voice-recognition software (e.g., Dragon Naturally Speaking) installed

☐ with screen-reading software (e.g., JAWS) installed

☐ with other (specify): _____

☐ Special equipment (specify): _____

☐ Private room

☐ Semi-private room

☐ Wheelchair accessibility (if table, specify height): _____

☑ Other: _____

Please provide a rationale for each request indicated above (attach additional sheets if necessary):

_Small_ frequent breaks for
eating given parents dr
_____
_____
_____

**Accommodation of Extra Time**

Specify the amount of **extra time** requested for each session of the examination. Indicate why the specified extra time is needed (based on the diagnostic evaluation), provide the rationale for requesting the amount of time for each test format of the examination, and explain how you arrived at the specific amount of extra time requested. If either the amount of time or your rationale is different for different portions of the examination, please explain. **All requests for extra time must specify the exact amount of extra time. It is important to keep in mind that breaks are included in the timed portion of the examination. No accommodation of unlimited time will be granted. If extra testing time is requested, but the specific amount of extra time is not indicated, the petition will be returned as incomplete.**

**California Bar Examination: Essay Questions 1, 2 & 3 (standard session is 3 hours):** Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

more frequent breaks for patient
beat . one hor breaks
_____
_____

**California Bar Examination:  Essay Questions 4 & 5, and Performance Test** (standard session is 3 hours and 30 minutes):  Specify the amount of extra test time needed <u>for this session</u> and  provide the rationale:

One hour break

**California Bar Examination:  Multistate Bar Examination - MBE (each standard session is 3 hours):**  Specify the amount of extra test time needed <u>for each MBE session</u> and  provide the rationale:

One hour break

**First-Year Law Students' Examination:  Essay Questions 1, 2, 3 & 4 (standard session is 4 hours):**  Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

One hour break)

**First-Year Law Students' Examination:  Multiple-Choice (standard session is 3 hours):**  Specify the amount of extra test time needed <u>for this session</u> and provide the rationale:

One hour break)

<u>**Explanations**</u>:  (attach additional sheets if necessary)

## IV. CONFIDENTIALITY

Confidentiality policies of the Committee of Bar Examiners/Office of Admissions of the State Bar of California will be followed regarding its responsibility to maintain confidentiality of this form and any documents submitted with it.  No part of the form or the accompanying medical documentation will be released without the applicant's written consent or under the compulsion of legal process.



Palo Alto Medical Foundation
Attn: My Health Online P.O. Box 255386
Sacramento , California 95865-5386

Name: Benjamin Kohn | DOB: 12/29/1993 | PCP: Graham Dresden, MD

# Letter Details



12/5/2019

RE: Benjamin Kohn

To Whom It May Concern:

Benjamin Kohn is under my care for myofascial pain. He also has autism. My medical opinion is as follows:

With his medical conditions, he would benefit from the dynamic active support of a specialized chair during the bar exam. The benefit of such a chair would reduce his symptoms of myofascial pain. Other measures such as oral medications would impact cognition and mental processing ability which would impair test taking performance.

I testify under the penalty of perjury that the above is true and correct to the best of my knowledge.

Chien-Ye Liu, MD
Board Certification, American Academy of Psychiatry and Neurology
650-934-7300

*This letter was initially viewed by Benjamin Kohn at 12/28/2019 12:01 AM.*

MyChart® licensed from Epic Systems
Corporation © 1999 - 2018
Copyright © 2019 Sutter Health. All rights
reserved. Sutter Health is a registered trademark
of Sutter Health ®, Reg. U.S. Patent & Trademark
office.



**THE STATE BAR OF CALIFORNIA**
**COMMITTEE OF BAR EXAMINERS/OFFICE OF ADMISSIONS**

**180 Howard Street • San Francisco, CA 94105-1639 • (415) 538-2300**
**845 S. Figueroa Street • Los Angeles, CA 90017-2515 • (213) 765-1500**

# FORM B
## TESTING ACCOMMODATIONS – PHYSICAL DISABILITIES VERIFICATION

All original documents must be filed with the Office of Admissions' San Francisco Office.
(Must be completed by the applicant; please type or print legibly)

**NOTICE TO APPLICANT: This section of this form is to be completed by you.**
The remainder of the form is to be completed by the qualified professional who is recommending testing accommodations for the California Bar Examination or First-Year Law Students' Examination for you on the basis of a physical disability. Please read, complete, and sign below before submitting this form to the qualified professional for completion of the remainder of this form.

