**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| BENJAMIN KOHN, | No. 20-17316 |
| *Plaintiff-Appellant*, | D.C. No. 4:20-cv-04827-PJH |
| v. | |
| STATE BAR OF CALIFORNIA; CALIFORNIA COMMITTEE OF BAR EXAMINERS, and Their Agents in Their Official Capacity, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Northern District of California
Phyllis J. Hamilton, District Judge, Presiding

Argued and Submitted En Banc September 20, 2023
San Francisco, California

Filed December 6, 2023

Before:  Mary H. Murguia, Chief Judge, and Johnnie B. Rawlinson, Sandra S. Ikuta, John B. Owens, Daniel A. Bress, Danielle J. Forrest, Patrick J. Bumatay, Jennifer Sung, Gabriel P. Sanchez, Holly A. Thomas and Salvador Mendoza, Jr., Circuit Judges.

Opinion by Judge Owens;
Partial Concurrence by Judge Mendoza;
Partial Concurrence and Partial Dissent by Judge Bumatay

## SUMMARY[*]

### Eleventh Amendment Immunity

The en banc court (1) affirmed in part the district court's dismissal of attorney Benjamin Kohn's action against the State Bar of California and the California Committee of Bar Examiners under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and California law; and (2) remanded to the original three-judge panel for consideration of the remaining issues.

In the State Bar's role in the admission of attorneys, it acts under the authority and at the direction of the California Supreme Court. Kohn sought monetary damages and other relief based on the State Bar's refusal to provide him with certain test-taking accommodations for the bar exam. The district court dismissed the action on the basis of Eleventh Amendment immunity.

The en banc court reaffirmed that the California State Bar enjoys Eleventh Amendment immunity from suit in federal court. The en banc court held that Eleventh Amendment immunity extends not only to suits in which a state itself is a named party, but also to suits against an "arm

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

of the state." The Ninth Circuit's version of the test for determining whether an entity is an arm of the state applied the so-called *Mitchell* factors. The en banc court concluded that the *Mitchell* factors test should be reshaped in light of developments in Supreme Court doctrine and the Ninth Circuit's experience applying the *Mitchell* factors. Accordingly, the en banc court adopted the D.C. Circuit's three-factor test, which considers: (1) the state's intent as to the status of the entity, including the functions performed by the entity; (2) the state's control over the entity; and (3) the entity's overall effects on the state treasury.

Applying this updated three-factor test, the en banc court held that the California State Bar is an arm of the state and entitled to sovereign immunity. The en banc court concluded that the first factor, California's intent as to the State Bar, strongly favored the conclusion that it is an arm of the state, as did the second factor, the state's control over the State Bar. The en banc court concluded that the third factor, the State Bar's effects on the state treasury, presented a closer call but was not dispositive.

Concurring in part, Judge Mendoza agreed with the majority that the *Mitchell* factors were out of step with the Supreme Court's jurisprudence and that the California State Bar is an arm of the state for sovereign immunity purposes. He wrote separately to caution against adopting the D.C. Circuit's approach to weighing the sovereign immunity factors, and he disagreed with the majority's wholesale embrace of the D.C. Circuit's entity-based approach to sovereign immunity.

Concurring in part and dissenting in part, Judge Bumatay, joined by Judge Sung, wrote that he agreed with

the majority's abandonment of the *Mitchell* factors in favor of the D.C. Circuit's more streamlined approach, looking at intent, control, and overall effects on a state's treasury to determine whether an entity is an arm of the state. Judge Bumatay, however, disagreed with the majority's application of this new approach, and he would hold that each of its factors cuts against finding sovereign immunity for the California State Bar.

## COUNSEL

Gregory R. Michael (argued) and Dorothy C. Yamamoto, Michael Yamamoto LLP, Berkeley, California, for Plaintiff-Appellant.

Brady R. Dewar (argued), Ellin Davtyan, Robert G. Retana, Rita K. Himes, and Jean R. Krasilnikoff, Office of General Counsel, The State Bar of California, San Francisco, California; for Defendants-Appellees.

Julian Sarkar, SarkarLaw, San Francisco, California, for Amicus Curiae SarkarLaw.

Claudia Center, Disability Rights Education and Defense Fund, Berkeley, California; Jinny Kim, Disability Rights Advocates, Berkeley, California; Laura A. Scalia, Legal Aid At Work, San Francisco, California; for Amici Curiae Disability Rights Education and Defense Fund, Inc., Legal Aid Work, et. al.

## OPINION

OWENS, Circuit Judge:

For nearly forty years, the California State Bar has enjoyed Eleventh Amendment immunity in federal court. *See, e.g.*, *Lupert v. Cal. State Bar*, 761 F.2d 1325, 1327 (9th Cir. 1985); *Hirsh v. Justs. of the Sup. Ct. of Cal.*, 67 F.3d 708, 715 (9th Cir. 1995) (per curiam). Appellant Benjamin Kohn, a licensed California attorney, seeks to change that. He contends that the State Bar is not an "arm of the state," and he can sue it without restriction. Consistent with every other circuit, we reaffirm that the State Bar enjoys Eleventh Amendment protection in federal court and update our arm of the state jurisprudence to better reflect the Supreme Court's most recent guidance.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The California State Bar is the "administrative arm" of the California Supreme Court "for the purpose of assisting in matters of admission and discipline of attorneys." *In re Rose*, 993 P.2d 956, 961 (Cal. 2000) (quoting *In re Att'y Discipline Sys.*, 967 P.2d 49, 59 (Cal. 1998)); *see also* Cal. R. Ct. 9.3 ("The State Bar serves as the administrative arm of the Supreme Court for admissions matters."). Under the California Constitution, "[e]very person admitted and licensed to practice law in [the] [s]tate is and shall be a member of the State Bar . . . ." Cal. Const. art. VI, § 9. The State Bar "acts under the authority and at the direction of the Supreme Court[,]" which has "inherent jurisdiction over the practice of law" in the state. Cal. R. Ct. 9.3. As part of its role in the admission of attorneys, the State Bar examines candidates' qualifications, administers the bar exam, and

certifies candidates to the California Supreme Court. *Id.*; Cal. Bus. & Prof. Code §§ 6046, 6060(g).

The claims in this case stem from the State Bar's admission function. Kohn filed a federal complaint against the State Bar seeking monetary damages and other relief. He alleged that its refusal to provide him with certain test-taking accommodations violated Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, sections of the California Government Code, and California's Unruh Civil Rights Act.[1] The State Bar moved to dismiss the lawsuit on several grounds, including that the Eleventh Amendment prohibited the action from going forward.[2]

The district court agreed with the State Bar. It granted the motion to dismiss and quoted *Hirsh*'s clear holding for support: "The Eleventh Amendment's grant of sovereign immunity bars monetary relief from state agencies such as California's Bar Association and Bar Court." *Hirsh*, 67 F.3d at 715. *Hirsh* relied exclusively on *Lupert* for its holding. *Id*; *see also Lupert*, 761 F.2d at 1327 ("The Eleventh

---

[1] 42 U.S.C. § 12131 *et seq.* (Title II of the Americans with Disabilities Act); 29 U.S.C. § 794 (Section 504 of the Rehabilitation Act); Cal. Gov't Code §§ 11135 *et seq.*, 12944 *et seq.*; Cal. Civ. Code § 51(f) (Unruh Civil Rights Act).

[2] In this opinion, we reach only the issue of whether the State Bar is an arm of the state for purposes of sovereign immunity. We remand the case to the original three-judge panel for consideration of the remaining issues. *See United States v. Dreyer*, 804 F.3d 1266, 1270 n.1 (9th Cir. 2015) (en banc) ("If the Court votes to hear or rehear a case *en banc*, the *en banc* court may, in its discretion, choose to limit the issues it considers." (quoting *Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 995 (9th Cir. 2003) (en banc))).

Amendment bars this suit against the named agencies as the state did not consent to being sued.").

Normally that would be the end of the story. A nearly forty-year-old precedent that largely has gone unchallenged[3] would control the panel's decision, and en bancs are quite rare. But this story is only getting started.

*Lupert* and *Hirsh* were largely silent as to why the State Bar enjoyed Eleventh Amendment immunity, and *Hirsh* ignored a long line of caselaw setting out our test (often called the *Mitchell* factors) for determining whether a state agency, like the State Bar, is an arm of the state entitled to such protection. *See, e.g.*, *Jackson v. Hayakawa*, 682 F.2d 1344, 1349–50 (9th Cir. 1982); *Mitchell v. L.A. Cmty. Coll. Dist.*, 861 F.2d 198, 201–02 (9th Cir. 1988). We have applied the *Mitchell* factors and the Eleventh Amendment to

---

[3] *See, e.g.*, *Viriyapanthu v. State Bar of Cal.*, 813 F. App'x 312, 313 (9th Cir. 2020) (The "State Bar of California . . . [is] entitled to sovereign immunity."); *Vartanian v. State Bar of Cal.*, 794 F. App'x 597, 600 (9th Cir. 2019) (same); *Kinney v. State Bar of Cal.*, 708 F. App'x 409, 410 (9th Cir. 2017) (same); *Haroonian v. Comm. of Bar Exam'rs*, 692 F. App'x 838, 838 (9th Cir. 2017) (same); *Kinney v. State Bar of Cal.*, 676 F. App'x 661, 663 (9th Cir. 2017) (same); *Tanasescu v. State Bar of Cal.*, 569 F. App'x 502, 502 (9th Cir. 2014) (same); *Joseph v. State Bar of Cal.*, 564 F. App'x 302, 303 (9th Cir. 2014) (same); *Khanna v. State Bar of Cal.*, 308 F. App'x 176, 177 (9th Cir. 2009) (same); *Torres v. State Bar of Cal.*, 143 F. App'x 13, 14–15 (9th Cir. 2005) (same); *Taggart v. State Bar of Cal.*, 57 F. App'x 757, 758 (9th Cir. 2003) (same).

We generally have taken the same approach with respect to other state bars. *See, e.g.*, *O'Connor v. Nevada*, 686 F.2d 749, 750 (9th Cir. 1982) (State Bar of Nevada); *Strojnik v. State Bar of Ariz.*, 829 F. App'x 776, 776 (9th Cir. 2020); *Block v. Wash. State Bar Ass'n*, 761 F. App'x 729, 731 (9th Cir. 2019). *But see Crowe v. Or. State Bar*, 989 F.3d 714, 733 (9th Cir. 2021) (per curiam); *infra* pp. 32–33.

a wide range of state entities.**[4]**  Yet we have spent little time over these decades considering whether our law accurately captures the latest Supreme Court thinking.

We sua sponte took this case en banc to decide whether (1) the *Mitchell* factors, described *infra* pp. 11–17, remain the optimal means to conduct an arm of the state analysis; and (2) the California State Bar enjoys Eleventh Amendment protection under a more rigorous scrutiny than it received in *Lupert* and *Hirsh*.

---

[4] *See, e.g.*, *Ray v. County of Los Angeles*, 935 F.3d 703, 709–11 (9th Cir. 2019) (county); *Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 928–34 (9th Cir. 2017) (school districts and county offices of education); *Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775, 778–86 (9th Cir. 2005) (air pollution control district); *Aguon v. Commonwealth Ports Auth.*, 316 F.3d 899, 901–04 (9th Cir. 2003) (public corporation created to manage ports); *In re Lazar*, 237 F.3d 967, 982–84 (9th Cir. 2001) (reimbursement program run by state water-resources control board); *Streit v. County of Los Angeles*, 236 F.3d 552, 566–67 (9th Cir. 2001) (county sheriff's department); *Hale v. Arizona*, 993 F.2d 1387, 1399 (9th Cir. 1993) (en banc) (operator of prison labor program), *abrogated on other grounds as recognized by Nwauzor v. GEO Grp., Inc.*, 62 F.4th 509, 514–15 (9th Cir. 2023); *Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 5 F.3d 378, 380–82 (9th Cir. 1993) (state-created railroad corporation); *ITSI T.V. Prods., Inc. v. Agric. Ass'ns*, 3 F.3d 1289, 1292–93 (9th Cir. 1993) (state fair and exposition); *Brooks v. Sulphur Springs Valley Elec. Coop.*, 951 F.2d 1050, 1053 (9th Cir. 1991) (public utilities commission and nonprofit public service corporation); *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1423–28 (9th Cir. 1991) (community development authority); *Austin v. State Indus. Ins. Sys.*, 939 F.2d 676, 678–79 (9th Cir. 1991) (state-run workers' compensation program).

## II. DISCUSSION

### A. Standard of Review

"We review de novo a dismissal on the basis of sovereign immunity or for failure to state a claim upon which relief can be granted." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 864 (9th Cir. 2016). Whether an entity is an arm of the state within the meaning of the Eleventh Amendment is a question of federal law. *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997) ("*Regents*").

