1    Benjamin Kohn, *pro se* plaintiff

2    1913 Fordham Way

3    Mountain View, CA 94040

4    (650) 919-3584

5    Benjamin.s.Kohn@gmail.com

6               UNITED STATES DISTRICT COURT

7            NORTHERN DISTRICT OF CALIFORNIA

8

9    BENJAMIN KOHN           )    CASE NO. 20-4827-PJH

10   *Plaintiff,*               )

11   v.                       )

12   THE STATE BAR OF CALIFORNIA,   )    **PLAINTIFF'S 2nd AMENDED**

13   CALIFORNIA COMMITTEE OF BAR    )    **COMPLAINT**

14   EXAMINERS, and THEIR AGENTS IN   )

15   THEIR OFFICIAL CAPACITY      )    **JURY TRIAL DEMANDED**

16   *Defendants.*             )

17                               )

18   _____ )

19         **PLAINTIFF'S SECOND AMENDED COMPLAINT**

20       BENJAMIN KOHN, pro se,[1] hereby files this Second Amended Complaint

21 ("SAC"), with jury demand, against Defendants State Bar of California, California

22 Committee of Bar Examiners, and Their Agents in Their Official Capacity, for violations

23 of the Americans with Disabilities Act ("ADA" and/or "Title II"), 42 U.S.C. §§ 12131–

24 12133, 12189, and its implementing regulations, e.g., 28 C.F.R. Pts. 35–36; and

25 California's Unruh Civil Rights Act, Cal. Civ. Code §§ 51–52 ("Unruh Act").

---

[1] Due to unforeseen circumstances, planned local counsel Kathleen Becket has needed to withdraw. Attorney Andrew Rozynski continues to intend to represent Kohn in this action if/once substitute local counsel can be located, but can only appear *pro hac vice* in this Court. To ensure timely filing of this SAC, Kohn proceeds *pro se* in the interim.

1    Plaintiff Kohn seeks compensatory, consequential, statutory, nominal, and

2  punitive damages in an amount to be set according to proof; attorney and expert fees and

3  expenses; costs; and pre-judgment and post-judgment interest. These damages claims

4  arise from: (1) Defendants' maintenance and enforcement with deliberate indifference to

5  federally-protected rights–and knowingly inconsistent with U.S. Department of Justice

6  guidelines–of unlawful procedural rules, policies, and practices for handling testing

7  accommodation requests on the California Bar Examination, which at the relevant times

8  both facially as applied to Kohn violated Title II and/or the Fourteenth Amendment to the

9  U.S. Constitution; and (2) Defendants' deliberately indifferent failures to reasonably

10  accommodate Kohn's disabilities on several of his attempts at that exam; and (3)

11  Defendants' Forced In-Person Policy for the October 2020 exam, which unlawfully and

12  with deliberate indifference to federally-protected rights under Title II and the Fourteenth

13  Amendment denied Kohn and similarly situated applicants approved for certain types of

14  disability-based testing accommodations the remote testing option offered standard at that

15  time unless in-person testing was requested by the applicant, and instead required to

16  travel to and test in-person at test centers during the pre-vaccine phase of the Covid

17  pandemic to avoid slightly higher expense and administrative burdens from adapting

18  Defendants' preferred remote-exam security methods to those accommodations.

19    **JURISDICTION AND VENUE**

20    1. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 for Plaintiff's

21  federal claims under ADA Title II, and supplemental jurisdiction under 28 U.S.C. §

22  1367(a) over Plaintiff's state law Unruh Act claims.

23    2. This Court has personal jurisdiction over Defendants, whose main office is

24  located at 180 Howard Street, San Francisco, CA 94105, within the Northern District of

25  California.

26    3. Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b)(1), (b)(2),

27  and (c).

28    **PARTIES**

29  **Plaintiff**

4. Plaintiff Benjamin Kohn ("Kohn") is a 2018 graduate of The University of Iowa College of Law who was admitted to practice law in California on February 8, 2021, after passing the October 2020 California bar examination on his fourth attempt. He remains an active California licensee in good standing.

5. At all relevant times, Defendants regarded Kohn as meeting their eligibility requirements to register and sit for the California bar examination, and Kohn attempted that examination during the July 2018, February 2019, February 2020, and October 2020 administrations.

6. Kohn was born in California, has resided there his entire life except during law school in Iowa, and his immediate family and treating specialist health care providers are located in California. Any conditioning of Kohn's ability to pursue his chosen occupation on doing so in another state would have imposed tremendous personal, professional, financial, and medical hardships, especially if on an indefinite basis.

7. Kohn has been diagnosed by qualified professionals with autism spectrum disorder and numerous distinct physical and visual disabilities. As of July 2020, his diagnosed conditions included:

Neuro-Psychiatric: Autism Spectrum Disorder (F84.0); highly variable attention and neuroprocessing speed deficit (R62.50), measured at the 0.2 percentile as of 2020; and Circadian Rhythm Sleep Disorder (G47.33).

Neuro-Muscular-Skeletal: Gross and Fine Motor Delay (F82); Myofascial Pain Syndrome (M79.18); Cervicalgia (M54.2); Occipital Neuralgia (M54.81); Scapular Dyskinesis (G25.89).

Visual: Keratoconus (H18.603); Irregular/Asymmetric Astigmatism (H52.213); Severe Dry Eye Syndrome (H04.123); Eye Floaters (H43.399).

Gastroenterological: Gastroparesis (K31.84); Postoperative Dysphagia (R13.10); Irritable Bowel Syndrome with Chronic Constipation (K58.9); Pelvic Floor Dyssynergia (M62.89).

Allergy/Immunological: Multiple severe food and environmental allergies; Drug-Induced Immunodeficiency (D84.9); Chronic Idiopathic Urticaria; Eczema.

1        Other: Chronic Oral Aphthae; history of Sleep Apnea; history of Sinonasal

2        Polyposis.

3        8. These conditions at all material times required approximately 5–10+ weekly

4  medical appointments with 11+ specialized medical providers, some requiring timing at

5  specific intervals, in addition to significant logistical and health insurance management

6  tasks.

7        9. None of Kohn's material diagnoses were ever genuinely contested by

8  Defendants during their administrative processes. All of Kohn's material medical

9  diagnoses were either expressly accepted by Defendants as disabilities that substantially

10  limit one or more major life activities, or at least were never explicitly alleged by

11  Defendants not to meet that threshold. These conditions substantially impair Kohn's

12  major life activities including reading, typing, concentrating, extended sitting, eating, and

13  performing bodily functions.

14        10. At all relevant times, Kohn was under the care of Dr. Graham Dresden ("Dr.

15  Dresden"), a board-certified family medicine physician and primary care physician. Kohn

16  was also evaluated and/or treated by numerous specialists, at least eight of whom

17  contributed to hundreds of pages of medical reports and affidavit documentation

18  supporting his accommodation requests, substantially all executed or reaffirmed under

19  penalty of perjury, including psychologist Drs. Preston, Pinn, and Toren;

20  ophthalmologists Drs. Goodman and Tearse; gastroenterologist Dr. Clarke; neurologist

21  Dr. Liu; and immunologist Dr. Rubinstein.

22        11. Dr. Dresden's August 4, 2020 affidavit (see Dkt.64 att.2, pp.249-253),

23  executed under penalty of perjury, documents the progressive development of Kohn's

24  conditions from birth through 2020, including the onset of autism spectrum disorder

25  around age 5–6, the progressive acquisition of neuro-muscular-skeletal, visual,

26  gastroenterological, and immunological conditions through law school and thereafter, and

27  a deterioration in neuroprocessing speed from the 9th percentile to the 0.2 percentile

28  between 2014 and 2020.

29        12. Kohn received disability accommodations for his autism throughout K–12

30  schooling (via an IEP), college, and law school, and for standardized testing including the

1    SAT, LSAT, GMAT, and MPRE. Until Kohn's final semester of law school, these
2    accommodations were requested and premised solely on the basis of his autism, and none
3    of his other conditions then existing were considered by these entities. Kohn had not
4    requested accommodations for myofascial pain syndrome on the LSAT, GMAT, or
5    MPRE, both because he was not yet aware of the effective auxiliary aids he'd later
6    discover in 2015, and because they were short, part-day tests that did not interrupt
7    physical therapy treatments. Kohn had not yet acquired keratoconus by the LSAT or
8    GMAT, or digestive disabilities prior to his final year in law school. Kohn was not
9    diagnosed with keratoconus before applying for accommodations on the MPRE, the July
10   2018 bar exam, and his final semester of law school, or with the digestive disabilities
11   before seeking accommodations for the February 2019 bar exam. For his final semester
12   of law school, considering both autism and keratoconus, Kohn received 150% extra time
13   on essay exams, double time on multiple choice exams, and a private room with a clock.
14   Kohn had always received at least double time for autism in college and law school.

15       13. The accommodation history on pre-bar-exam standardized tests is not a
16   reliable indicator of appropriate accommodations for the California bar exam because: (a)
17   those tests were largely multiple-choice and completed in part of a day, unlike the multi-
18   day, essay-dominant bar exam; and (b) each successive testing entity (LSAC, GMAC,
19   and NCBE) relied on and mirrored prior approvals on the preceding tests rather than
20   meaningful independent analysis even once Kohn obtained a comprehensive
21   neuropsychological evaluation from Dr. Preston at the demand of the LSAC in 2014
22   before LSAC partially granted his requests up to what the College Board had approved
23   before that. This created a chain of inherited error from the original College Board
24   decision made when Kohn was a minor without knowledge of documentation practices,
25   and had not specified a precise amount of extra time requested or included either as
26   comprehensive a neuropsychological evaluation as he'd later obtained to measure the
27   magnitude of his autism-related functional impairments or any expert recommendations
28   directly addressing the SAT; instead relying on his Individualized Education Plan ("IEP")
29   and autism diagnosis to request an unspecified amount of extra time, breaks, and
30   computer typing. Plaintiff was granted 50% extra time for autism, breaks, and computer
31   typing, which had not been sufficient extra time to provide a level playing field to

1    nondisabled individuals even at that time and for the SAT. Moreover, the LSAC, which

2    set the baseline for subsequent approvals, was operating under policies and practices that

3    later led to a consent decree for systematic disability discrimination, and has been

4    repeatedly held in contempt for continuing to discriminate.

5    14. Between the February 2019 and February 2020 California bar exams, Kohn sat for the

6    July 2019 Iowa bar exam and two FINRA certification exams. Although the Iowa Board

7    of Law Examiners ("Iowa BOLE") made some improper denials of requested reasonable

8    testing accommodations–these denials premised on a combination of the California Bar

9    having denied those same greater requests first and a reviewing optometrist consultant's

10   reliance for assessing the severity of Kohn's keratoconus on the 2014 neuropsychological

11   evaluation for autism (reading comprehension subpart) that predated his acquisition of

12   keratoconus–the Iowa BOLE did approve affirmative onsite provision of an ergonomic

13   chair and motorized sit-to-stand desk that Defendants denied, and decided Kohn's

14   accommodation appeal within three business days. Other accommodation requests later

15   denied by Defendants for the February 2020 and October 2020 exams based on the Iowa

16   BOLE allegedly having denied them were not requested from the Iowa BOLE because

17   they were provided as standard conditions in Iowa (i.e. disability-instructed-and-trained

18   proctors, scheduling extra time over proportionately more days so that testing per day is

19   no longer than standard) or were mooted by differences in standard conditions (travel

20   requirements to sit the Iowa bar exam made weekend-only scheduling impracticable).

21   FINRA approved several accommodations Defendants denied—including provision of

22   the specific ergonomic chair recommended by Dr. Dresden, the meal breaks

23   recommended by Dr. Clarke, and a fully private room—and provided decisions within

24   ten business days through collaborative processes. FINRA exam standard conditions

25   mooted several other accommodation requests denied by Defendants, as they are entirely

26   multiple-choice; even with extended time are given over part of one day; and may be

27   scheduled flexibly on demand throughout the year (including on Saturdays, and can be

28   taken on demand), not limited to fixed dates twice per year.

29        15. Kohn's passage or performance on subsequent exams does not establish that

30   he received a level playing field to nondisabled examinees, but rather only that his

31   proficiency with the subject matter allowed him to surmount enough of the remaining

1   handicap to achieve that result, which likely would have been higher if not distorted by

2   effects of Kohn's disabilities. Regardless, because these tests were so short and all

3   multiple choice, they were noncomparable to the bar exam.

4       16. At all relevant times from Kohn's July 2018 exam until release of results from

5   his October 2020 exam, he'd met all State Bar admission requirements to be put on

6   motion to practice law to the California Supreme Court except for passage of the

7   California bar exam, and after his admission in Iowa, supplying a certificate of good

8   standing from Iowa, which he was informed was outstanding only after bar exam passage

9   or he would have resolved it sooner. Kohn's admission to practice in California thus

10  would not have been delayed had he passed a sooner administration of the California bar

11  exam.

12      17. Had Kohn been required to defer to retesting February 2021 or later to attain

13  safer and/or more equal footing exam conditions, he would have needed to apply for an

14  extension to his positive moral character determination that would have cost hundreds of

15  dollars in fees to the State Bar and to third party document providers, and caused a

16  further delay upwards of one year for processing.

17      18. During Kohn's search for post-JD employment prior to learning of his failure

18  on the February 2019 California bar examination, and especially prior to learning of his

19  failure on the July 2018 California bar examination, prospective employer interest in

20  Kohn was strong and many prospective employers requested to be informed if Kohn

21  passed those exams. This interest evaporated after he failed the February 2019 exam and

22  remains lackluster to this day.

23      19. Kohn has attempted to gain some practice experience and mitigate any resume

24  gap by practicing law as a self-employed solo practitioner, upon becoming licensed to do

25  so. Nonetheless, while Kohn has enjoyed providing (largely low bono and pro bono)

26  legal services, due to his limited prior legal experience and employment to date his solo

27  practice has most of the time been unable to generate even as much as it costs in

28  overhead to maintain.

29      20. Had Defendants reasonably accommodated Kohn on the February 2019

30  California bar exam for his disabilities, he likely would have passed that exam, or

1    alternatively at least likely would have passed the February 2020 California bar exam had

2    he been so reasonably accommodated.

3    21. Beyond the injury of inability to demonstrate the full extent of his tested skills and

4    knowledge on exams and direct consequences thereof, adversely unequal conditions

5    cause burdens and bodily harms beyond performance on the exam or exam outcome.

6    Independent of whether Kohn passed or failed a given administration of the California

7    bar exam and the effect of delayed or denied licensure arising from being unable to

8    obtain the State Bar's endorsement to the California Supreme Court, Defendants' failure

9    to reasonably accommodate his disabilities placed extraordinary burdens and expenses on

10   Kohn in order to prepare for, attempt, and complete the exam four times, which due to

11   certain denied accommodations for all exams at issue also included having to transport

12   his own furniture to and from the exam site for each test day, unequal access to hotel

13   group block services as Defendants offered to nondisabled applicants (and the need to

14   stay at a particular test center hotel in the first place), disruptions to important medical

15   care access, etc. For the October 2020 exam, these harms also included being required to

16   test in unsafe conditions, which was not ameliorated by having passed that exam. Most

17   nondisabled examinees (but not Kohn) were permitted to test remotely, and Kohn's covid

18   safety accommodation requests for the event of any in-person modality were also

19   substantially denied, despite Kohn being considered immunocompromised by his

20   physicians to a degree that they opined Defendants' October 2020 bar exam conditions

21   for in-person testing as "reckless" for him, which included his need to regularly take

22   several types of immunosuppressive medications. Consequently, for that examination

23   Kohn improperly was subjected to unreasonable and grossly unequal covid exposure

24   risks compared to standard applicants in order to attempt the exam, which was especially

25   invidious during this 2020 pre-vaccine phase of the covid pandemic. In aggravation, a

26   multitude of Kohn's disabilities are thought, supported by extensive clinical research, to

27   separately and collectively greatly increase his risk of post-acute sequelae of covid

28   compared to the average person without such disabilities, which would be a cumulative

29   and compounding permanent bodily injury each time he was to contract it. This

30   exacerbates the emotional and potential physical harms of having been subjected to

31   substantial covid exposure, especially during the 2020 pre-vaccine phase of the

1  pandemic, which were not alleviated by Kohn having passed that exam. Also for the

2  October 2020 exam, Kohn further incurred hefty travel, ergonomic equipment

3  transportation, and hotel expenses not borne by other applicants, which physical,

4  emotional, and economic harms that were not alleviated by having passed that exam.

5  23. Kohn lost both employment opportunities and income during the period of time he

6  was delayed in becoming licensed to practice law in California and forced to spend

7  months of full-time study repeatedly to prepare for bar exam retakes in which he was not

8  properly accommodated (which further limited even nonlegal employment opportunities

9  during the interim in order to continue to pursue a career in law, as most such jobs would

10 not have allowed ten weeks off twice per year for that purpose and/or would not want to

11 hire and train someone who they perceived as likely to depart as soon as they were able

12 to practice law). As a direct consequence of the lost employment opportunities during this

13 long gap period from law school graduation, Kohn has faced (and continues to face) a

14 greatly diminished competitiveness in his candidacy for legal employment, as well as

15 reduced opportunities for nonlegal employment (in part due to him having spent several

16 years pursuing a career in law without gaining greater law practice experience prior to

17 any shift). Among the far-reaching and reasonably foreseeable effects of these lost

18 opportunities is that, even after Kohn attained his California law license on 2/8/2021, the

19 length of time that by then had elapsed during which he had not obtained gainful

20 employment placed his work experience outside the expectations most employers would

21 have from a 2018 JD graduate and continued to prevent him from obtaining such gainful

22 employment, which has caused cumulative and likely lifelong compounding lost income

23 and earnings potential coupled to an ongoing compounding detriment to his career

24 trajectory and nonmonetary intrinsic life experiences related thereto.

25 24. Kohn had, since childhood, held a strong interest in obtaining a masters in business

26 administration (MBA) degree, and invested considerable resources and efforts (far

27 beyond what he now has access to and likely now could not repeat) into preparing for the

28 GMAT test in pursuit of admission to such an educational program, on which in August

29 2015 he scored 730 (96th percentile). To be competitive for such graduate educational

30 program, Kohn needed to obtain competitive work experience (such as by post-JD law

31 practice experience); and without retaking the GMAT (a proposition that would cost him

over $15,000 and months of full-time study), Kohn needed to attain such work experience in time to apply before his GMAT score aged more than five years and expired. Defendants' discrimination prevented him from doing so. Had Kohn been able to attain admission to a meaningful MBA program prior to his father approaching retirement age, as he likely would have but-for Defendants' discrimination, his parents would have financially contributed the bulk of the tuition/fees and living expenses for such educational pursuit. Were Kohn to be admitted in the future, he would likely now need to pay or finance these costs himself.

25. Kohn's need to retake the bar exam more times than he should have also imposed considerable direct expenses and burdens on him, also independent of employment and business losses due to the delayed recommendation to the California Supreme Court that he be issued a law license, including months of full-time study and practice exam regimes and tens of thousands of dollars to pay for preparatory courses, materials, and tutoring, along with hotel and other incidental travel expenses and the State Bar's hefty registration fees for each exam, at least two of which were superfluously necessitated by Defendants' disability discrimination. That need also caused severe reputational damage. Moreover, the resulting uncertainties about life trajectory and options coupled with the above practical effects of Defendants' administrative procedures, including on long-term sustainable access to adequate medical care for his complex and exacting plethora of chronic illnesses, has strained and damaged Kohn's interpersonal and familial relationships, and Defendants' conduct collectively caused Mr. Kohn severe emotional distress.

**Defendants**

26. Defendant the State Bar of California ("State Bar") is a California public corporation that:

(a) was established by California statute in 1927, and then decades later codified into the California Constitution as such at Article VI, § 2, along with a mandatory membership requirement for all individuals practicing law in California, except while serving as a judge; and

1    (b) is authorized by California law to collect mandatory annual dues from its

2    members "… and raise additional revenue by any lawful means," Cal. Bus. & Prof. Code

3    §§ 6001, 6140, manifesting at all relevant times in annual budgets that have listed both

4    total revenues and expenses as slightly under to well over $200 million, which revenues

5    have been primarily sourced from:

6    (i) mandatory member dues; and

7    (ii) California bar exam registration fees charged to applicants, which at the

8    relevant times generated approximately $20 million annually, referred to by both CBE

9    members and the admissions director at the 12/2/2022 CBE meeting as a "business

10    model" for the State Bar, plus other exam and service fees; and

11    (iii) grants, voluntary donations, and other non-state sources; and

12    (c) possesses its own, separate treasuries from the State of California, Cal. Bus. &

13    Prof. Code § 6063, including both a "general fund" that is primarily funded by member

14    dues and an "admissions fund" that is primarily funded by fees charged to applicants for

15    admission services such as applying for a positive moral character determination or

16    registering to take the California bar examination; with the State of California:

17    (i) expressly disavowing legal liability for the State Bar's debts, Cal. Bus. & Prof.

18    Code § 6008.1; and

19    (ii) statutorily capping member dues in a similar regulatory manner as, for

20    example, its caps on rent increases by private landlords; and

21    (iii) allowing the State Bar greater discretion over–and no requirement to obtain

22    the California Legislature's or California Supreme Court's approval for adjusting–the

23    fees charged to applicants for admission services such as registering for the bar exam,

24    other than that such fees should be "reasonable" and consonant with the costs incurred to

25    administer the programs as the State Bar has chosen to manage them; and

26    (d) may sue and be sued, Cal. Bus. & Prof. Code § 6001, and can and does:

27    (i) make contracts, borrow money, and own, hold, use, and manage property in its

28    own name, not that of the State of California, Cal. Bus. & Prof. Code § 6001; and

1      (ii) similarly, can and does buy, sell, rent, maintain, and at all relevant times

2    generated millions of dollars in annual revenue by partially leasing out to tenants, real

3    property (including, at all relevant times, large office buildings in San Francisco and Los

4    Angeles), also in its own name, *id*.; and

5      (e) employs several hundred paid staff members, operates out of multiple physical

6    offices, and helps adopt and enforce rules and regulations for what it purports to be the

7    common good; and (f) helps oversee California's legal profession, a more than $42

8    billion sector of California's economy that at relevant times included more than 40,000

9    law firms; and

10      (g) is a public entity and governmental instrumentality–Cal. Bus. & Prof. Code §

11    6001–and thus is subject to Title II of the Americans with Disabilities Act ("ADA" or

12    "Title II"); and

13      (h) for the reasons discussed *infra*, the State Bar falls within the meaning of

14    "business establishment of any kind whatsoever" for purposes of California's Unruh Act,

15    Cal. Civ. Code §§ 51-52, or at least its administration of the bar examination has

16    sufficiently businesslike attributes to be covered by California's Unruh Act.