Benjamin Kohn
Applicant's Full Name: _____

468532
File Number: _____

> I give permission to the qualified professional completing this form to release the information requested on the form, and I request the release of any additional information regarding my disability or accommodations previously granted that may be requested by the Committee of Bar Examiners or consultant(s) of the Committee of Bar Examiners.

## /s/ Benjamin Kohn 7-14-20

_____          _____
Signature of Applicant                                               Date

**NOTICE TO QUALIFIED PROFESSIONAL:**

The above-named person is requesting accommodations for the California Bar Examination or First-Year Law Students' Examination. All such requests must be supported by appropriate documentation (including evaluation reports, test results and/or medical records) from the qualified professional who conducted an individualized assessment of the applicant and is recommending accommodations for the examination on the basis of a physical disability. The Committee of Bar Examiners also requires the qualified professional to complete this form. **If any of the information requested in this form is fully addressed in the documentation submitted (evaluation reports, test results, medical records, etc.), you may respond by citing the specific page and paragraph where the answer can be found.** Please attach a copy of the evaluation report and/or all records and test results on which you relied in making the diagnosis and recommending accommodations for the examination administered by the

TA-FormB.0417

1

Committee of Bar Examiners. Your assistance is appreciated.

The provision of reasonable accommodations is based on assessment of the *current* impact of the disability on the specific testing activity. The Committee of Bar Examiners generally requires documentation from an evaluation conducted within the past year because of the changing manifestations of many physical disabilities. Older evaluation reports may suffice if supplemented by an update of the diagnosis, current level of functioning, and a rationale for each recommended accommodation or an explanation of why the report and/or other documentation continue to be relevant in their entirety.

The Committee of Bar Examiners may forward this information to one or more qualified professionals for an independent review of the applicant's request. Print or type your responses to the items below. **Return the original of this completed form, the evaluation report, test results, and/or other relevant records to the applicant for submission to the Committee of Bar Examiners.**

## I. EVALUATOR/TREATING PROFESSIONAL INFORMATION

Name of professional completing this form:  Steven Rubinstein, MD

Address:  701 E. El Camino Real, Mountain View, CA 94040    7895

Telephone:  (650) 934-7888        Fax:  Please call on 650·934-7895

E-Mail:  Please call. rubins@pamf.org    but prefer all

Occupation, title, and specialty:  PAMF Physician: Allergy & Immunology Specialist.

License Number/Certification/State:  CA G45231

Describe your qualifications and experience to diagnose and/or verify the applicant's condition or impairment and to recommend accommodations.    35
I am an allergy & immunology specialist physician with more than 40 years of experience and have been Mr. Kohn's treating allergist for more than a decade.

## II. DIAGNOSIS AND RESULTING FUNCTIONAL LIMITATIONS

1. What is the specific diagnosis (including diagnosis code) for which the applicant requests testing accommodations?
Chronic Urticaria (L50.1), Allergic Eczema (L20.84), severe airborne food allergy to fish & other food allergies, wo./ suppression by Xolair medication (Z91.013), Allergic Rhinitis (J30.9) & Sinusitis (J32.9), and Med-Induced Immunodeficiency (D84.9).

2. Describe the nature of the physical disability. Include a history of presenting

TA-FormB.0417

symptoms, date of onset, and description of the duration and severity of the disability.

Mr. Kohn has had many severe food and environmental allergies, along with eczema and chronic urticaria, since infancy. Symptoms include itch, rash, hives, eyelid swelling, tongue swelling, digestive disturbances, dry skin, and anaphylaxis.

3. When did you first meet with the applicant?   Sometime 2010-2011.

4. When was the applicant's physical disability first diagnosed?   All but sinusitis in infancy; sinusitis 1/2018

5. Did you make the initial diagnosis?   ☐ YES   ☒ NO

If no, provide the name of the professional who made the initial diagnosis and when it was made, if known.   Attach copies of any prior evaluation reports, test results, or other records related to the initial diagnosis that you reviewed.