### B. The Arm of the State Doctrine and the *Mitchell* Factors

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Longstanding Supreme Court precedent has interpreted this Amendment to immunize states from suit in federal court by citizens and noncitizens alike. *See, e.g.*, *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) ("*Seminole Tribe*"); *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991); *Hans v. Louisiana*, 134 U.S. 1, 15 (1890). This immunity extends not just to suits in which the state itself is a named party but also to those against an "arm of the [s]tate." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977); *accord Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994); *Regents*, 519 U.S. at 429.

There is no standard test for determining whether an entity is an arm of the state for purposes of sovereign

immunity. *See Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 61 (1st Cir. 2003) ("The arm of the state analytical doctrine has moved freely . . . applying common principles."). The circuits have developed different approaches to this question based on considerations the Supreme Court has identified as relevant, including "the nature of the entity created by state law," *Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 280, whether the state "structured" the entity to "enjoy the special constitutional protection of the [s]tate[] [itself]," *Hess*, 513 U.S. at 43–44 (citation omitted), and the state's legal liability for judgments against the entity, *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401–02 (1979).[5]

---

[5] *See, e.g.*, *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 443 (6th Cir. 2020) ("(1) the [s]tate's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government" (citation omitted)); *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 135 (2d Cir. 2015) (alternating between (1) a six-factor test evaluating entity's structure and treatment under state law and (2) a two-factor test considering extent of state responsibility for judgment and state supervision of the entity); *Walker v. Jefferson Cnty. Bd. of Educ.*, 771 F.3d 748, 751 (11th Cir. 2014) ("(1) how the state law defines the entity; (2) the degree of state control over the entity; and (3) the entity's fiscal autonomy" (citation omitted)); *P.R. Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 874 (D.C. Cir. 2008) (analyzing state intent, state control, and effects on state treasury); *Bowers v. Nat'l Coll. Athletic Ass'n*, 475 F.3d 524, 546 (3d Cir. 2007) ("(1) whether the payment of the judgment would come from the state; (2) what status the entity has under state law; and (3) what degree of autonomy the entity has"); *Thomas v. St. Louis Bd. of Police Comm'rs*, 447 F.3d 1082, 1084 (8th Cir. 2006) (looking to effect of judgment on state treasury and to degree of entity's autonomy

The Supreme Court has directed that "[w]hen indicators of immunity point in different directions, the Eleventh Amendment's twin reasons for being remain our prime guide": the states' dignity and their financial solvency. *Hess*, 513 U.S. at 47, 52.

Our version of the arm of the state test, the so-called *Mitchell* factors, arose from a grab bag of Supreme Court and Ninth Circuit precedent and is normally reduced to the following:

> [1] whether a money judgment would be satisfied out of state funds, [2] whether the entity performs central governmental functions, [3] whether the entity may sue or be sued, [4] whether the entity has the power

---

and control over its own affairs); *Takle v. Univ. of Wis. Hosp. & Clinics Auth.*, 402 F.3d 768, 769–71 (7th Cir. 2005) (considering effect of judgment on state treasury, nature of entity's function, and treatment under state law); *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 260–61 (4th Cir. 2005) (considering effect on state treasury; entity's independence from state; entity's involvement in statewide concerns; and state-law treatment of entity); *Fresenius Med. Care Cardiovascular Res., Inc.*, 322 F.3d at 68 (asking (1) whether state has "clearly structured the entity to share its sovereignty" and, if the first stage is inconclusive, (2) whether "damages will be paid from the public treasury"); *Sw. Bell Tel. Co. v. City of El Paso*, 243 F.3d 936, 938 (5th Cir. 2001) ("the relationship between the state and the entity . . . the essential nature of the proceeding, the nature of the entity created by state law, and whether a money judgment against the instrumentality would be enforceable against the state"); *Duke v. Grady Mun. Schs.*, 127 F.3d 972, 974 (10th Cir. 1997) ("degree of autonomy . . . as determined by the characterization of the agency by state law and the extent of guidance and control exercised by the state" and "extent of financing the agency receives independent of the state treasury and its ability to provide for its own financing" (citation omitted)).

> to take property in its own name or only the
> name of the state, and [5] the corporate status
> of the entity.

*Belanger v. Madera Unified Sch. Dist.*, 963 F.2d 248, 250–
51 (9th Cir. 1992) (quoting *Mitchell*, 861 F.2d at 201).

This case presents the question of whether we ought to
reshape the *Mitchell* factors in light of developments in
Supreme Court doctrine and our experience applying them.
We conclude that we should.

First, the *Mitchell* factors are out of step with current
Supreme Court jurisprudence.  Under *Mitchell*, we have
placed the greatest weight on the first factor—whether a
money judgment would be satisfied out of state funds. *See,
e.g.*, *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 (9th
Cir. 1991) ("[T]he source from which the sums sought by the
plaintiff must come is the most important single factor in
determining whether the Eleventh Amendment bars federal
jurisdiction." (citations omitted)).  Our decision to prioritize
the first factor was a "recognition of *Edelman* [*v. Jordan*],"
which held that the Eleventh Amendment bars suits that seek
to impose liability that "would have to be satisfied out of
public funds from the state treasury." *Id.* (citing *Edelman v.
Jordan*, 415 U.S. 651, 663 (1974)).

But, since *Edelman* and *Mitchell*, the Supreme Court has
clarified that "[t]he Eleventh Amendment does not exist
solely in order to 'preven[t] federal-court judgments that
must be paid out of a [s]tate's treasury.'" *Seminole Tribe*,
517 U.S. at 58 (second alteration in original) (quoting *Hess*,
513 U.S. at 48).  "[I]t also serves to avoid 'the indignity of
subjecting a [s]tate to the coercive process of judicial
tribunals at the instance of private parties.'"  *Id.* (quoting

*P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)).

Consequently, the inquiry into whether a state is legally liable for judgments against an entity is important not as "a formalistic question of ultimate financial liability," but because it is "an indicator of the relationship between the [s]tate and its creation." *Regents*, 519 U.S. at 431. Taking heed of this doctrinal development, our sister circuits have moved away from an excessive emphasis on the treasury factor.[6] We, however, have never considered what the Supreme Court's more recent cases require, instead maintaining a primary focus on the treasury factor. Consequently, we have underemphasized the dignity interests of the states, one of the Eleventh Amendment's "twin reasons for being." *Hess*, 513 U.S. at 47.

Kohn asserts that we should continue to prioritize the treasury factor. He anchors his argument in *Hess*'s statement that the "vast majority of Circuits . . . have concluded that the state treasury factor is the most important." 513 U.S. at 49 (ellipsis in original) (citation omitted). But he ignores that *Hess* attached the same level of importance to state dignity. *See id.* at 41, 47, 52. *Hess* involved the potential immunity of a bistate entity created under the Compact

---

[6] *See, e.g.*, *Bowers*, 475 F.3d at 546 ("[W]e can no longer ascribe primacy to the first factor" of "whether payment comes from the state treasury." (citation omitted)); *Fresenius Med. Care Cardiovascular Res., Inc.*, 322 F.3d at 65–66 (holding that, "[i]n the aftermath of *Hess*," "potential payment from the state treasury is the most critical factor" *only if* "there is an ambiguity about the direction in which the *structural analysis* points" (emphasis added)); *cf. Duke*, 127 F.3d at 978 ("[E]ven after *Hess* and [*Regents*], which emphasized the primacy of the impact on the state treasury as a factor in determining immunity, other factors remain relevant.").

Clause.  *Id.* at 35.  The Supreme Court recognized that, because bistate entities "occupy a significantly different position in our federal system than do the [s]tates themselves," "[s]uit in federal court is not an affront to the dignity of a Compact Clause entity" or to "the integrity of the compacting States."  *Id.* at 40–41.

But this acknowledgment—that a suit against a bistate entity does not threaten its parent state's dignity interest in the same way that a suit against that state itself would—does not mean that the state's dignity interest is less important in determining *whether* a suit against an entity *is* a suit against the state itself.  Therefore, we read *Hess* for what it says: that state dignity and solvency are the Eleventh Amendment's "twin reasons for being" and entitled to equal weight.  *Id.* at 47, 52; *see also P.R. Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 874 (D.C. Cir. 2008) ("*Hess* does not require a focus solely on the financial impact of the entity on the [s]tate.  Rather, *Hess* 'pays considerable deference to the dignity interests of the state, focusing on both explicit and implicit indications that the state sought to cloak an entity in its Eleventh Amendment immunity.'" (quoting *Fresenius Med. Care Cardiovascular Res., Inc.*, 322 F.3d at 67)).  As a result, our continued elevation of state solvency under the *Mitchell* factors conflicts with the Supreme Court's guidance.

The *Mitchell* factors are not only inconsistent with Supreme Court arm of the state doctrine—they also generate a muddled arm of the state analysis within our Circuit.  For example, some of the *Mitchell* factors are of questionable relevance.  Consider the third factor, "whether the entity may sue or be sued."  *Belanger*, 963 F.2d at 250.  Under California law, a variety of state entities, including the State Bar, Cal. Bus. & Prof. Code § 6001, may "sue and be sued."

*See, e.g.*, *Belanger*, 963 F.2d at 254 (school district); *Beentjes v. Placer Cnty. Air Pollution Control Dist.*, 397 F.3d 775, 784 (9th Cir. 2005) (air pollution control district); *Sato v. Orange Cnty. Dep't of Educ.*, 861 F.3d 923, 933 (9th Cir. 2017) (county office of education). But this provision has limited relevance for purposes of federal immunity.

The Supreme Court has explicitly held that a state does not "consent to suit in federal court merely by stating its intention to 'sue and be sued . . . .'" *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 676 (1999) (citing *Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 149–50 (1981) (per curiam)).[7] Thus, "[a] mere statutory grant of the power to sue or be sued . . . is not enough to waive immunity from suits brought in federal court if it may fairly be construed as limited to a waiver of immunity in the state's own courts." *Durning*, 950 F.2d at 1427 n.4 (citing *Welch v. Tex. Dep't of Highways & Pub. Transp.*, 483 U.S. 468, 473–74 (1987)). As a result, we have said that the sue or be sued factor "is entitled to less weight." *Belanger*, 963 F.2d at 254 ("California school districts can sue and be sued in their own name," but "[i]f a school district is a state agency for purposes of the Eleventh Amendment, suits against the

---

[7] *See also Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 241 (1985) (declining to find waiver "[i]n the absence of an unequivocal waiver specifically applicable to federal-court jurisdiction"), *superseded by statute as recognized by United States ex rel. Cain v. Salish Kootenai Coll., Inc.*, 862 F.3d 939, 943 (9th Cir. 2017); *cf. Biden v. Nebraska*, 600 U.S. 477, 492 (2023) ("Every government corporation . . . is a corporation, after all, with the power[] . . . to sue and be sued," but it "nonetheless remains (for many purposes at least) part of the [g]overnment itself." (internal citations and quotations omitted)).

district in its own name are subject to the same Eleventh Amendment constraints as suits against the state.").

Similar problems arise under factor four—whether the entity has the power to take property in its own name or only the name of the state.   Even where an entity can hold property in its own name and thus satisfies factor four, we have said "the property ownership analysis is a close question" if "[state] law . . . treats such property as state property." *Id.*  As a result, this factor is also "entitled to little weight." *Id.*  Therefore, at least two of the *Mitchell* factors do not do much, if any, work.  The caselaw bears this out: While factors three and four are almost invariably satisfied, they do not have a predictable effect on the outcome of any individual case.[8]

We also have wavered as to whether we evaluate the second *Mitchell* factor—whether the entity performs central governmental functions—at the entity or activity level.  If the *Mitchell* analysis is entity based, then an entity is either immune or not.  But, if the *Mitchell* analysis is activity based, then an entity's immunity from suit may vary depending on the function it performs.  In applying *Mitchell*, we have said *both* that we cannot "hold that [an entity] is immune from suit with respect to some of its activities . . . but not others"

---

[8] *Compare Crowe*, 989 F.3d at 733 (entity could sue and be sued and take property in its own name and *was not* an arm of the state); *Ray*, 935 F.3d at 711 (same); *Beentjes*, 397 F.3d at 784–86 (same); *Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1187–89 (9th Cir. 2003) (same); *Savage v. Glendale Union High Sch.*, 343 F.3d 1036, 1049–51 (9th Cir. 2003) (same), *and Durning*, 950 F.2d at 1427–28 (same), *with Sato*, 861 F.3d at 933–34 (entity could sue and be sued and take property in its own name but *was* an arm of the state); *Aguon*, 316 F.3d at 903 (same); *Belanger*, 963 F.2d at 254 (same), *and Alaska Cargo Transp., Inc.*, 5 F.3d at 381–82 (same).

because "[t]o do so would impermissibly qualify sovereign immunity, which by its nature is absolute," *Durning*, 950 F.2d at 1426, *and* that "we look to whether the [entity], in performing the particular function at issue, performs a central government function," rather than "whether the [entity] performs central government functions in general," *Ray*, 935 F.3d at 710.  Scholarly criticism has focused on this inconsistency and argued that it allows lower courts in our Circuit to "twist" the arm of the state doctrine depending on the defendant.  *See* Kelsey Joyce Dayton, *Tangled Arms: Modernizing and Unifying the Arm-of-the-State Doctrine*, 86 U. Chi. L. Rev. 1603, 1633 (2019) (arguing that lower courts in the Ninth Circuit "brush aside aspects of" the *Mitchell* factors "in cases that prove especially troublesome").