17      27. Defendant California Committee of Bar Examiners ("CBE") is a body within

18    the State Bar tasked with overseeing its attorney admission programs, including the

19    California bar exam, by and through the actions of its staff and agents.

20      28. The CBE's members–ten attorney members and nine non-attorney members–

21    are not full-time employees of the State Bar, are largely unpaid, and most of them have

22    demanding careers with other employers, which often causes them to limit their time

23    commitment in connection with their CBE duties and depend on State Bar staff for

24    shaping their meeting agendas and most of the factual information they consider for their

25    policymaking regarding attorney admission issues. While appointed–if not removable at

26    will during the relevant times–by the State, the pool of candidates that State officials

27    select from is provided by the State Bar's Board of Trustees, which in turn delegates to

28    State Bar staff the task of recommending to the Board which applicants to the CBE are

29    shortlisted for the pool that is conveyed to State appointing authorities. The Board itself

1   is similarly composed of unpaid volunteers with a similar dynamic and candidate trustee

2   selection method with shortlists directly handled by staff.

3        29. State Bar staff attempt to use their influence over screening and shortlisting

4   applications for appointment to the State Bar's Board and CBE to ensure that the pool

5   conveyed to State appointing authorities is largely composed of candidates whom they

6   don't anticipate being critical of their own policy preferences and interests. From Plaintiff

7   observing most of the meetings held by these bodies from 2020-present, on information

8   and belief, these and other dynamics frequently cause a supermajority of these bodies to

9   give sycophantic degrees of deference to staff. In the rare cases where staff perceive

10  uncertainty about getting their way, they often wait to bring issues to the CBE or Board

11  until there is practically only one policy choice left without dire consequences–e.g., the

12  one staff prefer–and engage in various other manipulative tactics that they collaborate

13  with each other on to carefully curate the information that is presented to the CBE and

14  Board, and how.

15       30. At the relevant times, the CBE was the body that heard administrative appeals

16  of testing accommodation denials made by the office of admissions staff by briefly

17  deliberating–on information and belief, for on average less than five minutes per appeal

18  including reading and voting on a motion–those staffs' framing and summations of the

19  requests, issues, and evidence, with typically only up to one CBE member selected and

20  assigned by staff having read in advance a "file" of cherrypicked excerpts of record and

21  memorandum of issues staff select and frame before the meeting.

22       31. Defendant "[State Bar and CBEs'] agents in their official capacity" refers to

23  both known and unknown State Bar staff and contractors who'd been involved with any

24  material action described in this complaint, but prominently including then-examinations

25  program manager Lisa Cummins and then-admissions director Amy Nunez.

26       32. Lisa Jeong Cummins ("Ms. Cummins"), an attorney former CBE member,

27  had been the examinations program manager at all times relevant to this case, and also

28  during her efforts from 2020-2021 ("precursor initiative") to spearhead revisions to the

29  State Bar's procedural rules for considering disabled applicants' testing

30  accommodations–including even shorter deadlines to appeal denials and capping

1    applicants to one lifetime appeal–that she'd sought to reduce the burden on herself and

2    other admissions staff and "give staff more breathing room," and which she'd openly

3    pitched as having that purpose, even if it made the procedures more burdensome on

4    disabled applicants.

5        33. In the role of examinations program manager, at all relevant times to this case:

6        (a) Ms. Cummins had been the State Bar staff member who principally managed

7    the testing accommodations department and had been the principal initial decisionmaker

8    and case manager on such requests prior to appeal, after having conducted the initial and

9    primary file review, summarization, and evaluation for the State Bar administrative

10   decisions in Kohn's case for each exam and each iteration. This role included collateral

11   decisions of which reviewing experts to consult, what materials to provide them, how to

12   frame any questions posed to them for review, and which excerpts to disclose as relevant

13   from their responses. Ms. Cummins also performed this same role for all administrative

14   appeals, albeit with her upheld denials there being recommendations subject to review by

15   the director of admissions and then, if sustained, by a single CBE member assigned by

16   staff to that appeal (for independent review) culminating in a summary vote by a quorum

17   of either the CBE or the examinations subcommittee thereof; and

18       (b) Ms. Cummins was also the staff member who executed the declarations about

19   the administrative review of Kohn's testing accommodations that were relied upon by

20   Defendants in their oppositions to Mr. Kohn's preliminary injunction motions in this

21   action, including that at Dkt.21, in which she falsely testified that the exhibits attached

22   thereto comprised the complete administrative record as of that date, even though those

23   exhibits omitted key treating doctor affidavits that Kohn had submitted on appeal for the

24   February 2020 exam, and for the October 2020 exam; and

25       (c) on information and belief, was the subject of a legal ethics complaint

26   submitted to the State Bar by attorney Julian Sarkar that Ms. Cummins had intentionally

27   suborned false testimony in at least one other case litigated against the State Bar. In her

28   testimony for that subject case, *Tuma v. State Bar*, S.F. Cnty. Superior Ct. No. CPF-20-

29   517092, Ms. Cummins alleged a "single applicant" scope of a printing error connected

30   with the February 2020 California bar exam that, on information and belief unbeknownst

1    to Ms. Cummins at the time of her declaration, contradicted prior admissions of a broader

2    scope of applicants impacted by that printing error that on information and belief was

3    made by State Bar admissions staff member Farid Yusuf-Sada to applicant Neema

4    "Ryan" Yousefi, which on information and belief further included representations that a

5    May 2020 closed session CBE meeting could potentially impact Mr. Yousefi's (and

6    potentially other applicants') exam scores too and not just the singular applicant Ms.

7    Cummins had agendized it for. On information and belief, Ms. Cummins's testimony in

8    that case too had been false, and reasonably support an inference that she is not credible,

9    that her administrative decisions are overall unreliable, and/or that she intended her

10   testimony in *Tuma* to coverup the true scope of the printing error that Mr. Yusuf-Sada

11   had admitted and the plausibility that the State Bar had released exam results for

12   February 2020 failing–or even passing–a significant number of applicants in error, which

13   if publicly known might have forced it to investigate, remedy, and/or publicly

14   acknowledge such a scenario the immediate exam cycle after the State Bar had been

15   investigated by the California Supreme Court for having leaked the exam topics for the

16   July 2019 exam; and

17        (d) Ms. Cummins has made ableist comments at public meetings, and in written

18   public records: (i) urged other staff members not to take the concerns of various critics

19   seriously, including on disability rights issues, sometimes in a mocking tone; and

20        (ii) commended the suppression of certain critics' "unflattering" public comments

21   to the State Bar from the record; and

22        (e) on information and belief, Ms. Cummins and/or State Bar admissions staff

23   under her supervision in 2020 had stated-against-interest to applicants:

24        (i) that the ADA is unfair and applicants who can't take and pass the bar exam

25   under its standard testing conditions are *per se* unfit to practice law; and

26        (ii) that applicants were being "ungrateful" to staff for making the exam available

27   to anyone at all during the pandemic, and should "show gratitude" to staff by deferring

28   the exam until the pandemic was over if they didn't feel they could test safely in-person,

29   responsive to inquiries about the difficulties with requesting accommodations for the

30   October 2020 exam caused by the standard conditions not being known until four days

1   after the then-effective deadline to petition for accommodations for that exam and four

2   days before the final such deadline, and also about the State Bar's plan to require certain

3   disabled applicants–whose accommodations staff deemed to "not lend themselves to

4   online testing," and/or be too burdensome to implement remotely,–to test in-person,

5   while permitting all standard applicants who had not affirmatively requested to test in-

6   person to test remotely.

7        34. After the testing accommodation procedures rules revision precursor initiative

8   Ms. Cummins spearheaded did not proceed on return from public comment, where it had

9   elicited considerable opposition from the public, she was transitioned to a newly-created

10  position leading "examination development" with narrower job responsibilities not

11  including testing accommodations, which on information and belief was prompted either

12  by Ms. Cummins's unwillingness to work on testing accommodation functions without

13  the rule amendments she'd unsuccessfully proposed in the precursor initiative or because

14  even the State Bar recognized Ms. Cummins's attitude towards disabled applicants was

15  becoming too much of a liability no matter how indispensable her skills authoring exam

16  questions were perceived to be, but public records indicate she continued to coach her

17  successor, Christina Doell–the *public* proponent of a subsequent testing accommodation

18  procedures rules revision initiative the State Bar considered from 2022-2023 that

19  culminated at the California Supreme Court in case No. S285541 ("present initiative")–

20  and advised Ms. Doell not to take concerns of disability advocates in connection with the

21  present initiative seriously, sometimes in a mocking tone.

22        35. On information and belief, Ms. Cummins:

23        (a) both:

24        (i) resents disability law requirements for the administrative and budgetary

25  burdens they impose and she seeks to minimize; and

26        (ii) beyond burden, believes that those with disabilities tend to be unfit to be

27  attorneys, and that anyone who cannot take and pass the bar examination under its

28  standard testing conditions should not, in her opinion, be deemed adequately competent

29  to be allowed to practice law; and

(b) had been personally involved in the authorship of material aspects of the testing accommodation procedural rules in effect at all relevant times, and feels that the testing accommodation procedures should have high documentary requirements and administrative- burden-minimizing procedures at least in part to deter disabled applicants from seeking accommodations and thereby reduce both the number of administrative cases for staff to adjudicate and the number of applicants who are granted testing accommodations; and

(c) feels that the testing accommodation decisions the State Bar makes should minimize deviations from standard conditions to, at most, those for which absolute necessity to attempt the exam is clearly and convincingly proven and yet would not impose subjectively intolerable degrees of administrative burden or cost, even if accommodations for handicaps she'd consider surmountable or able to be self-accommodated would be more likely to fully ameliorate all effects of the disability functional impairments than any subset meeting her standards; and

(d) Ms. Cummins holds the political view that the Americans with Disabilities Act and related laws are unfair to nondisabled persons and/or otherwise are poor public policy, and thus should be abridged or repealed; and

(e) Ms. Cummins's annual compensation from the State Bar had been approximately $207,000 or more at the relevant times to this case.

36. At all relevant times to the July 2018 and February 2019 California bar exams, Gayle Murphy ("Ms. Murphy") had been the director of admissions for the State Bar, while at all relevant times to the February 2020 and October 2020 exams, Amy Nunez ("Ms. Nunez") had been the director of admissions for the State Bar.

37. On information and belief, Ms. Nunez at relevant times:

(a) shared with Ms. Cummins a general resentment towards–and desire to minimize–the imposition on staffing and budgetary resources and logistics effected by the obligation to review testing accommodation petitions and appeals and to provide reasonable testing accommodations, if not Ms. Cummins's views on disabled applicants'

1  general fitness to be attorneys or the general existence of legal duties to reasonably

2  accommodate; and

3      (b) nonetheless at relevant times perceived her role as a manager to include

4  advocacy for the positions and interests of her subordinates in deliberations with the CBE

5  and with the State Bar's chief of programs, executive director, and board of trustees, and

6  to prioritize her employees over applicants even to the extent Ms. Nunez perceived the

7  impact on said applicants as unfair. In this sense, to the extent Ms. Nunez had not shared

8  the same degree of discriminatory animus towards disabled applicants as held by Ms.

9  Cummins, Ms. Nunez nevertheless generally tended to prioritize helping subordinates

10  like Ms. Cummins contain their work responsibilities to levels they consider subjectively

11  tolerable and to save face for professionally damaging errors as they occur, even when

12  she might not have made the same decision as those subordinates absent their influence

13  or those considerations; and

14      (c) at the relevant times to this case Ms. Nunez's annual compensation from the

15  State Bar ranged from approximately $250,000 to more than $300,000.

16      38. On information and belief, the State Bar's office of admissions staff manages

17  the policies and programs of that office with the objective of maximizing the portion of

18  available funding that is allocated to their own compensation and limits on their expected

19  work hours, even at great detriment to the public interest or the State Bar's purported

20  institutional mission. Examples of this include not only the State Bar office of admissions

21  staffs' efforts, discussed *infra*, to minimize its expenses incurred in connection with

22  adjudicating and providing testing accommodations, and also any expenses for third-

23  party contractors supplying services largely affecting the *actual* reliability of the results

24  the exam produces for measuring attorney competency–e.g., proctoring and grading

25  contractors, if not those incurred to exam question bank and examination software

26  vendors for the ease of administering the program for State Bar staff that are well funded

27  and typically not competitively bid. These resource allocation policies are, on

28  information and belief, intended to maximize the fiscal resources preserved for

29  compensating State Bar office of admissions and upper management staff with pay scales

30  ranging from over $120,000 annually for administrative assistants to over $400,000

1   annually for upper management, and benefits packages (which include, but far exceed,
2   CalPERS pension and health insurance benefits) considerably more generous than the
3   typical State agency, with guaranteed automatic raises floored at increases to local cost of
4   living for all staff members and minimum proportion of "merit" raises beyond such
5   adjustments; while simultaneously not requiring significant overtime from those staff or
6   work hours proportionate to that pay-scale customary in either the private sector or public
7   sector. On information and belief, staff collaborate to deflect the high cost of their
8   programs onto specious causes and present their cushy employment terms as axiomatic
9   and necessary to offer the programs that are perceived to be indispensable, while
10  simultaneously pressing the resulting budgetary challenges as rendering safe and
11  accessible exam facilities, common accommodation requests, or workable timelines and
12  procedures for deciding them, as an "undue burden," such that "resource constraints"
13  preclude reforming various procedural and substantive flaws in the State Bar's testing
14  accommodation policies and practices under staffs' resource allocation priorities. The
15  deference the CBE and Board provides to staff discussed *supra* is exploited for this
16  purpose, and the State Bar's then-executive director Leah Wilson had been comfortable
17  publicly broadcasting–including at an April 2024 CLA meeting, and on information and
18  belief at other relevant times–to staffs' union that there is no demand it could make on
19  staffs' behalf over which the State Bar would ever risk a strike.

20          39. The State Bar's general functions include providing nonbinding advice to the
21  California Supreme Court on matters of attorney admission, attorney discipline, and rules
22  regulating the California legal profession. However, "[t]he State Bar does not admit
23  anyone to the practice of law, it does not finally disbar or suspend anyone, nor does it
24  ultimately establish ethical codes of conduct. All of those functions are reserved by
25  California law to the State Supreme Court." *Keller v. State Bar of California*, 496 U.S. 1,
26  11 (1990). The U.S. Supreme Court held the State Bar to be an "integrated bar" in *Keller*
27  based on its observations that the State Bar offered educational programming, lobbied the
28  Legislature, filed amicus briefs, recommended rules and disciplinary actions, and
29  collected mandatory annual dues. *Id*. Yet, those are all functions that it continued to
30  perform at all relevant times even after spinning off some of its other "associational"
31  functions into the private "California Lawyers Association" in 2017.

1    40. To the extent that the California Supreme Court has a policy to typically

2  require applicants to obtain Defendants' recommendation to grant admission to practice

3  law in California, and thereby passage of Defendants' California bar examination and the

4  NCBE's MPRE, *inter alia*:

5    (a) such policy makes the State Bar's administration of the California bar

6  examination analogous to the NCBE's administration of the MPRE and just as

7  businesslike; and

8    (b) in many jurisdictions, the NCBE–a private Wisconsin corporation–supplies

9  both the entire bar examination and moral character investigations for those States'

10  judiciaries; and

11    (c) Defendants' exam services and their role in the California Supreme Court's

12  admissions decisions are also analogous to the plethora of private standardized test

13  vendors whose products other State occupational licensing agencies and State

14  universities, for example, make required credentials for their grant of licensure or

15  admission; and

16    41. Separately or together, the totality of the facts pled throughout this complaint

17  or else reasonably inferable therefrom and/or judicially noticeable, makes the State Bar's

18  entire attorney admissions role–unlike the California Supreme Court's actual attorney

19  licensing decisions–functionally businesslike for purposes of California's Unruh Act,

20  Cal. Civ. Code §§ 51-52.

21    42. In addition to passage of the California bar examination, the State Bar has

22  several other requirements for recommending an applicant's admission to the California

23  Supreme Court, including:

24    (a) satisfaction of legal education requirements; and

25    (b) payment of various fees to register an applicant account with the State Bar,

26  and to apply for positive moral character determinations and/or extensions, and to take

27  the California bar exam; and (c) an extensive moral character investigation process and

28  documentation production, and positive determination thereupon; and

1      (d) passage of the "multistate professional responsibility exam" administered by

2    the NCBE, a private Wisconsin corporation; and

3      (e) absence of unpaid court debt and delinquent child support, etc.; and

4      (f) passage of the California bar examination, a standardized test described in

5    greater detail *infra* that, during the relevant times, was administered by the State Bar,

6    albeit with close to half of that exam licensed from–and scored by–the NCBE.

7      43. Defendants' California bar examination is a standardized test at all relevant

8    times comprised of a written section developed and scored by the State Bar and a

9    multiple-choice "multistate bar examination" section licensed from and scored by the

10    NCBE, a private Wisconsin corporation, which collectively the State Bar administers as

11    one of its methods for determining whether to recommend an applicant's admission to the

12    California Supreme Court, and:

13      (a) its passage is not required for admission to practice law by any state law (let

14    alone constitutional mandate) binding on the California Supreme Court's attorney

15    admission decisions, which:

16      (i) is reflected by the California Supreme Court's formation of a "Blue-Ribbon

17    Commission," active 2021-2023, which that Court chartered to investigate and

18    recommend which alternative non-exam pathways to licensure, if any, that Court should

19    consider adopting, a task that was recently inherited by the CBE going forward at the

20    California Supreme Court's direction following its rejection of a specific "portfolio bar

21    exam" program proposed by a subgroup of the Blue Ribbon Commission and endorsed

22    by the State Bar's Board of Trustees; and

23      (ii) signifies that, for purposes of California's Unruh Act, the California bar exam

24    is not being administered by the State Bar pursuant to a mandate enshrined in the

25    California Constitution like with public education–*contrast with Belanger v. Madera*

26    *Unified Sch. Dist.*, 963 F.2d 248, 253 (9th Cir. 1992) (discussing the extent of public

27    education minutiae micromanaged by the California Constitution, down to

28    constitutionally-imposed textbook selection mandates). Rather, the California Supreme

29    Court's policymaking discretion over whether and how the State Bar uses the bar exam in

1    its attorney admission recommendations, coupled with regular exam fees charged to

2    applicants instead of gratuitous provision, distinguishes the bar exam from the free public

3    education at issue in *Brennon B. v. Superior Ct.,* 13 Cal. 5th 662, 681 (2022), a case

4    regarding the applicability of the Unruh Act to public schools when providing free public

5    education and holding that state-funded gratuitous provision of a Constitutionally-

6    mandated service did not have sufficiently businesslike attributes to be covered by the

7    Unruh Act; and

8        (b) under standard conditions, at all relevant times has been given:

9        (i) in large group settings with hundreds to thousands of applicants; and

10        (ii) over 12.5 hours spread over two consecutive days of 6 to 6.5 hours testing

11    time each (excluding the standard lunch break), twice per year on firm dates the State Bar

12    does not offer alternatives or makeup exams to for virtually any cause (except for

13    October 2020, in February and July commencing the last Tuesday of the month, with

14    accommodated applicants expected to check-in the day before as well); and

15        (iii) consisting of 200 (except for October 2020, which used 100) multiple-choice

16    questions, five essay response questions, and one "performance" (simulated legal task)

17    written response question; and

18        (c) has been found by both outside psychometricians and many members of the

19    California Supreme Court's "Blue Ribbon Commission" to, at least in its design at

20    relevant times including 2018-2020, lack psychometric validity for testing minimum

21    competency to practice law; and

22        (d) was overwhelmingly proctored by "temp agency" contractors hired only for

23    the week of the exam, who were:

24        (i) paid at or close to minimum wage; and

25        (ii) despite frequently having little or no prior experience administering any high

26    stakes exam, given only a short "orientation" of training on the complex and exacting

27    examination security procedures/protocols the State Bar enforces even as they exist under

28    standard testing conditions, which leads to frequent operational errors even for standard

29    applicants; and

1    (iii) often not provided with individualized breakdowns of which and how these

2    scripted protocols describing standard conditions are modified by individualized

3    disability accommodations, but rather provided only a non-integrated letter identifying

4    the accommodations approved in general terms and no application to how they modify

5    the other instructions; and

6    (iv) only inconsistently fully implementing and honoring even those testing

7    accommodations approved by the State Bar, and causing other operational errors for

8    applicants approved testing accommodations at a substantially greater rate than for

9    standard applicants; and

10    (v) per State Bar incident report records, for each exam cycle for years and at the

11    relevant cycles taken by Kohn, a substantial portion of all applicants granted

12    accommodations by the State Bar experience onsite proctor(s)' repudiation or failure to

13    correctly implement some or all approved accommodations, which the State Bar had been

14    aware of every exam cycle; and

15    (e) with the policy that all applicants are strictly and vicariously responsible

16    through grading penalties and/or cancellation or invalidation of their exam and/or

17    prejudiced performance (without makeup or remedy) for failures of proctors, State Bar

18    staff, exam software selected by the State Bar and supplied by its (often no-bid)

19    contractors, or any other operational error by the above or by any other involved actor to

20    correctly instruct on, apply, or implement the "exam security"-premised protocols and

21    rules, or for prejudicial and/or unsafe exam conditions regardless of whose failure caused

22    such defect; and

23    (f) took about 3-4 months from exam to results, during which time the written

24    portion of the exam is graded by California attorney contractors who, on information and

25    belief, at the relevant times were:

26    (i) paid approximately $3.25 per ordinary essay and $3.75 per performance essay;

27    and

28    (ii) due to this low rate of compensation for California attorney contractors,

29    graders were expected–or at least allowed–to only skim each essay for approximately 2-3

1    minutes before assigning a grade, to the effect that when such same essays are read by

2    multiple graders (i.e., for applicants whose total scores come close enough to passing on

3    a first read to receive a subsequent read), on information and belief receive grades with

4    average standard deviations in raw scores assigned to such singular essay greater than the

5    difference between on track for a passing versus failing exam result, causing the written

6    section and overall exam results to not reliably measure the applicant's competency to

7    practice law and be substantially arbitrary; and

8          (iii) on information and belief, at relevant times were provided their copies of

9    disabled applicants' essay answers (where testing accommodations were provided) that

10   had been marked with an "A" not otherwise present on other applicants' answers, which

11   thus provided such contractors the opportunity to consider that an applicant had received

12   accommodations when scoring the answers; and

13         (g) is then "scaled" on a curve reflecting comparative performance to other

14   examinees and other proprietary statistical considerations (on information and belief,

15   including the number of retakers needed to generate sufficient exam fees revenue to meet

16   the State Bar's budgetary goals); and

17         (h) has a reputation as being among the hardest bar exams to pass of any

18   jurisdiction in the United States, which is reflected in its consistently low pass rates: the

19   July 2018, February 2019, and February 2020 exam administrations relevant to this case,

20   while in no way historical outliers, had been respectively <u>failed</u> by 59.8%, 67%, and

21   72.1% of applicants the State Bar deemed to have completed all subparts of the exam,

22   despite:

23         (i) all examinees having been required to meet stringent legal education

24   requirements to be eligible to sit for the exam; and

25         (ii) most examinees having studied for each attempt through 8-12 weeks of

26   typically full-time efforts often including participation in tailored preparation courses and

27   tutoring post-law school, which typically costs the applicant thousands to tens of

28   thousands of dollars per attempt beyond the time commitment, and which exam

29   preparation attempts largely does not remain adequately fresh without repetition for any

30   retake attempts 5-6+ months later.