Patient to append 2015 allergy blood retesting, and pathology lab ordered by surgeon Dr. Li on sinus polyp discovered during his maxillomandibular advancement surgery 12/2017. His original allergist, Dr. Goldsobel, made most initial diagnosises.

6. Provide the date of your last complete evaluation of the applicant:   Retesting 2015, Office Visit 12/2019

7. Is this a permanent condition/impairment?   ☑ YES   ☐ NO

If no, when is it likely to abate?

_____

_____

8. Does the severity of the condition/impairment fluctuate?   ☐ YES   ☑ NO

If yes, describe the settings and/or circumstances affecting severity that are relevant to taking the California Bar Examination of First-Year Law Students' Examination.

_____

_____

_____

9. Describe the applicant's current functional limitations and explain how the limitations restrict the condition, manner, or duration under which the applicant can take the California Bar Examination or First-Year Law Students' Examination.

Even treated, residual symptoms will likely increase the sensory distractions Mr. Kohn would experience testing that his autism causes hypersensitivity to. More importantly, meds have immunosuppressive effects that collectively cause him to be immunocompromised for purposes of his vulnerability to Covid, and frequent in-clinic treatments must be performed at fixed intervals.

10. Briefly describe any treatment, including any prescribed medications, and the effectiveness of treatment in reducing or ameliorating the applicant's functional limitations.

In-clinic Xolair shots every ~21 days, and for last 2 years allergy shots, presently every ~28 days. He takes singulair and clarinex orally daily, prednisone if needed; uses DML lotion, Eucrisa ointment, and desonide or protopic as needed; pazeo, xiidra, & cyclosporine eye drops; twice daily saline sinus rinses w./ pulmicort; and DyMista nasal spray; to substantial improvement, but increased Covid vulnerability.

## III. ACCOMMODATIONS REQUESTED FOR THE CALIFORNIA BAR EXAMINATION OR FIRST-YEAR LAW STUDENTS' EXAMINATION (check all that apply)

### FORMAT

The California Bar Examination is a timed examination administered over two days, consisting of a 3-hour morning session (9:00 a.m. to 12:00 noon) and a 3½-hour afternoon session (2:00 p.m. to 5:30 p.m.) on the first day, and two 3-hour sessions (9:00 a.m. to 12:00 noon and 2:00 p.m. to 5:00 p.m.) on the second day. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. each day. The examination is administered in a proctored setting.

The first day consists of three one-hour essay questions in the morning session and two one-hour essay questions plus one 90-minute Performance Test question in the afternoon session. The written portions of the examination are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The second day consists of 200 multiple-choice questions (Multistate Bar Examination or "MBE"), with 100 questions administered in the morning session and 100 questions in the afternoon session. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

The First-Year Law Students' Examination is a one-day timed examination administered in two sessions, a four-hour morning session from 8:00 a.m. to 12:00 noon and a three-hour afternoon session from 2:00 p.m. to 5:00 p.m. The examination is scheduled twice each year. There is a lunch break from 12:00 noon to 1:30 p.m. The examination is administered in a proctored setting.

The morning session consists of four one-hour essay questions. The essay questions are designed to assess, among other things, the applicant's ability to communicate his/her analysis effectively in writing. Applicants may use their personal laptop computers to type their answers, or they may handwrite their answers. The afternoon session consists of 100 multiple-choice questions. Applicants record their answers by darkening circles using a Number 2 pencil on an answer sheet that is scanned by a computer to grade the examination.

## SETTING

Applicants are assigned seats, two per six-foot table, in a room set for as few as 100 to 400 applicants for the First-Year Law Students' Examination to as many as 1,500 applicants for the California Bar Examination. Applicants are not allowed to bring food, beverages, or certain other items into the testing room unless approved as accommodations. All applicants may bring prescription medication. The examination is administered in a quiet environment, and applicants are allowed to use small foam earplugs. They may leave the examination room only to use the restroom or drinking fountain, within the time allotted for the test session.

Taking into consideration this description of the examination and the functional limitations that you currently experience, what testing accommodation (or accommodations, if more than one would be appropriate) are you requesting?