Notably, we did not always apply the *Mitchell* factors mechanically as a five-part test.  For example, in *Franceschi v. Schwartz*, 57 F.3d 828 (9th Cir. 1995) (per curiam), we cited *Mitchell* but analyzed only how "state law treats the entity . . . in an effort to assess the extent to which the entity 'derives its power from the [s]tate and is ultimately regulated by the [s]tate.'"  *Id.* at 831 (citations omitted).  Thus, our determination that a municipal court was an arm of the state turned on "the extensive control exercised by the state over the municipal courts."  *Id.*  Likewise, in *Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032 (9th Cir. 1999), we cited *Mitchell* solely for the proposition that we must look to an entity's "nature as created by state law" and "whether [it] performs central governmental functions" to conduct the arm of the state analysis.  *Id*. at 1035.

These cases suggest an earlier recognition that the best arm of the state test is not a multi-factor checklist involving potentially irrelevant factors but an analysis that drills down on whether the state "structured" the entity to enjoy

immunity from suit.  *Hess*, 513 U.S. at 43 (citation omitted). The D.C. Circuit's test fits the bill.  In an opinion by then-Judge Kavanaugh, the D.C. Circuit distilled the developments in the Supreme Court's more recent caselaw into a three-factor test: "(1) the [s]tate's intent as to the status of the entity, including the functions performed by the entity; (2) the [s]tate's control over the entity; and (3) the entity's overall effects on the state treasury."  *P.R. Ports Auth.*, 531 F.3d at 873 (citing *Hess*, 513 U.S. at 44–46; *Lake Country Ests., Inc.*, 440 U.S. at 401–02; *Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 280–81).

The first factor of intent turns on whether state law expressly characterizes the entity as a governmental instrumentality rather than as a local governmental or non-governmental entity; whether the entity performs state governmental functions; whether the entity is treated as a governmental instrumentality for purposes of other state law; and state representations about the entity's status.  *Id.* at 874.  The second factor depends on how members of the governing body of the entity are appointed and removed, as well as whether the state can "directly supervise and control [the entity's] ongoing operations."  *Id.* at 877.  And, the third factor, though relevant, is not dispositive.  While Kohn argues that this factor is the most important, we agree with the D.C. Circuit that the Eleventh Amendment "does not require a focus solely on the financial impact of the entity on the [s]tate" because the Eleventh Amendment is equally concerned with "the dignity interests of the state."  *Id.* at 874 (citation omitted) (interpreting *Hess*).

We have not updated the *Mitchell* factors since we first articulated them in 1982 in *Jackson*, despite the Supreme Court's intervening decisions in seminal sovereign immunity cases such as *Regents*, *Hess*, and *Seminole Tribe*.

Had we revisited our arm of the state jurisprudence after these cases, as several of our sister circuits have, *see supra* note 6, we would have realized that the *Mitchell* factors had failed to keep up.

By contrast, the D.C. Circuit test is consistent with current Supreme Court precedent.  The intent and control factors advance the states' dignity interests, and the treasury factor protects the states' financial solvency.  As a result, this test best promotes the Eleventh Amendment's "twin reasons for being."  *Hess*, 513 U.S. at 47.  Since the D.C. Circuit's three-factor test better encapsulates the current state of the law than the *Mitchell* factors and avoids their problems, we adopt it here and no longer endorse the *Mitchell* factors.

We likewise adopt the D.C. Circuit's rule that "[u]nder the three-factor test, an entity either is or is not an arm of the [s]tate: The status of an entity does not change from one case to the next based on the nature of the suit, the [s]tate's financial responsibility in one case as compared to another, or other variable factors." *P.R. Ports Auth.*, 531 F.3d at 873. The Supreme Court declined to resolve this question in *Regents*.   519 U.S. at 428 n.10 ("Nor is it necessary to determine whether there may be some state instrumentalities that qualify as 'arms of the [s]tate' for some purposes but not others.").   However, an entity-based approach complies better with the D.C. Circuit's test, which builds an analysis of an entity's functions *into* its intent prong but does not so narrowly limit its overall scope.  *See P.R. Ports Auth.*, 531 F.3d at 874.   And, like the D.C. Circuit, other circuits evaluate immunity at the level of the entity.[9]

---

[9] *See, e.g.*, *Lowe v. Hamilton Cnty. Dep't of Job & Fam. Servs.*, 610 F.3d 321, 331 (6th Cir. 2010) (declining to extend immunity to an entity after

The entity-based approach also makes sense as a matter of principle.  We agree with our statement in *Durning* that "sovereign immunity . . . by its nature is absolute."  950 F.2d at 1426.  The possibility that immunity may be waived or abrogated does not diminish this point.  Waiver and abrogation are second-stage inquiries as to whether, *if* an entity is immune, that immunity may be overcome.  *See Torres v. Tex. Dep't of Pub. Safety*, 142 S. Ct. 2455, 2462 (2022); *cf. Fin. Oversight & Mgmt. Bd. v. Centro de Periodismo Investigativo, Inc.*, 598 U.S. 339, 346 (2023) ("[W]e assume without deciding that Puerto Rico is immune from suit in federal district court, and that the Board partakes of that immunity.  We address only whether, accepting those premises, [the statute] effects an abrogation.").  But waiver and abrogation do not undermine the absolute nature of the first-stage question of whether immunity exists.

An entity-based approach also better promotes consistency, predictability, and finality because it settles an entity's immunity "unless and until there are relevant changes in the state law governing the entity."  *P.R. Ports Auth.*, 531 F.3d at 873.  By contrast, an activity-based approach would allow parties to relitigate an entity's immunity simply by articulating the challenged activity at a different level of generality.  Thus, even once an entity was deemed immune, it still could be "subject[ed] . . . to the coercive process of judicial tribunals at the instance of private parties," undermining the very purpose of immunity.  *Seminole Tribe*, 517 U.S. at 58 (quoting *P.R. Aqueduct &*

---

considering all its functions, not just the function at issue, in reliance on *Regents* permitting such an entity-based approach); *Hudson v. City of New Orleans*, 174 F.3d 677, 682 n.1 (5th Cir. 1999) (rejecting the view that "we look at the [specific] function of the [entity] being sued . . . in our Eleventh Amendment analysis" (citation omitted)).

*Sewer Auth.*, 506 U.S. at 146); *cf. Maliandi v. Montclair State Univ.*, 845 F.3d 77, 92–93 (3d. Cir. 2016) (rejecting the approach of parsing claim-specific Eleventh Amendment immunity as "untenable—both practically and in principle").

Though our decision to implement the D.C. Circuit's test represents a change in our jurisprudence, this new framework is unlikely to lead to different results in cases that previously applied the *Mitchell* factors and held an entity entitled to immunity.   The D.C. Circuit test does not overemphasize the treasury factor or rely on considerations that are minimally relevant to the immunity analysis, aspects of *Mitchell* that could erroneously lead to a conclusion of no immunity.   Although each case will be decided on its own facts, we have no reason to believe that our decision today will substantially destabilize past decisions granting sovereign immunity to state entities within the Ninth Circuit. Indeed, that is the case here as to the California State Bar, as we now explain.

## C. Applying the Updated Three-Factor Test Confirms that the California State Bar is an Arm of the State

Though we update our test, the California State Bar's status remains the same: It is an arm of the state and entitled to sovereign immunity.

### i. Intent

First, California's intent with respect to the State Bar supports immunity.  California law "characterizes" the State Bar as a "governmental instrumentality."  *P.R. Ports Auth.*, 531 F.3d at 874 (citing *Hess*, 513 U.S. at 44–45 (considering whether legislation "type[d]" the entity "as a state agency")). The State Bar is codified in the California Constitution,

which prescribes that "[e]very person admitted and licensed to practice law in this State is and shall be a member of the State Bar . . . ." Cal. Const. art. VI, § 9; *cf. In re New York*, 256 U.S. 490, 501 (1921) (in determining that a suit against a defendant in his official capacity was a suit against the state, the Court noted that the defendant's office was "established and its duties prescribed by the Constitution of the state"). Further, "[a]ll property of the State Bar is . . . held for essential public and governmental purposes in the judicial branch of the government," *id.* § 6008, and "[b]onds, notes, debentures, and other evidences of indebtedness of the State Bar are . . . issued for essential public and governmental purposes in the judicial branch of government," *id.* § 6008.2.

The state legislature's characterization of an entity is not the only important metric for the intent factor—state court treatment is also relevant. *See, e.g.*, *Hess*, 513 U.S. at 45 ("State courts . . . repeatedly have typed the Port Authority an agency of the [s]tates . . . ."). The California Supreme Court's description of the State Bar as its "administrative arm" for attorney discipline and admission purposes cuts decisively in favor of the State Bar's immunity. *E.g.*, *In re Rose*, 993 P.2d at 961, 974; *In re Att'y Discipline Sys.*, 967 P.2d at 59. As does the California Supreme Court's reference to the State Bar as "a constitutional entity within the judicial article of the California Constitution." *Obrien v. Jones*, 999 P.2d 95, 100 (Cal. 2000).

The dissent focuses on the State Bar's status as a "public corporation" under the California Constitution to argue that "California law treats the State Bar the same way as it treats independent municipalities," which "cuts strongly against sovereign immunity." But, as the various definitions of "public corporation" cited by the dissent indicate, the term

"public corporation" can mean different things in different places.  For example, as the dissent acknowledges, while certain provisions of California law define "public corporation[s]" as "municipal corporation[s]" or "political subdivision[s]," *see, e.g.*, Cal. Gov't Code § 67510, others use the term "public corporation" to refer to the state of California, *see, e.g.*, *id.* §§ 6300, 12100.50, or even the United States, *see, e.g.*, Cal. Pub. Cont. Code § 21561.

These varied definitions indicate that the designation "public corporation" merely means that something is not private. *See, e.g.*, Cal. Water Code § 12000 ("As used in this part, 'person' means any person, firm, association, organization, partnership, business trust, corporation, or company, but not including any public corporation or other public entity."). Beyond that, context matters. As a result, labeling the State Bar as a "public corporation" begs the question of whether it is an arm of the state, which is why we apply the three-factor test. While California's designation of the State Bar as a "public corporation" may be inconclusive regarding its intent with respect to the State Bar, the State Bar's codification in the California Constitution and treatment by the California Supreme Court clarifies any ambiguity as to whether California law "characterizes" the State Bar as a "governmental instrumentality." *P.R. Ports Auth.*, 531 F.3d at 874 (citing *Hess*, 513 U.S. at 44–45); *see also Hagman v. Meher Mount Corp.*, 155 Cal. Rptr. 3d 192, 195 (Cal. Ct. App. 2013) (citing State Bar's status as a "public corporation" under the California Constitution for the proposition that "'public corporation' is a term of art used to designate certain entities that exercise governmental functions").

The dissent's reliance on *Keller v. State Bar of California*, 496 U.S. 1 (1990), is likewise misplaced because

the California state legislature has since restructured the State Bar in ways that indicate a stronger intent to treat it as an arm of the state.   After *Keller*, the state legislature converted the State Bar's conference of delegates into a private entity.   2002 Cal. Stat. 2355, 2356–58 (amending Cal. Bus. & Prof. Code § 6031.5).   It moved the functions and activities of the State Bar's sixteen specialty law sections to a new voluntary private corporation, the California Lawyers Association, which explicitly "shall not be considered a state, local, or public body for any purpose." *See* The Nonprofit Association Act, 2017 Cal. Stat. 3349, 3357–58 (codified at Cal. Bus. & Prof. Code §§ 6056, 6056.3).   It took the power to appoint members to the State Bar's governing body away from the Bar's members, granting total control over appointment to the three branches of the state government.   2017 Cal. Stat. at 3353–54 (amending Cal. Bus. & Prof. Code §§ 6011, 6013.1, 6013.3, 6013.5).   Finally, today, the Bar regulates "licensees" rather than "members" who pay "fees" rather than "dues."   2018 Cal. Stat. 4356, 4357 (amending Cal. Bus. & Prof. Code § 6002).   This separation of the State Bar's associational and regulatory functions evinces California's intent for the State Bar to be an arm of the state.

Moreover, the State Bar "performs functions typically performed by state governments."   *P.R. Ports Auth.*, 531 F.3d at 875 (citing *Hess*, 513 U.S. at 45).   "Since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the [s]tates . . . .   The [s]tates prescribe the qualifications for admission to practice and the standards of professional conduct.   They also are responsible for the discipline of lawyers."   *Leis v. Flynt*, 439 U.S. 438, 442 (1979).   "The interest of the [s]tates in regulating lawyers is especially great since lawyers are

essential to the primary governmental function of administering justice . . . ." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975).