44. While Defendants purport the California bar examination to assess "minimum competency," the general concept of the bar exam historically had been invented by the NCBE for the intended purpose of excluding minorities from the legal profession, and State judiciaries' adoption of the modern bar examination was the result of intensive lobbying conducted for that end by the NCBE, a private Wisconsin corporation that:

(a) for many jurisdictions in the United States, at all relevant times, provided largely the same attorney admission advisory services and functions to State judiciaries– the actual attorney licensing authorities in every material jurisdiction–as the State Bar did for the California Supreme Court, which include:

(i) the entirety of the bar examination through its "uniform bar examination" product; and

(ii) it's co-required for attorney admission "multistate professional responsibility exam (MPRE)" product; and

(iii) some or all of the "moral character" background investigations for character and fitness checks; and

(b) for most jurisdictions in the United States, at all relevant times, provided both the entirety of the bar examination and the co-required MPRE exam; and

(c) for California, at all relevant times, provided the co-required MPRE exam, and further licensed to Defendants (and scored) the multiple-choice "multistate bar exam" comprising nearly half of the California bar exam; and

(d) at the relevant times to this case, has been led by attorneys who were licensed in Wisconsin via "diploma privilege" without ever taking a bar exam; and

(e) through its licensing agreements with Defendants, as Defendants have alleged, required Defendants to contract to never grant certain testing accommodations disfavored by the NCBE– and thus to not provide the individualized consideration 28 C.F.R. § 35.160(b) requires be given to a disabled individual's requests, which are entitled thereunder to "primary consideration" absent a timely showing by the covered entity of fundamental alteration or undue burden, cf. 28 C.F.R. § 35.164 (asserting fundamental alteration or undue burden); 28 C.F.R. § 35.130(b) (prohibiting public entities from

1   discriminating through "contractual or licensing arrangements"). Such contractual

2   agreements with the NCBE:

3       (i) were cited by Defendants on appeal as a reason for denying Kohn certain

4   accommodations for the February 2020 California bar exam; and

5       (ii) were also asserted in Defendants' "FAQs" for the February 2022, July 2022,

6   February 2023, July 2023, February 2024, and July 2024 California bar exams, wherein

7   immunocompromised applicants (and all other applicants whose disabilities increase their

8   risks from Covid exposure) were instructed that the only accommodation considered for

9   such disability needs is a private room (still requiring exposure to proctors and onsite

10  staff, plus the public in common areas to access the exam room, and for many such

11  applicants, travel to any in-person test site) and never remote testing. According to the

12  State Bar's FAQs, which alleged this policy was necessary to comply with the NCBE's

13  demands, Defendants categorically refused to individually consider remote testing as an

14  accommodation, but held it in reserve for if public health authorities determined the

15  nondisabled needed it too and not just such situated disabled applicants. Defendants

16  maintained this policy despite prior implementation of mass-remote testing on at least

17  three prior California bar exam cycles and at least one subsequent exam in an attempt to

18  yield budget savings that was thwarted by poor vendor selection and vetting;

19  and (f) NCBE was founded by the American Bar Association ("ABA") as part of ABA's

20  response to the admission of certain attorneys who were of color in 1912, which to ABA

21  leadership of that time posed "a question of keeping pure the Anglo-Saxon race," (see

22  Auerbach, *Unequal Justice: Lawyers and Social Change in Modern America* (1977) p.65,

23  and Shafroth, *Modern Tendencies in Preparation for the Bar*, 7 St. Bar J. (1932) p.215).

24  NCBE later gave this founding animus the euphemism of addressing the "overcrowded

25  condition of the bar" (see also *Editorial*, 1 B. EXAM'R 211 (1931); Philip J. Wickser,

26  *Ideals and Problems for a National Conference of Bar Examiners*, 1 B. EXAM'R 4, 7

27  (1931)).

28  45. While perhaps not Defendants' current dominating motive driving usage of the bar

29  examination, the exclusionary historical origin of the bar exam is vital context when

30  considering the disparate impact that the exam has continued to have on a plethora of

1    protected classes, see 6/18/2020 California Assembly Judiciary Committee letter,

2    https://s3.documentcloud.org/documents/6953139/Letter-to-Supreme-Court-Re-Cut-

3    Score-and-Race-6.pdf, which cited the February 2020 exam pass rate statistics and the

4    State Bar's 3/18/2020 study *Simulation of the Impact of Different Bar Exam Cut Scores*

5    *on Bar Passage, by Gender, Race/Ethnicity, and Law School Type [at p. 7],* and noted

6    thereupon that an alarming disparate impact of the exam on applicants belonging to racial

7    minorities, including that "only five percent of Black first-time bar exam takers who

8    graduated California ABA-accredited law schools passed [the California bar exam]."

9    That historical context further undermines the deflections from the exam's design opined

10   by the NCBE's and Defendants' mutually retained psychometrician of several decades,

11   Dr. Roger Bolus, in *The Size and Source of Differences in Bar Exam Passing Rates*

12   *Among Racial and Ethnic Groups*, 66 B. Exam'r 8 (Nov. 1997). Regardless of whether

13   the bar exam remains driven by similar animus to its original exclusionary purpose, the

14   totality of Defendants' attorney admission procedures, policies, and practices are, at least

15   in large part, the cause of the underrepresentation of various protected classes in the legal

16   profession, which of course then carries over into underrepresentation in the judiciary, as

17   law licensure and law practice experience is nearly always a prerequisite to becoming a

18   judge, with the consequentially impaired diversity and inclusion in the profession

19   undermining access to justice for the public.

20        46. The disparate impact upon the disabled caused by the totality of Defendants'

21   attorney admission programs, policies, and practices is similarly reflected in Defendants'

22   own reports, which indicate that, from 2019 to 2023, only approximately 4.8-5.7% of

23   California attorneys reported having one or more disability, even though people with

24   disabilities comprise about approximately 22%-23% of California's adult population. See

25   https://publications.calbar.ca.gov/2023-diversity-report-card/diversity-2023; *see also*

26   *Demographic Data Provided by Justices and Judges 2021*, Judicial Council of California,

27   at 15 (Dec. 31, 2021), https://www.courts.ca.gov/documents/2022-JO-Demographic-

28   Data.pdf (only 2% of California judges report having a disability).

29        47. The legal profession plays a unique and critical role in assisting the public,

30   including (and perhaps especially) those with disabilities and members of other

31   underrepresented communities, in navigating institutions and systems. People with

1   disabilities have historically faced a wide range of barriers to the legal system, such as

2   physical access to the court, access to suitable attorneys, and other important auxiliary

3   services needed to access judicial services. A diverse legal profession that includes

4   attorneys who are sensitive to the experiences of people with disabilities would facilitate

5   improved access to justice. Further, a diverse legal profession helps promote public

6   confidence and positive perceptions of the legal system, higher quality legal services, and

7   fairer representation.

8       48. Indeed, according to the Judicial Council of California, "increasing the

9   diversity of the state's judicial officers so that it reflects the composition of our state's

10  residents and to remove barriers to access in the courts will help increase Californians'

11  trust and confidence in our justice system." Administrative Office of the Courts (AOC),

12  *Pathways to Achieving Judicial Diversity in the California Courts: A Toolkit of Programs*

13  *Designed to Increase the Diversity of Applicants for Judicial Appointments in California*,

14  Judicial Council of California at 3 (Dec. 2010). Lack of diversity in the legal profession

15  has resulted in a statutory declaration of "commitment to and support of effective policies

16  and activities to enhance access, fairness, and diversity in the legal profession and the

17  elimination of bias in the practice of law" by the California Legislature in Cal. Bus. &

18  Prof. Code § 6001.3(a); *see also* Cal. Bus. & Prof. Code § 6001.1 (defining the State

19  Bar's "protection of the public" mission as including "support for greater access to, and

20  inclusion in, the legal system," and directing that such be prioritized by the State Bar and

21  its Board as "paramount" over any other interests).

22      49. The totality of Defendants' procedures, policies, and practices are–at least in

23  large part–the cause of the underrepresentation of disabled individuals in the legal

24  profession, which of course then carries over into underrepresentation in the judiciary, as

25  law licensure and law practice experience is nearly always a prerequisite to becoming a

26  judge.

27      50. As the experiences and affinity of attorneys with disabilities–and their unique

28  perspectives– facilitates greater access to justice for clients with disabilities, this

29  underrepresentation among both advocates and the judiciary harms disabled persons'

30  access to the legal system, including for the vindication of their federal constitutional

1    <u>rights</u>. Accordingly, the disparate impact on the disabled that Defendants have caused has

2    substantially undermined the fundamental right of access to judicial services–including,

3    but not limited to, the Courts–for disabled individuals among the public, as discussed in

4    *Tennessee v. Lane*, 541 U.S. 509 (2004). Especially combined with the role the exam

5    plays in decisions by the California Supreme Court concerning attorney admissions,

6    Defendants' administration of the bar examination therefore implicates judicial services.

7         51. The use of professional licensing exams like the California bar exam, and the

8    manner in which they're implemented, also brings such examinations into the educational

9    testing context. The California bar exam is a milestone in the education and training of

10   law students. Defendants have purported the exam to measure whether attorneys have the

11   "minimally needed competence" to practice law, and, both due to its importance in

12   attaining admission to licensure and its direct effects on their accreditation status with the

13   State Bar, law schools regularly evaluate and adjust curriculum based on the content of

14   the bar exam. *See, e.g.*, State Bar Rule 4.160(D)(4)(d); Cal. Bus. & Prof. Code § 6060.

15   Legal education would have little meaning if students are not then able to use that

16   education to become contributing members of society, including as officers of the court.

17   Thus, access to the California bar exam implicates similar Constitutional rights as does

18   the education it purports to assess, particularly at the intersection with both judicial

19   services and State occupational restrictions on the due process-protected liberty interest

20   in pursuing a chosen profession, and especially for a population that would have already

21   expended years of efforts and typically hundreds of thousands of dollars in expenses to

22   pursue a career in law reasonably relying on a fair and meaningful opportunity to seek

23   licensure.

24        52. The California Supreme Court is neither bound by–nor offers mandatory

25   review of–the State Bar's decisions, actions, and inactions, Cal. Rules Ct. 9.13, but under

26   California law, no lower state court has subject matter jurisdiction to review disability

27   discrimination claims arising from the California bar exam, *Morrowatti v. State Bar of*

28   *California*, No. B196392 (Cal. Ct. App. Dec. 27, 2007) (citing Cal. Bus. & Prof. Code §

29   6066), and the California Supreme Court's ordinary procedures governing petitions for

30   review of State Bar decisions at all relevant times have required months of briefing time

31   even excluding that Court's own review time, and so–coupled with the State Bar's own

1    timelines for exhausting administrative remedies–together have been facially incapable of

2    affording applicants a meaningful opportunity to obtain relief from that Court in time for

3    the next scheduled bar exam administration under the standard briefing schedules

4    California law prescribes by default, *see* Cal. Rules Ct. 9.13(d). Accordingly, the State of

5    California has failed to allow any meaningful process for the presentation of these kinds

6    of federal claims in state court.

7        53. Defendants have made numerous statements at public meetings indicating

8    discriminatory animus against the disabled by the CBE and State Bar staff, the closest in

9    time to Kohn's exams including, *inter alia*:

10   (a) at the 10/14/2022 CBE meeting, then-admissions director Amy Nunez reported a

11   statistical increase in the proportion of applicants requesting testing accommodations,

12   which <u>increased</u> to nearly 10% of applicants for the July 2022 exam. Several CBE

13   members expressed their surprise and concern over the legitimacy of these requests based

14   on this increase, but the CBE should have expected routinely seeing 23% of applicants

15   need accommodations for disabilities on average based on population statistics. Even

16   with a proportion of 10% of applicants requesting disability accommodations for the July

17   2022 exam, where at least 23% of the California adult population has one or more

18   disabilities, this would tend to indicate that the vast majority of disabled applicants were

19   being chilled from exercising their rights and receiving equal footing by the State Bar's

20   overly burdensome testing accommodations request procedures, and that such had been

21   even worse for the earlier exams (including those taken by Kohn), which the July 2022

22   exam statistic represented an increase from, and so the CBE's perception that an increase

23   to 10% of applicants is alarmingly high reflects discriminatory implicit bias at best; and

24       (b) commenting at one or more CBE meetings in 2018-2019 that providing testing

25   accommodations to applicants with disabilities was unfairly driving up the overall cost of

26   administering the bar exam and requiring nondisabled applicants to shoulder more

27   financial burdens because of their disabled peers, with at least one CBE member

28   commenting that the CBE should stop providing certain accommodations before catching

29   themselves and acknowledging the CBE was not at liberty to do so, because, to the effect

30   of, "that [expletive] ADA law;" and

1    (c) At one of the first-ever Zoom meetings of the CBE in March 2020, with CBE

2    members unused to microphone settings, one CBE member interrupted a disabled

3    applicant who was providing public comment that the CBE should be more considerate

4    of applicants' mental health concerns relating to pandemic testing policies with an

5    exclamation to the effect of "will you just shut the [expletive] up," despite the CBE

6    having had actual notice that applicants (i.e. Brian Christopher Grauman) had, in the

7    years just before this meeting, committed suicide due to mental health harms inflicted by

8    Defendants' bar exam policies and practices; and

9    (d) during an ADA training session to the CBE in 2021, State Bar Office of

10    General Counsel attorney James Chang remarked that the DOJ testing accommodations

11    guidance was "nonbinding" on the State Bar, but that the DFEH and DOJ litigation that

12    led to the LSAC consent decree from which it arose was still instructive to the degree and

13    effect that: "we have to be more careful to stop letting this get out of hand, or we might

14    be forced to do something similar;" notably, Mr. Chang had at that time recently emailed

15    DOJ Office of Civil Rights attorney David Devito to memorialize a phone discussion

16    with Mr. Devito on 4/28/2021, summarized by Mr. Chang in material part as follows:

17    "…I explained that the State Bar of California had reviewed your proposed

18    confidentiality agreement concerning Bar Exam testing accommodation applicants and

19    concluded that… the State Bar therefore is unable to agree to your proposal.

20    Unfortunately, you became very upset and stated your view that the State Bar was asking

21    your office to "pound sand" and that accordingly, without further discussion, you

22    threatened to proceed with your investigation without the State Bar's input and a possible

23    lawsuit against the State Bar." (Emphasis Added).

24    **FACTUAL ALLEGATIONS**

25    **Defendants' Facially Unlawful Testing Accommodation Procedures:**

26    54. Defendants, at all relevant times to this case, enforced procedural rules for

27    testing accommodation requests that facially deprive applicants with disabilities equal

28    opportunity to safely and readily access the California bae exam–and/or demonstrate their

29    competency on the knowledge and skills Defendants purport the California bar exam to

1    measure–and thereby equal opportunity to qualify to practice law in California. These
2    procedural defects both carried undue risks of substantive errors in the actual testing
3    accommodation decisions that deprive applicants of their rights under relevant federal
4    and state laws, and further perpetuate independent access barriers to seeking and
5    obtaining those accommodations that are not necessarily cured even when the substantive
6    result is a grant of all requested accommodations.

7        55. Perhaps the most serious of the procedural deficiencies are the processing
8    times allotted to State Bar staff to render decisions on testing accommodation requests
9    and appeals. Defendants' processing times of around sixty days at best and sometimes
10   much longer to achieve a single iteration of response to an applicant's written submission
11   is incompatible with equal opportunity for immediate repeater disabled applicants, given
12   the duration of the period between exam results release and the next scheduled exam
13   administration coupled to the traditional ten weeks of full-time advanced prep course or
14   other intensive study regimes needed to realistically pass the California bar exam and
15   generally undertaken by applicants.

16       56. With about seven weeks between the registration deadline and the bar exam,
17   an initial decision from State Bar staff within two weeks of receipt is necessary to fulfill
18   the ADA mandate that testing entities set deadlines to request testing accommodations on
19   a particular exam administration no sooner than that entity's final deadline for
20   nondisabled applicants to register for that exam administration, and respond to testing
21   accommodation requests quickly enough for disabled examinees to register with their
22   nondisabled peers, respond to any requests for additional information, and complete any
23   review procedures needed, *timely* to take the exam in the same testing cycle, and with
24   equal opportunity to prepare for the exam. A two-week response window leaves five
25   weeks between the initial decision and the bar exam for applicants who petition on or
26   around the State Bar's deadline, a period which is necessary for the applicant to complete
27   further steps, such as communications with State Bar staff, collection of any additional
28   information, and the filing and processing of any appeal. Such processing times would
29   also facilitate longer appeal deadlines, such that the State Bar could permit at least those
30   disabled applicants who petition at least two months before the start of the exam to
31   receive at least 30 days from the decision to appeal. That difference is critical for disabled

1    applicants to obtain responsive medical documentation from treating doctors and for

2    allowing them a *meaningful* opportunity to be heard in their appeal. A two-week response

3    window also would allow applicants who request their accommodations early (weeks or

4    months before the registration deadline) an opportunity to exhaust all administrative

5    review options and confirm their final approved accommodations prior to embarking on

6    exam preparation, typically an eight-to-ten-week endeavor, and to do so even if they're

7    an immediate repeater seeking expanded accommodations on the next exam cycle as long

8    as they begin working on their petition as soon as their last taken exam has been

9    administered. <u>This knowledge allows candidates to make informed plans about exam</u>

10   <u>preparation</u>, which might include taking time off from work, hiring a tutor, enrolling in

11   preparation courses, and taking timed practice exams.

12         57. Immediate repeaters inherently cannot request accommodations for the next

13   exam early enough to achieve these results under Defendants' procedures, and other

14   disabled applicants are disparately impacted and unduly burdened if required to either

15   petition that early or face the nested Hobbesian choice articulated above, especially as

16   doing so would risk their requests becoming obsolete relative to their functional

17   impairments by the time of the exam without adequate time to amend or supplement.

18   Consequently, Defendants' timeline timelines for the initial processing of testing

19   accommodation requests–apportioning staff nearly all the available time between exam

20   cycles for their side of the process while simultaneously requiring disabled applicants to,

21   at best, scramble in order to assemble in days what staff insist requires months to

22   evaluate–causes extreme undue burden at best, and more typically renders due testing

23   accommodations procedurally inaccessible entirely. It leaves disabled immediate repeater

24   applicants (inherently) without– and first-timer applicants without a meaningful–

25   opportunity to administratively appeal denials, let alone to seek judicial review or know

26   whether they'll be adequately accommodated on the next exam offering available to

27   nondisabled applicants when deciding among exam prep options.

28         58. The State Bar's policies shift to disabled applicants the burdens of its claimed

29   struggle to sustain the economic feasibility of the bar exam as the method of assessing

30   minimum competency–at least continuing the generous compensation and absence of

31   overtime expectations to which admissions staff have become accustomed, and without

1   the political scrutiny of increasing exam fees or seeking a governmental subsidy–on

2   information and belief simply because the disabled are a minority group that can be

3   excluded to evade making those choices with the least pushback; especially as admissions

4   staff handle their end of the process as part of their full-time job duties, whereas disabled

5   applicants face the laborious task of drafting–and seeking from third parties– extensive

6   documentation, and assembling those materials into "complete" petitions (and then, for

7   many, appeals) on their own time and coordinated around all other life responsibilities

8   and typically substantial medical needs. Defendants were and are obligated to do so *even*

9   *if* doing so would require expanding staff capacity, Defendants' excuse for not tackling

10  the timeline reforms to date.

11      59. Facial deficiencies with the rules in effect at the relevant times further

12  included excessively burdensome documentation requirements for "complete" status

13  findings and processing to substantive decisions; excessively burdensome documentation

14  requirements for establishing substantive standards and systematic inversion of required

15  deference to treating experts over consultants to the reverse rule; the lack of live hearings,

16  sufficiently interactive processes, and/or adequate requirements to explain denials and

17  provide fair notice.

18  **Deliberate Indifference and Malice Regarding Procedural Deficiencies**

19  **Inferences Supported Through Defendants' Conduct During 2020-2023 Rules**

20  **Revision Initiatives:**

21      60. Defendants considered two testing accommodation rules revision initiatives

22  from 2020-2023:

23      (A) Precursor rules revision from December 2020 to Spring 2021, spearheaded by

24  Ms. Cummins and openly pitched by her to "give staff more breathing room" to the

25  further detriment of disabled applicants, and was abandoned upon return from its first and

26  only public comment period, where it garnered overwhelming opposition from the public;

27  and

28      (B) Primary rules revision initiative from October 2022 to November 2023, which

29  began as a Trojan Horse to camouflage an even more detrimental and expansive set of

30  downgrades to the procedural rules than those sought in the precursor initiative as

1    purported "reforms" to benefit disabled applicants, and evolved after an overwhelming

2    public comment record into a public relations gambit to claim substantial reforms were

3    made when the worst deficiencies were not substantially corrected, and hundreds of near

4    unanimous public comments (including from the California Legislature, California

5    Access to Justice Commission, ADA Co-Author, etc.) were  rejected, purportedly due to

6    "insufficient staff resources in the office of admissions" claims and an acceleration of

7    new expansions to staff pay-scales and staff favorable amendments to memorandums of

8    understanding with the SEIU. To avoid having to either block or endorse the outcome of

9    this rules revision upon it coming before the California Supreme Court in S285541, that

10   Court repealed Cal. Rules Ct. 9.5's requirement that such admission rule changes be

11   approved by the Supreme Court and then dismissed the State Bar's petition as mooted by

12   the rules change because the CBE and Board had approved seeking what the State Bar

13   sought from the Supreme Court.

14        61. Not satisfied by the extremely mismatched allocation of most of the burden of

15   the State Bar's testing accommodations process to disabled applicants to minimize the

16   burden on staff under current rules, at the December 2020 CBE meeting, staff introduced

17   the precursor initiative, which sought to: (1) shorten the already extremely short

18   deadlines disabled applicants have to appeal denials; and (2) to textually–notwithstanding

19   staff disclaiming such intended effect in their presentation to the CBE–impose a

20   seemingly lifetime cap of one appeal per applicant, which seemed to preclude applicants

21   from seeking expanded accommodations even for new circumstances on subsequent

22   exam administrations. This precursor initiative was spearheaded by Ms. Cummins.

23        62. The CBE and Board both indulged her, and the precursor initiative was

24   circulated for public comment, where–like the primary initiative–it received

25   overwhelming opposition from the public.