**Alternative Formats**

☐ Audio CD version of the examination

☐ Electronic versions of the Essay and/or Performance Test questions in Microsoft Word format on CDs for use with screen-reading software

☐ Other: _____

**Personal Assistance**

☐ Dictate to a typist (for written sessions)

☐ Reader

☐ Assistance with multiple-choice answer sheet (Scantron sheet) (choose one)

    ☐ Permission to circle answers in question booklet

    ☐ Permission to dictate answers to proctor

☐ Dictate to a voice recorder (choose one)

    ☐ Digital voice recorder (for use with flash memory cards)

    ☐ Tape recorder (for use with microcassette tapes)

    ☐ Other: _____

**Equipment or Facility Requirements**

☐ Computer *as an accommodation* (must have direct nexus to the effects of the disability)

☐ with SofTest installed

☐ with voice-recognition software (e.g., Dragon Naturally Speaking) installed

☐ with screen-reading software (e.g., JAWS) installed

☐ with other (specify): _____

☐ Special equipment (specify): _____

☑ Private room

☐ Semi-private room

☐ Wheelchair accessibility (if table, specify height): _____

☑ Other: Admin of other TAs at home if offered standard, if possible, even if harder to administer. _____

Please provide a rationale for each request indicated above (attach additional sheets if necessary):
Due to his treatment needs for these conditions, e.g. the medications listed above that are associated with immunosuppressive side effects, Mr. Kohn would be considered immunocompromised by clinical standards. If a form of at home testing is offered to others due to the pandemic, if possible at greater burden to the Bar, he should not be required to test in-person and risk exposure because the Bar deemed accommodations for other disabilities to not lend themselves to online testing.

## Accommodation of Extra Time

Specify the amount of **extra time** requested for each session of the examination. Indicate why the specified extra time is needed (based on the diagnostic evaluation), provide the rationale for requesting the amount of time for each test format of the examination, and explain how you arrived at the specific amount of extra time requested. If either the amount of time or your rationale is different for different portions of the examination, please explain. **All requests for extra time must specify the exact amount of extra time. It is important to keep in mind that breaks are included in the timed portion of the examination. No accommodation of unlimited time will be granted. If extra testing time is requested, but the specific amount of extra time is not indicated, the petition will be returned as incomplete.**

**California Bar Examination: Essay Questions 1, 2 & 3 (standard session is 3 hours):** Specify the amount of extra test time needed for this session and provide the rationale:
Consider adverse sensory effects when deciding accommodations for autism recommended by other experts.

_____

_____

**California Bar Examination:  Essay Questions 4 & 5, and Performance Test (standard session is 3 hours and 30 minutes):**  Specify the amount of extra test time needed for this session and  provide the rationale:

Consider adverse sensory effects when deciding accommodations for autism recommended by other experts.

**California Bar Examination:  Multistate Bar Examination - MBE (each standard session is 3 hours):**  Specify the amount of extra test time needed for each MBE session and  provide the rationale:

Consider adverse sensory effects when deciding accommodations for autism recommended by other experts.

**First-Year Law Students' Examination:  Essay Questions 1, 2, 3 & 4 (standard session is 4 hours):**  Specify the amount of extra test time needed for this session and provide the rationale:

**First-Year Law Students' Examination:  Multiple-Choice (standard session is 3 hours):**  Specify the amount of extra test time needed for this session and provide the rationale:

**Explanations:**  (attach additional sheets if necessary)

See above for primary request of not being reassigned to a test center from testing at home to the extent offered to others due to the need for accommodations for other disabilities evaluated by other experts that may be deemed not to "lend themselves to online testing" if such is possible at the cost of greater burden to the Bar. If impossible or denied, private room is requested. As treatment doesn't completely remove symptoms, consider sensory effects in calculating any extra time.

## IV. CONFIDENTIALITY

Confidentiality policies of the Committee of Bar Examiners/Office of Admissions of the State Bar of California will be followed regarding its responsibility to maintain confidentiality of this form and any documents submitted with it.  No part of the form or the accompanying medical documentation will be released without the applicant's written consent or under the compulsion of legal process.

## V. PROFESSIONAL'S SIGNATURE

I am submitting the **original** of this form and have attached  copies of all evaluation reports, test results, medical records, and/or other documents that I relied upon in making this diagnosis of the applicant's condition/disability and completing this form.  I understand that all original documents submitted become the property of the Committee of Bar Examiners.