The state legislature has tasked the State Bar with the "[p]rotection of the public" in its "licensing, regulatory, and disciplinary functions." Cal. Bus. & Prof. Code § 6001.1. The State Bar carries out "the core functions of admission and discipline of attorneys," which go to the heart of California's interest in regulating lawyers. *Obrien*, 999 P.2d at 100 (citation omitted). It examines candidates' qualifications for admission and administers the bar exam, which is a prerequisite to practicing law in the state; it also certifies candidates for admission to the California Supreme Court. Cal. Bus. & Prof. Code §§ 6046, 6060(g); Cal. R. Ct. 9.3. The California Supreme Court has explicitly stated that the State Bar's "assistance . . . in the disciplinary process is an integral part of the judicial function." *Obrien*, 999 P.2d at 100. Consequently, the State Bar performs governmental functions. *See In re Wade*, 948 F.2d 1122, 1124 (9th Cir. 1991) (per curiam) ("In conducting disciplinary proceedings, the [Arizona State] Bar is enforcing its police or regulatory power.").

We also consider whether the State Bar is "treated as a governmental instrumentality for purposes of other [California] laws." *P.R. Ports Auth.*, 531 F.3d at 874, 876 (citing *Hess*, 513 U.S. at 44–45). The State Bar is subject to California public-records and open-meeting laws. Cal. Bus. & Prof. Code § 6001. Its property is tax-exempt. *Id.* § 6008.

Though California law authorizes the State Bar to "sue and be sued," *id.* § 6001, this provision "may fairly be construed as limited to a waiver of immunity in the state's own courts," *Durning*, 950 F.2d at 1427 n.4 (citing *Welch*,

483 U.S. at 473–74); *see also supra* pp. 14–16.  Individuals can challenge "[d]eterminations and recommendations of the bar in matters of discipline and admission" in the California Supreme Court.  *Saleeby v. State Bar of Cal.*, 702 P.2d 525, 529 (Cal. 1985).[10]  The California Court of Appeal has reasoned that these matters remain within the California Supreme Court's exclusive "original jurisdiction over the admissions process," as the "enactment of a comprehensive statutory scheme . . . established a public agency . . . without diminishing the court's authority over admissions." *Smith v. Cal. State Bar*, 261 Cal. Rptr. 24, 28 (Cal. Ct. App. 1989). Thus, the most reasonable construction of the "sue and be sued" provision is as part of this statutory scheme to establish the conditions under which the State Bar may be sued in *state* court, not as a waiver of federal sovereign immunity.

The dissent asserts that California law treats the State Bar "as distinct from state agencies" because it provides that "[n]o law of this state, restricting, or prescribing a mode of procedure for the exercise of powers of state public bodies or state agencies . . . shall be applicable to the State Bar, unless the [l]egislature expressly so declares." Cal. Bus. & Prof. Code § 6001.  But the California Supreme Court has interpreted this provision in the exact opposite way: "That the legislature considered the State Bar as at least akin to a state public body or agency . . . is illustrated by the last paragraph of section 6001, where it appears the [l]egislature felt the necessity of providing that laws prescribing

---

[10] *See also* Cal. Bus. & Prof. Code § 6066 (authorizing California Supreme Court review of Bar certification decisions); *id.* § 6082 (authorizing California Supreme Court review of Bar reinstatement decisions); Cal. R. Ct. 9.13 (setting forth procedures for review of Bar decisions).

procedures for state bodies . . . did not apply to the State Bar, thus indicating that the [l]egislature considered the State Bar in their category." *Chron. Publ'g Co. v. Superior Ct.*, 354 P.2d 637, 645 (Cal. 1960) (in bank).  In sum, the State Bar "is treated as a governmental instrumentality for purposes of other state laws." *P.R. Ports Auth.*, 531 F.3d at 874, 876 (citing *Hess*, 513 U.S. at 44–45).

Accordingly, the first factor—California's intent as to the State Bar—favors the conclusion that the State Bar is an arm of the state and entitled to its immunity.

### ii.  Control

The second factor of control considers, first, "how the directors and officers" of the entity "are appointed." *P.R. Ports Auth.*, 531 F.3d at 877 (citing *Hess*, 513 U.S. at 44). Again, this factor cuts in favor of immunity.  The California Supreme Court, the state legislature, and the governor appoint the State Bar's Board of Trustees.  Cal. Bus. & Prof. Code §§ 6010, 6013.1, 6013.3, 6013.5.  Officials within the three branches of the state government also appoint the Committee of Bar Examiners, a body that oversees the bar exam and admission.  *Id.* §§ 6046, 6046.5; Cal. R. Ct. 9.4. Thus, the power to appoint the State Bar's governing structure is housed wholly within the state government.

Beyond appointment, the California Supreme Court exercises significant control over the State Bar's functioning.  The California Supreme Court has "inherent jurisdiction over the practice of law" in the state, so the State Bar "acts under the authority and at the direction of the Supreme Court."  Cal. R. Ct. 9.3.  Admission rules adopted by the State Bar are subject to California Supreme Court review and approval, *id.* at 9.5, and the State Bar must report to the California Supreme Court on each administration of

the bar exam, *id.* at 9.6(c).   Relatedly, the State Bar's
admission and disciplinary decisions are subject to
California Supreme Court review.   Cal. Bus. & Prof. Code
§§ 6066, 6082; Cal. R. Ct. 9.13.   The California Supreme
Court has explained that "in matters of discipline and
disbarment, the State Bar is but an arm of th[e] court," which
"retains its power to control any such disciplinary
proceeding at any step," *In re Att'y Discipline Sys.*, 967 P.2d
at 59 (citation omitted), including by, for example, imposing
procedural standards on such proceedings, *Emslie v. State
Bar of Cal.*, 520 P.2d 991, 999 (Cal. 1974).

Presented with a comparably close relationship between
the Arizona Supreme Court and the Arizona State Bar, the
Supreme Court concluded that the Arizona State Bar's
actions were state action and therefore exempt from antitrust
law.   *Bates v. State Bar of Ariz.*, 433 U.S. 350, 361 (1977).
The Supreme Court reasoned that where the Arizona State
Bar's role was "completely defined" by the Arizona
Supreme Court, and it acted "as the agent of the court under
its continuous supervision," claims arising from that role
were "against the State. The Arizona Supreme Court [was]
the real party in interest." *Id*.   Likewise, the California
Supreme Court's significant degree of control over the State
Bar strongly suggests that the State Bar is an arm of the
judicial branch of California.

The dissent recognizes that the State Bar is subject to the
Supreme Court's "supervision."   However, it contends that
"supervision is not control" because the Supreme Court of
California "does not veto the decisions of the State Bar" but
"merely chooses whether to adopt the State Bar's
recommendations as to admission and discipline."   This is a
distinction without a difference, as the Supreme Court of
California need not have the power to veto the decisions of

the State Bar when it has total control over which of those decisions will be adopted in the first place.

The California state legislature also controls the State Bar's ability to raise revenue. Though the legislature has authorized the State Bar to raise its own funds, which are "paid into the treasury of the State Bar," *id.* § 6063, the legislature sets an annual cap on the amount the State Bar can charge in licensee fees, *id.* § 6140, and requires the State Bar to submit an annual budget for the legislature's review and approval in conjunction with any bill that would authorize the State Bar to collect such fees, *id.* § 6140.1. The legislature's power over the State Bar's fundraising ability and annual budget further illustrates the state's control over the State Bar.

Thus, the second factor of control also favors the State Bar's immunity.

### iii. Treasury

Finally, we consider the State Bar's financial relationship to California and its overall effects on California's treasury. *P.R. Ports Auth.*, 531 F.3d at 878 (citing *Hess*, 513 U.S. at 43–44). "In analyzing this third factor . . . the relevant issue is a [s]tate's overall responsibility for funding the entity or paying the entity's debts or judgments, *not* whether the [s]tate would be responsible to pay a judgment *in the particular case at issue*." *Id.* (emphasis in original) (citations omitted).

There is no dispute that California law makes the State Bar responsible for its own debts and liabilities, so California would not be liable for a judgment against the State Bar. Cal. Bus. & Prof. Code § 6008.1. The State Bar, however, posits that, because "[a]ll property of the State Bar . . . [is] held for

essential public and governmental purposes in the judicial branch of government," *id.* § 6008, the State Bar's funds *are* state funds. The State Bar also points to the control the California state legislature exercises over its ability to raise revenue. *See supra* p. 29. These aspects of the State Bar's financial administration do not prove that California is responsible for funding the State Bar or paying its debts or judgments. But they are indicia of California's intent with respect to the State Bar and control over it, and they undermine Kohn's portrait of the State Bar as a financially self-sustaining, independent entity.

The State Bar also relies on cases where we considered whether the State, even if not directly liable for a judgment against an entity under state law, would be the "real, substantial party in interest," *Regents*, 519 U.S. at 429 (citation omitted), because the entity performed essential governmental functions that the state could not do without. For example, in *Alaska Cargo Transport, Inc. v. Alaska R.R. Corp.*, 5 F.3d 378 (9th Cir. 1993), Alaska would not have been liable for a judgment against a state-created railroad. *Id.* at 380–81. But the railroad was "a unique and essential fixture in the lives of thousands of widely dispersed Alaskans" and "perform[ed] a vital governmental function." *Id.* Therefore, we concluded that, in the face of a large judgment, the railroad "would be compelled to turn to legislative appropriation in order to remain in business, and the legislature would have to respond favorably so that the 'essential' transportation function would continue to be performed . . . ." *Id.* at 381 (citation omitted).

Similarly, in *Aguon v. Commonwealth Ports Auth.*, 316 F.3d 899 (9th Cir. 2003), we determined that the Commonwealth Ports Authority of the Northern Mariana Islands, a public corporation created to operate and manage

the Northern Mariana Islands' ports, "perform[ed] a central governmental function," so that if it "were to be faced with a large money judgment which it could not pay, the Commonwealth would be compelled to protect its island economy by responding with an appropriation to provide the citizens of the Commonwealth with essential seaport and airport services." *Id.* at 902–03.

The State Bar presses a similar argument.  As a surrogate for the California Supreme Court, the State Bar performs "a vital governmental function" in the regulation of lawyers. *Alaska Cargo Transp., Inc.*, 5 F.3d at 381.  Therefore, a "structure of compulsion" might force California "into the role of real, substantial party in interest" if the State Bar were unable to satisfy a money judgment against it to ensure that the State Bar could continue to serve this role.  *Holz v. Nenana City Pub. Sch. Dist.*, 347 F.3d 1176, 1185 (9th Cir. 2003).

This factor presents a closer call.  The State Bar's functions are "essential to the primary governmental function of administering justice . . . ." *Goldfarb*, 421 U.S. at 792.  However, we also have said that "in the absence of a showing that money used to pay a judgment will necessarily be replaced with state funds, 'we adhere to our basic proposition that the fact that the state may ultimately *volunteer* to pay the judgment . . . is immaterial . . . .'" *Beentjes*, 397 F.3d at 781 (quoting *Holz*, 347 F.3d at 1185).

Either way, despite Kohn's arguments to the contrary, this third factor is not dispositive.  *See supra* pp. 13–14.  Given that the intent and control factors strongly favor the conclusion that California "structured" the State Bar to "enjoy the special constitutional protection of the [s]tate[] [itself]," the third factor, placed in its proper context, cannot

overcome the first two.  *Hess*, 513 U.S. at 43–44 (citation omitted).  We see no reason to disturb our nearly forty-year-old determination that the California State Bar is an arm of the state and entitled to immunity in federal court.

***

This conclusion puts us in good company.  In the years since we last considered the State Bar's immunity in *Lupert* and *Hirsh*, all the other federal circuits to have considered the question have agreed: State bars are arms of the state and enjoy      sovereign      immunity      under      the      Eleventh Amendment.[11]

The one circuit court decision that bucks this trend is our own.  In *Crowe v. Or. State Bar*, 989 F.3d 714 (9th Cir. 2021) (per curiam), we applied the *Mitchell* factors to conclude that the Oregon State Bar is not an arm of the state.  *Id.* at 731–33.  Although there may be some differences between the California and Oregon State Bars, whether the Oregon State

---

[11] *See, e.g.*, *T.W. v. N.Y. State Bd. of L. Exam'rs*, 996 F.3d 87, 92 (2d Cir. 2021) ("The Board of Law Examiners, as an 'arm[]' of the State of New York, 'share[s] in [its] immunity . . . ." (first and second alterations in original) (citation omitted)); *Nichols v. Ala. State Bar*, 815 F.3d 726, 732 (11th Cir. 2016) (per curiam) (holding Alabama State Bar immune given that its powers were "public in nature and would otherwise be exercised by the Alabama Supreme Court"); *Dubuc v. Mich. Bd. of L. Exam'rs*, 342 F.3d 610, 612, 615 (6th Cir. 2003) (holding Michigan Board and Bar immune in the absence of evidence as to whether Michigan would be responsible for judgment against the Bar because "the Board and the Bar are merely extensions of the Michigan Supreme Court"); *Thiel v. State Bar of Wis.*, 94 F.3d 399, 405 (7th Cir. 1996) ("The State Bar is immune from suit under the Eleventh Amendment."), *overruled on other grounds by Kingstad v. State Bar of Wis.*, 622 F.3d 708, 718 (7th Cir. 2010); *Green v. State Bar of Tex.*, 27 F.3d 1083, 1087–88 (5th Cir. 1994) (dismissing § 1983 claims against Texas State Bar committee as barred by the Eleventh Amendment).