26        63. After the precursor initiative Ms. Cummins spearheaded failed, she was

27   transitioned to a newly created position leading "examination development" with

28   narrower job responsibilities not including testing accommodations, but public records

29   indicate she continued to coach her successor–the *public* primary initiative proponent,

30   Christina Doell–and repeatedly advised Ms. Doell not to take concerns of disability

1   advocates seriously, sometimes in a mocking tone. Ms. Cummins has made ableist

2   comments at public meetings and in written records, and conveyed other indicia of

3   discriminatory animus as pled passim. Moreover, in public email records obtained by

4   Kohn under the CPRA she commended the improper suppression of certain critics'

5   "unflattering" public comments (in another matter) from the record, despite

6   simultaneously acknowledging that they were likely technically required to be posted.

7       64. While the precursor initiative didn't proceed on return from public comment,

8   staffs' ambition to downgrade the already-discriminatory current rules persisted, so they

9   conceived a multi-stage Trojan Horse strategy for pitching their even more expansive

10   wish list of rule downgrades, veneered with pretextual purposes and led with a sooner-

11   published "policy changes framework" independent of rule amendments. Said framework

12   proposed only superficial and woefully inadequate improvements to documentation

13   requirements and evidentiary standards, to obfuscate the detrimental impact the planned

14   rule amendments themselves would bring. On information and belief to provide cover

15   and pre-framing for this intent, staff held two "stakeholder public input forums" in June

16   and September 2022.

17       65. On 6/29/2022–a date Then-Chief of Programs Donna Hershkowitz requested

18   for the express purpose of timing the input forum (and its implicitly-anticipated

19   unflattering comments) after a Senate Judiciary Committee hearing on the State Bar's

20   "fee bill,"–Defendants received nearly six hours of near-unanimous negative feedback on

21   the rules and related practices in place at all relevant times to this case, which public

22   comments underscore the systemic extent of the State Bar's abuses. *See*

23   https://youtu.be/vSakD1D4Q6c.

24       66. Then, at a second such forum held on 9/16/2022, the State Bar solicited

25   feedback on their purported responsive proposal–the non-rule-amendment, alterable-at-

26   will policy changes "framework" regarding documentation requirements, a streamlined

27   procedure for matched-accommodation requests of particular, limited accommodations if

28   they'd been recently and unanimously approved by all prior "high stakes" standardized

29   test vendors and licensing exam agencies–and while the State Bar received even more

30   negative feedback on current rules and the inadequacies of the scope of improvements

1   proposed, the State Bar didn't receive the type or degree of visceral opposition it

2   would've had it circulated the rule amendments staff would seek to initiate at the October

3   2022 CBE meeting. See https://youtu.be/cw5RXgejlTs?si=P8g-Thsx6k05FEPB.

4       67. Following the precursor initiative's failure and the growing scrutiny over

5   current rules, staff conceived and implemented their new Trojan Horse strategy, cleverly

6   pre-framed as reforms for the benefit of disabled applicants by leading its introduction

7   with the aforementioned stakeholder forums purported to be for guiding remedial reforms

8   responsive to the criticism; and by circulating for feedback at the second such forum only

9   the non-detrimental framework of changeable-at-will, non-admission-rules policy

10   changes to elicit the CBE's perception of less opposition to their proposal from critics–to

11   exploit upon introduction of the actual proposal– compared to what would've been

12   voiced at the September 2022 forum if staff had solicited feedback thereat on the *actual*,

13   detrimental rule amendments proposal that they planned to introduce at the October 2022

14   CBE meeting. Indeed, at that meeting, the "policy-change framework" that comments

15   made at the September 2022 forum had been responsive to was merely footnoted as an

16   aside not requiring CBE action.

17       68. The result was the first iteration of the primary initiative, which aside from

18   including no beneficial amendments to the rules themselves (in contrast to the

19   documentation policies "framework" in this iteration kept separate from the rule

20   amendments) provided the following downgrades from current rules, *inter alia*:

21       (A) Applicants who fail to petition at least six months before their targeted exam–

22   inherently including every immediate repeater seeking expanded accommodations–would

23   risk not merely an initial decision too late to appeal or to timely rely on for exam

24   registration and preparation decisions, but rather risk no decision by the next exam

25   administration at all. Rather–without committing to any particular staffing level or pace

26   of review–First-Iteration-Proposed Rule 4.84(B) provided that applicants' petitions

27   would be processed "in the order received," but applicants should apply "at least six

28   months early," as "… it is possible that processing will not be completed… prior to

29   administration of the examination."

1    (B) Administrative appeals of denials <u>would no longer be considered by the CBE</u>

2    <u>in the event the admissions director denied them</u> and instead stop at director review–as

3    already occurred as a first-stage matter under current rules, and which existing practices

4    already would include the director's review being informed by reconsidered input from

5    the reviewing expert consultant (something staff framed as a "new," "replacement"

6    safeguard).

7    (C) Revival of the proposal from the precursor initiative to cap each applicant to

8    one appeal, retaining the same verbiage that had been extensively criticized during the

9    precursor initiative for <u>seeming to apply on a lifetime basis and preclude the availability</u>

10    <u>of any administrative remedies to seek expanded accommodations on subsequent exam</u>

11    <u>administrations,</u> and despite that criticism having provided ample notice that clearer

12    language should be used if that was not the intended effect.

13    (D) Where the existing rules entitled applicants who provide timely notice each

14    exam cycle to automatic renewals of accommodations previously approved by the State

15    Bar on a prior California bar examination for a permanent disability–if approved or

16    renewed within the last five years–the primary initiative first iteration limited this

17    entitlement to the scope of like auto-approvals on other "high stakes" exams.

18    69. Both the CBE and Board rejected this advice and advanced the first iteration

19    proposal to its first public comment circulation, which spanned December 2022 to

20    January 2023 and returned overwhelming opposition that cohesively opined the proposal

21    would make already discriminatory rules even worse. Commenters over the course of the

22    primary initiative included countless public interest organizations, law school deans,

23    disabled applicants and attorneys, and members of the California Legislature, Access to

24    Justice Commission, DFEH testing accommodations best practices expert panel, health

25    care professionals, and a former Congressperson who'd co-authored the ADA (Tony

26    Coelho).

27    70. The first period of these comment drives persuaded staff to change plans:

28    abandoning their initial goal of downgrading the rules to pursue self-serving workload

29    and budgetary concerns, they switched gears to salvaging from their twice-failed attempts

30    a public relations victory instead; namely, to project the specious perception that they

1  meaningfully addressed the criticism about current rules while instead making as little

2  reforms to the most intractable and prejudicial defects as they felt they could get away

3  with omitting, by focusing on comparatively superficial areas where improvements

4  would also reduce staff burden or at least not significantly increase it.

5  71. Pursuing this new strategy, staff amended their proposal to remove many–if

6  not all[2]– of the downgrades; "folded" the improvements to documentation requirements

7  and evidentiary standards into the rule-amendments themselves and expanded them (e.g.,

8  to remove the recency and unanimity requirements for prior "high stakes" approvals to be

9  eligible for limited summary-match auto-approval procedures); and slightly extended the

10  part of the deadline to appeal denials measured in days from the initial decision –now

11  Proposed Rule 4.88(A)–from 10 days to 14 days.

12  72. From those changes emerged the primary initiative's second iteration,

13  introduced for the March 2023 CBE meeting. While commenters at that meeting and at

14  the May 2023 Board meeting recognized that the proposal now moved in the correct

15  direction, they maintained that it failed to remedy current rules, and renewed the concern

16  that proceeding with known fatal flaws protracted any process that could lead to adequate

17  results despite the severity of the ongoing harms the current rules inflict. Their concerns

18  were again dismissed by both bodies, which approved public comment of this second

19  iteration.

20  73. Despite some dubious handling of its collection,[3] public comment on the

21  second iteration spanned from June to July 2023, and yielded a similarly overwhelming,

---

[2] The one-appeal-per-applicant cap, not provided under current rules, was retained, but clarified as applying per exam cycle, not on a lifetime basis. The narrowing of automatic approvals for same-accommodations from prior California bar exam attempts was also carried over into the primary initiative's second iteration, and the enumeration into the rules of the existing policy never to offer certain accommodations (and into the evaluator forms the policy to hold a further swath to a higher standard than allowed by *Enyart*) was also retained.

[3] *I.e.*, the updated proposal on return from the second comment period was posted publicly mere hours before the written comment deadline for the meeting at which it would be advanced; the "formsite" vendor supplying the public comment submission portal was inaccessible to some commenters with visual disabilities, and demonstrably failed to record all known submissions; the State Bar delayed production of certain public records Kohn requested in May under the CPRA to inform comments for the second

1  near-unanimous response. The commenters could scarcely have been more clear or more

2  unified as to what further reforms the present initiative should add.

3      74. Yet, largely unperturbed–but perhaps holding residual doubts about the optics

4  of wholly rejecting such a comment record–staff nonetheless made two incremental

5  concessions to their proposal, resulting in the present initiative's third–and operative–

6  iteration and triggering the requirement for another public comment period.[4] This time,

7  however, staff concluded Board input and approval was unnecessary for a third comment

8  period, and to ensure the primary initiative would be ready for adoption at the November

9  2023 Board meeting, the CBE authorized a comment period unilaterally–and over

10  considerable commenter objections to the new amendments' sufficiency–during the

11  August 2023 CBE meeting.

12      75. This third comment period closed on 10/7/2023, and despite the new and

13  notable addition of compelling comments by Assemblymember Marc Berman,[5] the CBE

14  rejected those and many other comments, and summarily reapproved the third iteration

15  for adoption at its October 2023 meeting. The Board did likewise at its November 2023

16  meeting.

17              **July 2018 California Bar Exam**

18      76. Kohn requested (and the State Bar decided) the following testing

19  accommodations for his disabilities on the July 2018 California bar exam:

---

comment period until after the 7/31 deadline for that comment period, producing them
the day before the August CBE meeting, despite the State Bar's indication that the
responsive records were identified and compiled in early June and originally forecasted
for production by July 21, seemingly so their contents wouldn't come to the CBE's
attention before it acted.

[4] The two concessions in the third iteration consisted of: (1) the set of accommodations
eligible for the summary-matched auto-approval process in Proposed Rule 4.83–and not
requiring the "exceptional need" treating expert attestation when requested under
ordinary procedures–was expanded from 50% extra time to double time; and (2) the
same-accommodations renewal policy under existing rules for the State Bar's own prior
approvals on earlier bar exams was reinstated.

[5] Albeit, Assemblymember Berman's comment was initially inadvertently omitted due to
"staff oversight" before–to staffs' credit–they promptly corrected the record upon the
Undersigned raising the omission.

| Requested Accommodation: | Predicate Disability: | Outcome: |
|---|---|---|
| 100% extra time, over correspondingly more test days. | Autism & Keratoconus Additively. | Partly granted (66%) before appeal; granted on appeal. |
| Computer to type written responses. | Autism | Granted. |
| Ergonomic Workstation defined by Dr. Dresden (provision of chair with special features and permission to bring peripherals). | Myofascial Pain Syndrome, Scapular Dyskinesis, Neuralgias, Motor Delays, Autism | Denied provision, but granted permission to bring. |
| Private Room | Autism | Denied, but granted semiprivate room. |

76. Due to Defendants' processing timelines and exacting documentation requirements for testing accommodation requests at the relevant times, from May 2017 to July 2017 (more than a year before his first targeted bar exam), Kohn worked diligently on compiling the required paperwork from third parties at considerable financial expense and time commitment for his first administrative petition to the State Bar, for testing accommodations on the July 2018 California Bar Exam, which was mailed to the State Bar on or around 7/18/2017. Indulging the State Bar's excessively burdensome documentation requirements, the initial 2017 Petition submission contained Kohn's "Form A" affidavit responses to a lengthy State Bar questionnaire, accompanied by a written "narrative" affidavit attesting factual elaborations upon those answers; a copy of Kohn's High School Individualized Education Plan (IEP) for autism reflecting his K-12 special education disability services; an evaluator "Form C" affidavit responses to another exacting State Bar questionnaire completed by psychologist Drs. Preston and Pinn, based on extremely thorough and specific neuropsychological evaluations demanded by LSAC in 2014 and conducted by Dr. Preston, appended with Drs. Preston's and Pinn's 2014 comprehensive neuropsychological testing reports analyzing more than twenty hours of testing in 2014 concerning Kohn's autism impairments at the time relating to standardized tests, and also appended with another (earlier, but similar) neuropsychological evaluation report by psychologist Dr. Toren dating to 2010 that Dr.

Preston had reviewed and considered during his evaluation; a "Form F" verification affidavit concerning Kohn's law school testing accommodations completed by his law school; and letters from the College Board, Law School Admissions Council, Graduate Management Admissions Council, and National Conference of Bar Examiners, attesting their approvals of testing accommodations for Kohn's autism on the SAT, LSAT, GMAT, and MPRE standardized tests respectively with official score reports for each of their taken tests (each of which letters required payment of substantial fees to those testing entities, but all of which was required for threshold procedural consideration by the State Bar).

Kohn spent dozens of hours and thousands of dollars acquiring, compiling, and mailing this documentation to the State Bar.

77. In mid to late August 2017, Kohn received a letter from the State Bar by postal mail indicating that his petition still lacked sufficient documentation for the threshold procedural requirements to submit for consideration. That letter requested evaluator documentation for Kohn's attested physical and visual disabilities then present and relied upon (he'd neither acquired nor been diagnosed with any digestive disabilities at that time, nor several other later acquired and/or diagnosed conditions).

78. Kohn diligently and promptly pursued the requested documentation (more lengthy questionnaire affidavits including "Form B" for physical disabilities, and "Form H" for visual disabilities, and medical test record copies, including extensive and recent cornea scans establishing keratoconus) from both his primary care physician (then Dr. Dresden) and his ophthalmologist (Dr. Goodman), persistently pushing their respective offices to facilitate completion for an addendum dated and express mailed to the State Bar on 8/28/2017, which also proffered a supplemental affidavit from Kohn.

79. The relevant times for consideration of Kohn's administrative requests for the July 2018 and February 2019 exams predated the State Bar's current Applicant Information Management System (AIMS) portal for electronic submission and management of testing accommodation requests and appeals. Prior to AIMS, the State Bar only sent correspondence by regular postal mail, and required such submissions be delivered in paper copy form to their physical offices to satisfy deadlines.

80. The evening of 11/9/2017, Kohn received in Iowa by paper mail only Defendants'
initial administrative decision letter, dated 11/1/2017, for the July 2018 exam. That
decision letter partially denied Kohn's requested accommodations as described in the
table, *supra*, and indicated that the deadline for receipt of a printed and mailed, full
appeal with all relied upon documentation was ten days from the date of the letter.

81. Defendants did not include any specific fact findings or legal analysis or application
in their decision letter, nor did they explain their reasons for crediting their consultants
over Kohn's treating doctors and evaluators. They did include, this cycle, excerpts from a
visual disability consultant and psychological disability consultants, which credited the
diagnoses and general disability premises, but contested the recommendations for
accommodations.

82. For July 2018, those consultants recommended 16% extra time for keratoconus, and
50% extra time, computer typing, and semiprivate room for autism. The visual
disabilities consultant based their reduction on the purported availability of glasses to
"largely correct" the impairment, overlooking that Dr. Goodman had explained the
impairment could not be corrected using glasses. They also identified clinical information
they would have liked to see that was not previously requested or included. One
psychological disabilities expert misunderstood the Form C evaluator form because Drs.
Pinn and Preston had made a confusingly handwritten note of the LSAC's approval for
50% extra time that had been written too close to the recommendation field on the form,
and so been mistakenly perceived as supplanting their double time recommendation even
for that partial day, multiple choice exam, which was codified in their appended report.
The consultant mistakenly perceived a concession by those doctors that 50% extra time
was adequate, at least for the autism portion of the impairment, and premised their
recommendation on this perceived concession. The other consultant principally relied on
the history of that accommodation for largely multiple-choice, part day standardized tests
predating any visual impairment, which they assumed had been adequate for those tests
solely because Kohn performed above average on some of them, which should not have
been considered so conclusive given the accommodation standard of equal access to
perform as well as one would have (even to elite performance levels based on intellectual
capacity for the tested skills and knowledge) without the disability functional limitation

1  distorting performance, something better assessed by the neuropsychological evaluation

2  than the standardized test results produced despite likely inferior access to those tests and

3  the potential to have scored even better with equal access. This was especially true given

4  all of the other deficiencies with the standardized testing accommodation history

5  discussed above (even solely as to autism, the only disability considered for them) and

6  the snowballed reliance on SAT decisions made without the benefit of any

7  neuropsychological evaluation provided at the time. The consultants opined a semiprivate

8  room was adequate because of prior academic successes in "classroom" settings, ignoring

9  that the actual exam activities for those academic programs nonetheless had been

10  administered in private rooms.

11  83. The timing of the receipt of the decision letter, coupled with the unduly short deadline

12  to submit completed appeal materials (not just notice) and the requirement at that time for

13  paper copy receipt by the deadline, forced Kohn to do an all-nighter to turnaround an

14  initial appeal submission in time to ship it to the State Bar for overnight delivery on the

15  deadline at his own expense; pressured him to limit his appeal only to the partial denial of

16  the requested extra time, and not challenge any other denial for that exam cycle; and

17  prevented him from accessing responsive medical documentation from his doctors in his

18  initial appeal submission.

19  84. Kohn had no opportunity to even attempt contact with the State Bar to request any

20  extension before completing the initial submission and still have the option to have

21  submitted the initial submission timely, though he did so for after posting it and was

22  granted a short "courtesy" extension for an addendum, notwithstanding the rules offering

23  no right to one.

24  85. During the late Fall 2017 law school semester, on top of the law school finals crunch

25  Kohn was also already juggling extensive medical preparations to undergo major jaw

26  surgery during winter break, including by navigating not only insurance arrangements,

27  but also arranging for his many prescription medications from many providers that were

28  required for unrelated chronic conditions to be custom compounded into liquid form and

29  making unusual arrangements for a provider in Iowa to collect and ship three advance

30  autologous blood draws for a hospital in California at specified intervals. Defendants'

31  unreasonably short deadlines and the unduly burdensome logistics of initiating an

administrative appeal and sourcing supplemental documentation with rigid admissibility requirements from multiple specialist doctors (all of whom located in California and not able to be visited in-person during the relevant times) according to Defendants' procedures strained Kohn's preparations for both law school exams and his surgery.

86. On 12/5/2017, Kohn mailed the State Bar an addendum with an edited appeal statement, and two responsive affidavits from Doctors Goodman and Preston.

87. Dr. Goodman flatly reconfirmed that Kohn's keratoconus impairment was not correctable using glasses or any other means usable by someone with Kohn's concurrent autism disability impairments, and that the impairment was aggravated by the comorbid dry eye syndrome condition, which had predated the keratoconus, but progressed to become severe following the recent crosslinking surgery used to attempt to slow future progression of the keratoconus and prevent a future cornea transplant need, or becoming blind.

88. Dr. Preston clarified that his extra time recommendation as to autism for multiple-choice exams (like the LSAT, MPRE, and MBE part of the bar exam) remained double time, notwithstanding the confusion over where the LSAT's approval had been noted on the form, but also elaborated that an exam with the bar exam standard conditions would need even greater extra time, including because he opined essay composition to be impacted by Kohn's autism functional limitations even more than multiple choice is.

89. That same day, 12/5/2017, before receiving the addendum, the State Bar issued a letter so dated and that Kohn subsequently received, which granted Kohn's appeal on the initial submission for the double time then requested on the July 2018 exam.

90. The later-received addendum seemingly was disregarded by the State Bar as moot upon receipt, though the relevant documentation and clarifications from Kohn and his doctors would become relevant to the record for Kohn's expanded accommodation requests for the February 2019 exam, and incorporated by reference into subsequent petitions.

91. That same (12/5/2017 addendum) documentation resulted in Kohn receiving expanded accommodations (150% extra time for essay responses) for autism during his final semester of law school in 2018.

92. Dr. Preston was unavailable to complete the new evaluator forms or further elaborate beyond this final addendum originally intended for the July 2018 exam appeal, however, as Kohn later learned he died later the same month as he'd supplied his final 12/5/2017 affidavit. The practice he shared with Dr. Pinn permanently closed, and Dr. Pinn (who was never the primary evaluator to have conducted the testing anyway) moved to a practice that had specific eligibility criteria for patients that Kohn did not meet, and did not serve the general public.

93. Both sets of appeal submissions were later incorporated into the record by reference within Kohn's subsequent administrative petitions and appeals for subsequent exam cycles.

94. From July 2017 to August 2018, Kohn suffered an effective doubling of his chronic medical ailments, requiring extensive diagnostic workups and further inpatient stomach and esophagus surgeries with extensive recovery to be arranged right after the July 2018 exam to minimize recovery impact on potential employment post-results, after having already done jaw and cornea crosslinking surgeries within the past year, and significantly expanding the relevant disability functional limitations at issue requiring accommodation on the bar exam from what they had been even at the time of Kohn's July 2018 exam requests. Due to Defendants' administrative timelines and procedures, it was impracticable for him to seek expanded accommodations for these new disabilities and their effects for July 2018, illustrating that effectively requiring even non-repeater applicants to request accommodations so far in advance of an exam risks functional limitations becoming obsolete by the time the exam actually takes place, and not a proper condition even for getting the decision far enough in advance to commit to competitive exam preparation not done at risk of waste, let alone for getting one by the next scheduled exam administration.

95. While standard applicants are ordinarily permitted to select their preferred test site location at the time of registration, and receive confidence of where and when they will be testing available months in advance of their exam to make applicable travel arrangements, at all relevant times the State Bar maintained a policy that any location selected by an applicant approved testing accommodations is merely a placeholder and that State Bar staff determine closer to the exam the most administratively convenient

1   location at which to implement the testing accommodations at issue, and reassign such
2   applicants to a location and confirm the precise test schedule much closer to the exam.
3   This arrangement burdens disabled applicants with much higher costs and more difficult
4   logistics to travel to test sites.
5   96. Since the deadline circumstances discussed above pressured Kohn into only appealing
6   the partial July 2018 accommodation denials as to extra time, and not the substitution of
7   requested ergonomic equipment provision for permission to bring that equipment
8   (requiring Kohn to furnish and remove nonportable furniture at the start and end of each
9   of four test days, with perfect timing but no phone access with any helper), it was
10  necessary for Kohn to stay five nights at the test center hotel, at his own expense, so
11  furniture transportation could occur on non-test days (also at his expense) and be stored
12  onsite, aggravating the disparate access to the opportunity to arrange hotel reservations at
13  or near the test site.
14  97. At the relevant times, Defendants ordinarily provided applicants the service of
15  negotiating group block discount hotel rates with hotels used as a test center or in close
16  proximity to one. However, Defendants negotiated cutoff dates to book these hotels at
17  these rates that elapse far before test location assignments are released to testing
18  accommodation applicants, with caps on the quantity of rooms available at the discount
19  further resulting in first-come, first-served treatment that gave standard applicants a
20  competitive advantage to securing the limited discounted rooms over accommodated
21  applicants who were required to wait far longer for test schedules and location
22  assignments. Defendants also largely negotiated these discounts only for the dates
23  relevant to standard test schedules and not including any extended days for those with
24  extra time, even at locations primarily used for testing accommodation applicants. Thus,
25  despite choosing to offer this program generally, which incurred the federal duty under
26  Title II to make it equally accessible, Defendants took little to no care to provide equal
27  access to it for applicants whose disabilities required testing accommodations. When
28  Kohn inquired with the hotel about options for those who needed to stay onsite due to
29  disability need for the exam, but due to those same disability circumstances had no option
30  to book by the cutoff, the sales manager for the hotel to which Kohn was assigned in July
31  2018 aggressively told him he "didn't have to listen to more of this from disabled bar

examinees," because despite apparent common complaints when negotiating the terms for test room facilities rentals and the group rate for applicants who choose to book a room, "the State Bar has told us they're okay with doing this discount only for those of you without those kinds of accommodations, they want it this way," evincing the State Bar's deliberate indifference even prior to Kohn's expanded accommodation requests on subsequent exams to ensuring equal access to this program.