I declare under penalty of perjury under the laws of the State of California that the above information is true and correct.

_____        7.14.20
*(Signature of Licensed Professional)*                        *(Date)*

The Committee of Bar Examiners reserves the right to make final judgment concerning testing accommodations and may have all documentation related to this matter reviewed by an individual professional consultant or a panel of professional consultants if deemed necessary.

Print This Page | Close This Window
Name: Benjamin Kohn | DOB: 12/29/1993 | MRN: 60507761 | PCP: Graham M Dresden, MD

# SURGICAL PROCEDURE - Details
## Study Result
### Narrative
Accession No: SHS-17-57866
SPECIMEN SUBMITTED:
RIGHT MAXILLARY SINUS CONTENTS


DIAGNOSIS (MICROSCOPIC):
A. SINUS CONTENTS, RIGHT MAXILLA, RESECTION
-- CHRONIC ALLERGIC SINUSITIS
-- GMS STAIN IS NEGATIVE FOR FUNGAL ORGANISMS

WOOD/CHARVILLE/VAN DE RIJN

CLINICAL HISTORY: Sleep apnea


OPERATION: Maxillary and mandibular osteotomy with bone graft,
septoplasty, arch bar placement

GROSS DESCRIPTION: One specimen is received labeled with the
patient's name and medical record number.

The specimen labeled "right maxillary sinus contents" is received in
formalin and consists of a 3.5 x 2.5 x 1.1 cm aggregate of four tan
fragments of soft tissue and mucoid material. A representative
section of each fragment of tissue is submitted in A1. Woods
(12/16/2017)

I have reviewed the specimen and agree with the interpretation
above. MATT VAN DE RIJN, M.D. Electronically signed 12/21/2017
1:23 PM
There is no component information for this result.

## General Information
Ordered by Kasey Kai-Chi Li, MD
Collected on 12/15/2017 8:20 PM
Resulted on 12/21/2017 1:53 PM
Result Status: Final result
**This test result has been released by an automatic process.**



Palo Alto Medical Foundation
Attn: My Health Online P.O. Box 255386
Sacramento , California 95865-5386

Name: Benjamin Kohn | DOB: 12/29/1993 | PCP: Graham Dresden, MD

# IGE, TOTAL - Details

**If you have questions or concerns regarding your test results, contact the clinician who ordered the test.**

Common Test Results Flags: A=Abnormal, L=Low, H=High, more flags

## Component Results

| Component | Your Value | Standard Range | Flag |
|---|---|---|---|
| **IGE, TOTAL** | **Your Value**<br>**736.00** kU/L | *Standard Range*<br>*<114 kU/L* | **Flag**<br>**H** |

## General Information

Ordered by Steven Rubinstein, MD

Collected on 06/04/2015 5:30 PM from Blood (Serum)

Resulted on 06/05/2015 10:19 PM

Result Status: Final result

This test result has been released by an automatic process.

MyChart® licensed from Epic Systems Corporation © 1999 - 2018
Copyright © 2020 Sutter Health. All rights reserved. Sutter Health is a registered trademark of Sutter
Health ®, Reg. U.S. Patent & Trademark office.

Name: Benjamin Kohn | DOB: 12/29/1993 | PCP: Graham Dresden, MD

# Cashew Nut IgE - Details

**If you have questions or concerns regarding your test results, contact the clinician who ordered the test.**

Common Test Results Flags: A=Abnormal, L=Low, H=High, more flags

## Component Results

| Component | Your Value | Standard Range | Flag |
|---|---|---|---|
| **CASHEW NUT, IGE** | **Your Value** **1.42** kU/L | *Standard Range* *<0.35 kU/L* | **Flag** **H** |

Interpretation for Specific Allergens:
<0.35 Absent
0.35-0.70 Low Level
0.71-3.50 Moderate Level
3.51-17.5 High Level
17.6-50.0 Very High Level
50.1-100 Very High Level
>100 Very High Level

## General Information

Ordered by Steven Rubinstein, MD

Collected on 06/04/2015 5:30 PM from Blood (Serum)

Resulted on 06/05/2015 10:35 PM

Result Status: Final result

This test result has been released by an automatic process.