Bar would be an arm of the state under the three-factor test we now employ, rather than the *Mitchell* factors, is not before us today. Any future case brought against the Oregon State Bar will need to be analyzed under the new test we articulate in this decision.

### III. CONCLUSION

In sum, we update our arm of the state jurisprudence to better reflect the Supreme Court's latest guidance and affirm our precedent that the California State Bar is entitled to immunity from suit in federal court. We remand to the original three-judge panel for consideration of the remaining issues consistent with this opinion.

**AFFIRMED IN PART and REMANDED to the three-judge panel**.

---

MENDOZA, Circuit Judge, concurring in part:

I agree with the majority that the factors set out in *Mitchell v. Los Angeles Community College District* are out of step with the Supreme Court's jurisprudence. I also agree that, in this case, the California Bar is an arm of the state for sovereign immunity purposes. I write separately for two reasons. *First*, I probe the panel's adoption of the D.C. Circuit's sovereign immunity test and its reading of *Hess v. Port Authority Trans-Hudson Corp*. The D.C. Circuit's three-factor test makes good legal and practical sense. But that circuit's approach to weighing the sovereign immunity factors hews far more closely to Justice O'Connor's dissenting opinion in *Hess* than Justice Ginsburg's majority. I do not read our majority opinion as adopting that aspect of the D.C. Circuit's reasoning, and I

caution against doing so.   *Second*, I disagree with the majority's wholesale embrace of the D.C. Circuit's entity-based approach to sovereign immunity.   This case was a close call, and I urge my colleagues to be wary of deeming certain state instrumentalities—which often perform functions unrelated to the express delegation of state power—categorically immune from every federal suit. Doing so lacks good cause in either precedent or fact.

# I

The scope of state sovereign immunity extends more broadly than the Eleventh Amendment's text.   *See Alden v. Maine*, 527 U.S. 706, 713 (1999); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) ("[W]e have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition . . . which it confirms." (quoting *Blatchford v. Native Vill. of Noatak*, 501 U.S. 775, 779 (1991))).   The Eleventh Amendment, passed by Congress in 1794 and ratified by the states in 1795, accomplishes more than nullifying *Chisholm v. Georgia* to protect states' purses and restricting the Article III diversity jurisdiction of the federal courts.   *See Seminole Tribe*, 517 U.S. at 54, 68 (citing *Chisholm v. Georgia*, 2 U.S. 419 (1793)).   Its "object and purpose" is "to prevent the indignity of subjecting a state to the coercive process of judicial tribunals at the instance of private parties."   *Ex parte Ayers*, 123 U.S. 443, 505 (1887); *see also Alden*, 527 U.S. at 715.   The Eleventh Amendment thus confirms the centuries-old presupposition that "each State is a sovereign entity in our federal system," *Seminole Tribe*, 517 U.S. at 54 (citing *Hans v. Louisiana*, 134 U.S. 1, 10 (1890)), and that "courts may not ordinarily hear a suit brought by any person against a nonconsenting state," *Torres v. Tex. Dep't of Pub. Safety*, 597 U.S. --, 142 S. Ct. 2455, 2461–62 (2022).   At its core, Eleventh Amendment

immunity is rooted in the "respect owed [the states] as members of the federation." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993).

The Eleventh Amendment sometimes extends sovereign immunity to state instrumentalities that operate as arms of the state, barring valid abrogation or waiver. *See P.R. Aqueduct & Sewer Auth.*, 506 U.S. at 144 ("Absent waiver, neither a State nor agencies acting under its control may 'be subject to suit in federal court.'"); *Alden*, 527 U.S. at 756. The Supreme Court, however, has offered limited guidance as to when respect for a state's dignity compels us to immunize a state instrumentality. Treasury concerns have consistently and historically spurred the extension of sovereign immunity to state-created entities. *See, e.g.*, *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401 (1979) ("[S]ome agencies exercising state power have been permitted to invoke the Amendment in order to protect the state treasury from liability[.]"); *see also Edelman v. Jordan*, 415 U.S. 651, 663 (1974) ("[A] suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury is barred by the Eleventh Amendment."). The legal "structure" of the entity affects any sovereign immunity analysis, as well. *Lake Country Ests.*, 440 U.S. at 401; *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (considering the "nature of the entity created by state law" in determining whether the entity was an arm of the state). The Court has also directed us to examine various factors, including whether the entity receives guidance and extensive funds from the state, the entity's ability to raise revenue, whether the state appoints its board, the function of the entity, and the entity's power to issue bonds or levy taxes. *Mt. Healthy*, 429 U.S. at 280; *Lake Country Ests.*, 440 U.S.

at 400–02.  But these cases do not lay out a concrete arm-of-the state test for the extension of Eleventh Amendment sovereign immunity.

## A

*Hess v. Port Authority Trans-Hudson Corp.* is a notable exception.  513 U.S. 31 (1994).  In *Hess*, the Court addressed whether the Eleventh Amendment immunized a bistate Port Authority, charged with coordinating transport through a port on the New York-New Jersey border, from a personal injury suit brought by railroad workers under federal law.  *Id.* at 32.  It answered "no."  *Id.* at 32–33.  Guided by *Lake Country Estates*' examination of a bistate entity, the *Hess* Court first focused on the entity's "structure," examining various "indicators" of immunity, including: (1) the entity's "function"; (2) the nature of the entity's governing body; (3) the entity's implementing legislation; and (4) whether the states have "financial responsibility" for the entity, including "legal liability."  *Id.* at 43–46.  Unlike the bistate entity in *Lake Country Estates*, where the factors disfavored sovereign immunity, the *Hess* Court concluded that those factors "point[ed] in different directions" for the Port Authority's immunity from suit.  *Id.* at 47.  The Court thus needed a tiebreaker.

So it invoked the Eleventh Amendment's "twin reasons for being" to guide its analysis: "solvency" and "dignity." *Hess*, 513 U.S. at 47, 52.  Those twin reasons, however, have a critical factor in common: the practical and legal effect of a judgment on a state's treasury, which trumped concerns over "control" of the entity.  *See id.* at 51; *id.* at 48 ("[T]he impetus for the Eleventh Amendment[ is] the prevention of federal-court judgments that must be paid out of a State's treasury.").  Indeed, the *Hess* Court explicitly declined to

"render[] control dispositive," reasoning that control was a "perilous," "uncertain," and "unreliable" indicator of a state's intention to make an agency immune. *Id.* at 47–48 (citations omitted). By contrast, addressing whether a judgment against the entity would put the state's purse on the line was certain; and the *Hess* Court thus affirmed that treasury concerns are "the most salient factor in Eleventh Amendment determinations." *Id.* at 48. Or, as Justice O'Connor's dissent succinctly puts it: "for determining arm-of-the-state status, we may now substitute a single overriding criterion, vulnerability of the state treasury." *Id.* at 55 (O'Connor, J., dissenting). After all, "[t]he Court dismisses consideration of control altogether." *Id.* at 62 (O'Connor, J., dissenting).

## B

Three years later, the Court issued its decision in *Regents of the University of California v. Doe*. 519 U.S. 425 (1997). Like *Hess*, the Court in *Regents* addressed when to apply Eleventh Amendment immunity to a state instrumentality, zeroing in on "the relationship between the State and the entity in question." *Id.* at 429. To determine whether this relationship gives rise to immunity, the *Regents* Court examined (1) "the essential nature and effect of the proceeding"; (2) "the nature of the entity created by state law"; and, as in *Lake Country Estates* and *Hess*, (3) "whether a money judgment against a state instrumentality or official would be enforceable against the State . . . ." *Id.* at 429–30 (citing, among other cases, *Hess*, 513 U.S. 30; *Mt. Healthy*, 429 U.S. at 274; *Kennecott Copper Corp. v. State Tax Comm'n*, 327 U.S. 573 (1946); *Ford Motor Co. v. Dep't of Treasury of State of Ind.*, 323 U.S. 459 (1945)). And the *Regents* Court reaffirmed the "considerable importance" of that last consideration. 519 U.S. at 430.

## II

Despite the Court's guidance in *Regents* and *Hess*, the circuit courts have struggled to translate that precedent into a workable, arm-of-the-state standard for Eleventh Amendment sovereign immunity. Most have revised or expanded upon existing, factor-based tests to assess whether subjecting a state agency to suit in federal court would infringe on the "dignity," "solvency," and "respect" concerns underpinning the Eleventh Amendment. Some follow *Hess* quite faithfully. They examine the sovereign nature of the entity using factor-based tests; if those factors point in different directions, they determine whether "solvency" and dignity" concerns compel an answer, while recognizing that a judgment's impact on the state's treasury is the most important factor. *See, e.g.*, *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 61 (1st Cir. 2003). Other circuits employ balancing tests—or in the Second Circuit's case, nesting, factor-based, balancing tests—to assess whether the Eleventh Amendment shields a state instrumentality from suit. *See, e.g.*, *Leitner v. Westchester Cmty. Coll.*, 779 F.3d 130, 135–36 (2d Cir. 2015) (citing *Clissuras v. City Univ. of N.Y.*, 359 F.3d 79 (2d Cir. 2004) and *Mancuso v. N.Y. State Thruway Auth.*, 86 F.3d 289 (2d Cir. 1996)); *Sw. Bell Tel. Co. v. City of El Paso*, 243 F.3d 936, 938 (5th Cir. 2001). Some abandon a test altogether, *see Takle v. Univ. of Wis. Hosp. & Clinics Auth.*, 402 F.3d 768, 769–81 (7th Cir. 2005), or, following *Regents*' lead, focus primarily on the relationship between the entity and the state, *Duke v. Grady Mun. Schs.*, 127 F.3d 972, 974 (10th Cir. 1997).

Our decision in *Mitchell*, which preceded *Regents* and *Hess*, was just such a factor-based test—an imperfect

vehicle, perhaps, but one that we repeatedly defended as compatible with Supreme Court precedent. *See, e.g.*, *Ray v. Cnty. of L.A.*, 935 F.3d 703, 711 (9th Cir. 2019); *see also Crowe v. Or. State Bar*, 989 F.3d 714, 731 (9th Cir. 2021), *cert denied* 142 S. Ct. 79 (Mem). Today, we reverse course and align ourselves with the D.C. Circuit's approach in *Puerto Rico Ports Authority v. Federal Maritime Commission*, 531 F.3d 868 (D.C. Cir. 2008). That decision directs courts to examine: "(1) the State's intent as to the status of the entity, including the functions performed by the entity; (2) the State's control over the entity; and (3) the entity's overall effects on the state treasury." *Id.* at 873. I concur in that choice—the D.C. Circuit's test is a fair one. But I caution us from taking the D.C. Circuit's decision too far by adopting (1) its approach to weighing the sovereign immunity factors, which curiously departs from *Hess*'s majority in favor of its dissent; or (2) its entity-based approach to sovereign immunity.

## A

The Eleventh Amendment's "twin reasons for being"— "state dignity" and "solvency"—ought to be afforded equal weight in our sovereign immunity analysis. *See Hess*, 513 U.S. at 47, 52; *see also Auer v. Robbins*, 519 U.S. 452, 456 n.1 (1997) (affording equal weight to treasury and dignity considerations). I like the majority's analytical framework for these concerns, which neatly parses the "intent" and "control" factors as advancing the state's dignity interest, while the "treasury" factor protects the states' financial solvency. But I am concerned by the equal weight that the D.C. Circuit and, by implication, the majority, appear to give the intent, control, and treasury factors, respectively. I read the D.C. Circuit's decision as putting its thumb on the scale for "state dignity" (which, adding together its attendant

factors, would get approximately two-thirds of the immunity vote), veering quite far from *Hess* and *Regents*.  In my view, control and intent should count for half the vote, and the treasury factor should be weighed equally against them.  To be consistent with the Court's guidance, I urge my colleagues not to read our decision today as de-emphasizing solvency concerns in favor of those that implicate dignity.