98. Apart from the facially unlawful procedures for receiving and deciding testing accommodation requests and unequal access to hotel group rate services, Defendants' policies and practices for implementation of approved accommodations also manifested both disparate treatment and disparate impact as to disability during the July 2018 exam itself, both due to hidden nonstandard exam rules concerning the locations and activities allowed for lunch breaks between applicants with testing accommodations and applicants without, and due to the manner in which the exam was proctored.

99. Kohn was assigned to a proctor for his exam who had been recruited through a temp staffing agency the day before the exam began, an arrangement the State Bar disproportionately uses for the subset of the proctor pool it assigns to testing accommodation applicants, and who had received sparse training that he persistently complained to Kohn during the exam setup times he did not understand.

100. On the first exam day, the proctor had not even finished negotiating his work schedule with the State Bar staff managing him, and arguments over how late he would be required to stay (to allow Kohn full time) took place loudly during exam sessions, distracting and panicking Kohn. Exam sessions started considerably late (with Kohn anxious about the possibility of being blamed or not given full time) as the proctor struggled to parse the exam instructions. These instructions were boilerplate for standard conditions, and not adapted to Kohn's approved accommodations, and so the proctor also had to parse the testing accommodation letters separately and work out what was or was not still in effect among those rules, procedures, and announcements he was required to read with Kohn. The proctor constantly interrupted Kohn while he was testing on the clock, including to request that Kohn commit to finishing the exam session before time was up so the proctor could take his own lunch sooner. The proctor was not familiar with the location of the break room where testing accommodations applicants (but not

1    standard applicants, who were free to leave the secure test area and access offsite or
2    delivery sources of fresh food without the added hassle of bringing a packed lunch) were
3    required to have sequestered lunches, so had to search for it. In fact, the nonstandard
4    restrictions on the location and food options for accommodated applicants' lunches was
5    also not communicated effectively to Kohn prior to the first exam day, where Kohn
6    initially expected the standard policies and rules to be in effect and had not brought a
7    lunch. Kohn's proctor was also not aware that he was required to establish a pickup time
8    to return to the testing, as Kohn would not be allowed to leave at the end of the break and
9    resume until the proctor returned to collect him, while the proctor assumed Kohn would
10   return to him on his own, creating further chaos on the first day and eliciting fears about
11   not receiving full-time for later test sessions as the break did not end timely.
12   101. Kohn's autism disability functional limitations made him far more susceptible to
13   prejudicial distraction and reduced performance on the exam as a result of these
14   proctoring incidents and operationally chaotic exam administration than a neurotypical
15   person would have been. More generally, this type of proctoring is especially risky for
16   the added operational complexity of testing under nonstandard conditions with
17   accommodations, and so disparately impacts the disabled.
18   102. The State Bar uses temp agency contractors for a substantial portion, but not all, of
19   its proctoring pool, but as a general practice assigns them disproportionately to testing
20   accommodation sites and applicants, and prioritizes the better trained contractors who
21   more regularly staff high stakes exams and its own employees assigned to proctoring
22   duty that week for standard applicants.
23   103. State Bar public records and incident reports indicate that these types (and far
24   worse) proctoring issues are not uncommon, and occur on virtually every exam cycle for
25   which Kohn obtained records (including the years immediately before July 2018, all
26   cycles through 2020 in which he tested, and years of subsequent administrations,
27   culminating in the catastrophic, near universally botched February 2025 administration).
28   Applicants are often held accountable with grading penalties when exam answers or
29   exam security protocols are mishandled or lost by proctors, and for at least 20% of
30   applicants approved testing accommodations by the State Bar on any particular exam
31   administration, some or all of even the accommodations approved are not honored and

implemented by the proctor(s) present on exam day, frequently also because the State Bar refuses to customize its scripts and manuals to individualized testing accommodations by explaining which parts are modified by an approved accommodation and which remain. Even when the State Bar finds this to have occurred, its general policy is not to offer any makeup or remedy, especially for issues not equally affecting nondisabled applicants testing standard (and then only to the same "remedy" as selected for those other applicants less impacted). It maintains the applicant's sole recourse in such events is to retake the exam at a future regularly scheduled administration. This long-term practice and notice support concluding the State Bar's deliberate indifference to the disparate treatment and disparate impact its exam proctoring policies and practices have on disabled applicants, and had on Kohn in July 2018. So too does its subsequent, consistent denials of any testing accommodation request for modifications to these proctoring conditions based on Kohn's autism rendering them more prejudicial than they would to someone neurotypical.

104. While Defendants may have substantially granted Kohn the testing accommodations he'd requested on appeal for this initial July 2018 exam cycle, if not for any of the subsequent ones, Defendants' bar exam rules, procedures, policies, and practices separately and collectively inflicted both disparate treatment and disparate impact against applicants with disabilities generally, and Kohn specifically was denied an equal opportunity to demonstrate his qualifications to practice law through the July 2018 exam as a result, and severely damaged by that denial. The administrative history for and during the July 2018 bar exam is also critical context to understanding the reasoning of the expanded accommodation requests that were unreasonably denied once requested for subsequent exam administrations.

105. Defendants' procedures for seeking testing accommodations prevented Kohn from requesting (or maintaining requests for) adequate accommodations on the July 2018 exam, and otherwise imposed burdens and expenses on him that were excessive and unlawful.

106. Kohn's July 2018 exam was also prejudiced by proctoring policies and practices that Defendants knew or should have known have an adverse disparate impact on applicants

1  with disabilities, and that compounded the particular handicaps of his own disability-
2  related impairments.

3  107. At all relevant times, State Bar staff maintained these proctoring policies and
4  practices (and other vendor selection decisions) despite knowing they were impacting any
5  integrity, physical safety, accessibility, and validity the examination may have possessed,
6  because the alternatives would have rendered the budget unable to support their excessive
7  compensation scales and/or desired increases thereto, absent politically controversial fee
8  increases.

9  **February 2019 California Bar Exam**

10      108. Kohn requested the following testing accommodations for the February 2019
11  exam, to the noted outcome:

| Requested Accommodation: | Predicate Disability: | Outcome: |
|---|---|---|
| Renewal of 100% extra time on multiple choice sections (MBE) and increase to 150% extra time on essay sections (CBE & CPT), over correspondingly more test days. | Autism, keratoconus, and dry eye syndrome additively. | Increased extra time for autism and visual disabilities was denied; prior amount renewed; 30 minutes extra time per test day added as purported substitute to meal breaks requested for unrelated digestive disabilities; test days longer than standard (not correspondingly more as requested). |
| Renewal of Computer to type written responses. | Autism | Renewed. |
| Ergonomic Workstation defined by Dr. Dresden (provision of chair with special features and permission to bring peripherals); Kohn offered to bring chair if provided | Myofascial Pain Syndrome, Scapular Dyskinesis, Neuralgias, Motor Delays, and Autism. | Provision Denied; Permission to Bring Renewed. |

| | | |
|---|---|---|
| test center hotel room to store chair with him between test days so as to avoid needing movers with special vehicle both ways all test days, or alternatively if provided indemnification for loss, theft, or damage if leaving overnight between test days. | | |
| Private Room | autism | Denied; Semiprivate Room renewed. |
| Permission to bring food, drinks, and medicine, into the exam room and to eat/drink and take medicine. | severe gastroparesis and postoperative dysphagia | Granted. |
| Up to 30-minute stop-the-clock break for each 90 minutes test time for smaller, more frequent, and meals that can be timed at Kohn's discretion based on live symptoms, instead of standard lunch break. | severe gastroparesis and postoperative dysphagia | Denied; substituted for single 30 minute per test day extra time addition. |
| Permission to remain in the exam room subject to proctor supervision during lunch and any other breaks. | autism, severe gastroparesis, and postoperative dysphagia | Granted on appeal. |
| Assignment to proctor with adequate training and | autism | Denied. |

| instructions in advance of the exam to administer testing accommodations with fewer distractions, confusion, and logistical issues; training on autism. | | |
|---|---|---|
| Scheduling of exam on only weekend days. | 25+ medical conditions collectively. | Denied. |
| Equal access to hotel group rate services State Bar arranges for standard examinees. | Effects of testing accommodations for disabilities and longer uncertainty about schedule and location due to the process to seek them. | Denied. |

109. Promptly after sufficient recovery progress from his August 2018 Nissen Fundoplication and Pyloroplasty stomach and esophagus surgeries, and without waiting for July 2018 exam results, risking that his resources and efforts would be wasted by a potential pass result effectively mooting them to maximize time for processing, Kohn worked diligently on his expanded testing accommodation requests petition, which he delivered to the State Bar around 11/1/2018.

110. Due to a combination of the new digestive disabilities; the considerably greater and less flexibly-scheduled medical treatment needs that had accumulated from those and other ballooning chronic health conditions on top of those that had already been required long-term, including to treat conditions that had caused polyps discovered during the jaw surgery; Kohn's experiences with July 2018 and greater knowledge of the conditions of the bar exam; and expert evaluator elaborations on his autism functional limitations: Kohn requested greater accommodations for the February 2019 exam than for the July 2018 exam, and also renewed the requests he'd originally unsuccessfully sought (but not appealed from denial of) for July 2018.

111. On all of its evaluator and applicant forms, the State Bar requires that the responses and appended information be attested under penalty of perjury. Every material

1    submission from Kohn and his doctors in the administrative record was so executed, and

2    thus has the evidentiary weight of an affidavit.

3    112. For the February 2019 exam, in addition to the affidavits from Drs. Preston and

4    Goodman originally submitted on appeal for July 2018, but never considered after that

5    appeal was granted prior to receipt of them, Kohn submitted an updated narrative

6    affidavit of his own detailing the new disabilities and the issues with the July 2018 exam;

7    updated evaluator forms and recommendations from Dr. Dresden; and a corroborating

8    evaluator form and recommendations concerning the new digestive disabilities from

9    treating gastroenterologist Dr. Clarke.

10   113. Dr. Dresden, Kohn's then-Primary Care Physician, was not a "new" evaluator, as

11   would later be claimed by a State Bar consultant during the February 2020 exam cycle,

12   but rather he completed an updated evaluator form to take over further recommendations

13   and elaborations concerning Kohn's autism for Dr. Preston after the latter's death, in

14   addition to the physical disabilities he initially handled for July 2018.

15   114. Dr. Dresden independently reviewed all available clinical information regarding

16   Kohn's autism, including but not limited to the testing and reports on that testing by Dr.

17   Preston.

18   115. Dr. Dresden recommended that Kohn be granted the degree of extra time for autism

19   that Kohn was granted his final semester of law school based on Dr. Preston's

20   clarifications: 150% extra time for the essay composition subparts, and double time for

21   multiple choice subparts, reflecting the worsened impact of the impairments on the

22   former. Dr. Dresden recommended that the extra time be scheduled over a

23   proportionately extended number of test days, such that any particular test day not require

24   testing longer than standard, because a given quantity of extra time would be less

25   effective at ameliorating the disability functional limitations if it also lengthened the

26   amount of testing per day.

27   116. Dr. Dresden's extra time recommendations did not consider the visual disabilities,

28   though Kohn still did not seek more for the additive effect of those disabilities than Dr.

29   Dresden recommended total, instead relying both on autism and on the visual disabilities

30   (if not Kohn's requests for the same amount Dr. Dresden requested). That the autism

31   experts and visual disability experts intended their recommendations to be additive, and

1   so supported more extra time than Kohn requested, only aggravates Defendants' refusal

2   to grant even what Kohn requested.

3   117. Beyond extra time, to address functional limitations stemming from Kohn's autism

4   disability, Dr. Dresden recommended a fully-private room, that Kohn's assigned proctor

5   be trained to work with autistic individuals and instructed in advance regarding how all

6   approved accommodations modify standard rules and instructions; and that Kohn be

7   permitted to take breaks (including for meals) supervised in the testing room rather than

8   coordinate the logistics and transitions of the lunch room.

9   118. Beyond autism, Dr. Dresden addressed that the nonportable ergonomic chair

10  required to accommodate myofascial pain syndrome and other aggravating conditions

11  should be provided on site rather than require Kohn to transport his own, and adduced the

12  digestive disabilities (severe gastroparesis and postoperative dysphagia, as relevant to

13  standard conditions of the February 2019 exam), for which he identified and explained

14  additional recommendations for a number of up to 30 minute off-clock breaks (1 per 90

15  minutes of test time) instead of a standard lunch break; and permission to bring food,

16  drinks, and medicine into the exam room for use during those breaks.

17  119. Finally, Dr. Dresden noted the volume of Kohn's chronic medical conditions and of

18  the medical appointments required to treat them on an ongoing basis, which had

19  multiplied from 2017 to 2018, combined with the scheduling inelasticity of those

20  appointments both for clinical and health care provider availability reasons. As clearing

21  an entire business week of any appointments had caused considerable crises and issues

22  with maintaining the surgery plan and addressing various medical circumstances during

23  the July 2018 exam, and considering the length of the bar exam compared to other

24  standardized tests, Dr. Dresden recommended it be scheduled over a series of weekends

25  as an accommodation.

26  120. In addition to the supporting documentation from Dr. Dresden, Kohn also supplied

27  an evaluator form completed by a specialist in the new disabilities, gastroenterologist Dr.

28  Clarke, who joined the recommendations of Dr. Dresden for gastroparesis and dysphagia.

29  121. Kohn further supplied, with his initial petition for February 2019, an updated

30  verification form from his law school, confirming the expanded extra time

accommodations for autism (comparable to that he sought on the bar exam for all disabilities) that he received on law school exams his final semester.

122. Around New Years' Eve in 2018, Kohn received by mail the State Bar's initial decision letter, dated 12/28/2018, largely denying his February 2019 exam expanded accommodation requests. In that letter, the State Bar renewed those accommodations it granted for July 2018, and added permission to bring food, drinks, and medicine into the test room and to eat or drink during test time (though on-clock), plus an additional 30 minutes per test day of extra time. That extra time was purportedly to address the digestive disabilities instead of the requested breaks to eat more frequent, smaller meals timed around symptoms, instead of one standard lunch break.

123. The 12/28/2019 letter again indicated that a hard copy of a completed appeal delivered to the State Bar's offices would have a deadline ten calendar days from the date of the letter, 1/7/2019 (requiring work during New Years gatherings and hours of driving to personally deliver on the deadline).

124. The 12/28/2019 letter:

(A) heavily mischaracterized what accommodations Kohn had even requested from the State Bar. For example, it purported the proctor assignment request to be for an "experienced" proctor rather than one with specific training and instructions; that the ergonomic equipment provision request was for a chair that cost a specific amount of money rather than one with specific functional features, with the cost of Kohn's chair noted in the petition only to explain his objection to leaving it in the test room overnight at his own risk; and that the various alternative arrangements to facilitate bringing his own chair Kohn offered to substitute for provision were independent accommodation requests. The recitals of the purportedly requested accommodations also omitted some of the requests, suggesting that they were never even considered.

(B) did not disclose any expert opinion or claim any expert had recommended denial of any of Kohn's requests that iteration;

(C) did not assert any allegation that any of Kohn's requests would constitute a fundamental alternation or impose an undue burden;

(D) did not communicate any genuine factual findings or legal analysis;

(E) did not otherwise explain any of the reasons for denial beyond the single-sentence assertion that "the documentation you and your specialist have provided does not adequately support those requests," and did not identify what material supporting information was alleged to have been omitted.

125. The 12/28/2019 decision letter thus failed to provide Kohn with adequate notice to effectively appeal the denial, or to engage in the interactive process prescribed by the ADA.

126. On 1/7/2019, Kohn personally delivered his appeal statement to the State Bar's San Francisco office, in which he clarified what had been requested and explained the adequacy of the documentation to warrant those denied requests, though he was unable to access further documentation from his doctors until 1/26/2019.

127. On 1/26/2019, Kohn express mailed the State Bar a further, more detailed affidavit from Dr. Dresden dated that same day.

128. In fact, the subsequent length and detail of Kohn's submissions and the volume of the supporting evidence regarding which the State Bar would later complain about to justify its processing times was a direct response to the repeated vague allegations of inadequate documentation or perceived failures to explain particular details that had hitherto never been asked for or that had been supplied.

129. Kohn's administrative appeal statement dated 1/7/2019 had, for purposes of California's Government Claims Act and his Unruh Act claims, contained administrative notice that Kohn sought to judicially contest any upheld denials to result from his administrative appeal. The statement contained Kohn's contact information and sufficient other information to satisfy any CGCA administrative notice requirement.

130. On 2/15/2019, about 1.5 weeks before the start of the exam, the State Bar emailed Kohn its decision letter on his appeal for the February 2019 exam. The only denial that was overturned for that exam was permission to take the lunch break in the exam room, subject to supervision. The 2/15/2019 letter similarly did not disclose any expert opinions or recommendations for the upheld denials, nor any substantive reasoning for disagreeing with Kohn's experts. The letter did demur any legal duty to "separately address" the reasons for denying any particular accommodation request, asserting instead that the summary claim of inadequate supporting documentation was a sufficient explanation of

1    the reasons for denial. The letter further asserted that the State Bar's timelines and

2    deadlines complied with its own rules, and summarily alleged, for the first time on

3    appeal, that the request for equal access to hotel group rates the State Bar negotiates with

4    hotels for other applicants would constitute a fundamental alteration, though this

5    assertion was limited solely to that request, conclusory, and untimely for that exam cycle.

6    Otherwise, the State Bar denied the appeal as summarily as it had the petition.

7    131. The State Bar failed to reasonably accommodate Kohn's disabilities for the February

8    2019 exam:

9    (A) Considering the full cumulative effect of Kohn's numerous, distinct disability

10   functional limitations, the accommodations he requested for February 2019 based on the

11   recommendations of his doctors, including those he was denied, would have better

12   ensured Kohn received equal access to the California bar exam, and/or equal opportunity

13   as nondisabled applicants had to demonstrate his competency on the tested knowledge

14   and skills through that exam, compared to the accommodations Defendants granted.

15   (B) For the February 2019 exam, Defendants failed to allege by the time of initial denial

16   (or at all for nearly every denial) that any of the accommodations it denied or adversely

17   substituted constituted a fundamental alteration and/or imposed any undue burden, and

18   that it granted the maximum extent possible without such fundamental alteration or undue

19   burden.

20   (C) Defendants further failed to adequately establish at any point that the

21   accommodations it denied or adversely substituted for the February 2019 exam would

22   have rendered that exam fundamentally incapable of testing the intended skills or

23   knowledge, at least to the extent it could have without those accommodations. Indeed,

24   they could not have established this, because none of those accommodations would have

25   had that effect.

26   (D) Defendants further failed to establish at any point that any of the accommodations

27   Kohn requested and was denied for the February 2019 exam would have imposed

28   administrative burdens or financial expenses on the State Bar grossly disproportionate to

29   Kohn's interest in an opportunity to qualify to practice law. Indeed, they could not have

30   established this, because none of those accommodations would have required that

31   magnitude of a burden or cost to provide.

132. When deciding Kohn's petition and appeal for the February 2019 exam, Defendants knowingly did not follow U.S. Department of Justice technical guidance on procedural and substantive standards for addressing disability accommodation requests on standardized tests and licensing exams, which Defendants have dismissed as "nonbinding policy proposals" even though the guidelines were issued pursuant to statutory direction for the DOJ to issue technical guidance and opine *Auer* deference-entitled interpretations (if not adducing independent binding requirements to) of the ADA and its implementing regulations, which binding regulations the DOJ itself had promulgated pursuant to statutory authority.

133. By failing to even consult any expert on any of Kohn's material disabilities before disregarding the sworn recommendations of Kohn's treating experts supporting Kohn's requests, Defendants knew or should have known that its accommodation denials posed a substantial likelihood of depriving Kohn of his federally-protected legal rights.

134. Defendants later admitted following appeal for the February 2020 exam that it had never considered any of Dr. Dresden's attestations or recommendations concerning autism, because Dresden had applied, interpreted, and supplemented–but had not personally performed–the over 20 hours of neuropsychological testing that the deceased Dr. Preston had performed. This admission further confirms that Defendants knew or should have known that they were taking a considerable risk of denying Kohn his federally-protected rights when it denied his accommodation requests for the February 2019 exam, even though it had not revealed that reasoning at the time and thereby prevented Kohn from addressing that issue for the February 2020 exam petition or appeal as he later did for the October 2020 exam.

135. By failing to engage in a good faith and collaborative interactive process with Kohn regarding the propriety of his requested accommodations during the administrative process or even genuinely explaining its denials, Defendants knew or should have known that there was a substantial risk of error in its accommodation decisions, and so any denials of reasonable accommodations by Defendants resulting from that refusal also were made with Defendants recklessly disregarding the likelihood of depriving Kohn of his federally-protected rights.

136. By demanding excessive documentation to request accommodations and challenge denials (costing Kohn substantial further time, labor, and financial expense beyond that invested in his documentation for July 2018), and setting a capriciously short and prejudicial deadline for Kohn to appeal the denials, Defendants placed excessively burdensome documentation, financial, and logistical requirements upon him that also prevented him from fully celebrating New Years with his friends and family.

137. Due to these burdens, inter alia, Defendants' appeal deadline thus not only knowingly increased the risk of substantive errors in the administrative appeal decision to an extent they knew or should have known would likely implicate Kohn's federally-protected rights, but also knowingly perpetuated unequal opportunity for the disabled to seek admission to practice law independent of the substantive outcome of the appeal.