MyChart® licensed from Epic Systems Corporation © 1999 - 2018
Copyright © 2020 Sutter Health. All rights reserved. Sutter Health is a registered trademark of Sutter
Health ®, Reg. U.S. Patent & Trademark office.



Palo Alto Medical Foundation
Attn: My Health Online P.O. Box 255386
Sacramento , California 95865-5386

Name: Benjamin Kohn | DOB: 12/29/1993 | PCP: Graham Dresden, MD

# Pistachio Nut IgE - Details

**If you have questions or concerns regarding your test results, contact the clinician who ordered the test.**

Common Test Results Flags: A=Abnormal, L=Low, H=High, more flags

## Component Results

| Component | Your Value | Standard Range | Flag |
|---|---|---|---|
| **PISTACHIO NUT, IGE** | **Your Value**<br>**3.03** kU/L | *Standard Range*<br>*<0.35 kU/L* | **Flag**<br>**H** |

Interpretation for Specific Allergens:
<0.35 Absent
0.35-0.70 Low Level
0.71-3.50 Moderate Level
3.51-17.5 High Level
17.6-50.0 Very High Level
50.1-100 Very High Level
>100 Very High Level

## General Information

Ordered by Steven Rubinstein, MD

Collected on 06/04/2015 5:30 PM from Blood (Serum)

Resulted on 06/05/2015 10:35 PM

Result Status: Final result

This test result has been released by an automatic process.

MyChart® licensed from Epic Systems Corporation © 1999 - 2018
Copyright © 2020 Sutter Health. All rights reserved. Sutter Health is a registered trademark of Sutter Health ®, Reg. U.S. Patent & Trademark office.



Palo Alto Medical Foundation
Attn: My Health Online P.O. Box 255386
Sacramento , California 95865-5386

Name: Benjamin Kohn | DOB: 12/29/1993 | PCP: Graham Dresden, MD

# Peanut IgE - Details

**If you have questions or concerns regarding your test results, contact the clinician who ordered the test.**

Common Test Results Flags: A=Abnormal, L=Low, H=High, more flags

## Component Results

| Component | Your Value | Standard Range | Flag |
|---|---|---|---|
| **Peanut, IgE** | **Your Value** <br> **8.95** kU/L | *Standard Range* <br> *kU/L* | **Flag** <br> **H** |
| **Peanut Class** | **Your Value** <br> **3** | | |

Note
INTERPRETATION
SPECIFIC LEVEL OF ALLERGEN
IGE CLASS kU/L SPECIFIC IGE ANTIBODY
-------- --------- ----------------
0 <0.35 ABSENT/UNDETECTABLE
1 0.35-0.70 LOW LEVEL
2 0.71-3.50 MODERATE LEVEL
3 3.51-17.5 HIGH LEVEL
4 17.6-50 VERY HIGH LEVEL
5 51-100 VERY HIGH LEVEL
6 >100 VERY HIGH LEVEL

# General Information

Ordered by Steven Rubinstein, MD

Collected on 06/04/2015 5:30 PM from Blood (Serum)

Resulted on 06/08/2015 5:56 PM

Result Status: Final result

This test result has been released by an automatic process.

MyChart® licensed from Epic Systems Corporation © 1999 - 2018
Copyright © 2020 Sutter Health. All rights reserved. Sutter Health is a registered trademark of Sutter Health ®, Reg. U.S. Patent & Trademark office.



Palo Alto Medical Foundation
Attn: My Health Online P.O. Box 255386
Sacramento , California 95865-5386

Name: Benjamin Kohn | DOB: 12/29/1993 | PCP: Graham Dresden, MD

# Codfish IgE - Details

**If you have questions or concerns regarding your test results, contact the clinician who ordered the test.**

Common Test Results Flags: A=Abnormal, L=Low, H=High, more flags

## Component Results

| Component | Your Value | Standard Range | Flag |
|---|---|---|---|
| **CODFISH, IGE** | **Your Value**<br>**46.10** kU/L | *Standard Range*<br>*<0.35 kU/L* | **Flag**<br>**H** |

Interpretation for Specific Allergens:
<0.35 Absent
0.35-0.70 Low Level
0.71-3.50 Moderate Level
3.51-17.5 High Level
17.6-50.0 Very High Level
50.1-100 Very High Level
>100 Very High Level

## General Information

Ordered by Steven Rubinstein, MD

Collected on 06/04/2015 5:30 PM from Blood (Serum)

Resulted on 06/05/2015 10:35 PM

Result Status: Final result

This test result has been released by an automatic process.