In my and most circuit courts' view, Supreme Court precedent is clear: whether the state legally or practically pays a money damages judgment against the entity is central to the sovereign immunity analysis.  *See supra* Section I; *see also Fresenius Med. Care*, 322 F.3d at 66, 68; *Leitner*, 779 F.3d at 134 ("The first factor, 'the vulnerability of the State's purse,' is 'the most salient factor in Eleventh Amendment determinations.'" (quoting *Hess*, 513 U.S. at 47–48)); *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 261 (4th Cir. 2005) ("[T]he most important consideration is whether the state treasury will be responsible for paying any judgment that might be awarded." (citation omitted)); *Sw. Bell Tele. Co.*, 243 F.3d at 938 ("[C]ourts must review . . . whether a money judgment against the instrumentality would be enforceable against the state."); *Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 979 F.3d 426, 443 (6th Cir. 2020) (reciting that the "state's potential legal liability for a judgment against the defendant 'is the foremost factor' to consider in our sovereign immunity analysis"); *Takle*, 402 F.3d at 769 (noting that an entity would be immune if it "were financed by the state . . . so that any judgment against it would be paid out of state funds"); *Thomas v. St. Louis Bd. of Police Comm'rs*, 447 F.3d 1082, 1084 (8th Cir. 2006) (noting that courts assess autonomy and control and, "more importantly, whether a money judgment against the agency will be paid with state funds"); *Duke*, 127

F.3d at 975 ("The Supreme Court has indicated more recently that 'the vulnerability of the State's purse [i]s the most salient factor in Eleventh Amendment determinations.'") quoting *Hess*, 513 U.S. at 48)) (alteration in *Duke*).  We said the same two years ago.  *See Crowe*, 989 F.3d at 731.  And while solvency is not the sole concern that we address when considering an entity's sovereign immunity, *see Seminole Tribe*, 517 U.S. at 58 (considering what protections a state is owed by the Eleventh Amendment, and not who is entitled to share that protection), that does not mean it is lesser than its twin.

To read otherwise, as the D.C. Circuit does, draws far closer to *Hess*'s dissent than its majority.  In dismissing a party's outsized reliance on treasury considerations, the D.C. Circuit reasoned that predominantly focusing on a state's financial liability in the lawsuit "would inappropriately convert a *sufficient* condition for sovereign immunity into the single *necessary* condition for arm-of-the-state status." *P.R. Ports Auth.*, 531 F.3d at 879 (emphasis in original). Citing *Hess*, the D.C. Circuit further stated: "That is not the law[.]"  *Id.* at 879.  But under a plain reading of *Hess*'s majority, that *was* the law; it was Justice O'Connor's *dissent* that sought to limit such an approach.  *Hess*, 513 U.S. at 59 (O'Connor, J., dissenting).    Criticizing the majority's "conclusion that the vulnerability of the state treasury is determinative," she wrote that its treasury-focused analysis "takes a *sufficient* condition for Eleventh Amendment immunity, and erroneously transforms it into a *necessary* condition."  *Id.* at 59 (emphasis in original).  Like the D.C. Circuit in *Puerto Rico Ports Authority*, Justice O'Connor's dissent in *Hess* thus championed state "control" as either co-extensive with, or more important than, "treasury" concerns when assessing sovereign immunity.  *Compare Hess*, 513

U.S. at 61 (O'Connor, J. dissenting) (reasoning that "control can exist even where the State assumes no liability for the entity's debts") *with P.R. Ports Auth.*, 531 F.3d at 879 (rejecting the argument "that there is no sovereign immunity if the State is not obligated to pay a judgment in a particular case").

But the Supreme Court has expressly declined to embrace Justice O'Connor's attempts in *Hess* to "look beyond the potential impact of an adverse judgment on the state treasury, and examine the extent to which the elected state government exercises 'real, immediate control and oversight' over the [entity.]" *Regents*, 519 U.S. at 431–32 (quoting *Hess*, 513 U.S. at 62 (O'Connor, J., dissenting)). And the Court reaffirmed the critical role played by the treasury consideration to Eleventh Amendment immunity for state instrumentalities. *Id.* at 431. It might be true that an equally weighted, intent-control-treasury test would avoid *Hess*'s "counterproductive" and "objectionable" aspects, including its "nearly exclusive focus on the vulnerability of the state's treasury." Héctor G. Bladuell, *Twins or Triplets?: Protecting the Eleventh Amendment through a Three-Prong Arm-of-the-State Test*, 105 Mich. L. Rev. 837, 842 (2007) (proposing, in large part, the test adopted by the D.C. Circuit the following year). But I agree with the First Circuit—"*Hess* binds us," *Fresenius Med. Care*, 322 F.3d at 67–68, and we can neither sidestep it nor recharacterize it.

Thankfully, our decision today does not reach this issue and the D.C. Circuit's decision does not foreclose our approach to weighing these factors. Here, the first two factors weigh strongly in favor of immunity, and the third factor, though "mixed," indicates a significant financial relationship between the State Bar and California. So we

need not and, as I read the majority, do not determine the exact weight that we should ascribe to each factor. To remain consistent with *Hess* and *Regents*, I encourage us not to neglect solvency for dignity by indexing too heavily on control and intent.

### B

Unlike the majority, I hesitate to embrace the D.C. Circuit's conclusion that "once an entity is determined to be an arm of the State under the three-factor test, that conclusion applies unless and until there are relevant changes in the state law governing the entity." *P.R. Ports Auth.*, 531 F.3d at 873. In my view, we need not reach this issue today, given that it was neither briefed nor argued. And while this categorical approach to sovereign immunity may make our job easier as judges, it lacks consistent support in our precedent or practice and would lead to anomalous results.

The majority is right that our *Mitchell*-based precedent on the question of "entity versus activity" immunity is mixed. *Compare Durning v. Citibank, N.A.*, 950 F.2d 1419, 1426 (9th Cir. 1991), *with Ray*, 935 F.3d at 710. In 1995, however, we held that state entities that function in various capacities are "not entitled to Eleventh Amendment immunity" with respect to every function; instead, the indicia of sovereign immunity "must be examined closely to ascertain that the [entity] is indeed functioning as an arm of the state." *Doe v. Lawrence Livermore Nat'l Lab'y*, 65 F.3d 771, 775 (9th Cir. 1995), *rev'd sub nom. on other grounds by Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425 (1997). When the Supreme Court reversed our decision in *Doe*, it declined to disturb that holding. *See Regents*, 519 U.S. at 425 n.2. This might well be because the "function" of an

entity, including the function that "g[ives] rise to the specific controversy at issue in [the] litigation," sheds significant light on the sovereign immunity analysis. *See Lake Country Ests.*, 440 U.S. at 402; *Hess*, 513 U.S. at 43–46; *c.f.*, *N. Ins. Co. of N.Y. v. Chatham Cnty., GA.*, 547 U.S. 189, 197 (2006) (phrasing the relevant immunity question as whether "the County . . . was acting as an arm of the State . . . in operating the drawbridge"); *Regents*, 519 U.S. at 431–32 (leaving open whether it is appropriate to consider, for sovereign immunity purposes, "the character of the function that gave rise to the litigation"). *See also Walker v. Jefferson Cnty. Bd. of Educ.*, 771 F.3d 748, 757 (11th Cir. 2014) (tethering the sovereign immunity analysis to "the particular function in which the [entity] was engaged when taking the actions out of which liability is asserted to arise") (alteration in original). After all, contrary to our reasoning in *Durning*, sovereign immunity is not always absolute; it is subject to waiver and valid abrogation. *See Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 618, 620 (2002). And while a state's immunity may well be absolute as a first-stage inquiry, I do not see why a state instrumentality's immunity necessarily follows suit.

Preserving a function-based approach instead of the D.C. Circuit's entity-based approach serves the Eleventh Amendment's twin purposes. *See Seminole Tribe*, 517 U.S. at 58 (noting that the Eleventh Amendment prevents "federal-court judgments that must be paid out of a State's treasury" and "serves to avoid 'the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties'") (cleaned up). *First*, the function-based approach narrows our focus to the entity's conduct in the dispute at hand, avoiding an overbroad view of sovereign immunity. An arm of the state is not the state,

and its dignity interest is relevant insofar as it functions as an arm of the state. After all, it is the entity's conduct, and not merely its legal status, that brings it to court, thus raising Eleventh Amendment concerns in the first place. *See Lake Country Ests.*, 440 U.S. at 402; *c.f.*, *ex parte Ayers*, 123 U.S. at 505; *Regents*, 519 U.S. at 429 (assessing the "nature and effect of the proceeding" to determine the relationship between the state instrumentality and the state). Indeed, our very framing of the question—"whether a state instrumentality *may* invoke the State's immunity"—reinforces this view. *See Regents*, 519 U.S. at 429 (emphasis added). I see nothing in our or the Supreme Court's Eleventh Amendment jurisprudence that would require us to declare a state instrumentality, like a state, sovereignly immune in perpetuity.

*Second*, a function-based approach avoids a far-ranging inquiry into potentially irrelevant aspects of an entity's legal structure, which might be leveraged to immunize that entity for conduct otherwise divorced from or beyond the state's mandate. State instrumentalities are, increasingly, sprawling institutions with generalized state mandates, attending to a myriad of far narrower state, local, and even private interests. And it is not hard to imagine a scenario in which a state instrumentality is deemed immune as an "arm of the state" in one case, despite administering to a host of local and private interests not at issue in that litigation. Our new entity-based approach would broadly immunize that entity's conduct and any future conduct, categorically granting or denying immunity regardless of that instrumentality's activity. Indeed, the entity-based approach could, ostensibly, immunize a state instrumentality even when it acts contrary to or in excess of the direction and authority it received from the state. On balance, a function-based

approach thus avoids over-and under-categorizations of sovereign immunity, aligning our doctrine with *Hess*'s and *Regents*' goals.

These theoretical concerns have practical implications. Take, for example, public universities, which have long been afforded sovereign immunity under the Eleventh Amendment. *See, e.g.*, *Lapides*, 535 U.S. at 617 (assuming the university system's immunity for purposes of examining waiver); *Rounds v. Or. State Bd. of Higher Educ.*, 166 F.3d 1032, 1035 (9th Cir. 1999) ("[T]he University performs the central governmental function of providing opportunities for 'deserving and qualified citizens to realize their aspirations for higher education' . . . . [It] is an arm of the State of Oregon for Eleventh Amendment immunity purposes.") (internal citation omitted). Yet this immunity, construed at the entity level, protects universities from a variety of suits seemingly divorced from their state mandate to provide higher education, such as federal patent prosecution. Indeed, state universities successfully invoke sovereign immunity to block collaborative research partners from challenging the inventorship of patents arising out of that research, *see Xechem Int'l, Inc. v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 382 F.3d 1324 (Fed. Cir. 2004); dictate venue for their own patent enforcement lawsuits, *see Tegic Commc'ns Corp. v. Bd. of Regents of Univ. of Tex. Sys.*, 458 F.3d 1335 (Fed. Cir. 2006); and avoid being compelled to join a patent infringement lawsuit brought by an exclusive licensee of the university's patent, *see Gensetix, Inc. v. Bd. of Regents of Univ. of Tex. Sys.*, 966 F.3d 1316 (Fed. Cir. 2020). Their private counterparts have no such privilege. *Accord* Christopher M. Holman, *State Universities Push the Limits of Eleventh Amendment Sovereign Immunity at the Federal Circuit*, 39 Biotech. L. Rep. 347, 360 (2020) ("[State

universities] exploit the patent system as a sword, while largely insulating themselves from liability or judicial intervention through the shield of Eleventh Amendment state sovereign immunity.") (citing *Pennington Seed, Inc. v. Produce Exch. No. 299*, 457 F.3d 1334, 1340 (Fed. Cir. 2006)).

Or consider the challenge posed by county sheriffs' departments.  They are often structured as quasi-local and quasi-state entities, following mandates issued by both governments.  Yet, when they are categorically deemed arms of the state, plaintiffs are "unable to sue" over "entirely locally dictated policies."  *See* Kelsey Joyce Dayton, *Tangled Arms: Modernizing and Unifying the Arm-of-the-State Doctrine*, 86 U. Chi. L.R. 1604, 1650 (2019) (citing *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996)). Adopting an explicit, entity-based approach to sovereign immunity only magnifies these concerns because it permits a state instrumentality to avoid federal lawsuits in perpetuity—regardless of the roles it chooses to play or the actions it chooses to take.

Today's case illustrates the value of a function-based approach that accounts for the conduct at issue in the dispute. Consistent with the D.C. Circuit's test, both the majority and the dissent address the "intent" factor by devoting considerable attention to the "functions" performed by the State Bar.  The dissent, relying on *Keller v. State Bar of California*, 496 U.S. 1 (1990) and *Crowe*, 989 F.3d at 732, construes "function" broadly, and it discusses the State Bar's largely "advisory" role, which points away from immunity. By contrast, the majority focuses on the State Bar's role in licensing and regulating lawyers, including its "core functions of admission and discipline of attorneys."  In finding the State Bar immune, the majority draws particular

attention to the State Bar's job of "examin[ing] candidates' qualifications for admission and administer[ing] the bar exam."  In my view, the majority's approach is more persuasive because it examines the State Bar's function *as it relates to* the conduct at issue here—namely, the State Bar's allegedly discriminatory administration of the bar exam.  An entity-based approach, by contrast, provides little means of resolving the sovereignty dispute teed up by the majority and dissent over the State Bar's broad function.  In essence, it leaves parties to dredge up aspects of that entity's legal status to make their case for or against immunity, without reference to the challenged conduct at hand.