138. This is particularly true considering that the purpose of the unreasonably short appeal deadline has been to, at best, facilitate months long turnaround for State Bar staff to complete their side of the process, particularly when public records have revealed that Defendants' contracts with its "expert" consultants (who were not even consulted in Kohn's case for February 2019) entitle the State Bar to turnaround within 7 days from those contractors. Moreover, on information and belief that stems from other applicants' reports of their interactions with State Bar staff, an admissions staff member has further conceded that both the deadline and Defendants' customary practice of releasing decisions for the February exam requests that were submitted months early right before the holidays–preventing Defendants from instead deploying their ubiquitously reported practice of issuing initial decisions shortly after their cutoff for taking any administrative appeals for the next scheduled exam if the petition had not been submitted months early– to time the deadline over those holidays were intended to deter enough applicants from appealing denials as to keep the volume of appeals manageable for staff consistent with the workload "we signed up for," which public records like time card spreadsheets Kohn obtained from Defendants have revealed to be close to thirty hours per week for many testing accommodations-facing staff who nonetheless are paid more (and receive greater benefits) than most State employees.

139. Relatedly, the months-long procedural processing times for initial petitions and again for appeals provided under State Bar rules and practices–which facially deny at

least immediate repeater disabled applicants equal opportunity on the exam when coupled

to the duration of the period between exam results release and the next scheduled exam

administration; and to the magnitude, lead time, and cost of the exam preparation

competitive for this curved exam–caused Kohn to receive his final administrative

decision for the February 2019 exam less than two weeks before that exam commenced,

despite his petition having been prepared and submitted while July 2018 exam results

were still pending. This unlawfully put Kohn to the choice of foregoing competitive exam

preparation far enough in advance of the exam to be effective, to extreme prejudice even

had the accommodations decision outcome been a full grant, or else investing immense

degrees of time and money at high risk of complete waste if the accommodations

decision deprived him of a meaningful opportunity to test with sufficiently equal access

to the next exam administration, as those preparations would not remain fresh without

repetition for any exam retake 5-6+ months later. That is not a choice that the ADA

permits testing entities to lawfully force upon disabled applicants, especially in the

unique context of the California bar exam and its semiannual frequency of offerings,

results turnaround,  exacting standards to achieve passage, and mandatory nature for

graduates of specialized 3-year post-graduate programs to lawfully enter the profession

for which they'd spent years and typically hundreds of thousands of dollars training for.

Coupled to the severe underrepresentation of the disabled in California's legal profession,

these timelines can easily be reasonably inferred to cause unlawful disparate impact upon

disabled applicants.

140. Absent the extended period of uncertainty (and later confirmation of unequal access)

Defendants caused, Kohn would have felt able to afford investments into greater exam

preparation arrangements than the already costly ones he made at risk (and lost the

benefit of) for the February 2019 exam, that exacerbated the accommodation denials'

impact on his performance on that exam, which the State Bar informed him he'd failed

mid-May 2019.

141. In almost every administrative process affecting a State Bar requirement for moving

an applicant's admission to practice law to the California Supreme Court, Defendants

have deemed at least nondisabled applicants' interests as worthy of a live hearing before

confirming an adverse administrative decision. For example, the State Bar offers such

1  hearings to those it is considering denying a positive determination of moral character, or

2  whom it has accused of a "Chapter 6" exam rules violation on which it is considering

3  grading sanctions. In testing accommodations matters, however, such hearings are not

4  offered.

5  142. This lack of a hearing, coupled with the timelines that allow only 1-2 exchanges of

6  written correspondence per exam cycle that each provide only vague and inconsistent

7  degrees of substantive feedback on the purported deficiencies with the supporting

8  documentation, likely prevented Kohn clearing up basic factual misconceptions through

9  live, iterative dialogue, and forced attempted resolution of proper testing

10  accommodations to span over multiple, unnecessary exam retake cycles, resulting in

11  catastrophic harm to Kohn. Singling out testing accommodations to withhold such a

12  hearing constitutes disparate treatment against the disabled.

13  143. The State Bar has claimed its "resource constraints" foreclose providing such a

14  hearing even just for the limited the subset of disabled applicants who appeal an initial

15  decision for whom Defendants cannot grant said appeal on the papers.

16  144. Yet, this is merely part of consistent patterns of State Bar decision makers' active

17  efforts to prioritize its resources to other applicants and issues out of the discriminatory

18  view that the needs of disabled applicants are less worthy of those resources it does have

19  than those of other applicants. For example, to illustrate indicia of Defendants' animus

20  and pretexts that can be reasonably imputed to Kohn's claims herein:

21  (A) Access to Remote Testing: Both during and following a period from October 2020 to

22  July 2021 in which remote testing was the standard condition of the exam for nondisabled

23  applicants, Defendants made a point of considering only the needs of the nondisabled as a

24  sufficient or weighty consideration for what extent remote testing should be made

25  available, both by excluding many disabled applicants from remote testing even when

26  offered standard, and then by refusing individualized consideration of remote testing even

27  as a testing accommodation and categorically refusing remote testing to anyone where

28  not offered to the nondisabled standard too. First, when remote testing was offered

29  standard, this was exemplified through Defendants' Forced In-Person Policy, where

30  Defendants required applicants (including Kohn) with certain accommodations to test in-

31  person instead, even for accommodations that could have been implemented remotely

1  had Defendants customized their remote-exam security methods (i.e. utilizing bodycams),

2  to provide equivalent assurances against cheating for implementing those

3  accommodations remotely (rejected as too burdensome on staff), or else tolerated slightly

4  less anti-cheating security from applicants already required to execute affidavits they

5  would not use accommodations to cheat. Second, from February 2022 to July 2024

6  exams (once the NCBE stopped permitting standard remote testing as an emergency

7  pandemic mitigation), Defendants simultaneously communicated the viability of remote

8  testing for validly testing the knowledge and skills the exam is intended to measure, and

9  their readiness to return to remote testing as a viable contingency if they perceived public

10  health circumstances to justify it for the nondisabled too or if convenient enough to State

11  Bar budgetary concerns to temporarily attempt to drop the NCBE for a new multiple-

12  choice question vendor, with the simultaneous position in published FAQs that remote

13  testing would never be considered for any applicant if not offered standard, for disabled

14  applicants generally and immunocompromised applicants specifically, because of their

15  vendor contracting preferences for NCBE and the alleged policy preference of that

16  vendor. The FAQs instructed such disabled applicants not to request such an

17  accommodation. In other words, Defendants maintained such arrangements and their

18  accessibility and safety benefits were only worth offering on any scale if the nondisabled

19  needed it too, as only their needs were perceived sufficiently important to motivate the

20  administrative work required.

21  (B) Nonstandard, Recklessly Unsafe TA Testing Facilities as "Cost Cutting Measure":

22  for the February 2024 exam, Defendants further corroborated their deliberately ableist

23  institutional attitudes and culture by assigning testing accommodations applicants

24  assigned to the Cow Palace testing site–which already received media scrutiny for

25  torturously cold temperatures even for indoor standard applicants so assigned–to an open

26  barn frequented by stinging insects and bats, aggravated by hyper-allergenic conditions,

27  and at least one disabled applicant who had notified their proctor of being allergic to bee

28  stings was forced to test while constantly "buzzed" by bees while denied permission to

29  retrieve an EpiPen after discovering the conditions.

30  (C) Disabled Applicants Last in Line, Then Baited and Switched to Being Singularly

31  Denied Remedies for Vendor's Complete Destruction of February 2025 Exam After All

1    <u>Non-TA Issues Addressed First</u>: Defendants' inadequately-vetted, integrated remote
2    testing tech platform, in-person testing facilities supplier, and proctoring vendor,
3    Meazure Learning (selected during Defendants' "cost-cutting" initiatives to stabilize an
4    admissions budget deficit caused by the unsustainable admissions staff pay scales and
5    work hour expectations), which vendor is now facing an intentional fraud lawsuit brought
6    by Defendants, utterly botched nearly every operational and technological component of
7    the February 2025 exam. This spanned from pre-exam scheduling and mass exam
8    enrollment cancellations on their end to exam-day platform availability and proctoring,
9    and then shuffling answer files among applicants such that many were not even graded on
10   their own submitted work. Nearly every applicant that cycle was impacted by one or
11   more of a plethora of failure points, but there were numerous manifestations experienced
12   only by applicants needing testing accommodations, or that otherwise disparately
13   impacted those with disabilities both for exam performance and bodily safety. One such
14   manifestation was that, to an even greater scale than Defendants' usual vendors, even
15   accommodations approved by Defendants were not implemented or honored, leading to
16   bodily injuries and inherently inferior access (relative to the nondisabled co-victims) to
17   an exam that had already been severely compromised to begin with. Defendants sought
18   from the California Supreme Court (and largely received) a series of progressive, one-
19   size-fits all "scoring adjustments" that expressly did not consider individualized degree of
20   impact and thus was incapable of restoring equal access to those who faced disability-
21   related impacts others did not, and temporary supervised practice provisional licensure
22   for certain first-time takers. Each iteration of these purported "remedies" was crafted with
23   staffs' representation that there was no intent to address the failures to implement
24   approved accommodations through those remedies, reserving that issue (and some other
25   residual ones affecting a handful of nondisabled applicants) for further study and
26   eventually for an investigation by a contractor, HumRRO. Not only did applicants whose
27   grievances were addressed without HumRRO receive their remedy by (or shortly after)
28   initial exam results for that exam cycle, and then able to begin competing in the
29   employment market if successful, but even among applicants forced to wait for
30   HumRRO's investigation the disabled were singled out for disparate treatment expressly
31   in order to prioritize the nondisabled while containing the contract price to preserve

1   budget for staff preferences, citing "limited resources." Even among that group,
2   purportedly to contain costs Defendants negotiated that HumRRO would only need
3   enough capacity to report on some of the applicants' remaining issues in time for relief
4   before the July 2025 exam and potentially needing to retake despite potentially having
5   already passed. Of course, Defendants negotiated that HumRRO would prioritize the
6   remaining nondisabled applicants to receive their answer before that exam, and only then
7   would HumRRO need to work on the failure to implement approved accommodations.
8   Another disparity was that Defendants worked out and arranged speedy approvals for
9   how various findings would be remedied for the remaining nondisabled cohort, with
10  whom Defendants agreed had been wronged, while the disabled applicants were a "policy
11  call" Defendants purported the entire time they were not obligated to provide a remedy
12  even if their testimony was credited, which should be taken up at Defendants' leisure
13  after HumRRO's report by end of September 2025. Finally, when HumRRO largely
14  confirmed the disabled applicants' accounts in some cases and found no contrary
15  substantial evidence to applicants' testimony in others, Defendants made the decision
16  staff had seemingly initially hoped to make with cover, despite those findings, and
17  refused any further remedies beyond what had been provided to the nondisabled too, for
18  other distinct issues.
19  145. The "resource constraints" pretext for purportedly nondiscriminatory animus is
20  further undermined by the unreasonably generous employment terms the State Bar offers
21  its staff, and by revealing comments they've made during public meetings before, during,
22  and since the relevant times to this case. For example:
23  (A) CBE member Paul Kramer at various public meetings admitted in their deliberations
24  that he disagrees with the ADA's requirements as a policy matter, and wants to prioritize
25  resources to primarily focus on standard applicants first, or at least have sooner deadlines
26  and no immediate repeat option for "anyone requesting anything other than a standard
27  seat," but he has similarly complained that accessibility unduly burdens "people who
28  already have too much to do," and relatedly stated that when they "comply" by
29  instructing proctoring vendors to provide approved accommodations, any failure by those
30  vendors (such as the mass-scale one in February 2025) to implement those approved
31  accommodations are still not injustices where the State Bar had been unfairly required to

1   approve those accommodations, and so if the law requires only the instruction and not the

2   remedy for non-performance, should not be remedied separately or additively to any

3   blanket remedy to any other issues affecting all applicants (the policy the State Bar

4   eventually adopted for February 2025).

5   (B) CBE member Larry Kaplan during public meetings has expressed how it was

6   "unfortunate" if the CBE had to offer people with disabilities fewer test center location

7   options [than standard applicants] and they had to "schlep," but he trusted that "staff has

8   run the numbers and concluded that's what's most efficient for all applicants."

9   (C) Then-CBE member Robert Brody had obsessively opined across years of meetings

10   that staff working conditions must always come first, with some amount of inaccessibility

11   to applicants is acceptable to that end, and also made comments that the State Bar had

12   "enough people" to do an "experiment" exam offered in 2024 for extra credit on future

13   bar exams such that it need not include either out of state applicants or applicants who'd

14   need new testing accommodation determinations before the dates most administratively

15   convenient for the State Bar, which were very rapid after that exam and opportunity to

16   earn extra credit was announced. Defendants indeed did go on to exclude many disabled

17   applicants from having an opportunity to receive merits consideration of any testing

18   accommodation requests not previously approved for an earlier exam or pending well

19   before the experiment was approved from an equal opportunity (with accommodations)

20   to attempt to earn extra credit on future bar exams based on their performance on said

21   experiment, which opportunity many of their nondisabled peers had. Then-CBE member

22   Brody has further made casual comments falsely assuming that "Covid no longer poses a

23   health or safety to any of our applicants" (even though its sequelae indeed continue, even

24   post-vaccines, to pose substantial long-term health risks even in healthy individuals, and

25   even more so in those already suffering chronic illnesses like disabled applicants), and

26   during the Testing Accommodations Rules Revision Initiative he retaliated against

27   protected speech he disagreed with by targeting some public commenters writing or

28   speaking in favor of accessibility reforms by contacting their supervisor at their place of

29   employment and accusing them of making "inappropriate" comments he purported as

30   unfairly critical of Defendants' historical approach to testing accommodations, which he

31   felt was especially unbecoming "from UC Berkeley."

(D) To be sure, a minority of CBE members have, both over more recent years and at relevant times, expressed dissent from their colleagues' disability discrimination and displayed some sensitivity to disability rights. Most recently, at least one attorney CBE member has publicly acknowledged for the record that the CBE's decisions and policies were, in their view, violating the ADA. However, nearly every time the issue comes up, the body as a whole does not.

146. Accordingly, for these and many other reasons to be developed through discovery, Defendants' Title II violations in connection with the February 2019 California bar exam were committed while Defendants were on notice of Kohn's disability-related needs and requests, such that Kohn's federally-protected rights were implicated, but without Defendants exercising reasonable, good faith diligence to ensure their decisions and conduct were in compliance with Title II's prohibitions against disparate treatment, disparate impact against the disabled as a class, and failures to reasonably accommodate Kohn as an otherwise qualified disabled individual. Defendants' violations were committed with at least deliberate indifference.

**February 2020 California Bar Exam**

147. On 10/24/2019, more than two months before Defendants' deadline, Kohn submitted his initial petition for the February 2020 California bar exam. This petition asserted largely the same accommodation requests as those made for the February 2019 exam, with the sole change of offering the ergonomic equipment that the Iowa Bar had provided him onsite (not reduced to permission to bring) as a fourth alternative to Defendants providing the specific chair he primarily requested and that FINRA had approved providing him with on their exams, but with additional supporting documentation to address Defendants' summary claims that the previous record had "lacked adequate supporting documentation." Without any guidance from Defendants on what was perceived to have been missing before, Kohn was forced to guess at what (if anything) could resolve those purported concerns.

148. In addition to a new statement from Kohn explaining why the documentation adduced and that previously provided should be legally sufficient, including further details surrounding why those accommodations, and not those Defendants had granted,

1    best ensured Kohn would receive a level playing field on the exam compared to

2    nondisabled applicants. Kohn submitted an updated, more detailed evaluator form from

3    Dr. Dresden and his approval letters from FINRA and the Iowa Board of Law Examiners.

4    All other documentation previously submitted during the July 2018 and February 2019

5    exam cycles was incorporated by reference.

6    149. On 12/17/2019, Defendants issued their initial administrative decision for the

7    February 2020 exam, adding only permission for Kohn to bring a sit-to-stand desk like

8    that which Iowa had provided Kohn (along with an alternative ergonomic chair), and

9    otherwise denying all accommodations Defendants had not previously approved.

10    150. This time, Defendants did disclose excerpts of an "expert" consultant opinion

11    recommending that outcome, but only from a psychological disabilities consultant

12    qualified only regarding (at most) autism, and not from any physician or consultant with

13    expertise in any of Kohn's physical or visual disabilities. The consultant introduced

14    themselves as having been the psychological disabilities expert who'd previously been

15    consulted concerning Kohn's autism for the July 2018 exam.

16    151. Like with the July 2018 exam initial decision, Defendants' 12/17/2019 letter did not

17    communicate any specific fact findings, nor any meaningful legal analysis or application

18    of law in their decision letter, nor did Defendants explain their reasons for crediting their

19    consultants over Kohn's treating doctors and evaluators.

20    152. Beyond the unlawful summary reliance on this single consultant's recommendations

21    and the failure to timely provide notice on which the appeal could rely of Defendants'

22    reasons for denial, even the consultant's own commentary makes clear that what they

23    seemed to have perceived was Kohn's "complete" file was the information Kohn had

24    submitted dating prior to the 12/5/2017 addendum for the July 2018 exam appeal, and the

25    new documentation submitted for the first time in connection with February 2020. Their

26    detailed recitals of what documentation they had reviewed, and what facts and evidence

27    they seemed to be aware of contrasted with information that they incorrectly alleged had

28    not been provided or else did not discuss at all, cannot be reasonably reconciled with the

29    proposition that they had, at the time of this opinion, read Kohn's 12/5/2017 addendum to

30    his appeal for July 2018 or anything Kohn had first submitted for February 2019 (either

31    initially or on appeal).

1   153. On information and belief, to elicit a recommendation for her desired outcome for

2   cover, Ms. Cummins intentionally cherrypicked what documentation to provide this

3   consultant in precisely this way, especially in the context of her subsequent false

4   testimony about what exhibits comprised the full administrative records in her declaration

5   filed in connection with Defendants' opposition to Kohn's preliminary injunction motion

6   in this action.

7   154. Deficiencies with the consultant's reasoning for their recommendation did not stop

8   with their misstatements on what documentation and information Kohn had cumulatively

9   submitted to Defendants, or even the related further confusion appearing to stem from

10  their review of an incomplete record, such as perceiving Dr. Dresden to have been a

11  "new" expert and Defendants' own attributions to Kohn from February 2019 as what

12  he'd requested substituted for what those requests in fact had been. The consultant also

13  fundamentally misunderstood and/or misattributed the grounds Kohn had proffered for

14  the expanded accommodation requests and recited/applied an incorrect legal construction

15  of the ADA's reasonable accommodation standard to an already erroneous factual

16  analysis. To top it off, the consultant notably did not genuinely contest any of Dr.

17  Dresden's material factual premises, and certainly did not do so with any independent

18  clinical analysis objectively weighing the proffered evidence; where their

19  recommendation relied on not crediting any of his positions, they instead focused on

20  tangential information they perceived to have been omitted, largely of little or no legal

21  relevance, but which they'd have preferred to have considered before entertaining any

22  expanded requests.

23  155. The consultant improperly opined that the only basis for which expanded

24  accommodations could properly be considered was "new or worsened" disability

25  functional limitations since the last time any previously denied requested accommodation

26  was sought. To them, any arguments or new evidence supporting the proposition that

27  prior accommodations decisions by any testing entity had been error for the degree of

28  disability functional limitations then present were largely immaterial, and that there was

29  an irrebuttable presumption that Kohn was afforded equal access to any other exam by

30  whatever a testing entity had approved for him in the past, especially if Kohn had

31  surmounted any residual handicap and still achieved a passing score on such exam. On

1   this basis, even on their core autism zone of purported expertise, they refused to even

2   address the clinical veracity of the explanations Dr. Preston had offered in his 12/5/2017

3   affidavit, or that Dr. Dresden had also endorsed regarding essay composition tasks being

4   more affected by Kohn's autism functional limitations than answering multiple choice

5   questions is, distinguishing the bar exam from earlier part-day multiple-choice

6   standardized tests on which Kohn had also been underaccommodated for even just his

7   autism as it was at the times relevant to those tests. The consultant further failed to even

8   acknowledge that, even with less documentation than had been offered subsequently,

9   Defendant's own visual disabilities consultant for July 2018 had recommended an

10  additive 16% extra time to that granted for autism, which was already reduced from Dr.

11  Goodman's recommendation of an additive 100% extra time, and that Defendants

12  previously purported the 30 minutes per day of additional extra time as a substitution for

13  the meal breaks recommended by Drs. Clarke and Dresden (also reduced from what

14  could functionally even potentially substitute for those doctors' recommendations), to the

15  combined effect that their own recommendation of even just double time for autism

16  would amount to more than Defendants had granted even fully crediting Defendants' past

17  consultants.

18  156. The consultant incorrectly assumed Dr. Dresden to have been a "new" expert, and

19  expressly considered only Dr. Dresden's recommendations for autism on the

20  psychological disabilities evaluator form, and not his recommendations for the physical

21  disabilities, which the design of the State Bar's forms had required or at least steered Dr.

22  Dresden to separately enumerate on a distinct form that he'd provided for the earlier

23  exam cycles and did not redo for February 2020 (likely never provided to the consultant

24  by Defendants). Consequently, this consultant incorrectly perceived Dr. Dresden to have

25  expressly declined to recommend (or explain bases for) the off-clock breaks for the

26  digestive disabilities, provision of the ergonomic equipment for the myofascial pain

27  syndrome, and weekend scheduling for the cumulative effects of all medical conditions

28  (which the consultant also incorrectly perceived to not have been specified,

29  demonstrating their ignorance of Dr. Dresden's 1/26/2019 affidavit). To the contrary, Dr.

30  Dresden had recommended and explained all of those things.

1    157. The consultant did not even appear to have been aware of Dr. Clarke's

2    recommendations regarding the digestive disabilities, submitted for the February 2019

3    exam cycle and incorporated by reference.

4    158. Beyond refusing to consider Kohn's position that the Iowa bar exam

5    accommodations had not granted him equal access to that exam either (despite granting

6    more than California, and relying on Defendants' prior decisions, among other improper

7    things, for some of the requests both jurisdictions denied), the consultant made significant

8    factual errors concerning the nature of both the scope of approvals he'd obtained for the

9    Iowa Bar Exam and FINRA exams, and that of those exams' material standard testing

10    condition distinctions from the California bar exam. Among those errors were those pled

11    *supra*, but both of those entities' decisions *supported* the ergonomic equipment provision

12    request, and FINRA's supported the requested breaks. Moreover, even assuming that

13    both of their decisions were proper for their respective exams (and Iowa BOLE's was

14    not), neither of them undermined the scheduling or proctoring related requests under their

15    differing standard test conditions, and FINRA's would not have even undermined the

16    expanded extra time request making that assumption as it was entirely multiple-choice.