MyChart® licensed from Epic Systems Corporation © 1999 - 2018
Copyright © 2020 Sutter Health. All rights reserved. Sutter Health is a registered trademark of Sutter
Health ®, Reg. U.S. Patent & Trademark office.



Palo Alto Medical Foundation
Attn: My Health Online P.O. Box 255386
Sacramento , California 95865-5386

Name: Benjamin Kohn | DOB: 12/29/1993 | PCP: Graham Dresden, MD

# Salmon IgE - Details

**If you have questions or concerns regarding your test results, contact the clinician who ordered the test.**

Common Test Results Flags: A=Abnormal, L=Low, H=High, more flags

## Component Results

| Component | Your Value | Standard Range | Flag |
| --- | --- | --- | --- |
| **SALMON, IGE** | **Your Value** **73.70** kU/L | *Standard Range* *<0.35 kU/L* | **Flag** **H** |

Interpretation for Specific Allergens:
<0.35 Absent
0.35-0.70 Low Level
0.71-3.50 Moderate Level
3.51-17.5 High Level
17.6-50.0 Very High Level
50.1-100 Very High Level
>100 Very High Level

## General Information

Ordered by Steven Rubinstein, MD

Collected on 06/04/2015 5:30 PM from Blood (Serum)

Resulted on 06/05/2015 10:35 PM

Result Status: Final result

This test result has been released by an automatic process.

MyChart® licensed from Epic Systems Corporation © 1999 - 2018
Copyright © 2020 Sutter Health. All rights reserved. Sutter Health is a registered trademark of Sutter Health ®, Reg. U.S. Patent & Trademark office.



Palo Alto Medical Foundation
Attn: My Health Online P.O. Box 255386
Sacramento , California 95865-5386

Name: Benjamin Kohn | DOB: 12/29/1993 | PCP: Graham Dresden, MD

# Halibut IgE - Details

**If you have questions or concerns regarding your test results, contact the clinician who ordered the test.**

Common Test Results Flags: A=Abnormal, L=Low, H=High, more flags

## Component Results

| Component | Your Value | Standard Range | Flag |
|---|---|---|---|
| **HALIBUT, IGE** | **Your Value**<br>**23.00** kU/L | *Standard Range*<br>*<0.35 kU/L* | **Flag**<br>**H** |

Interpretation for Specific Allergens:
<0.35 Absent
0.35-0.70 Low Level
0.71-3.50 Moderate Level
3.51-17.5 High Level
17.6-50.0 Very High Level
50.1-100 Very High Level
>100 Very High Level

## General Information

Ordered by Steven Rubinstein, MD

Collected on 06/04/2015 5:30 PM from Blood (Serum)

Resulted on 06/05/2015 10:35 PM

Result Status: Final result

This test result has been released by an automatic process.

MyChart® licensed from Epic Systems Corporation © 1999 - 2018
Copyright © 2020 Sutter Health. All rights reserved. Sutter Health is a registered trademark of Sutter Health ®, Reg. U.S. Patent & Trademark office.



Palo Alto Medical Foundation
Attn: My Health Online P.O. Box 255386
Sacramento , California 95865-5386

Name: Benjamin Kohn | DOB: 12/29/1993 | PCP: Graham Dresden, MD

# Tuna IgE - Details

**If you have questions or concerns regarding your test results, contact the clinician who ordered the test.**

Common Test Results Flags: A=Abnormal, L=Low, H=High, more flags

## Component Results

| Component | Your Value | Standard Range | Flag |
|---|---|---|---|
| **TUNA, IGE** | **Your Value** **14.00** kU/L | *Standard Range* *<0.35 kU/L* | **Flag** **H** |

Interpretation for Specific Allergens:
<0.35 Absent
0.35-0.70 Low Level
0.71-3.50 Moderate Level
3.51-17.5 High Level
17.6-50.0 Very High Level
50.1-100 Very High Level
>100 Very High Level

## General Information

Ordered by Steven Rubinstein, MD

Collected on 06/04/2015 5:30 PM from Blood (Serum)

Resulted on 06/05/2015 10:35 PM

Result Status: Final result

This test result has been released by an automatic process.