It seems logical to me that consideration of the function-at-issue must remain relevant to the sovereign immunity analysis.  Nor does it seem particularly unworkable.  We managed to successfully grapple with "the function at issue" analysis for many years—even finding it consistent with Supreme Court precedent.  *See Ray*, 935 F.3d at 710 (reasoning that the "function at issue" test "fits with the Court's statement in *Chatham*"); *see also Streit v. Cnty. of L.A.*, 236 F.3d 552, 567 (9th Cir. 2001).  So I would not abandon it now.

\* \* \*

In sum, I do not see our decision today as a Trojan horse, carrying *Hess*'s dissent in its stomach.  It is, instead, a faithful translation of the Supreme Court's arm-of-the-state precedent, and a long overdue update to our sovereign immunity case law.  Although I depart from the majority's reasoning with respect to entity-based immunity, so long as we continue to appropriately weigh the sovereign immunity factors, I am pleased to concur in the outcome.

BUMATAY, Circuit Judge, joined by SUNG, Circuit Judge, concurring in part and dissenting in part:

Our court rightly abandons the multi-factor test from *Mitchell v. Los Angeles Community College District*, 861 F.2d 198 (9th Cir. 1988), in favor of the D.C. Circuit's more streamlined approach articulated in *Puerto Rico Ports Authority v. Federal Maritime Commission*, 531 F.3d 868 (D.C. Cir. 2008). Looking at intent, control, and overall effects on a State's treasury to determine whether an entity is an "arm of the State" more closely aligns with Supreme Court precedent. Those factors better illuminate the "twin" aims of Eleventh Amendment sovereign immunity—State dignity and State solvency. *Hess v. Port Auth. Trans-Hudson Corp*., 513 U.S. 30, 47 (1994). So I agree with the majority's retirement of the *Mitchell* test.

But I part ways with the majority's application of this new approach to the facts before us. In my view, each of its factors cuts against finding sovereign immunity for the State Bar of California. First, California has made evident its intent to treat the State Bar more like an independent state-created entity, such as a municipality, rather than an "arm of the State." Second, California has relinquished nearly all direct and immediate control over the Bar. And finally, California is not on the hook for the Bar's funding or its debts. With these considerations in mind, we should have recognized that the State Bar is not entitled to the sovereign immunity reserved only for the State and its instrumentalities.

For these reasons, I join Parts I, II.A, and II.B of the majority's opinion and respectfully dissent from the rest.

## I.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.  The Supreme Court has long held that actions "'against one of the United States' encompasses not only actions in which a State is actually named as the defendant, but also certain actions against state agents and state instrumentalities." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997) (quoting U.S. Const. amend. XI).  The Constitution extends this grant of immunity to state agencies and instrumentalities to preserve the States' dignity and financial solvency—"the Eleventh Amendment's twin reasons for being." *Hess*, 513 U.S. at 47.

We, along with several other federal courts, have long struggled to formulate a consistent test for determining whether a state-created entity should be afforded sovereign immunity.  But as the majority explains, today we adopt the D.C. Circuit's approach, which follows the Supreme Court's guidance in this difficult area of law.  *See* Maj. Op. 18–19.  That approach requires us to look at (1) whether the State has expressed its *intent* to treat the entity like an arm of the State, (2) whether the State exercises significant *control* over the entity, and (3) whether private suits against the entity would impact the State's *treasury*.  *P.R. Ports Auth.*, 531 F.3d at 873.

The question here is whether the State Bar of California enjoys the State of California's sovereign immunity.  Following our newly adopted analysis, I would hold that it does not.

### A.

Start with intent.  We must look first at how state law characterizes the "nature of the entity" and whether the State treats the entity "more like a county or a city than . . . like an arm of the State." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977).    That involves determining whether the entity is a legal entity that exists "separate" from the State.  *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401 (1979).  From there, we can assess whether the State intended for the entity to enjoy sovereign immunity.  Here, California law classifies the State Bar much like a municipality, the Bar operates unlike a state agency, and even the California Supreme Court has disclaimed the State Bar's role in state governance.  This factor thus cuts against immunity here.

### *State Bar as a Municipality-like Public Corporation*

California law treats the State Bar the same way as it treats independent municipalities.  California's Constitution establishes the State Bar as a "public corporation."  Cal. Const. art. VI, § 9.  That term has been used in California to describe municipalities and the like for nearly a century and a half.  *See, e.g.*, *Ex parte Wall*, 48 Cal. 279, 311 (1874) (classifying "subordinate local governments," like "counties, towns and cities," as "local public corporations"), *overruled on other grounds by Ex parte Beck*, 162 Cal. 701 (1912); *Martin v. Aston,* 60 Cal. 63, 67 (1882) (observing that the California Constitution prohibits imposing "taxes upon counties, cities, towns, or other public or municipal corporations"); *In re Werner*, 129 Cal. 567, 572 (1900) (observing that "[a]ll municipal corporations are public corporations" and that "public corporation" and "municipal corporation," while technically distinct, are often considered

"synonymous").  The U.S. Supreme Court has had a similar understanding of the term. *See, e.g.*, *Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 668–69 (1819) (opinion of Story, J.) (stating that public corporations "exist for public political purposes only, such as towns, cities, parishes and counties").

And historically, "neither public corporations nor political subdivisions [were] clothed with that immunity from suit which belongs to the state alone by virtue of its sovereignty." *Hopkins v. Clemson Agric. Coll. of S.C.*, 221 U.S. 636, 645 (1911); *Lincoln County v. Luning*, 133 U.S. 529, 530 (1890) (observing that even though counties are "integral to the State," they are still unprotected by sovereign immunity); *Mt. Healthy*, 429 U.S. at 280 (stating sovereign immunity does not extend to "municipal corporation[s] or political subdivision[s]"). So classification as a "public corporation" cuts strongly against sovereign immunity.

Here, the State Bar was established as a "public corporation" in 1927—not to imbue it with State authority but to recognize its importance to the public interest. *See State Bar of Cal. v. Superior Ct. of L.A. Cnty.*, 207 Cal. 323, 328 (1929).[1]  Back then, a superior court judge challenged the State Bar's classification as a "public corporation." *Id.* at 328–30. Given "its membership," "its function," and "its independence of public regulation and control," amici for the judge argued that it should be considered a "private

---

[1] When the California Legislature created the State Bar, state law defined "public corporation" as "one formed or organized for the government of a portion of the State"—i.e., a local government. *Keller v. State Bar*, 47 Cal. 3d 1152, 1162 (1989) (emphasis added) (quoting Cal. Civ. Code § 284 (repealed)), *rev'd* 496 U.S. 1 (1990).

corporation." *Id*. at 329.  The Supreme Court of California rejected that view.    While California's highest court recognized that the "profession and practice of the law" involves "in a limited sense a matter of private choice and concern," it is also "essentially and more largely a matter of public interest and concern." *Id*. at 330.  That's because of the "integral and indispensable" role attorneys serve in "our system of administering justice." *Id*.  Thus, the profession and practice of law "is not such a matter of purely private concern," *id.* at 332, but its relation to the administration of civil and criminal law make it the "proper subject of legislative regulation and control," *id*. at 331.  So from the beginning, the State Bar was not conceived of as an "arm of the State," but an entity subject to special legislative oversight given its unique public-interest role.  Certainly, nothing in the State Bar's classification as a "public corporation" grants it *more* immunities or privileges than municipalities, which have no sovereign immunity.

And the same understanding of the State Bar's classification as a "public corporation" exists today.  The State Bar is statutorily established as a "public corporation" in the Business and Professions Code—not the *Government* Code. *See* Cal. Bus. & Prof. Code § 6001.  Although "public corporation" isn't defined in the Business and Professions Code, it is elsewhere in California law:

- The Government Code defines "public corporation" as "any county, city and county, city, town, municipal corporation, district of any kind or class, authority, redevelopment agency or political subdivision of this state."  Cal. Gov. Code § 67510 (as codified in the

San Francisco Bay Area Transportation Terminal Authority Act).

- That definition was carried over to the Financial Code. *See* Cal. Fin. Code § 22050(f) ("This division does not apply to any public corporation as defined in [§] 67510 of the Government Code[.]").

- The Government Code defines "local agency" to include municipalities and other "public corporation[s]." *See, e.g.*, Cal. Gov. Code §§ 53069, 53200(a), 53215, 53227.2(a), 53460(a), 53820, 53850(a), 54307.

- Definitions of "political subdivision" often equate "public corporation[s]" with municipalities. *See, e.g.*, Cal. Pub. Util. Code § 21010 ("'Political subdivision' means any county, city, city and county, public corporation, district or other political entity or public corporation of this State.").

- As do definitions of "[l]ocal public entity," which "includes [any] county, city district, public authority, public agency, and any other political subdivision or public corporation in the State, but does not include the State." Cal. Gov. Code § 940.4; *id.* § 970(c) (similar); *see also id.* § 5600 (defining "[p]ublic body" as "any county, city and

> county, city, public district, public
> authority or other public corporation").

- And the Labor Code distinguishes the
  "State" from "public corporations" for
  employment purposes. *See* Cal. Lab.
  Code § 3300 (separating "Employer" into
  distinct categories of "(a) [t]he State and
  every State agency" and "(b) [e]ach
  county, city, district, and all public and
  quasi public corporations"); *see also id.* §
  9006 (same).

To be sure, California law also defines "public
corporation" to include the State in some limited
circumstances. *See, e.g.*, Cal. Gov. Code § 6300(b)
(defining "Public Corporation" to include "the state" and
"municipalit[ies]" for foreign trade zones); Cal. Pub. Cont.
Code § 21561 (for the Metropolitan Water District, "public
corporation" includes both the "United States," "any other
state," or any state "subdivision"); Cal. Gov. Code §
12100.50(b)(1) (for the California Foreign Investment
Program, the term means "the state" or "any corporate
municipal instrumentality").     But notice that these
definitions are significant outliers and are limited to only
those distinct areas of the law.    And invariably these
definitions include municipalities, which no one believes are
entitled to sovereign immunity.   So these outliers have no
relevance for our sovereign immunity inquiry.

Thus, under California law, the State Bar's classification
as a "public corporation" only signifies that it should be
treated like a municipality—not an arm of the State. So it's
a red herring to rely on assumptions about the term "public

corporation" to find immunity here.  We've not made these assumptions about public corporations before.  *See Crowe v. Or. State Bar*, 989 F.3d 714, 720, 733 (9th Cir. 2021) (acknowledging the Oregon State Bar's status as a "public corporation" but ruling that it was not entitled to immunity).

The Supreme Court of California once relied on the State Bar's superficial classification as a "public corporation" to consider it a "governmental agency"—only to be unanimously reversed by the U.S. Supreme Court.  *See Keller v. State Bar*, 47 Cal. 3d at 1162–63.  In that case, members of the State Bar sued the Bar for forcing them to pay dues to advance political ideas the members disagreed with, in violation of their First and Fourteenth Amendment right to free speech.  *Keller v. State Bar of Cal.*, 496 U.S. 1, 4 (1990).  The California high court reasoned that the Bar's status as a public corporation made it a state agency, and thus the Bar could use dues for any purpose within the scope of its authority.  *Id.* at 6–7.  But the U.S. Supreme Court rejected that reasoning.  It noted that the State Bar "is a good deal different from most other entities that would be regarded in common parlance as 'governmental agencies.'" *Id.* at 11.  That's because "[t]he State Bar of California was created, not to participate in the general government of the State, but to provide specialized professional advice to those with the ultimate responsibility of governing the legal profession"—the Supreme Court of California.  *Id.* at 13. Indeed, while the State Bar performs "important and valuable services" for the California's court system, the Bar itself plays only an "advisory" role. *Id.* at 11.  The Supreme Court thus overruled the California court's ruling that the State Bar was a government entity.  We should not make the same mistake.  *See Crowe*, 989 F.3d at 732 (holding that *Keller*'s "analysis is pertinent and analogous to the

[sovereign] immunity question"). While the State Bar may have separated its associational and administrative functions since then, the administrative half of the Bar remains a largely autonomous and advisory public corporation. So none of the changes identified by the majority undermine the thrust of the Supreme Court's holding—the Bar's mere advisory role means that it should not be treated as a government entity.

### *State Bar's Statutory Functions*

Beyond California's express designation of the State Bar as something like a political subdivision not entitled to sovereign immunity, the State Bar does not function like a state agency. By statute, it's treated as distinct from state agencies. The California Legislature expressly withheld "the exercise of powers of state bodies or state agencies" from the Bar. Cal. Bus. & Prof. Code § 6001 ("No law of this state restricting, or prescribing a mode of procedure for the exercise of powers of state public bodies or state agencies . . . shall be applicable to the State Bar, unless the Legislature expressly so declares.").