17    159. The consultant's misunderstandings of the law fared no better than their

18    misunderstandings of the facts. For example:

19    (A) This consultant's 12/17/2019 decision opinion had opined: "If [accommodations are]

20    needed, someone, an expert, needs to say so, and they would need to explain why they

21    are needed. Not why they might be desirable, not how they might allow [or] create a

22    beneficial/optimal testing experience, but why they are required. Aid is for need, not so

23    that one's preferences, however well explained, might be addressed." Similarly, their

24    11/1/2017 decision opinion had opined: "Double time might indeed be best, but, one

25    gains the aid that one needs, that is sufficient to meet one's needs, not all that might be

26    best and/or preferred." In both instances, this consultant seems to suggest that the ADA's

27    reasonable accommodation standard requires only accommodations so inescapably

28    necessary to addressing the disability functional limitations that in their absence the

29    applicant could not possibly attempt the exam, or at least not possibly surmount any

30    remaining handicap that not receiving those accommodations would create relative to

31    someone not so disabled, such as performing to an even higher standard on the tested

1    knowledge and skills than that which was intended to warrant passage. Yet, the Ninth

2    Circuit's *Enyart* standard instead evaluates what accommodations best ensure a level

3    playing field to nondisabled applicants. This differing standard may have contributed to

4    this consultant's perception that if Kohn passed a past exam or academic milestone with

5    particular accommodations, those accommodations definitively were sufficient for the

6    disability functional limitations that existed at that time.

7    (B) Primarily regarding the accommodation request regarding the training and

8    instructions of the assigned proctor, the consultant further conflated the law regarding

9    conditional disabilities as applicable to uncertainties about standard testing conditions

10    impacting whether the consistent, permanent functional limitations of one or more

11    present disabilities would be implicated to an extent warranting the requested

12    accommodation. Such a theory would foreclose accommodations for many disabilities,

13    such as epilepsy, that are known to be triggered by specific hazards, the presence or

14    absence of which without accommodation may be less than certain in advance.

15    160. As is Defendants' custom, the 12/17/2019 decision was timed to issue such that the

16    appeal deadline for completed submission of the sooner of 10 days from the decision or

17    the first business day of the exam month would place those 10 days for turnaround from

18    Kohn and his doctors over the holidays. Here, the deadline was 12/27/2019.

19    161. Satisfying this deadline was not only exceptionally burdensome, but forced Kohn to

20    largely sit out annual holiday gatherings with his extended family, and again prejudiced

21    his access to legal advice and supporting medical documentation.

22    162. Despite this deadline and holiday timing, by exceptional generosity from his treating

23    doctors and extraordinary lengths of his own, Kohn timely appealed with not only a

24    detailed narrative brief and affidavit of his own, but supporting responsive affidavits from

25    no fewer than four of his treating specialist physicians, including PCP Dr. Dresden,

26    gastroenterologist Dr. Clarke, ophthalmologist Dr. Goodman, and neurologist Dr. Liu.

27    Dr. Dresden explained in key detail why the ergonomic equipment was needed, and

28    permission to bring would not suffice; clarified that he had recommended on the

29    designated form (if not integrated into both forms yet) all requested accommodations and

30    not just those for autism, and elaborated further on why; Dr. Clarke elaborated further on

31    the digestive disabilities; Dr. Goodman further on the insufficiency of the granted extra

1   time for Kohn's combined disabilities and how double time for the multiple uncorrectable

2   visual disabilities were intended to be additive to extra time for autism; and Dr. Liu

3   endorsed Dr. Dresden's position on the ergonomic equipment and chronic pain.

4   163. Some of the doctor affidavits submitted on 12/27/2019 with Kohn's February 2020

5   appeal had been omitted from the exhibits that Ms. Cummins's declaration herein had

6   falsely testified to comprise the full administrative record to that date.

7   164. On information and belief, Ms. Cummins intentionally committed the omission and

8   false testimony to mislead this Court regarding the propriety of the sought preliminary

9   injunction.

10  165. On 2/14/2020, about a week before the February 2020 exam, Defendants issued a

11  decision wholly denying Kohn's appeal. Although no further consultant opinions were

12  disclosed addressing the latest submissions, Defendants–for the first and last time among

13  all four exam cycles at issue–meaningfully explained their own reasons for some, if not

14  all, of the denials. A true and correct copy of this letter is in the record at Dkt.64 att.1,

15  pp.281-284.

16  166. The 2/14/2020 decision reasoning repeats many of the same legal and factual errors

17  discussed above concerning the consultant's reasoning in the original decision, and

18  similarly distorts both the requests attributed to Kohn and the grounding for some

19  requests attributed both to Kohn and his treating doctors. Beyond the overlapping errors,

20  made even more egregious by the clarifications and supplemental documentation

21  provided on appeal, illustrative examples of further erroneous premises in the 2/14/2020

22  letter include:

23  (A) Defendants' position that Dr. Dresden's affidavits concerning autism need not be and

24  were not considered, because Dr. Dresden had applied, supplemented, and interpreted–

25  but not personally performed–the more than twenty hours of neuropsychological testing

26  performed by Kohn's prior psychologist evaluator, Dr. Preston. As pled above, Dr.

27  Preston had died at the end of 2017 and was thus unavailable to elaborate.

28  (B) Conflating a minor aggravating factor for solely the length of meal break despite the

29  premise of smaller meals (the postoperative need to cut food into small bite-size pieces,

30  which is slowed by autism fine motor impairments) and not the premise of needing to

31  split a single lunch into multiple smaller meals that minimize idle digestion time in order

1  to avoid unacceptable risks (given the vigor and time pressures of the exam) of various

2  adverse, painful, and distracting symptoms, and further overlooking that their (first time

3  on appeal) suggestion that Kohn cut his food before arrival would have been logistically

4  complicated given their refusals to provide ergonomic equipment forced Kohn to stay at a

5  hotel and depend on fresh restaurant deliveries timed during limited hours outside of the

6  exam already.

7  (C) Both mathematically faulty and legally defective concerns about how the requested

8  extra time and breaks could speculatively run afoul of vendor (NCBE) alleged

9  preferences.

10  (D) An untimely (first time on appeal) attempt to make broader allegations of *potential*

11  fundamental alteration and undue burden as to an unspecified subset of Kohn's denied

12  requests that Kohn's submissions failed to affirmatively negative, which was both

13  procedurally and substantively defective as a matter of law. Fundamental alteration and

14  undue burden are narrow circumstances that can sometimes permit an ADA subject entity

15  to rebut a *prima facie* presumption that a requested accommodation by an otherwise

16  qualified disabled individual is reasonable (e.g. best ensures equal opportunity/access

17  compared to nondisabled) to permit denial of such request without such constituting a

18  failure to reasonably accommodate violation. To preserve or assert such exceptions

19  timely, 28 C.F.R. 35.164 requires a written decision by the head of the public entity

20  detailing various information, including how they granted the maximum extent possible

21  without constituting such, by the time the accommodation is initially denied, and the

22  burden of proof is very much on the subject entity to timely establish the requirements in

23  writing, not the individual requesting accommodations to disprove any potential for those

24  exceptions to manifest from their requests. Beyond the procedural deficiency, Defendants

25  have  never alleged an adequate substantive basis to satisfy 28 C.F.R. Ch.35 App. B at

26  p.707: that the requested accommodations would inherently render the exam incapable of

27  measuring the intended knowledge and skills (fundamental alteration), or that they would

28  impose an administrative burden or financial cost grossly disproportionate to Kohn's

29  interest as a law school graduate in an opportunity to qualify to practice law (undue

30  burden).

167. The State Bar failed to reasonably accommodate Kohn's disabilities for the February 2020 exam:

(A) Considering the full cumulative effect of Kohn's numerous, distinct disability functional limitations, the accommodations he requested for February 2020 based on the recommendations of his doctors, including those he was denied, would have better ensured Kohn received equal access to the California bar exam, and/or equal opportunity as nondisabled applicants had to demonstrate his competency on the tested knowledge and skills through that exam, compared to the accommodations Defendants granted.

(B) For the February 2020 exam, Defendants failed to allege by the time of initial denial that any of the accommodations it denied or adversely substituted constituted a fundamental alteration and/or imposed any undue burden, and that it granted the maximum extent possible without such fundamental alteration or undue burden.

(C) Defendants further failed to adequately establish at any point that the accommodations it denied or adversely substituted for the February 2020 exam would have rendered that exam fundamentally incapable of testing the intended skills or knowledge, at least to the extent it could have without those accommodations. Indeed, they could not have established this, because none of those accommodations would have had that effect.

(D) Defendants further failed to establish at any point that any of the accommodations Kohn requested and was denied for the February 2020 exam would have imposed administrative burdens or financial expenses on the State Bar grossly disproportionate to Kohn's interest in an opportunity to qualify to practice law. Indeed, they could not have established this, because none of those accommodations would have required that magnitude of a burden or cost to provide.

168. Beyond failures to reasonably accommodate, for the same reasons as with February 2019 as well as the additional facts pled above, Defendants' procedural rules, policies, and practices, imposed unlawful disparate impact, and in some instances disparate treatment, against the disabled (and including Kohn) under Title II. As discussed above, the harms inflicted by these rules and policies was not limited to their effects on the substantive accommodations decisions, or even solely to performance on the relevant exams, but included distinct physical, emotional, and financial harms.

1  169. For the same reasons pled as to the February 2019 exam, as well as the manipulation

2  of the documents provided to a consultant on whom Defendants summarily relied,

3  Defendants' Title II violations for the February 2020 exam were also committed with at

4  least deliberate indifference to federally-protected rights.

5  170. Around 6/17/2020, Kohn sent Defendants a demand letter that substantially

6  complied with the requirements of the California Government Claims Act for his Unruh

7  Act claims in connection with the February 2020 California bar exam (and earlier exams

8  to the extent not already satisfied by the February 2019 exam's appeal statement).

9  171. A more formal CGCA claim, which also adduced the October 2020 exam, was

10  submitted through counsel on 8/14/2020, and rejected by Defendants on 9/28/2020. The

11  timeline required to pursue urgent injunctive relief by the time a lawsuit became

12  necessary precluded waiting to sue until Defendants formally rejected formal CGCA

13  claims, but the ongoing string of related violations through instantiation of the suit and

14  the circumstances under which the timing occurred should excuse any purported

15  untimeliness even if the pre-suit letters were held insufficient (which they were not).

16  **October 2020 California Bar Exam:**

17  172. Kohn began work on his petition for the then-July 2020 exam immediately upon the

18  conclusion of testing for his February 2020 California bar exam, months before results

19  from that exam were released and the need to spend countless hours and thousands of

20  dollars to do so was confirmed.

21  173. Now aware of Defendants' position that no elaborations concerning his autism

22  would be considered coming from an expert who had not personally performed a

23  comprehensive neuropsychological evaluation on Kohn, coupled with Dr. Preston's

24  death/unavailability to further elaborate, Kohn understood that he would effectively need

25  to redo more than twenty hours of neuropsychological testing with a different

26  psychologist evaluator who would then analyze the results and complete another

27  comprehensive report interpreting and applying those results to the bar exam, plus

28  complete Defendants' exacting questionnaire forms thereupon to have any chance at

29  Defendants granting adequate accommodations for his autism.

174. Kohn was further aware that such an endeavor had not previously been covered (and generally is not covered by health insurance), and even if it was, finding a qualified professional local to him who would accept insurance for this type of service would be a massive longshot. Many such local professionals at that time generally would quote upwards of $10,000 without accepting insurance.

175. While making considerable efforts to nonetheless explore his options to indulge Defendants on such neuropsychological evaluation, hoping Defendants had turned over a new leaf at explaining their denials and that he could obtain iterative feedback or responses to his own substantive responses to the reasoning for denial communicated in the 2/14/2020 letter, while still being able to adequately respond to it in connection with the next exam cycle if he acted rapidly enough, Kohn also did not wait until he could determine the availability and viability of the retesting to submit a new petition in connection with the then-July 2020 exam. Kohn did so on 3/19/2020, with detailed briefing addressing the issues and overlooked information implicated by the 2/14/2020 decision and its newly provided explanations. This initial submission was accompanied by a tentative response to that decision letter by Dr. Dresden, in an affidavit dated 3/13/2020.

176. At the time of the March 2020 submissions, Dkt.64 att.1 pp.286-315, little was known about whether the emerging Covid crisis was going to cause weeks-long disruption vs. months-long disruptions, with few mainstream news sources predicting the years-long societal restrictions; and even less the permanency of its pervasive circulation, permanent post-acute sequelae risks, record-breaking airborne contagiousness, and permanent adverse alterations to the health and safety of much of hitherto routine everyday life activities and lifestyles. That Defendants would need to alter the standard test conditions of the bar exam, postpone that exam, and/or that there would still be substantial covid exposure risks to in-person testing months down the road was not yet plausible, let alone known. As such, in the first March 2020 submission Kohn requested the same accommodations as he'd requested for February 2020.

177. Never idle for the entirety of 2020 on his State Bar testing accommodations, Kohn diligently continued post-submission with his inquiries into neuropsychological testing to indulge Defendants' excessively burdensome documentation demands, despite the rapid

1    escalation of the Covid emergency, Santa Clara County's shelter-in-place order initially

2    slated to last 3 weeks (one of the earliest-initiated local ones in the country) and shortly

3    thereafter a months-long statewide one, and the resulting upheaval to his access to routine

4    medical care.

5    178. After little initial success, Kohn learned that psychologist Dr. Toren, who had

6    previously been engaged by Kohn's high school to do a more limited subset of such

7    testing in 2010 for his IEP, was willing to accept some insurance and more affordably

8    offer the type of testing effectively demanded by Defendants; however, Dr. Toren

9    concluded that the testing would need to be done in-person despite the pre-vaccine Covid

10    safety hazards and Kohn's elevated disability-based risks, and would need to wait until

11    both the State and County lifted shelter-in-place orders. Kohn went to extraordinary

12    efforts to ensure that Dr. Toren scheduled the testing over far more clustered, intensive

13    timeframes and expedited her report, and that the arrangements were made to start

14    immediately upon the lift of State and County shelter-in-place orders to get these

15    materials to Defendants as soon as was remotely possible, let alone reasonable.

16    179. Meanwhile, during the same Spring 2020 shelter-in-place period that choke-pointed

17    Kohn's access to the redone neuropsychological evaluation, applicants planning to take

18    the Then-July 2020 bar exam (as Kohn did if he learned he failed February 2020) were

19    plunged into chaos and uncertainty as attorney admissions stakeholders nationwide began

20    to respond to the implications that the pandemic had for the exam.

21    180. While Defendants' current psychometrician since 2024, Dr. Chad Buckendahl, has

22    opined that Defendants could validly the scale the essay portions of the California Bar

23    Exam using a different multiple choice question vendor than the NCBE, which led to

24    such a commission by the State Bar from Kaplan, for decades prior to that transition and

25    at the relevant times in 2020, Defendants instead employed Dr. Roger Bolus, a

26    psychometrician who simultaneously was employed by the NCBE. Dr. Bolus advised

27    Defendants they had no choice but to license the MBE from the NCBE, and the NCBE

28    maintained considerably into 2020 (e.g. summer) that its exam security preferences

29    outweighed Covid health and safety concerns with mass in-person testing, positing that it

30    would not be licensing the MBE to jurisdictions which offered a remote exam, and

31    adding to the uncertainty which applicants needed to plan for the exam around.

X. Nevertheless, on 4/27/2020, the California Supreme Court ordered Defendants to start considering contingencies for remote testing as a possible modality for if pandemic circumstances continued to develop in a direction foreclosing mass in-person testing, and Defendants began preparing the conditions and rules for such a remote administration of the June 2020 First Year Law Students' Exam as a purported pilot for the concept. Shortly thereafter, in mid-May 2020 the California Supreme Court ordered that the July 2020 exam be postponed until September 9-10, 2020, regardless of what modality was decided upon. Defendants accordingly updated their deadlines to submit initial testing accommodations petitions for that exam through 7/16/2020, and appeals through the sooner of 10 days from the initial decision or 8/1/2020, though the standard testing conditions remained unknown until 7/16/2020.

181. Also in mid-May 2020, Kohn was informed he'd failed the February 2020 exam. Expecting to have a comprehensive neuropsychological evaluation from Dr. Toren in early June 2020, and with the unlawfully long 60-days mark processing time for petitions under Defendants' own rules imminent, Kohn hoped he would receive a decision addressing his March 2020 responses to the February 2020 appeal decision, with another iteration of explanations to respond to for any denials, in time to guide Dr. Toren when drafting her report, and other medical providers like Drs. Dresden and Clarke whom Kohn anticipated would need to address the new potential remote modality and its differing standard conditions as to his physical disabilities functional limitations, as well as the elevated disability-related safety hazards in-person testing would pose to him due to Covid.

182. Accordingly, Kohn reached out to Defendants around 5/22/2020 by phone during one of the last months in the leadup to the October 2020 exam in which secretary-level admissions staff accepted support phone calls even from applicants willing to wait hours on hold (wait times predating 2020), though not usually to address substantive issues with testing accommodation decisions. He sought a status update on his 3/19/2020 petition and its overdue decision, which had become untimely before Kohn submitted any subsequent addendums to those requests. Testing accommodations secretary Suzanne Klyde informed Kohn that she had been instructed not to discuss Kohn's matter with him, and

1  that all communication about it would have to go through her supervisor, Ms. Cummins,

2  though she promised Kohn a callback from Ms. Cummins in the next day or so.

3  183. Ms. Cummins refused to honor the promised callback. Instead, she sent him a

4  message summarily stating that his petition would be considered at a CBE meeting on

5  6/19/2020, and the decision communicated the following week, a timeline that already

6  violated Defendants' own rules and foreclosed the approach of using the planned

7  supplemental documentation to support any appeal on which he could simultaneously

8  respond to another iteration of feedback from Defendants responsive to the March 2020

9  materials.

10  184. While Kohn was aware that with the new mid-July deadline for new petitions for the

11  then-September 2020 exam, he technically could still take that approach if he sat on Dr.

12  Toren's report even once it was ready and submitted it on appeal, he felt that doing so

13  would not be in good faith and risked further limiting the time available for the

14  possibility of further iterations of feedback that could be addressed in time for this exam

15  cycle. Of particular concern was that the accommodation requests that would need to be

16  amended for Covid and likely different standard conditions would then not be considered

17  during the first iteration, with the appeal/amended petition then coming close enough to

18  the deadline that Defendants might (as he'd learn they'd do anyway) refuse to issue a

19  first-ever decision on those amended requests until after the cutoff for any opportunity to

20  appeal anything Defendants denied on his first try.

21  185. Grinding himself to the bone as soon as the State and County shelter-in-place lifted,

22  and at tremendous expense and burden, Kohn simultaneously completed the over twenty

23  hours of testing with Dr. Toren in a clustered time; drafted an amended affidavit and brief

24  addressing all plausible iterations of the undisclosed standard conditions of the exam and

25  how they altered what accommodations he requested from Defendants and why; and

26  obtained from Dr. Dresden in that same parallel timeframe an additional affidavit how

27  disabilities previously immaterial to the bar exam might become necessary to

28  accommodate for the Then-September 2020 exam.

29  186. The new documentation from Kohn, Dr. Toren, and Dr. Dresden were all submitted

30  as an addendum to his existing petition on 6/4/2020 regarding the existing in-person test

31  center modality updates, and for correct routing of the differing requests pertaining to

1   modified accommodation requests (which for some modalities meant both expanded and

2   contracted requests, as remote or other at-home testing would have mooted many of the

3   prior requests).

4   187. At the time the 6/4/2020 addendum (Dkt.64 att.1, pp.316-356, att.2, pp.1-77) was

5   submitted:

6   (A) Kohn's March 2020 petition had already been pending for 77 days; and

7   (B) The Then-Effective 7/16/2020 deadline to request new accommodations in a new

8   petition for the Then-September 2020 exam was still more than six weeks away; and

9   (C) The 6/19/2020 CBE meeting that Ms. Cummins hitherto indicated Kohn's March

10  2020 petition would be considered at, with a decision to be communicated by the end of

11  the following week, was still 15 days out; and

12  (D) Further CBE Subcommitte meetings agendized to consider testing accommodation

13  requests and appeals prior to Defendants' cutoff to submit testing accommodation

14  appeals were scheduled throughout July 2020; and

15  (E) Kohn immediately made best efforts to ensure that the submission was quickly on the

16  State Bar's radar to maximize time available to consider it prior to the 6/19/2020 CBE

17  meeting, including by making public comment at a CBE Subcommittee meeting in early

18  June. The public comment triggered a response from Suzanne Klyde on 6/12/2020 in the

19  form of a voicemail left while Kohn was in a medical appointment at the direction of

20  Then-Director of Admissions Amy Nunez. Ms. Klyde relayed that, due to the "late" (less

21  early) 6/4/2020 addendum, not only could neither Kohn's petition (even on just the

22  existing standard conditions and March 2020 materials) nor the addendum or new

23  requests still be considered at the 6/19/2020 CBE meeting, but that none of Kohn

24  requests for the exam then starting on September 9 could be considered before 8/21/2020

25  (ultimately being relayed late afternoon on 8/27/2020). This was after the hard cutoff to

26  receive an opportunity to administratively appeal any denial, including of the requests

27  never before considered that implicated the safety of the exam during the pandemic.

28  188. Over the next several days, Kohn repeatedly attempted to get ahold of Ms. Klyde or

29  Ms. Nunez by phone or email, raising the concern about the appeal deadline, apparent

30  violations of the State Bar's own rules, and his good faith early submission of materials

1  he could have timely submitted after receiving the decision on the March 2020 materials,

2  but did not.

3  189. On 6/17/2020, Defendants sent Kohn an email that flatly reaffirmed the decision and

4  did not substantively respond to any further pre-suit correspondence. This email also

5  confirmed that Defendants would first determine testing accommodations, and then the

6  modality those accommodations would be implemented in, effectively foreclosing

7  modality-specific consideration of accommodations where what was requested and

8  warranted naturally differed depending on modality, and setting up the later Forced In-

9  Person Policy. The standard conditions of the exam remained unknown until 7/16/2020,

10  but potential exam rules were tested in the June 2020 First Year Law Students Exam.

11  Lastly, the 6/17/2020 email informed Kohn that he had through 8/13/2020 to submit any

12  further addendums to his pending petition without further delaying the decision.

13  190. The California Supreme Court again postponed the exam on 7/16/2020, to October

14  2020 (dates for which the NCBE grudgingly allowed jurisdictions to license a half-set of

15  MBE questions for remote administration on, which unlike those offered to in-person

16  only jurisdictions, it would not help score or scale and would not allow to be portable

17  between jurisdictions), and confirmed the standard test condition of the exam would be

18  remote, from-home testing.

19       191. Defendants then disclosed exam rules and conditions on 7/20/2020, and

20  while the exam had been pushed back almost a month, extended the deadlines to petition

21  for accommodations and to appeal denials by only 8 days, tailored to still elapse the very

22  day of the CBE meeting at which it then planned to consider Kohn's (and other

23  applicants') testing accommodations.