MyChart® licensed from Epic Systems Corporation © 1999 - 2018
Copyright © 2020 Sutter Health. All rights reserved. Sutter Health is a registered trademark of Sutter Health ®, Reg. U.S. Patent & Trademark office.

# D. FARINAE ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Dermatophagoides farinae Allergen, IgE** | **Your Value**<br>**0.45** kU/L | *Standard Range*<br>*<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# CAT EPITHELIUM/DANDER ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Cat Epithelium and Dander Allergen, IgE** | **Your Value** **4.08** kU/L | *Standard Range* *<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# DOG HAIR, DANDER ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
| --- | --- | --- |
| **Dog Dander Allergen, IgE** | **Your Value**<br>**8.85** kU/L | *Standard Range*<br>*<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# ALTERNARIA ALT.(TENIUS) ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Alternaria alternata (tenuis) Allergen, IgE** | **Your Value**<br>**0.83** kU/L | *Standard Range*<br>*<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# ASPERGILLUS FUM. ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
| --- | --- | --- |
| **Allergen, Fungi/Mold, Aspergillus fumigatus IgE** | **Your Value** <br> **0.41** kU/L | *Standard Range* <br> *<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# CLADOSPORIUM HERBARIUM ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Hormodendrum (Cladosporium) Allergen, IgE** | **Your Value**<br>**1.48** kU/L | *Standard Range*<br>*<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# EPICOCCUM PURPURASCENS ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Epicoccum purpurascens Allergen, IgE** | **Your Value**<br>**2.74** kU/L | *Standard Range*<br>*<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# FUSARIUM MONILIFORME ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Fusarium moniliforme Allergen, IgE** | **Your Value**<br>**1.26** kU/L | *Standard Range*<br>*<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# HELMINTHOSPORIUM HALODES ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Helminthosporium halodes Allergen, IgE** | **Your Value** **2.02** kU/L | *Standard Range* *<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# JUNE (KY BLUE) GRASS ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **June (Kentucky Blue) Grass Allergen, IgE** | **Your Value** **>100.00** kU/L | *Standard Range* *<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# TIMOTHY (GRASS) ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Timothy Grass, Allergen, IgE** | **Your Value**<br>**80.00** kU/L | *Standard Range*<br>*<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# LAMBS QUARTERS ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Lamb Quarters Allergen, IgE** | **Your Value** **0.89** kU/L | *Standard Range* *<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# PLANTAIN, ENGLISH ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **English Plantain Allergen, IgE** | **Your Value** **0.59** kU/L | *Standard Range* *<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# RUSSIAN THISTLE ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Russian Thistle, Allergen, IgE** | **Your Value**<br>**0.75** kU/L | *Standard Range*<br>*<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# ASH, WHITE ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **White Ash, Allergen, IgE** | **Your Value**<br>**1.65** kU/L | *Standard Range*<br>*<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# COTTONWOOD ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Cottonwood Allergen, IgE** | **Your Value**<br>**0.89** kU/L | *Standard Range*<br>*<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# ELM, AMERICAN ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Elm Allergen, IgE** | **Your Value**<br>**1.50** kU/L | *Standard Range*<br>*<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# HICKORY, WHITE ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Hickory/Pecan Allergen, IgE** | **Your Value**<br>**2.32** kU/L | *Standard Range*<br>*<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# WALNUT, (TREE) ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Walnut Tree, Allergen, IgE** | **Your Value**<br>**8.52** kU/L | *Standard Range*<br>*<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019

# RAGWEED, GIANT ALLERGEN - Details

## Component Results

| Component | Your Value | Standard Range |
|---|---|---|
| **Giant Ragweed Allergen, IgE** | **Your Value** **0.60** kU/L | *Standard Range* *<=0.34 kU/L* |

## General Information

Ordered by Sohaib Aleem

Collected on 11/19/2015 8:36 AM (Blood)

Resulted on 11/21/2015 3:35 AM

MyChart® licensed from Epic Systems Corporation © 1999 - 2019