On the other hand, California law imbues the Bar with other powers typically indicative of its *separate* corporate status. For example, the Bar can issue bonds in its own name, Cal. Bus. & Prof. Code § 6001(b), which "strongly suggests that it has a legal independence from the state for Eleventh Amendment purposes." *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1428 (9th Cir. 1991); *see also Mt. Healthy*, 429 U.S. at 280 (noting that a school board's authority to issue bonds made it more like a county or city and thus not entitled to sovereign immunity).

California law also gives the State Bar the power to sue and be sued, which again is "strongly suggestive of . . .

autonomy and independence" from the State. *Durning*, 950 F.2d at 1427 n.4. In *Durning*, our court held that the Wyoming Community Development Authority did not enjoy sovereign immunity in part because the Wyoming Legislature "unequivocally grant[ed] the Authority the power to '[s]ue and be sued' in its own right." *Id.* at 1427 (quoting Wyo. Stat. § 9–7–105(a)(i) (1977)). We face the same circumstances here. The California Legislature unmistakably gave the State Bar the power to "sue and be sued." Cal. Bus. & Prof. Code § 6001. The majority attempts to wave away this point by relying on *Durning*'s caveat that "[a] mere statutory grant of the power to sue or be sued . . . is not enough to waive immunity from suits brought in federal court if it may fairly be construed as limited to a waiver of immunity in the state's own courts." Maj. Op. 25 (quoting *Durning*, 950 F.2d at 1427 n.4). But the language in § 6001 is virtually identical to the language the *Durning* court said weighed *against* immunity. *Compare* Cal. Bus. & Prof. Code § 6001 ("The State Bar . . . may sue and be sued."), *with* Wyo. Stat. § 9–7–105(a)(i) (1977) (stating that the authority may "[s]ue and be sued"). What's more, the California Attorney General is statutorily responsible for representing all state agencies in California—with few exceptions—but is not so obligated with respect to the State Bar. *See* Cal. Gov. Code § 12512 ("The Attorney General shall . . . prosecute or defend all causes to which the state . . . is a party[.]"). That suggests that the State Bar's ability to "sue and be sued" *is* another designation of its independent legal status.

Of course, California law subjects the State Bar to some of the same government-only laws as state agencies. For instance, the State Bar must comply with California public-records and open-meetings laws. Cal. Bus. & Prof. Code

§ 6001.  But this alone does not swing this factor decisively toward finding immunity, especially when the Bar's "separate corporate status is clearly established." *Durning*, 950 F.2d at 1427.  The Oregon State Bar was also subject to Oregon's public records law, and yet there we found no immunity for the Oregon State Bar. *Crowe*, 989 F.3d at 730. Determining California's intent for its State Bar requires a holistic approach—not one that turns on incidental similarities between corporations and state agencies.

### State Bar as an Administrative Assistant

Likewise, the Supreme Court of California has disclaimed the State Bar's role as a government decisionmaker.  The California Supreme Court has said that the "State Bar is not in the same class as state administrative agencies placed within the executive branch." *In re Rose*, 22 Cal. 4th 430, 439 (2000) (simplified).  That's because the "State Bar Court *exercises no judicial power*." *Id*. at 436 (emphasis added).  Rather, the State Bar "makes recommendations" to the California Supreme Court, "which then undertakes an independent determination of the law and the facts, exercises its inherent jurisdiction over attorney discipline, and enters the first and only disciplinary order." *Id*.  So even though the California court has described the State Bar as its "administrative arm," *id.* at 438 (simplified), and "a constitutional entity within the judicial article of the California Constitution," *Obrien v. Jones*, 23 Cal. 4th 40, 48 (2000), this isn't dispositive of the State's intent.  Indeed, the California Supreme Court made these observations in the context of establishing that the State Bar is merely an "administrative assistant" with *no* independent decisionmaking authority. *In re Rose*, 22 Cal. 4th at 438. And it reaffirmed that the State Bar lacked the "powers to regulate and control the attorney admission and disciplinary

system"—powers that are part of the inherent judicial authority of the California Supreme Court. *Obrien*, 23 Cal. 4th at 48. So given this context, these superficial descriptions of the State Bar reveal little about the State's intent.

\* \* \*

Taken together, the State Bar's classification as a municipality-like public corporation, the State Bar's statutory functions separate from the State and its agencies, and the California Supreme Court's descriptions of the Bar as merely advisory all weigh strongly against immunity.

**B.**

Next, we look at the amount of control California exercises over the State Bar. Admittedly, this factor is a closer call. But ultimately, this factor also cuts against immunity.

While somewhat opaque, control can be assessed based on whether the State may "appoint and . . . remove" the entity's officers, whether the State may "veto [the entity's] actions," and whether "the State['s] legislature[] can determine the projects the [entity] undertakes." *Hess*, 513 U.S. at 47. But, as the Court warned, "[g]auging actual control . . . can be a perilous inquiry, an uncertain and unreliable exercise." *Id.* (simplified). And, of course, "ultimate control of every state-created entity resides with the State" given the State's power to "destroy or reshape any unit it creates." *Id.* So "ultimate control" is not dispositive. After all, "[p]olitical subdivisions exist solely at the whim and behest of their State . . . yet cities and counties do not enjoy Eleventh Amendment immunity." *Id.* (simplified).

So we're not looking for just any kind of control; we're looking for the kind that demonstrates that "the State 'clearly structured the entity to share its sovereignty.'" *P.R. Ports Auth.*, 531 F.3d at 874 (simplified).  It "should turn on real, immediate control and oversight, rather than on the potentiality of a State taking action to seize the reins." *Hess*, 513 U.S. at 62 (O'Connor, J., dissenting).  Indeed, in *Hess*, even with the States' power to appoint and remove officers, the States' veto power, and the States' determination of the entity's projects, that level of control *wasn't* enough to establish sovereign immunity.   *Id*. at 48–53 (majority opinion).

Here, the State Bar's Board of Trustees is appointed by all three branches of California's government—the Supreme Court of California, the State Legislature, and the Governor. *See* Cal. Bus. & Prof. Code §§ 6010, 6013.1, 6013.3, 6013.5.   But that appointment power *alone* doesn't demonstrate control sufficient to find immunity.  In fact, the Court has explicitly rejected such a myopic view of control.  *See Auer v. Robbins*, 519 U.S. 452, 456 n.1 (1997) ("While the Governor appoints four of the board's five members . . . the city of St. Louis is responsible for the board's financial liabilities . . . and the board is not subject to the State's direction or control in any other respect.  It is therefore not an 'arm of the State' for Eleventh Amendment purposes." (simplified)).

Looking beyond appointment power, California has far less control over the Bar's Board.  For instance, unlike the officers in *Puerto Rico Ports Authority* or in *Hess*, the Board's members and officers are not removable at will.  So once they've appointed members to the Board, California's state officials lose the power to "directly supervise and control [the Bar's] ongoing operations" by way of removal.

*P.R. Ports Auth.*, 531 F.3d at 877.  And unlike in *Puerto Rico Ports Authority*, no government official serves in the Bar's leadership.  In fact, the Board consists of only attorneys and members of the public—not judges—which strongly suggests the California Legislature intended the Bar to be advisory.  *See* Cal. Bus. & Prof. Code §§ 6013.1, 6013.3, 6013.5.  Even if government officials were on the Board, this fact on its own is not enough to establish control.  *Durning*, 950 F.2d at 1427 (acknowledging that the governor and state treasurer serve on the entity's board but still denying immunity).  Thus, once the Board's members and officers take their positions, California lacks direct control over the Bar's day-to-day affairs.

True, the Board is under the *supervision* of the Supreme Court of California.  But supervision is not control.  For instance, unlike the States in *Hess*, the Supreme Court of California does not veto the decisions of the State Bar.  *See Hess*, 513 U.S. at 37; *see also Lake Country Ests.*, 440 U.S. at 402 (noting that the State's lack of veto power over the entity made the entity more like a municipality).  Rather, the California court merely chooses whether to adopt the State Bar's recommendations as to admission and discipline.  So although the Bar reports to California's highest court, the court does not exercise direct control over how the Bar operates or what recommendations it may ultimately make.  Such an advisory role cuts against immunity here.  As in Oregon, the State Bar is "not the typical government official or agency, but rather a professional association that provides recommendations to the ultimate regulator of the legal profession."  *Crowe*, 989 F.3d at 732 (simplified).

Nor does the State Legislature's *regulation* of the State Bar change the calculus.  It should be of no surprise that the State has the authority to *regulate* the State Bar.  As Justice

O'Connor observed, "[v]irtually every enterprise, municipal or private, flourishes in some sense at the behest of the State." *Id*. at 62 (O'Connor, J., dissenting). So the mere fact that the State Bar is subject to California legislation does not automatically make it an instrumentality of the State. Far from it. Indeed, the indirect nature of legislative action over the State Bar underscores how little control the State has over the Bar. Unlike with state agencies, the California Legislature does not appropriate State Bar funds. At most, the California Legislature can cap the amount the State Bar collects in licensing fees. *See* Maj. Op. 29 (citing Cal. Bus. & Prof. Code § 6140). The State Bar's counsel conceded at argument that the Legislature might *negotiate* with the State Bar through fee caps and other legislative measures to *encourage* the Bar to spend its money in a certain manner. For instance, if the State Bar wished to sell one of its buildings, the California Legislature could express its disapproval and threaten to cap licensing fees, but it couldn't outright veto the sale. This is not the same kind of "legal control" we would expect to see the State exert over a state agency or other instrumentality. *Cf. P.R. Ports Auth.*, 531 F.3d at 878 (explaining that the Governor's authority to direct the entity to demolish infrastructure illustrates that the entity "operates subject to the control of the Governor"). Instead, it is the State attempting to prod an independent institution into choosing an action under threat of legislative retaliation. This is not the "real" and "immediate" control required to show, "not just on paper, but also in its operation," that the State and the State Bar are effectively the same. *Id.*

The Bar is thus not subject to a level of State control that would cloak it in sovereign immunity.

### C.

Finally, we analyze the Bar's impact on the State's treasury.  Here, we ask whether the entity "generates its own revenues" and whether the State bears legal liability for the entity's debts.  *Hess*, 513 U.S. at 45, 52.  This factor cuts decisively against immunity.

It is inescapable that this suit—or any other—against the State Bar would not impact the State's treasury.  As the majority admits, "California law makes the State Bar responsible for its own debts and liabilities."  Maj. Op. 29 (citing Cal. Bus. & Prof. Code § 6008.1).  And the State Bar is tasked with raising its own funding.  That the California Legislature may impose a cap on Bar dues does not alter the State Bar's financial independence from the State.  Simply put, the State is not responsible for the Bar's funding, debts, or liabilities.  If Kohn were to ultimately prevail here, neither California nor its citizens would bear the costs of any judgment.      Thus, this factor lands squarely against immunity.

The impact on the State's treasury is a big deal even if it's not dispositive.  While the Eleventh Amendment may have "twin reasons for being," *Hess*, 513 U.S. at 47, the State's solvency was the "impetus for the Eleventh Amendment," *id.* at 48.  That did not change after *Hess*.  In *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996), the Court merely observed that the "[t]he Eleventh Amendment does not exist *solely* in order to prevent federal-court judgments that must be paid out of a State's treasury." *Id.* at 58 (emphasis added) (simplified).  That means we must respect the State's sovereign immunity even in cases of "prospective injunctive relief"—when money judgments against the States are not at issue.  *Id.*  But in the context of

a suit for damages, as here, the Court has never brushed off or minimized the importance of the treasury factor in the sovereign immunity analysis.

With this framing, we should readily acknowledge the treasury factor's import—not downplay it—in assessing whether the Bar is an arm of the State.  Given that intent and control *together* represent one half of sovereign immunity's purpose—the State's dignity interest—the overall effects on the State's treasury make up the other half.  *See P.R. Ports Auth.*, 531 F.3d at 874.  So while perhaps not dispositive, the treasury factor must at least be treated as equally important to the intent and control factors *when combined*.  Whenever intent and control *together* cut only weakly in favor of immunity, the twin concern for treasury should win the day. Here, the answer should have been even more obvious because *all* the factors point the same way: no immunity.

## II.

California law lays out a structure for the State Bar like an independent municipality.   By creating that structure, California has shown an intent not to clothe the State Bar with the immunity that California enjoys.  More than that, California has treated the State Bar as a separate entity by allowing it to operate without significant control or direction.   And finally, the State Bar's liabilities are independent of the State.  Each of these factors strongly points to concluding no immunity for the State Bar.

Unfortunately, our court failed to recognize the clear signs that California has laid out before us and thus the majority mistakenly affords the State Bar total immunity from suit.  I would have paid due respect to the sovereign's wishes.

I respectfully dissent.