24

25

26

27

28

1    192. The October 2020 exam was further complicated by Defendants' repeated
2    changes to testing dates, modalities, and standard conditions. The exam was originally
3    scheduled for July, postponed to September, then rescheduled to October, with
4    accommodation petition deadlines shifting each time:

| Deadlines: | Petition Filing Deadline to Expect Decision Prior to Appeal Deadline (to get up to 10 days to appeal): | Petition Filing Deadline: | Appeal Filing Deadline (if sooner than 10 days from decision): |
|---|---|---|---|
| When exam scheduled July 28-29, 2020 (before 4/27/2020): | 4/2/2020 | 6/1/2020 | 7/1/2020 |
| When exam scheduled September 9-10, 2020 (4/27/2020 to 7/15/2020): | 5/17/2020 | 7/16/2020 (4 days before first disclosure of standard conditions). | 8/13/2020 |
| When exam scheduled October 5-6, 2020 (7/16/2020 on): | 5/25/2020 | 7/24/2020 (4 days after first disclosure of standard conditions). | 8/21/2020 |

5
6    193. Around this time, Defendants announced their Forced In-Person Policy that
7    applicants whose testing accommodations "do not lend themselves to online testing" at
8    the "sole discretion" of State Bar staff will be required to travel to and test at in-person
9    test centers.
10   194. This policy's scope was motivated to reduce the slight additional administrative
11   burden and financial expense of customizing remote-exam security measures to those
12   accommodations (such as by using bodycams, as Kohn requested), or else by trusting
13   applicants' sworn affidavits not to use accommodations to cheat. Kohn had even offered
14   to be recorded in the restroom if necessary to test remotely while still being able to
15   address the restroom-related needs of some of his digestive disabilities.

195. Another applicant with disabilities reported on social media during the Summer of 2020 having conversations with an office of admissions staff member under the supervision of Ms. Cummins, who reportedly told them that disabled applicants were "being really ungrateful" to staff for making the exam available at all during the pandemic, and those needing testing accommodations that Defendants were purporting to not be eligible for remote testing, but who had medical conditions elevating Covid risks should defer the exam and not test in October 2020 to "show gratitude to staff"

196. As pandemic circumstances eventually allowed access to more of Kohn's treating specialists, who were harder to access in Spring 2020, and as information about the exam rules, pandemic, and conditions evolved, Kohn continued to submit addendums in support of his requests for the October 2020 exam, next with his 7/16/2020 addendum (Dkt.64, att.2, pp.100-328), with affidavits and supporting medical testing from gastroenterologist Dr. Clarke, immunologist Dr. Rubinstein, primary ophthalmologist Dr. Goodman, and subspecialized ophthalmologist Dr. Tearse; and PCP Dr. Dresden). For the reasons in those materials, incorporated by reference, Kohn's requests for the October 2020 exam were even more reasonable and, as the doctors opined, requiring Kohn (who was considered immunocompromised due to certain medications) to test in-person to receive his accommodations would deny him safe and equal access to the exam, and be "reckless." These materials not only provided overwhelming further details and support to Kohn's need for the longstanding requests, but particularly expanded upon Kohn's heightened risks from forced nonstandard in-person testing, including due to his medication-induced immunodeficiencies and other disability comorbidities. This addendum was submitted prior to Defendants' deadline to submit a new accommodation petition for October 2020.

197. After this suit was filed, Defendants tried to mitigate optics with the Court by issuing a "tentative staff recommendation" ahead of the CBE meeting by Ms. Nunez informing Kohn that, based on the submissions through 6/4/2020 (not considering 7/16/2020 yet), she intended to recommend that the CBE deny any accommodations Defendants had not approved for the February 2020 exam, including any accommodations addressing changed standard conditions or the Covid pandemic. Ms. Nunez provided no substantive explanation of her reasons for that plan, except for yet

1    another factually and legally flawed opinion from the same psychology disabilities

2    consultant who'd been involved with the July 2018 and February 2020 exam petitions,

3    recommending that same outcome. A true and correct copy of this letter is in the record at

4    Dkt.64 att.2, pp.329-339.

5    198. Despite the pandemic-era challenges to accessing health care providers, where in

6    2020 all health care providers placed considerable triage around non-emergency routine

7    health care services like disability accommodations paperwork beyond what is customary

8    for schools and employers to need, but Kohn and Drs. Toren and Dresden substantively

9    responded to the glaring deficiencies in the consultant's reasoning promptly,

10   approximately a week later, in an addendum submitted to Defendants on 8/5/2020. Dr.

11   Clarke too responded in an affidavit submitted on 8/10/2020. These responses are in the

12   record at Dkt.64 att.2, pp.330-379, and incorporated by reference herein.

13   199. On 8/20/2020, Defendants communicated Ms. Nunez's revised recommendations to

14   the CBE on Kohn's petition, which were to grant extra time expanded to 150%

15   administered over six test days, subsuming the extra 30 minutes per test day earmarked to

16   the digestive disabilities and the double time for all other disabilities, but otherwise that

17   all other accommodations remain as previously decided for the February 2020 exam and

18   all requests concerning nonstandard Covid safety mitigations be denied. Ms. Nunez again

19   provided no meaningful substantive explanation of her reasoning beyond excerpts from

20   the same psychological disability consultant and a visual disabilities consultant.

21   200. Collectively, Defendants' consultants now recommended less than Kohn's experts,

22   but more than Ms. Nunez or than was granted.

23   201. Defendants' visual disabilities consultant now recommended an additive 66% extra

24   time for the visual disabilities.

25   202. While, continuing similar types of misattributions of Kohn's positions and other

26   errors as they had throughout the history of the case and insisting that only the worsening

27   of Kohn's disability impairment was now to be credited, the psychological disabilities

28   consultant recommended 150% extra time on all sections (still not addressing Kohn's

29   experts' position the essays would need more for autism), and expressly reasoned that on

30   more being appropriate for autism functional limitations than prior recommendations that

31   had to have been at least 84% extra time for autism for July 2018 given the 16% extra

1    time recommendation the visual disabilities consultant had given then. As such,

2    Defendants' own consultants recommended more for October 2020 than was granted, and

3    Defendants had previously granted 30 minutes per test day for the digestive disabilities

4    starting February 2019 that was not only insufficient to allow for the degree of breaks (if

5    on clock) that Drs. Clarke and Dresden recommended, but also was subsumed into the

6    extra time granted October 2020, placing the amount granted for the autism and visual

7    disabilities as less than Kohn requested on the essay section and even further less than

8    Defendants' own experts recommended.

9    203. The psychological disabilities expert seemed to accept that some degree of

10   accommodations would be necessary to address Kohn's digestive disabilities and Covid

11   in the altered conditions of the bar exam, but basically acknowledges Defendants

12   instructed them to remove that recommendation from their report, and Defendants failed

13   to provide any such accommodations nor access to the standard remote testing.

14   204. While Kohn may have only requested 150% extra time on the essay portions

15   assuming he was separately

16   205. The CBE upheld Ms. Nunez's recommendations without meaningful further

17   elaborations in their decision letter communicated 8/27/2020. The 8/27/2020 decision

18   also confirmed that Kohn would be subjected to Defendants' Forced In-Person Policy and

19   required to travel to and test in-person at a nonstandard test center, even despite his

20   disability-elevated risk factors to Covid.

21   206. Covid is caused by SARS-CoV-2, an airborne virus that is primarily transmitted

22   through aerosols, not droplets, and as such indoors will permeate all distances within an

23   enclosed space if infected person(s) had been present for long periods of time (regardless

24   of if they remain in the room at the time of the uninfected person(s)), and often remains

25   in the air for hours absent extremely heightened ventilation and/or very high airflow

26   HEPA filtration.

27   207. At the times relevant to the October 2020 exam, there were still substantial

28   shortages, high prices, and rationing among the public for higher-grade respirator-type

29   face masks, and even using such masks the risk of transmission from spending long

30   periods indoors with others outside one's household was high, particularly if meals were

1    required to be subject to supervision, as they were for Kohn, when masks could not be

2    used.

3    208. Defendants did not require or provide covid tests for staff, proctors, or applicants at

4    test sites during the pre-vaccine October 2020 exam, on information and belief because

5    staff were planning to have their union request yet further floor raises to the amount of

6    "merit increase" raises the office of admissions would be entitled to, and that such costs

7    might either interfere with this or with the headcount desired to maintain their sub-full

8    time work hour expectations.

9    209. Instead of Covid testing or expanded access to standard remote testing, Defendants

10   concocted a less narrowly tailored plan to the potential detriment of Kohn and other

11   Forced In-Person Policy victims of strictly cancelling the exams of anyone who displays

12   any symptoms of Covid during a multi-day, all-day test, even when (as Kohn's experts

13   explained) permanent non-contagious disabilities would likely mimic some of those

14   symptoms to some extent over such a long period, or at least have enough risk of doing

15   so to make conditioning access to the exam on assuming the risk of not being able to take

16   it and of a several month delay to qualifying to practice law after investing months and

17   thousands of dollars into preparations as egregiously unfair and discriminatory.

18   210. Since 2020, Ms. Cummins and her protegee, current exam program manager

19   Christina Doell, have taken (and responded) to social media to mock public health and

20   safety advocates who request any interventions or consideration of Covid-related

21   concerns at all, or who've objected to Defendants knowingly assigning applicants

22   (including immunocompromised applicants) to proctors it knows had Covid exposure,

23   symptoms, and/or positive tests, disproportionately at testing accommodation sites,

24   confirming the attitudinal and cultural causation of the 2020-era policies.

25   211. Defendants did not allow for video-based supervision even if it was monitored live

26   on-site (CCTV) rather than dependent on uninterrupted internet connections, claiming it

27   would overburden their staff.

28   212. Defendants did not provide or use HEPA filtration units in test rooms.

29   213. Instead, Defendants deliberately chose, for cover, a design provided by an

30   epidemiologist who they knew was (and selected because of) challenging much of the

31   Covid restrictions and mitigations deemed appropriate by California's own public health

1   agencies and other California state or local public entities and school districts, instead of

2   following the more burdensome guidance of those the State they purported themselves to

3   be an arm of issued.

4        214. Each Covid infection cumulatively drastically increases long-term risks of

5   acquiring and/or worsening almost every type of chronic illnesses (post-acute sequelae,

6   of which "Long Covid" is but one subset), and this increase in risk is higher for those

7   who are already chronically ill (especially with autism and several of Kohn's neurogenic

8   and immune dysregulation conditions) than someone who is not. These uniquely broad

9   health risks, not present among airborne pathogens circulating prior to 2019, were higher

10  prior to the availability of covid vaccines than they are in someone who has up to date

11  vaccination, though are substantial regardless of vaccination status, and are not limited to

12  infections that are acutely symptomatic, let alone those with severe acute symptoms

13  worse than those perceived comparable to ordinary colds.

14       215. Defendants' Forced In-Person Policy substantially and unconscionably

15  increased the risks of physical and emotional harms to Kohn and his household from

16  seeking to pursue his liberty interest in the opportunity to qualify to practice law, which

17  risks Kohn's physicians attested to Defendants as "reckless" before Kohn was subjected

18  to that policy. As Defendants conditioned a liberty interest on assuming these safety risks

19  with deliberate indifference, they further violated Kohn's right to freedom from state-

20  created danger.

21       217. Defendants' CBE decision for the October 2020 exam was issued on August

22  27, 2020. For the October 2020 exam, omitting requests overlapping with earlier exams

23  that had the same outcome for October 2020 as February 2020 other than the above-pled

24  increased extra time, and a private room as a standard one-time pandemic mitigation (still

25  with nonstandard exposure to various shifts of proctors and supervisors, plus interactions

26  in hotel common areas on the way in and out, and for Kohn's other disability needs

27  without provision of ergonomic equipment, also the need to stay at the hotel for nearly a

28  week and depend on restaurant food). Kohn's new/amended requests for the October

29  2020 exam and their outcomes were as follows:

30

| Requested Accommodation: | For Standard At-Home Modality: | For At-Home Proctored Modality: | To Mitigate Forced In-Person Test Center: | Predicate Disability: | Outcome: |
|---|---|---|---|---|---|
| Permission to use restroom freely and still return to test session in progress. | Yes | Yes | Yes | pelvic floor dyssynergia, irritable bowel syndrome, and medication side effects | Granted, but only conditioned on nonstandard in-person test center modality and in-room proctor supervision despite immunocompromised status. |
| That all proctors mask, distance, and test negative for Covid. | No | Yes | Yes | Immunocompromised status with other medical risk factors for Covid, and involuntary assignment to riskier nonstandard modality | Denied negative test for proctors; masking and distancing were standard. |
| Permission to remain in exam room subject to supervision during lunch/breaks, via onsite video surveillance when actively eating or drinking and unable to mask. | No | Yes | Yes | ^ | Denied |

| That Kohn's PPE not be inspected by any means that could contaminate it for intended Covid prevention purpose. | No | Yes | Yes | ^ | Denied |
|---|---|---|---|---|---|
| Instructions to onsite staff not to terminate exam based solely upon cough symptoms. | No | Yes | Yes | gas-bloat chronic cough due to gastroparesis, surgical history, and irritable bowel syndrome. | Denied |
| Videorecording Kohn from bodycam and webcam during exam sessions, including in the restroom at the State Bar's option, instead of AI security flags that would be falsely triggered by the effects of Kohn's disabilities or approved | Yes | No | No | Compatibility between AI flags and rules intended to improve their performance and Kohn's accommodations. | Moot to Assigned Modality. |

| accommodations. | | | | | |
|---|---|---|---|---|---|
| Remote proctors and security flag reviewers instructed on all accommodations approved. | Yes | No | No | autism | ^ |
| Increased login time limit and logon period flexibility. | Yes | No | No | Effects of expanded schedule on equipment reliability during wildfire season. | ^ |
| Mitigations of unequal accessibility barriers compared to standard at-home testing. | No | No | Yes | Nonstandard exam modality was assigned due to disability. | Denied |

218. Kohn had also conditionally withdrawn as moot his prior requests for provision of ergonomic equipment, private room, specially trained proctor, and equal access to hotel services from those carrying over from his February 2020 exam requests, *supra*, while offering alternatives to others, for if the State Bar had not applied its Forced In-Person Policy to him.

219. The State Bar failed to reasonably accommodate Kohn's disabilities for the October 2020 exam:

(A) Considering the full cumulative effect of Kohn's numerous, distinct disability functional limitations, the accommodations he requested for October 2020 based on the recommendations of his doctors, including those he was denied and compared to the accommodations Defendants granted, would have better ensured Kohn received equal

1   access to the California bar exam without going to the extraordinary burdens, expenses,

2   and emotional traumas Defendants' refusals to accommodate caused, especially including

3   equal safety and freedom from state-created danger this particular administration, and/or

4   equal opportunity as nondisabled applicants had to demonstrate his competency on the

5   tested knowledge and skills through that exam (for which his passage was not necessarily

6   conclusive).

7   (B) For the October 2020 exam, Defendants failed to allege by the time of initial denial

8   that any of the accommodations it denied or adversely substituted constituted a

9   fundamental alteration and/or imposed any undue burden, and that it granted the

10  maximum extent possible without such fundamental alteration or undue burden.

11  (C) Defendants further failed to adequately establish at any point that the

12  accommodations it denied or adversely substituted for the February 2020 exam would

13  have rendered that exam fundamentally incapable of testing the intended skills or

14  knowledge, at least to the extent it could have without those accommodations. Indeed,

15  they could not have established this, because none of those accommodations would have

16  had that effect.

17  (D) Defendants further failed to establish at any point that any of the accommodations

18  Kohn requested and was denied for the February 2020 exam would have imposed

19  administrative burdens or financial expenses on the State Bar grossly disproportionate to

20  Kohn's interest in an opportunity to qualify to practice law. Indeed, they could not have

21  established this, because none of those accommodations would have required that

22  magnitude of a burden or cost to provide.

23  220. Defendants also failed to fully implement and honor all of the testing

24  accommodations it approved for the October 2020 exam, including the permission to

25  bring and use an external display for ergonomic reasons. Its Examsoft software could not

26  be made compatible with that monitor, despite Kohn's warnings during the mock exams,

27  during all exam sessions of the October 2020 exam.

28  221. Beyond failures to reasonably accommodate, for the same reasons as with the prior

29  exams, as well as the additional facts pled passim, Defendants' procedural rules, policies,

30  and practices, imposed unlawful disparate impact, and in some instances disparate

31  treatment, against the disabled (and including Kohn) under Title II. As discussed above,

1   the harms inflicted by these rules and policies was not limited to their effects on the

2   substantive accommodations decisions, or even solely to performance on the relevant

3   exams, but included distinct physical, emotional, and financial harms.

4   222. For the same reasons pled as to the prior exams, as well as the manipulation of the

5   documents provided to a consultant on whom Defendants summarily relied, Defendants'

6   Title II violations for the February 2020 exam were also committed with at least

7   deliberate indifference to federally-protected rights.

8   223. Notably, Kohn expended considerable time and resources Fall 2020 compiling an

9   administrative petition for accommodations on the February 2021 exam, because

10   Defendants' timelines and dilatory practices necessitated he submit such before his

11   passage of the October 2020 exam was released to him on 1/8/2021.

12   224. Kohn, through counsel, submitted a CGCA claim for the October 2020 exam

13   violations, which was rejected by Defendants on 9/28/2020. The timeline required to

14   pursue urgent injunctive relief by the time a lawsuit became necessary had precluded

15   waiting to sue until Defendants formally rejected formal CGCA claims, but the ongoing

16   string of related violations through instantiation of the suit and the circumstances under

17   which the timing occurred should excuse any purported defects (if there even are any).

18   X. For all the reasons pled throughout this complaint, Defendants' decisions, policies,

19   and conduct was at least deliberately indifferent to Kohn's federally-protected rights.

20   **FIRST CAUSE OF ACTION**

21   **Violation of Title II of the Americans with Disabilities Act**

22   **42 U.S.C. §§ 12131–12134, 12189**

23   **(Against All Defendants)**

24   225. Plaintiff realleges and incorporates all preceding paragraphs.

25   226. Plaintiff is a qualified individual with a disability within the meaning of 42

26   U.S.C. § 12131(2). Defendants are public entities within the meaning of 42 U.S.C. §

27   12131(1). The California bar examination is an examination related to licensing within

28   the meaning of 42 U.S.C. § 12189.

227. Defendants violated Title II by: (a) failing to make reasonable modifications necessary to afford Plaintiff equal opportunity, in violation of 28 C.F.R. § 35.130(b)(7); (b) denying Plaintiff equal opportunity to participate in and benefit from the examination, in violation of 28 C.F.R. § 35.130(b)(1); (c) failing to give primary consideration to Plaintiff's requests, in violation of 28 C.F.R. § 35.160(b)(2); (d) failing to administer the examination in a manner that best ensures results accurately reflect Plaintiff's aptitude rather than his disabilities; (e) using contractual arrangements with the NCBE to discriminate, in violation of 28 C.F.R. § 35.130(b)(1) and (b)(3); and (f) utilizing eligibility criteria that screen out individuals with disabilities, in violation of 28 C.F.R. § 35.130(b)(8).

228. Defendants never timely asserted or established that any denied accommodation would fundamentally alter the examination or impose an undue burden, as required by 28 C.F.R. § 35.164.

229. Defendants acted with deliberate indifference—consciously disregarding known risks of discrimination—as specifically alleged in the factual allegations above and others to be uncovered by discovery.

230. Each denial of reasonable accommodations on each examination constituted a completed violation of Plaintiff's federally protected rights.

231. Defendants' conduct violated both Title II of the ADA and the Fourteenth Amendment. Congress validly abrogated sovereign immunity for Title II claims involving actual constitutional violations under United States v. Georgia, 546 U.S. 151 (2006). Inter alia, Defendants' conduct was arbitrary and irrational: (a) denying accommodations recommended by treating physicians without consulting any expert on Plaintiff's primary disability (autism); (b) rejecting medical evidence from Dr. Dresden without reading it because he did not personally perform the neuropsychological testing he interpreted; (c) granting less than their own consultants recommended; (d) providing consultants intentionally incomplete records; and (e) falsely testifying about the completeness of the administrative record.

232. Plaintiff's claims are not moot despite his subsequent admission to the bar, and nominal damages are always available for completed constitutional violations and prevent mootness under Uzuegbunam v. Preczewski, 141 S. Ct. 792 (2021);

233. Plaintiff is entitled to compensatory damages for economic harm, nominal damages, declaratory relief, injunctive relief, and attorneys' fees and costs pursuant to 42 U.S.C. § 12133.

**SECOND CAUSE OF ACTION**

**Violation of California's Unruh Civil Rights Act**

**Cal. Civ. Code §§ 51–52**

**(Against All Defendants)**

234. Plaintiff realleges and incorporates all preceding paragraphs.

235. The State Bar's examination administration constitutes a "business establishment of any kind whatsoever" under the Unruh Act, or at minimum its bar examination administration has sufficiently businesslike attributes to be covered. The State Bar: (a) derives approximately $20 million annually in exam registration fees through voluntary transactions with applicants; (b) contracts with private vendors including the NCBE, ExamSoft, and proctoring agencies; (c) possesses its own separate treasuries; (d) employs several hundred staff; (e) owns and leases real property in its own name; (f) does not administer the bar exam pursuant to any California Constitutional mandate; and (g) performs a function analogous to private standardized test vendors whose products licensing agencies require.

236. Defendants denied Plaintiff full and equal treatment because of his disabilities, in violation of Cal. Civ. Code § 51(b), (f).

237. Plaintiff suffered four distinct violations: July 2018, February 2019, February 2020, and October 2020.

238. Plaintiff is entitled to actual damages for economic harm, statutory damages of at least $4,000 per violation (totaling at least $16,000) under Cal. Civ. Code § 52(a),

1  actual damages for emotional distress, treble damages where applicable, declaratory

2  relief, injunctive relief, and attorneys' fees and costs.

3  **<u>PRAYER FOR RELIEF</u>**

4

5  WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in

6  his favor and against Defendants, and award the following:

7

8  (A) Compensatory damages for economic harm, including but not limited to lost

9  income during the delay period, examination registration fees, bar preparation

10  costs, travel and lodging expenses, medical documentation expenses, and lost

11  educational opportunities, in an amount to be proven at trial;

12  (B) Statutory damages of at least $4,000 per violation under the Unruh Act;

13  (C) Actual damages for emotional distress under the Unruh Act;

14  (D) Treble actual damages under the Unruh Act where applicable;

15  (E) Nominal damages for each completed violation of Plaintiff's civil rights;

16  (F) A declaratory judgment that Defendants' policies and practices violated Title

17  II of the ADA and the Unruh Act;

18  (G) Pre-judgment and post-judgment interest;

19  (H) Attorneys' fees, expert fees, and costs pursuant to 42 U.S.C. § 12205 and Cal.

20  Civ. Code § 52(a); and

21  (I) Such other and further relief as the Court deems just and proper.

22

23

24  Dated: _2/5/2026_____

25

26  /s/ Benjamin Kohn_____

27  Benjamin Kohn, *pro se*

1    Benjamin.s.Kohn@gmail.com

2    1913 Fordham Way

3    Mountain View, CA 94040

4    (650) 919-3584

5                                    **<u>JURY TRIAL DEMANDED</u>**

6          Plaintiff demands a trial by jury on all claims and issues so triable. Defendants

7    have yet to file any answer to any complaint in this case.